1  JOHN HOUSTON SCOTT  (SBN 72578)
   LIZABETH N. de VRIES    (SBN 227215)
2  THE SCOTT LAW FIRM
   1388 Sutter Street, Suite 715
3  San Francisco, California 94109
   Telephone:     (415) 561-9600
4  Facsimile:      (415) 561-9609
   John@scottlawfirm.net
5  liza@scottlawfirm.net

6  DAVID ANTON (SBN 94852)
   1717 Redwood Lane
7  Davis, CA 95616
   Telephone: (530) 759-8421
8  Facsimile:  (530) 759-8426
   antonlaw@sbcglobal.net
9
   Attorneys for Plaintiffs and Qui Tam Relators
10



**SEALED
BY COURT ORDER**

*JCS*

11          UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA

13  THE UNITED STATES OF AMERICA ex    **CV 13  3835**
    rel. ARTHUR R. JAHR III, ELBERT G.    Case No.
14  BOWERS, SUSAN V. ANDREWS, and
    ARCHIE R. JACKSON,
15
         Plaintiff and Qui Tam Relators    **COMPLAINT FOR:**
16
                v.                          **1) FALSE CLAIMS ACT VIOLATION**
17                                          **PURSUANT TO 31 U.S.C. §3729 et seq.;**
    TETRA TECH EC, INC.; TETRA TECH,
18  INC.; NEW WORLD ENVIRONMENTAL,          **2) RETALIATION VIOLATION**
    INC. d/b/a NEW WORLD TECHNOLOGY;        **PURSUANT TO 31 U.S.C. §3730(h)**
19  ALEUT WORLD SOLUTIONS,
                                            **[FILED UNDER SEAL - 31 USC §3730]**
20       Defendants.
                                            **Jury Trial Demanded**
21  --------------------------------------------------
    ARTHUR R. JAHR III, ELBERT G.
22  BOWERS, SUSAN V. ANDREWS, and
    ARCHIE R. JACKSON,
23
         Plaintiffs
24              v.

25  TETRA TECH EC, INC.; TETRA TECH,
    INC.; NEW WORLD ENVIRONMENTAL,
26  INC. d/b/a NEW WORLD TECHNOLOGY;
    ALEUT WORLD SOLUTIONS,
27
         Defendants.
28

- 1 -

COMPLAINT

**ORIGINAL**

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1

## PARTIES

2     1.  Plaintiff SUSAN V. ANDREWS, (herein Andrews), Plaintiff ARTHUR R. JAHR III,

3 (herein Jahr), Plaintiff ELBERT G. BOWERS, (herein Bowers) and ARCHIE R. JACKSON,

4 (herein Jackson) are natural persons and competent to sue.  The information contained herein

5 pertaining to the fraud engaged in by defendants at the expense of the United States of America,

6 and the United States Navy has not been publicly disclosed as defined by 31 USC

7 §3730(e)(4)(A).  Plaintiffs are the original source for all information.  Plaintiffs have direct

8 individual knowledge of the facts and fraud herein alleged.  Plaintiffs have provided the

9 information to the government before filing suit, have filed complaints with government agencies,

10 having submitted documents and have been interviewed by government agents, and agents for

11 Plaintiffs have met and conferred with the United States Attorney General's office and made

12 disclosures prior to filing of suit.  Plaintiffs have previously filed personal litigation against

13 Defendants in the Superior Court of California in which some of the facts pertaining to the fraud

14 by Defendants were alleged.  Federal jurisdiction is proper for this action is based on a federal

15 statute 31 USC §3729 and §3730.

16     2.  Defendants Tetra Tech, Inc. and Tetra Tech EC, Inc. are corporations that have

17 contracted with the United States Navy and United States of America government to perform

18 clean-up and remediation services of hazardous wastes including radioactive materials at the

19 closed Hunters Point Naval Shipyard in San Francisco.  On information and belief it is alleged

20 that the principal business office of Tetra Tech EC, Inc. is located in California.  Defendant Tetra

21 Tech EC, Inc., on information and belief is alleged to be a corporate subsidiary of Defendant

22 Tetra Tech, Inc., that was involved in the performance of services in the clean up and remediation

23 of Hunters Point Shipyard.

24     3.  Defendant NEW WORLD ENVIRONMENTAL INC., doing business under its

25 corporate name and doing business under the name NEW WORLD TECHNOLOGY, with its

26 principal place of business in California, contracted with Defendants Tetra Tech, Inc. and Tetra

27 Tech EC, Inc., to assist in the remediation of the Hunters Point Shipyard, including providing

28 specifically trained and experienced radiological safety and remediation oversight specialists

- 2 -

COMPLAINT

1    regulated by the United States Nuclear Regulatory Commission. Defendants Tetra Tech, Inc.,

2    and Tetra Tech EC, Inc. exerted control over employment and labor relations of employees of

3    NEW WORLD ENVIRONMENTAL, INC. The control over employment and labor relations by

4    Tetra Tech, Inc. and Tetra Tech EC, Inc. over radiological workers provided to Tetra Tech, Inc.

5    and Tetra Tech EC, Inc. by NEW WORLD ENVIRONMENTAL, INC. caused these companies

6    to be joint employers over the employees NEW WORLD ENVIRONMENTAL, INC. provided.

7           4. Defendant ALEUT WORLD SOLUTIONS contracted with Defendants Tetra Tech,

8    Inc. and Tetra Tech EC, Inc., to assist in the remediation of the Hunters Point Shipyard, including

9    providing specifically trained and experienced radiological safety and remediation oversight

10    specialists regulated by the United States Nuclear Regulatory Commission. Defendants Tetra

11    Tech, Inc., and Tetra Tech EC, Inc. exerted control over employment and labor relations of

12    employees of ALEUT WORLD SOLUTIONS. The control over employment and labor relations

13    by Tetra Tech, Inc. and Tetra Tech EC, Inc. over radiological workers provided to Tetra Tech,

14    Inc. and Tetra Tech EC, Inc. by ALEUT WORLD SOLUTIONS caused these companies to be

15    joint employers over the employees ALEUT WORLD SOLUTIONS provided.

## FALSE CLAIMS ACT FACTS AND CLAIMS UNDER §3729 (a)(1)(A), (B) and (C)

18       5. Between 1939 and 1966, the United States of America acquired some of the

19    property commonly referred to as the Hunters Point Shipyard, and also known as the Hunters

20    Point Division, San Francisco Bay Naval Shipyard. Portions of the property known as Hunters

21    Point were not owned by the United States, but the United States obtained easement rights

22    involving property owned by Southern Pacific Railroad. The Department of Defense used these

23    properties for operating a shipyard, and Southern Pacific Railroad continued to own and operate

24    rail lines through the Hunters Point site. The Department of Defense, in addition to using Hunters

25    Point for a Naval Shipyard, also used these properties to conduct radiological activities on the site

26    including sandblasting radioactive waste off Navy ships subjected to nuclear testing at the Bikini

27    Atoll, extensive application of fluorescent radium on dials, knobs, and buttons, as well as

28

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 3 -

1   operating the radiological defense laboratory on multiple site locations from 1955 to 1979

2   inclusive of Buildings 364, 815, and 816. Additionally, radioactive waste materials generated by

3   the University of California at Berkeley and the Lawrence Livermore Laboratories were shipped

4   to Hunters Point for handling, transport and disposal. The conduct of these activities involving

5   radioactive materials contaminated the ground, buildings, sewer lines, landfills, and surrounding

6   areas of Hunters Point with radioactive contamination. The conduct of the Department of

7   Defense resulted in hazardous wastes, including radiological wastes, being disposed of on

8   properties owned by the United States of America at Hunters Point and on properties that are and

9   have been owned during all relevant times by State of California entities including the University

10  of California San Francisco, entities of the City and County of San Francisco including the San

11  Francisco Housing Authority and the Redevelopment Agency of the City and County of San

12  Francisco, private companies including Crisp Building, Inc. and Southern Pacific Railroad, and

13  private parties, including Theodore and Bernice Lowpensky; all such properties are within the

14  historic Hunters Point Shipyard.

15      6.      The United States government began in 1976 to quitclaim property that was

16  contaminated with hazardous wastes, including radiological wastes, to private parties, including

17  Theodore and Bernice Lowpenshy, agencies of the City of San Francisco, including the San

18  Francisco Housing Authority and the Redevelopment Agency of the City and County of San

19  Francisco, entities of the State of California, including the University of California San Francisco,

20  and private companies including Crisp Building, Inc. These non-United States entities continued

21  during all relevant times to own properties that were Hunters Point Shipyard properties that were

22  contaminated by hazardous wastes, including radiological wastes.

23      7.      The United States Congress enacted the Defense Base Closure and Realignment

24  Act of 1990 (DBCRA). The Hunters Point Shipyard was selected for closure under the Defense

25  Base Closure and Realignment Act in 1991. The federally owned portion of the Hunters Point

26  Shipyard property was determined to be transferred to the City and County of San Francisco.

27  With the selection of Hunters Point Shipyard to the DBCRA, the federal government entered into

28  agreements with the State of California and the City and County of San Francisco that related to

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 4 -

1 agreements regarding the joint jurisdiction and authority between Federal, State, and San

2 Francisco agencies over the property pending ultimate transfer of the property to the City and

3 County of San Francisco, and final relinquishment by the federal government.

4      8.    In 1989, the United States Environmental Protection Agency placed the Hunters

5 Point Shipyard and related properties on the National Priorities List as a Superfund site pursuant

6 to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as

7 amended by the Superfund Amendments and Reauthorization Act (SARA).  Congress directed

8 through CERCLA, SARA and DBCRA that State and Local governments were to share with

9 federal agencies jurisdiction and authority involving remediation of Superfund sites designated

10 for transfer to State and Local governments.

11      9.    The Superfund remediation of Hunters Point and related properties have had joint

12 jurisdiction and oversight by Federal, State of California, and San Francisco agencies including

13 the California Department of Public Health, the California Regional Water Quality Control

14 Board, the California Department of Toxic Substances Control, the San Francisco Redevelopment

15 Agency, the California Environmental Protection Agency, and the San Francisco Department of

16 Public Health, working with the Department of the Navy, the Federal EPA and Federal Nuclear

17 Regulatory Commission.

18      10.    Defendants Tetra Tech, Inc. and Tetra Tech EC, Inc. (formerly Tetra Tech FW,

19 Inc. and Foster Wheeler Environmental Corporation) contracted with the United States

20 government to provide remediation services for the removal of radiological materials pursuant to

21 the Base Realignment and Closure Program and Superfund designation for the Hunters Point

22 Shipyard and related properties, including properties then owned by the City and County of San

23 Francisco, the San Francisco Redevelopment Agency, the University of California, and land

24 owned by private individuals and entities.  The contracts and related authorization documentation

25 between the United States, through its agencies, including but not limited to the Department of

26 the Navy, with Defendants Tetra Tech EC, Inc. (including its former corporate names of Tetra

27 Tech FW, Inc. and Foster Wheeler Environmental Corporation) and Tetra Tech, Inc. included

28

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  directives that jurisdiction and responsibility over the Hunters Point Shipyard remediation involve

2  federal agencies as well as State and Local governmental agencies, laws and regulations.

3         11.     The United States Navy issued contract specifications for contractors to bid on the

4  nuclear radiation remediation work at the Hunters Point Naval Shipyard. The United States Navy

5  contract specifications included the specification that the nuclear radiation remediation safety

6  specialists have training and experience sufficient to satisfy ANSI Standard 3.1 in order to

7  perform safety, remediation and oversight services as either a senior or junior Radiological

8  Control Technician (RCT).

9         12.     Defendants Tetra Tech EC, Inc. and Tetra Tech, Inc. initially contracted with

10  Defendant New World Environmental, Inc. to obtain individuals who satisfied ANSI Standard 3.1

11  in prior training and experience in the remediation of radiological materials as RCTs. Defendants

12  Tetra Tech EC, Inc. and Tetra Tech, Inc. on or about January 1, 2011 subsequently changed

13  companies providing ANSI 3.1 RCT radiological remediation safety specialists by ceasing to use

14  New World Environmental, Inc. and using in part Defendant ALEUT WORLD SOLUTIONS.

15  Defendant Tetra Tech EC, Inc. undertook and agreed with the United State Navy requirements to

16  have only ANSI 3.1 qualified RCT radiological remediation safety specialists perform services

17  under the contract with the United States Navy for the clean-up of Hunters Point Naval Shipyard

18  contracts, including contract N62473. By billing the United States Navy for RCT radiological

19  remediation safety specialists, Defendant Tetra Tech EC, Inc. initially and expressly represented

20  that all RCT radiological remediation safety specialists would satisfy ANSI Standard 3.1 by prior

21  training and experience, and thereafter implied certification when submitting requests for periodic

22  payments under the contract with the United States Navy that Defendant Tetra Tech EC, Inc.

23  continued to comply with the rule and requirement that all individuals for which bills and requests

24  for progress payments by Defendant Tetra Tech EC, Inc. were submitted that the RCT

25  radiological remediation safety specialists satisfied ANSI Standard 3.1.

26         13.     On or about early 2006 Plaintiff Bert Bowers, at that time a management official

27  of New World Environmental, Inc. as the Radiological Safety Officer Representative for the

28  Hunters Point Naval Shipyard project reported to New World Environmental, Inc. upper

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 6 -

1  management, including but not limited to Human Resources Director Kari Guidry that the resumé
2  of Jane Taylor, who had applied for a RCT nuclear radiation remediation position to perform
3  radiological safety and remediation services at Hunters Point and had not yet been hired, appeared
4  to present a fraudulent resumé based on Bowers' experience and knowledge of the industry.
5  Plaintiff Bowers advised management of New World Environmental, Inc. that his review of the
6  resumé of Jane Taylor and his conclusion that the resumé's references to nuclear radiation
7  remediation work experience were fraudulent raised his suspicion and belief that Jane Taylor did
8  not have the training and experience necessary to satisfy ANSI Standard 3.1 to work on the
9  Hunters Point Shipyard project to perform nuclear radiation safety, remediation and oversight as
10  required by the agreement with the United States Navy.  Plaintiff Bowers was directed by
11  management of New World Environmental, Inc. that Bowers had no role or involvement in the
12  human resources function of determining who would be hired by New World Environmental Inc.
13  to perform nuclear radiation safety, remediation and oversight services for Tetra Tech and the
14  United States Navy. After Plaintiff Bowers reported his information and conclusion to the
15  Human Resources Director that the resumé of Jane Taylor was fraudulent and that she was not
16  qualified to perform nuclear radiation safety, remediation and oversight work under the contract
17  with the United States Navy Plaintiff Bowers reported this information and the response of the
18  Human Resources Director to his superior, the company's Vice President of Operations. On or
19  about March 1, 2006, Jane Taylor was hired by New World Environmental, Inc. to perform
20  nuclear radiation RCT safety, remediation and oversight work for Tetra Tech on the United States
21  Navy remediation project at Hunters Point Naval Shipyard despite being advised of the lack of
22  qualifications for Jane Taylor to be employed in the RCT position based on the United States
23  Navy requirements that such RCT employees satisfy ANSI Standard 3.1.

24      14.    In 2005, Plaintiff Art Jahr, an ANSI Standard 3.1 qualified nuclear radiation
25  safety, remediation and oversight specialist was hired by New World Environmental, Inc. in an
26  RCT position.  A few months after Plaintiff Jahr was hired he was approached by Samantha
27  Taylor, the daughter of Jane Taylor, who advised Plaintiff Jahr that Jane Taylor was seeking
28  employment as an RCT with New World Environmental, Inc. at Hunters Point, but that Jane

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 7 -

1   Taylor did not have the necessary experience to work as a nuclear radiation RCT safety,
2   remediation, and oversight specialist at Hunters Point. Samantha Taylor requested Plaintiff Jahr
3   lie to New World Environmental, Inc. by falsely representing to New World Environmental
4   management that the resumé of Jane Taylor was truthful and to lie by representing that Plaintiff
5   Jahr had worked with Jane Taylor in prior nuclear radiation remediation jobs. Plaintiff Jahr
6   refused to lie and support the fraudulent resumé of Jane Taylor and her efforts to be employed on
7   the Hunters Point Naval Shipyard nuclear radiation remediation project. In 2006, Plaintiff Jahr
8   reported to human resources management for New World Environmental, Inc. that he had been
9   approached by the daughter of Jane Taylor and asked to lie and support the application and
10  fraudulent resumé of Jane Taylor after Plaintiff Jahr learned that Jane Taylor had been hired by
11  New World Environmental, Inc. Plaintiff Jahr also reported to New World Environmental, Inc.
12  management that from his observations of Jane Taylor at the worksite it appeared that Jane Taylor
13  was involved with and was approaching males, including Plaintiff Jahr, in a sexually suggestive
14  manner possibly to secure her employment at the Hunters Point Naval Shipyard. On information
15  and belief it is alleged that Jane Taylor engaged in sexual relations with one or more male
16  managers or principles of New World Environmental, Inc. to obtain and to retain her
17  employment. Plaintiffs have personal observations and have been informed by co-workers that a
18  New World Environmental, Inc. principal, namely Chief Executive Officer Michael Wilson, and
19  a supervisor of New World Environmental, Inc., namely Gary Wilson, as well as senior RCT
20  specialists including Patrick Vigil, engaged in sexual relations with Jane Taylor and that these
21  sexual relations were related to and motivated the fraudulent hire, retention and use of Jane
22  Taylor as an RCT at Hunters Point despite her inability to satisfy ANSI Standard 3.1 to work in
23  that position. One source of the information disclosed was Gary Wilson who had personally
24  made the disclosure of his and his brother's sexual involvement with Jane Taylor. Another
25  source of that information was Jane Taylor herself in discussions with Plaintiff Andrews.
26  Additionally, Plaintiff Andrews' personal observations of the conduct of Jane Taylor during the
27  time Jane Taylor and the plaintiff shared an apartment, as well as personal observations and
28  information provided to the plaintiffs by co-workers, were also sources. New World

- 8 -
COMPLAINT

Environmental, Inc. hired and continued the employment of Jane Taylor despite information that she was unqualified to work in nuclear radiation safety and remediation in an RCT position at Hunters Point Naval Shipyard under the terms and conditions of the contract with the United States Navy.

15.     On or about March 1, 2006 New World Environmental, Inc. hired Jane Taylor as an RCT radiological safety, remediation and oversight specialist in spite of the knowledge that she was not qualified under the terms and agreement with the United States Navy that required specific experience and credentials for that position, including meeting the ANSI Standard 3.1 criteria. On a two week period basis, New World Environmental, Inc. submitted billings to Tetra Tech EC, Inc. for payroll payment that included the payroll for Jane Taylor, having expressly committed to supply staff meeting the United States Navy's requirements, and submitted the claim for payment with specific knowledge that Jane Taylor was not qualified to work in an RCT position. New World Environmental, Inc. management knew that the payment for the wage and benefit invoices would be paid based on the master contract with the United States of America, through the United States Navy contract. From March of 2006, on a two week basis thereafter, New World Environmental, Inc. submitted the payroll billing that fraudulently implied certification and certified that Jane Taylor satisfied ANSI Standard 3.1 criteria and was qualified to be employed in the RCT position and qualified to be paid as an RCT for her services.

16.     On or about May 1, 2006, New World Environmental, Inc. promoted Jane Taylor from a Junior to a Senior RCT nuclear radiation safety, remediation and oversight worker despite her lack of training, lack of experience, and inability to satisfy ANSI Standard 3.1 criteria. On information and belief it is alleged that Jane Taylor was promoted to the Senior RCT position due to her sexual involvement with individuals in management of New World Environmental, Inc. On or about May 19, 2006, Richard Stoney, an experienced Senior RCT employee of New World Environmental, Inc. tendered his resignation to management of New World Environmental, Inc. and disclosed that his resignation was motivated by the promotion of Jane Taylor to a Senior RCT position when it was known throughout the worksite, and he knew, that Jane Taylor's credentials were fraudulent and that she was not qualified to work in the Senior RCT position. On

- 9 -

1   information and belief it is alleged that soon after Richard Stoney resigned and expressed to

2   Human Resources management of New World Environmental, Inc. that he was resigning due to

3   the fact that Jane Taylor was not qualified to be in an RCT position, and that her resumé was a

4   fraud, Human Resources Manager Kari Guidry requested that Jane Taylor confirm her

5   qualifications and submit an updated resumé.  On information and belief it is alleged that shortly

6   after that request Jane Taylor submitted to New World Environmental, Inc. a resumé that no

7   longer contained any reference to the nine-plus years of radiological decontamination work as a

8   Senior HP she had earlier claimed on her resumé to have worked from February 1983 through

9   July 1992 with Taylor Made Construction, and contained no reference to any radiological

10  experience prior to her fraudulent hire by New World Environmental, Inc. a few months before.

11  Rather, the revised resumé referenced work in barbeque and sandwich eating establishments, and

12  working as a sales representative.  Plaintiffs assert this information on the basis that Jane Taylor

13  told one of the plaintiffs this information and that plaintiff was shown the false resumés that Jane

14  Taylor and her daughter Samantha created.  Despite this further confirmation to New World

15  Environmental, Inc. that Jane Taylor's hire was based on fraud, and that she had no previous

16  experience and training in nuclear radiation remediation, New World Environmental, Inc. kept

17  Jane Taylor employed as a RCT for Tetra Tech EC, Inc. with Defendant Tetra Tech EC, Inc.'s

18  knowledge and agreement to continue her employment dispute the fraud and lack of any prior

19  training and experience.

20      17.    From May 1, 2006 for most time periods onward, New World Environmental, Inc.

21  billed Defendant Tetra Tech EC, Inc. for the time submitted by Jane Taylor at the Senior HP RCT

22  nuclear radiation remediation worker rate with the knowledge that Jane Taylor's resumé was a

23  fraud, and with the knowledge that Jane Taylor was not qualified to work in an RCT nuclear

24  radiation remediation position at Hunters Point under the contract with the United States Navy,

25  and was not qualified to be billed at the Senior HP level or at any RCT level.

26      18.    Defendant New World Environmental, Inc. falsely certified and implied

27  certification to Tetra Tech EC, Inc., Tetra Tech, Inc. and to the United States Navy that all

28  nuclear radiation remediation workers, including Jane Taylor, satisfied ANSI Standard 3.1 criteria

- 10 -

COMPLAINT

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1 and met training and experience requirements to be hired and to perform in the RCT job category.

2 Defendant New World Environmental, Inc. billed Tetra Tech EC, Inc. which billed the United

3 States Navy for the payroll, per diem and benefit costs incurred for RCT nuclear radiation

4 remediation specialists, including RCT nuclear radiation remediation workers such as Jane Taylor

5 who were knowingly not qualified to be hired and not qualified to perform the nuclear radiation

6 remediation services for the RCT job category based on the terms specified by the United States

7 Navy. Defendant New World Environmental, Inc. billed Tetra Tech EC, Inc. for the payroll

8 invoices at Tetra Tech EC, Inc.'s San Diego, California offices on a two week basis. Tetra Tech

9 EC, Inc. requested from the United States Navy through the NAVFAC SW Division offices in

10 San Diego, California to be paid and reimbursed for the New World Environmental, Inc. invoices

11 on a monthly basis, with the express and implied certification that the billing expressly complied

12 with the contract and the related rules and regulations of the United States Navy under that

13 contract. The fraudulent scheme to employ knowingly unqualified RCT specialists by New

14 World Environmental, Inc. with the express condition to comply with the rule and regulation of

15 the United States Navy that such workers satisfy ANSI Standard 3.1 criteria, and not disclose the

16 lack of qualifications, had a material effect in causing the contract administration office of the

17 United States Navy NAVFAC SW Division to authorize payment on a monthly basis to Tetra

18 Tech EC, Inc. for the invoices billed by New World Environmental, Inc. The conduct of

19 Defendant New World Environmental, Inc. violated 31 USC §3729(a)(1)(A), (B) and (C). The

20 conduct of Defendant Tetra Tech EC, Inc. with knowledge of the fraud violated 31 USC

21 §3729(a)(1)(A) and (C).

22 19. On or about September 22, 2008 Jane Taylor gave notice that she was leaving

23 employment on October 10, 2008 with New World Environmental, Inc., to seek employment in

24 Tennessee at the Oak Ridge Nuclear Facility. On or about late March of 2009, Jane Taylor

25 returned and sought re-employment with New World Environmental, Inc. On information and

26 belief it is alleged that the Oak Ridge Nuclear Facility would not employ Jane Taylor due to

27 insufficient prior experience, and unsatisfactory classroom training results. Although Jane Taylor

28 had worked at Hunters Point for New World Environmental, Inc. and Tetra Tech EC, Inc. from

- 11 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1   March 2006 through October 2008 under fraudulent representations, Jane Taylor's experience

2   and training did not satisfy ANSI Standard 3.1 criteria in March of 2009, and Jane Taylor was not

3   qualified to be hired for an RCT position under the terms and conditions the United States Navy

4   imposed for the qualifications and experience for individuals to work in RCT positions to perform

5   nuclear radiation safety, remediation and oversight services at Hunters Point under the contract

6   with Tetra Tech, EC, Inc.

7      20.    In March of 2009, on information and belief it is alleged that Jane Taylor was in a

8   sexual relationship with a high level Tetra Tech EC, Inc. manager, Construction Superintendent

9   Dennis McWade. On information and belief it is also alleged that Tetra Tech EC, Inc.

10  Construction Superintendent Dennis McWade knew that Jane Taylor had obtained employment

11  with New World Environmental, Inc. by resumé fraud, knew that Jane Taylor did not have the

12  training, knowledge and experience to satisfy ANSI Standard 3.1 criteria, and knew that Jane

13  Taylor was not qualified to work as an RCT nuclear radiation remediation specialist at Hunters

14  Point Naval Shipyard under the terms required by the United States Navy. On or about late

15  March or early April of 2009, Tetra Tech EC, Inc. Construction Superintendent Dennis McWade

16  directed management of New World Environmental, Inc. to hire Jane Taylor to be assigned to

17  work for Tetra Tech EC, Inc. under its contract with the United States Navy, and directed that

18  Jane Taylor was to be employed in the Senior HP RCT nuclear radiation remediation specialist

19  position. Tetra Tech EC, Inc. Construction Superintendent Dennis McWade knew that Jane

20  Taylor was not qualified under the terms required by the United States Navy to work in the

21  nuclear radiation remediation position and the Senior HP RCT position at the Hunters Point

22  Naval Shipyard. Upon being directed by Construction Superintendent Dennis McWade to hire

23  Jane Taylor in a Senior HP RCT position for Tetra Tech EC, Inc. at Hunters Point Naval

24  Shipyard, Defendant New World Environmental, Inc. Human Resources Director Kari Guidry,

25  knowing that Jane Taylor did not satisfy ANSI Standard 3.1 criteria, and knowing that Jane

26  Taylor had submitted a fraudulent resumé to obtain employment, and knowing that Jane Taylor

27  did not have the necessary level of training and experience based on the United States Navy

28  criteria to work at the Hunters Point Naval Shipyard, re-hired Jane Taylor, created an over-budget

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  Senior HP RCT position for Jane Taylor which senior Tetra Tech EC, Inc. management agreed to,

2  and assigned Jane Taylor to work for Tetra Tech EC, Inc. with the intent to defraud in billing

3  Tetra Tech EC, Inc. and the United State Navy in certifying and implying that all RCT radiation

4  remediation workers, including Jane Taylor, met the United State Navy standards for the position.

5        21.     Defendant New World Environmental, Inc. falsely certified and implied

6  certification to Tetra Tech EC, Inc., Tetra Tech, Inc. and to the United States Navy that all RCT

7  nuclear radiation remediation specialists, including Jane Taylor, satisfied ANSI Standard 3.1

8  criteria and met training and experience requirements to be hired and to perform in the RCT job

9  category. Defendant New World Environmental, Inc. billed Tetra Tech EC, Inc. which billed the

10  United States Navy for the payroll, per diem and benefit costs incurred for nuclear radiation

11  remediation workers, including RCT nuclear radiation remediation specialists such as Jane Taylor

12  who were knowingly not qualified to be hired and to perform the nuclear radiation remediation

13  services for their job category based on the terms specified by the United States Navy on a two

14  week basis. Defendant Tetra Tech EC, Inc., with knowledge of the lack of ANSI Standard 3.1

15  criteria qualifications, lack of training, lack of required experience, and the fraudulent conduct of

16  Jane Taylor, was directly involved in returning Jane Taylor to work by and through New World

17  Environmental, Inc. under the United States Navy contract. Defendant Tetra Tech EC, Inc.

18  falsely certified and implied certification that all RCT nuclear radiation remediation specialists

19  performing services under the contract with the United States Navy were qualified to perform in

20  those positions, and received payments under the contract with the United States Navy due to the

21  profit margin, salary, per diem, and benefit costs incurred by the use of individuals who were

22  knowingly not qualified to perform in the RCT positions. Defendant New World Environmental,

23  Inc. and Defendant Tetra Tech EC, Inc. engaged in a conspiracy to defraud the United States

24  Navy by hiring and using Jane Taylor in the Senior HP RCT nuclear radiation remediation

25  specialist position with knowledge of her fraudulent resumé and with knowledge that Jane Taylor

26  did not satisfy ANSI Standard 3.1 criteria to work as a Senior HP RCT at Hunters Point Naval

27  Shipyard under the rules and regulations of the contract with the United States Navy. The

28  fraudulent scheme to employ knowingly unqualified RCT nuclear radiation remediation

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1   specialists by New World Environmental, Inc. with the express condition to comply with the rule

2   and regulation of the United States Navy that such workers satisfy ANSI Standard 3.1 criteria,

3   and not disclose the lack of qualifications, had a material effect in causing the contract

4   administration office of the United States Navy NAVFAC SW Division to authorize payment on

5   a monthly basis to Tetra Tech EC, Inc. for the invoices billed by New World Environmental, Inc.

6   The conduct of Defendant New World Environmental, Inc. and Tetra Tech EC, Inc. violated 31

7   USC §3729(a)(1)(A), (B) and (C).

8       22.     On or about January 1, 2011, Defendant Tetra Tech EC, Inc. entered into

9   contractual arrangements with Defendant ALEUT WORLD SOLUTIONS to supply RCT nuclear

10  radiation remediation specialists who met the United States Navy mandated ANSI Standard 3.1

11  criteria and met training and experience requirements to be hired to perform in the RCT job

12  category, replacing in part the role that Defendant New World Environmental, Inc. previously

13  filled in supplying these RCT workers. A number of nuclear radiation remediation supervisors

14  from Defendant New World Environmental, Inc. transferred over to Defendant Tetra Tec EC, Inc,

15  and ALEUT WORLD SOLUTIONS at or around that time. A number of the RCT nuclear

16  radiation remediation specialists who had been working under Defendant New World

17  Environmental, Inc. for Tetra Tech EC, Inc. at Hunters Point Naval Shipyard were transferred

18  over as employees to ALEUT WORLD SOLUTIONS, and other RCT workers transferred to a

19  second subcontractor for Tetra Tech EC, Inc. Management of ALEUT WORLD SOLUTIONS,

20  including but not limited to the Vice President-Operations, had personal knowledge that the

21  resumé of Jane Taylor was fraudulent, that Jane Taylor lacked the training and experience for the

22  RCT position, that Jane Taylor did not satisfy ANSI Standard 3.1 criteria to be hired into an RCT

23  position, and that the employment and continued employment of Jane Taylor as a Senior HP RCT

24  nuclear radiation remediation specialist at Hunters Point Naval Shipyard was contrary to the

25  requirements of the United States Navy and a fraud. ALEUT WORLD SOLUTIONS, despite the

26  knowledge that the resumé and claimed experience of Jane Taylor was a fraud, hired Jane Taylor,

27  assigned her as a Senior HP RCT nuclear radiation remediation specialist to Tetra Tech EC, Inc.

28  to work on the nuclear remediation clean up at Hunters Point Naval Shipyard under contract with

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 14 -

the United States Navy, and billed Tetra Tech EC, Inc. which billed the United States Navy for the payroll, per diem and benefit costs incurred for nuclear radiation remediation workers, including RCT nuclear radiation remediation workers such as Jane Taylor who were knowingly not qualified to be hired and not qualified to perform the nuclear radiation remediation services for the RCT job category based on the terms specified by the United States Navy.

23.     Defendant ALEUT WORLD SOLUTIONS falsely certified and implied certification to Tetra Tech EC, Inc., Tetra Tech, Inc. and to the United States Navy that all RCT nuclear radiation remediation specialists, including Jane Taylor, satisfied ANSI Standard 3.1 criteria, and met training and experience requirements to be hired and to perform in this job category. Defendant ALEUT WORLD SOLUTIONS billed Tetra Tech EC, Inc. which billed the United States Navy for the payroll, per diem and benefit costs incurred for RCT nuclear radiation remediation specialists, including nuclear radiation remediation workers such as Jane Taylor who were knowingly not qualified to be hired and not qualified to perform the RCT nuclear radiation remediation services for the RCT job category based on the terms specified by the United States Navy. Defendant Tetra Tech EC, Inc., with knowledge of the lack of meeting ANSI Standard 3.1 criteria, lack of necessary training, and lack of required experience of Jane Taylor, was directly involved in having Jane Taylor continue to work under the United States Navy contract and in having Jane Taylor employed and retained through ALEUT WORLD SOLUTIONS. Defendant Tetra Tech EC, Inc. falsely certified and implied certification that all RCT nuclear radiation remediation workers performing services under the contract with the Unites States Navy were qualified to perform in those positions, and received payments under the contract with the United States Navy due to the profit margin, salary, per diem, benefit costs incurred for the use of individuals who were knowingly not qualified to perform in the RCT positions based on the United State Navy requirements. Defendant ALEUT WORLD SOLUTIONS, Defendant Tetra Tech EC, Inc., and Defendant Tetra Tech, Inc. engaged in a conspiracy to defraud the United States Navy by hiring, retaining and billing for Jane Taylor in the Senior RCT nuclear radiation remediation specialist position with knowledge of her fraudulent resumé, fraud in obtaining employment on the Hunters Point project, and by knowing that she did not satisfy ANSI Standard

- 15 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1   3.1 criteria to work as a Senior RCT at Hunters Point Naval Shipyard under the rules and

2   regulations of the contract with the United States Navy. The fraudulent scheme to knowingly

3   employ unqualified RCT nuclear radiation remediation specialists by ALEUT WORLD

4   SOLUTIONS with the express condition to comply with the rules and regulations of the United

5   States Navy that such workers satisfy ANSI Standard 3.1 criteria, and not disclose the lack of

6   qualifications, had a material effect in causing the contract administration office of the United

7   States Navy NAVFAC SW Division to authorize payment on a monthly basis to Tetra Tech EC,

8   Inc. for the invoices billed by ALEUT WORLD SOLUTIONS to Tetra Tech EC, Inc. The

9   conduct of Defendant ALEUT WORLD SOLUTIONS, Defendant Tetra Tech EC, Inc. and

10  Defendant Tetra Tech, Inc. violated 31 USC §3729(a)(1)(A), (B) and (C).

11      24.     On or about June 8, 2011and continuing, with the knowledge of managers of Tetra

12  Tech EC, Inc. and Aleut World Solutions, nuclear radiation remediation workers employed by

13  Aleut World Solutions and overseen by Tetra Tech EC, Inc., including but not limited to Jane

14  Taylor and Marie Snyder Winder, intentionally entered false timecard entries to obtain ½ hour of

15  overtime on a regular basis for time that was not worked, making such false overtime entries one

16  or more times per week as having worked 1 ½ hours of overtime when 1 hour of overtime or less

17  was worked. Tetra Tech EC, Inc. management, including but not limited to Construction

18  Superintendent Dennis McWade, permitted Jane Taylor to have access to, control of, and

19  authority to enter time entries in the timecard system contrary to standards, procedures and

20  controls, and the rules and regulations of the United States Navy. Tetra Tech EC, Inc.

21  management permitted and allowed the violation of standards, procedures and controls involving

22  the timecard entry system with the knowledge and intent of permitting particular nuclear radiation

23  remediation workers, including Jane Taylor and Marie Winder, to falsify timecards to obtain

24  overtime based on fraud. Fraudulently billed overtime amounts of no less than ½ hour per day by

25  Jane Taylor were made on June 8, 13, 15, 17, 20, 22, 24, 27, 29, and July 1 for the billing of July

26  2, 2011 by Aleut World Solutions, and with similar fraudulent billing of no less than ½ hour per

27  day for Marie Winder. Jane Taylor and Marie Winder conspired to submit the fraudulent

28  overtime entries and coordinated their fraud by making efforts to list only one of the two as

- 16 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1   obtaining the extra ½ hour of overtime on any particular day, effectively taking daily turns on

2   submitting the fraudulent overtime entries. The fraudulent overtime entries by Jane Taylor and

3   Marie Winder began on or about February of 2011 and continued thereafter.

4       25.   During the time that New World Environmental, Inc. supplied RCT workers to

5   Tetra Tech EC, Inc. Plaintiff Andrews informed management that numerous RCT workers were

6   leaving the Hunters Point worksite early, but were fraudulently placing on the timecards entries

7   that they had worked full work shifts. Management of New World Environmental, Inc. followed

8   up the report by Plaintiff Andrews and in approximately 2007 obtained a timecard machine that

9   required a hand scan of the individual to clock in and to clock out and installed this hand scan

10   timecard machine at the Hunters Point Naval Shipyard project. The use of the hand scan timecard

11   machine reduced dramatically the fraudulent timecard entries of RCT workers at Hunters Point.

12       26.   In mid-2009, Construction Superintendent Dennis McWade began complaining

13   about the use of the hand scan timecard machine at Hunters Point. Dennis McWade had begun

14   living with RCT Jane Taylor and often commuted to work with Jane Taylor. Due to his position

15   as Construction Superintendent for Tetra Tech EC, Inc., Dennis McWade did not have to use the

16   hand scan timecard machine and often sought to leave work at Hunters Point prior to the

17   scheduled shift ending for Jane Taylor, who could not easily falsify the time she left due to the

18   use of the hand scan timecard machine. Dennis McWade wished to leave the worksite early and

19   wanted Jane Taylor to accompany him, but she was unable to do so without a docking of pay

20   since she had to use the hand scan timecard machine to clock out of work.

21       27.   In January of 2011 when New World Environmental, Inc. was removed as the

22   supplier of RCT specialists at Hunters Point, Tetra Tech EC, Inc., Construction Superintendent

23   Dennis McWade and Construction Project Manager William Dougherty demanded that

24   Defendant Aleut World Solutions not use the hand scan timecard machine, and insisted that New

25   World Environmental, Inc. remove the hand scan timecard machine from Hunters Point. The

26   hand scan timecard machine was removed in early 2011 from Hunters Point.

27       28.   After Aleut World Solutions was installed as the supplier of RCT specialists in

28   place of New World Environmental, Inc., Tetra Tech EC, Inc. Project Manager Dougherty and

- 17 -

COMPLAINT

1  Construction Superintendent McWade assigned Jane Taylor to manage all timecard entries and to

2  report to Aleut World Solutions the work hours of RCT specialists working for Aleut World

3  Solutions. Tetra Tech EC, Inc. Project Manager Dougherty and Construction Superintendent

4  McWade chose Jane Taylor to oversee, control, manage, and report work hours for RCT

5  specialists working for sub-contractor Aleut World Solutions to enable Jane Taylor to

6  fraudulently manipulate the time entries to satisfy Jane Taylor and the desires of Tetra Tech EC,

7  Inc. Construction Superintendent Dennis McWade.

8    29.    Shortly after Jane Taylor was assigned responsibility of oversight, control,

9  management, and the reporting of work hours for the RCT specialists, Jane Taylor and Marie

10  Winder entered into a conspiracy to defraud Aleut World Solutions, Tetra Tech EC, Inc. and

11  ultimately the United States Navy. The RCT specialists were regularly scheduled to work a 9

12  hour shift beginning at 7 a.m. with the start of the safety meeting on site at Hunters Point. Jane

13  Taylor and Marie Winder conspired to fraudulently enter an additional ½ hour of overtime on the

14  weekly timesheets for themselves, and to coordinate the entries of that ½ hour of overtime to

15  minimize the number of entries in which both would be listed as working the extra ½ hour of

16  overtime on the same date. Week after week, Jane Taylor and Marie Winder entered the

17  fraudulent ½ hour of overtime in a systematic and coordinated manner. Plaintiff Andrews alerted

18  supervisors of Tetra Tech EC, Inc. to the fraudulent overtime scam of Jane Taylor and Marie

19  Winder, and was advised to drop the subject due to the protected status of Jane Taylor due to her

20  sexual relationship with Construction Superintendent Dennis McWade. Tetra Tech EC, Inc.

21  management, including but not limited to Project Manager William Dougherty and Construction

22  Superintendent Dennis McWade, were aware of and permitted the fraudulent entry and

23  submission of overtime by Jane Taylor and Marie Winder.

24    30.    Shortly after Jane Taylor was assigned responsibility of oversight, control,

25  management, and reporting of work hours for the RCT specialists, Jane Taylor and Marie Winder

26  no longer adhered to the work schedule's end of the day. Rather, due to the unfettered leeway

27  Jane Taylor had over falsifying the timecard entries, her protected status due to her relationship

28  with Tetra Tech EC, Inc. Construction Superintendent Dennis McWade, and the desire of Dennis

- 18 -

1   McWade for Jane Taylor to leave with him before Jane Taylor's shift had completed, Jane Taylor

2   and Marie Winder on a regular and recurring basis left work early rather than work the full 9 hour

3   scheduled work period, but fraudulently entered a full 9 hours or more.

4          31.     Defendant Aleut World Solutions, with knowledge of the false timecard entries by

5   RCT nuclear radiation remediation specialists, including but not limited to Jane Taylor and Marie

6   Winder, certified and implied certification that the time records, and billing for payroll, were true

7   and correct, when Defendant Aleut World Solutions management knew that the billing records

8   were false. Defendant Tetra Tech EC, Inc. with knowledge of the false timecard entries by RCT

9   nuclear radiation remediation specialists, including but not limited to Jane Taylor and Marie

10  Winder, certified and implied certification that the time records, and billing and reporting to the

11  United States Navy for payroll were true and correct, when Tetra Tech EC, Inc. management

12  knew that the billing records were false. Defendant Aleut World Solutions and Defendant Tetra

13  Tech EC, Inc. engaged in a conspiracy to defraud the United States Navy by billing and

14  submitting for reimbursement the fraudulent billing for overtime for Jane Taylor and Marie

15  Winder with the knowledge that the overtime listings were fraudulent. The fraudulent scheme to

16  bill for overtime not worked by Aleut World Solutions and Tetra Tech EC, Inc., with the express

17  condition to comply with the rule and regulation of the United States Navy that all time billed be

18  actually worked had a material effect in causing the contract administration office of the United

19  States Navy at NAVFAC SW Division to authorize payment on a monthly basis to Tetra Tech

20  EC, Inc. for the invoices billed by Aleut World Solutions for the fraudulent overtime listed by

21  Jane Taylor and Marie Winder. The conduct of Defendant ALEUT WORLD SOLUTIONS and

22  Tetra Tech EC, Inc. violated 31 USC §3729(a)(1)(A), (B) and (C).

23         32.     The contract and requirements of the United States Navy requires that Tetra Tech

24  EC, Inc. perform the nuclear radiation remediation services for the Hunters Point Naval Shipyard

25  meeting certain minimum standards and procedures. Defendant Tetra Tech EC, Inc. certified that

26  it met the minimum standards and procedures for the nuclear radiation remediation services to the

27  Unites States Navy for the services Tetra Tech EC, Inc. and its subcontractors performed. Tetra

28  Tech EC, Inc. repeatedly and knowingly failed to meet the minimum standards and procedures

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 19 -

1  for the nuclear radiation remediation services performed but falsely certified and implied

2  certification to the United States Navy that the minimum standards and procedures for the nuclear

3  radiation remediation services have been performed and met.

4      33.    Defendant Tetra Tech EC, Inc. certified and implied certification that all soils and

5  materials processed at Hunters Point were processed, evaluated, and correctly designated as

6  having met the Remediation Goals, or had failed the Remediation Goals (RG) imposed by the

7  contract with the United States Navy contract, rules, regulations, and protocols. Defendant Tetra

8  Tech EC, Inc. certified or implied certification that soils had met the RG standards, when

9  Defendant Tetra Tech EC, Inc. knew that soils failed the RG standards. Defendant Tetra Tech

10  EC, Inc. knowingly certified or implied certification that soils had been properly sampled and

11  tested under the rules, protocols and standards established under the contract with the United

12  States Navy when Defendant Tetra Tech EC, Inc. knew that the soils had not been properly

13  sampled and tested under these rules, protocols and standards. Defendant Tetra Tech EC, Inc.

14  certified and implied certification that equipment and materials released from Hunters Point met

15  radiological release levels when Defendant Tetra Tech EC, Inc. knew that equipment and

16  materials released did not meet radiological release levels. Defendant Tetra Tech EC, Inc.

17  certified and implied certification that all equipment and materials designated for free release had

18  been tested for release pursuant to rules, regulations and protocols and met the required radiation

19  release levels required by the United States Navy contract when Defendant Tetra Tech EC, Inc.

20  knew that such materials had not been tested for release pursuant to the rules, regulations and

21  protocols that were required by the contract with the United States Navy and knew and had

22  reason to know that such materials did not meet the release levels.

23      34.    A fundamental function of the nuclear radiation testing and remediation services

24  the United States Navy contracted with Tetra Tech EC, Inc. to perform is the screening of soil for

25  nuclear radiation contamination, the remediation of that soil to Remediation Goal levels, and the

26  classification and containment of soil that could not be remediated below the RG levels. Federal

27  and California agencies reached agreements with the United States Navy in the setting of

28  Remediation Goals for soil to be "free released" which allowed the soil to be used at Hunters

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 20 -

1   Point as clean fill dirt for back fill purposes, or shipped offsite as soil which met the established
2   RG. Tetra Tech EC, Inc. agreed to testing procedures, rules, regulations, and operating
3   procedures under the contract with the United States Navy pertaining to the radiological clean-up
4   of Hunters Point and the sampling and testing to be done to determine whether soils meet the RG
5   required under the contract. The designation of soil to be "free released" resulted in substantially
6   less time and fewer costs to Defendant Tetra Tech EC, Inc. than if the soil was designated as soil
7   with radioactivity above the Remediation Goal levels under the contract. Due to the terms and
8   conditions of the contract, Defendant Tetra Tech EC, Inc. had a financial self interest in soils
9   being designated and treated as "free release" soil.

10  35.     Under the contract with the United States Navy, a Multi-Agency Radiation Survey
11  and Site Investigation Manual (MARSSIM) was established that set forth investigation,
12  remediation, and final confirmation processes and procedures for soil remediation. Defendant
13  Tetra Tech EC, Inc. was required under the contract with the United States Navy to follow the
14  rules, procedures, and protocols established including those contained in the MARSSIM. The
15  MARSSIM required that a Survey Unit be established of soil, and that 18 confirmation samples
16  be taken from each Survey Unit. Soil was not to be free released until all Final Status Survey
17  samples for a Survey Unit had reported results below the remediation goal. The confirmation
18  samples were to be taken from the Survey Unit throughout the Unit with a focus on areas of the
19  Unit that had elevated radiological readings. Defendant Tetra Tech EC, Inc. was required by the
20  rules, regulations, and contract to comply with these requirements and directives contained in the
21  MARSSIM.

22  36.     Radiological testing and the designation of soil excavated as either qualified for
23  free radiological release or that the soil exceeded the MARSSIM free release Remediation Goal
24  and had to be removed to specialized sites for storage of radiation contaminated soils and
25  materials was a major and critically important component of the contract between the United
26  States Navy and Defendant Tetra Tech EC, Inc.

27  37.     Tetra Tech EC, Inc. processed soil for remediation and testing by establishing
28  Survey Unit "pads" upon which excavated soil was placed and spread out to about a uniform

- 21 -

1   smoothed six inch depth. A towed array detector system (towed array) was slowly pulled over

2   the pad by a small tractor with sensors that detected radioactivity intensity levels. The towed

3   array used a Global Positioning System (GPS) to electronically report soil positions that were

4   identified by the towed array system as having high radioactive readings.

5   38.   The towed array GPS report with radioactive level readings was transmitted to a

6   Radiation Data Analyst. The Analyst was to identify 18 positions on the pad that represented the

7   highest levels of radioactivity. The Analyst was to transmit information of the GPS locations of

8   the 18 highest radioactive readings to a Senior RCT. The Senior RCT was to have samples taken

9   from the 18 identified GPS positions on the pad. The Senior RCT was to take the samples to a

10   predetermined area of low radioactive background and scan the samples. Samples with high

11   radioactive readings were not delivered to the lab but deposited in a Department of Transportation

12   approved contained for radioactive waste to be disposed of off-site with companies that accepted

13   radioactive wastes, and a replacement sample was to be taken from pad area with the high reading

14   samples. The 18 resulting samples were taken to an on-site lab operated under the direction of

15   Tetra Tech EC, Inc. to test the radioactivity levels of the soil samples provided by the Senior

16   RCT. The towed array and laboratory results were reported to management of Tetra Tech EC,

17   Inc. as well as to the United States Navy Radiological Affairs Support Office (RASO) with a

18   recommendation to free release the Survey Unit soil on the pad, or for the soil to be removed to

19   specialized sites at Hunters Point for storage of radiation contaminated soils pending off site

20   shipment in DOT approved containers to Nuclear Regulatory Commission authorized sites to

21   receive radioactive wastes.

22   39.   The United States Navy RASO was responsible for oversight of the processes,

23   procedures, and accuracy of the soil surveys, sampling and testing by Defendant Tetra Tech EC,

24   Inc.. RASO staff, in consultation with Defendant Tetra Tech EC, Inc. made the determination

25   whether Survey Unit soil was to be free released, remediated and re-tested, or categorized as soils

26   that could not be remediated to below Remediation Goal levels. Survey Unit soil that RASO

27   cleared as at or below the Remediation Goal was "free released" and used as non-radioactive fill

28   at Hunters Point Naval Shipyard and also was shipped off site and disposed of as non-radioactive

- 22 -

COMPLAINT

waste when contaminated with other non-radioactive pollutants. Disposition of Survey Unit soils as non-radioactive fill at Hunters Point Naval Shipyard is the lowest cost disposition of the soil to Tetra Tech EC, Inc. Processing and disposition of soils designated as radioactively contaminated soil above the minimal safe Remediation Goal level was the most expensive and time consuming for Tetra Tech EC, Inc. and other sub-contractors to contain, process, transport, and remove.

40.     Defendant Tetra Tech EC, Inc. engaged in efforts to have Survey Unit soil falsely designated for "free release". Defendant Tetra Tech EC, Inc. engaged in a number of efforts to falsely effect and influence a variety of steps in the Survey Unit soil designation, including the selection of the 18 points of soil to be tested, the taking of soil samples for testing, and sought to influence the oversight of the processed soil by the responsible Navy RASO official.

41.     The Navy RASO Radiological Site Manager over the Hunters Point Naval Shipyard project is and has been Ms. Laurie Lowman, a long-term employee of the Navy and its radiological programs. Laurie Lowman is and has been the central individual of the Navy RASO office to oversee the radiological remediation conduct and progress of Tetra Tech EC, Inc., and has some authority and discretion to make decisions that impact the sampling, testing, operations, and results of Tetra Tech EC, Inc. in the nuclear radiological remediation processes at Hunters Point.

42.     In approximately late 2009, top management of Tetra Tech EC, Inc., including Senior Vice President Andrew Bolt, and Tetra Tech, Inc. top management determined that the hiring of the son of Navy RASO Radiological Site Manager Laurie Lowman should be pursued to potentially influence and assist the relationship between Tetra Tech EC, Inc. and RASO related to the Hunters Point Naval Shipyard contract and remediation. On information and belief it is alleged that Laurie Lowman's son, Thorpe Miller, had recently been terminated from working with Target Stores in Virginia due to theft, and that he had no experience or training in nuclear radiation remediation and testing. The information upon which the belief is based is that Plaintiff Bowers was personally informed by a Vice President of Operations of New World Environmental, Inc. and later the Vice President of Operations of Aleut World Solutions the information above regarding Thorpe Miller, and is also based on Plaintiff Bowers' knowledge of

- 23 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  Thorpe Miller who was later assigned to Plaintiff Bower's as his subordinate. Tetra Tech EC, Inc.

2  violated standard protocol and hired Thorpe Miller in late 2009 without allowing the manager that

3  Thorpe Miller would directly report to, namely Radiation Safety Officer Representative Bert

4  Bowers, to interview or provide any input into whether Thorpe Miller would be hired. On

5  information and belief it is alleged that the hiring of Laurie Lowman's unemployed son, Thorpe

6  Miller, by Tetra Tech EC, Inc., was done to influence Laurie Lowman, the Navy RASO

7  Radiological Site Manager responsible for the Hunters Point remediation project and oversight of

8  Tetra Tech EC, Inc., and not due to the skills, training and experience of Thorpe Miller.

9       43.    Defendant Tetra Tech EC, Inc. top management sought to increase the conflict of

10  interest and influence that the hiring by Tetra Tech EC, Inc. had on Navy RASO Radiological

11  Site Manager Laurie Lowman by giving her son, Thorpe Miller, a significant pay grade and

12  payroll increase within one year after being hired. Defendant Tetra Tech EC, Inc. management,

13  including Project Manager Bill Dougherty, directed Plaintiff Bowers that the review of Thorpe

14  Miller was to be done with a high rating so that a pay grade and substantial salary increase could

15  be justified for Thorpe Miller. Plaintiff Bowers, being aware of the objective and directive given

16  by Project Manager Dougherty, completed the performance review for Mr. Miller with

17  satisfactory ratings. Tetra Tech EC, Inc. Project Manager Dougherty personally met with

18  Plaintiff Bowers and directed that ratings be upwardly changed to include outstanding ratings of 1

19  and 2, when Plaintiff Bowers had only given Mr. Miller ratings of 3. Project Manager Dougherty

20  also directed changes to the written text of the performance review to enhance the review for Mr.

21  Miller. Project Manager Dougherty informed Plaintiff Bowers that these changes were to be

22  made so that Mr. Miller would receive the pay grade increase and salary increase which could

23  only be justified with such high ratings. These increased ratings were not the opinion of Plaintiff

24  Bowers, who informed his direct report, Erik Abkemeir, of the directive by Project Manager

25  Dougherty. The inflated ratings and text were entered onto the performance review and

26  submitted to Mr. Miller in place of the ratings and text that Plaintiff Bowers had given as his

27  evaluation for Mr. Miller.

28

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 24 -

1    44.    After Thorpe Miller worked directly on the payroll of Tetra Tech EC, Inc. for

2    approximately one year, top level managers of Tetra Tech EC, Inc. and Tetra Tech, Inc.

3    concluded having Thorpe Miller on the payroll of Tetra Tech EC, Inc. was too obvious to

4    outsiders as a nepotistic conflict of interest to influence RASO Radiological Site Manager Laurie

5    Lowman. Management of Tetra Tech EC, Inc. and Tetra Tech, Inc., including Senior Vice

6    President, Andrew Bolt, directed that Thorpe Miller be removed from the payroll of Tetra Tech

7    EC, Inc. and that his employment be taken over by a sub-contractor for Tetra Tech EC, Inc. to

8    hide the nepotism and conflict of interests, with Tetra Tech EC, Inc. agreeing to pay all salary,

9    benefits, and additional profit to the subcontractor due to the hire of Thorpe Miller by the

10   subcontractor. Management of Tetra Tech EC, Inc. arranged for and coordinated the "hire" of

11   Thorpe Miller by subcontractor IO Environmental & Infrastructure in which Tetra Tech EC, Inc.

12   Project Manager Bill Dougherty's wife, Christine B. Dougherty, was a manager working as a sub-

13   contractor also for Tetra Tech EC, Inc. Subcontractor IO Environmental & Infrastructure agreed

14   to these terms and took over the formal employment and payroll of Thorpe Miller to

15   accommodate the requests of Tetra Tech EC, Inc., but Thorpe Miller's job, desk, and duties

16   continued to be exactly the same working on the Hunters Point contract as they were when Tetra

17   Tech EC, Inc. was the direct employer. Shortly after Thorpe Miller's employment was

18   exchanged between Tetra Tech EC, Inc. and IO Environmental & Infrastructure, Thorpe Miller

19   married Karisa Miller. Tetra Tech EC, Inc. requested that sub-contractor IO Environmental &

20   Infrastructure hire the wife of Thorpe Miller to strengthen the potential influence on RASO

21   Radiological Site Manager Laurie Lowman. Karisa Miller was hired without a competitive hiring

22   process by IO Environmental & Infrastructure to work as a sub-contractor for Tetra Tech EC, Inc.

23   under the Hunters Point contract due to the request by Tetra Tech EC, Inc.

24   45.    Upper management of Tetra Tech EC, Inc. directed that Thorpe Miller work in the

25   nuclear remediation support area which RASO Radiological Site Manager Laurie Lowman would

26   have direct responsibility over for RASO on behalf of the Navy, despite Mr. Miller's lack of

27   experience in nuclear remediation work. The Tetra Tech EC, Inc. Radiation Safety Office

28

- 25 -

1   Representative that Mr. Miller reported to directly, Plaintiff Bert Bowers, was not consulted nor

2   did he approve the assignment of Mr. Miller to the Radiological Data Analyst position.

3          46.     During the relevant time periods, Tetra Tech EC, Inc. had developed and used a

4   "towed array" detector device with radiological sensing instruments that was designed to be

5   slowly pulled behind a tractor over Survey Unit soil. The towed array radiation sensing

6   instruments transmitted information of "hot spots" of radiation sources with Global Positioning

7   System (GPS) coordinates linked to a computer. The towed array GPS radiological hot spot

8   information went to Mr. Miller as the Radiological Data Analyst. Mr. Miller was to provide a

9   map of the Survey Unit soil with GPS coordinates identifying the highest 18 radioactive soil

10  locations so that Senior RCT specialists would take a sample of each of the 18 soil locations for

11  laboratory analysis. The Senior RCT specialist was to take the map issued by Mr. Miller of the

12  Survey Unit soil with 18 locations identified as the highest radiologically tested readings from the

13  towed array. The Senior RCT was to consult the GPS map and use a hand held radiological

14  scanning instrument to locate and identify the specific soil locations emitting the high radioactive

15  levels. The Senior RCT was to take or direct Junior RTC specialists to take samples of the soil

16  with the high radioactivity emissions, so that a sample from the 18 highest radioactivity soil

17  locations would be sampled for analytical soil testing by the Tetra Tech EC, Inc. on site

18  laboratory. The laboratory analysis of the 18 soil samples were to be forwarded to management of

19  Tetra Tech EC, Inc. and to the Navy RASO office to be determined if the Survey Unit soil would

20  be "free released", subjected to further remediation to try and lower the radiological readings to

21  meet Remediation Goal levels, or contained and shipped out to Nuclear Regulatory Commission

22  licensed and authorized radiological waste disposal facilities soil above the Remediation Goal

23  levels.

24         47.     Tetra Tech EC, Inc., with knowledge of the false resumé, lack of training and

25  experience, and absence of ANSI Standard 3.1 compliance by Jane Taylor, assigned Jane Taylor

26  to supervise and manage the taking of soil samples that were to be tested for Tetra Tech EC, Inc.

27  and the Navy RASO office to determine if the soil would be used as free release soil, had to be

28  remediated and retested, or had to be treated and removed as radioactively contaminated soil

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 26 -

1   above the Remediation Goal levels. On information and belief it is alleged that Tetra Tech EC,

2   Inc. knew and expected that Jane Taylor would direct the taking of Survey Unit soil samples to

3   fraudulently increase the designation of contaminated soil as meeting the free release radiation

4   levels. In 2010 and thereafter Tetra Tech EC, Inc. also assigned Marie Snyder Winder as a fill-in

5   and substitute for Jane Taylor to supervise and manage the taking of soil samples that were to be

6   tested for Tetra Tech EC, Inc. and the Navy RASO office to determine if the soil could be used as

7   free release soil, had to be remediated and retested, or had to be treated and removed as

8   radioactively contaminated soil above the Remediation Goal levels. On information and belief it

9   is alleged that from 2010 on, Tetra Tech EC, Inc. management knew that Marie Winder was

10  submitting fraudulent timecard entries during this time period, and knew and expected that Marie

11  Winder would direct the taking of Survey Unit samples to fraudulently increase the designation of

12  contaminated soil as meeting the free release radiation levels.

13  48.     On information and belief it is alleged that Tetra Tech EC, Inc. management in

14  2010 and thereafter assigned Jane Taylor and Marie Winder to supervise and manage the taking

15  of soil samples from Survey Units so that Survey Units would not be properly sampled, resulting

16  in fraudulent sampling of the Survey Units so that the 18 samples taken were not consistently

17  taken from the 18 highest radioactive readings from the towed array GPS data. Experienced and

18  qualified radiological remediation workers advised management of Tetra Tech EC, Inc. that Jane

19  Taylor and Marie Winder, and the laborers they supervised, were not performing the radiological

20  sampling of the soil according to standards set forth in the agreement, rules, regulations and

21  protocols with the United States Navy, and such conduct would result in soil being designated for

22  free release as fill although the soil was radiologically impacted beyond the Remediation Goal

23  levels established by the contract with the United States Navy and regulatory agencies. For

24  example, Plaintiff Archie Jackson informed Tetra Tech EC, Inc. management that Jane Taylor

25  directed laborers to just take any soil, not even from the Survey Unit, and place the soil in the

26  sample containers for radioactive isotope testing rather than use the towed array GPS mapping

27  coordinates provided by Thorpe Miller to extract representative radioactive material for testing as

28  identified by the towed array. Experienced and qualified radiological remediation workers

- 27 -

COMPLAINT

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1   advised management of Tetra Tech EC, Inc. that Jane Taylor and Marie Winder and the non-RTC
2   laborers they supervised improperly used the hand held radiation detection instruments in a
3   manner contrary to the specifications of the contract and requirements with the United States
4   Navy such that radioactive material would not be located, identified and subjected to testing to
5   determine whether the soil should be treated as radioactively contaminated soil above the
6   Remediation Goals or be designated for free release that could be used at Hunters Point as clean
7   fill soil, or shipped off site as non-radioactive soil. Other companies performing services for the
8   United States Navy at Hunters Point learned and reported that the soil processed by Tetra Tech
9   EC, Inc. and designated as clean fill and used as fill at Hunters Point that Jane Taylor and Marie
10  Winder oversaw the sampling for testing of had not been properly collected, was not
11  representative of the soil identified as of radioactive concern for testing, and contained dangerous
12  materials with high radioactive levels . Employees of Shaw Engineering worked in areas at
13  Hunters Point with soil that Tetra Tech EC, Inc. and RASO designated for free release as clean
14  fill for Hunters Point which was put back into processed trench areas at Hunters Point. The soil
15  sampling of this "free release" clean fill had been done and supervised by Jane Taylor and Marie
16  Winder. Employees of Shaw Engineering found elevated radioactive materials contained in the
17  soil designated as clean fill emitting radioactivity above the Remediation Goal established by the
18  United States Navy, including finding a radioactive radium button that emitted radioactivity far in
19  excess of the minimal safe levels and Remediation Goal established by the United State Navy
20  requirements.

21      49.     Radiological Data Analyst Thorpe Miller received towed array information that
22  identified the intensity of the radioactivity of the Survey Unit soils to be sampled under the
23  supervision of Jane Taylor and Marie Winder. Mr. Miller also received the lab analysis of the
24  samples of the Survey Unit soils taken under the supervision of Jane Taylor and Marie Winder.
25  Mr. Miller had responsibility to review the towed array information with the resulting laboratory
26  test results from the Survey Unit soil samples. The Survey Unit soil laboratory results were
27  regularly lower than the radioactive intensity readings that would have been indicated from the
28  towed array reports. The regular lower radioactive intensity readings were due to fraudulent use

- 28 -

1   of the towed array report in the taking of soil samples to intentionally take samples for lab testing

2   from areas that did not have the highest radioactive readings. The inconsistent information

3   between the towed array intensity readings and the laboratory results, when the sampling was

4   taken and supervised by Jane Taylor and Marie Winder, compared with the towed array and

5   laboratory results when taken and supervised by skilled, dedicated RCT specialists indicated that

6   accurate sampling was not being done by Jane Taylor and Marie Winder and those they

7   supervised. Radiological Data Analyst Thorpe Miller failed to alert RASO, regulatory agencies,

8   and his radiological supervisors that the samples taken from Survey Units of soil under the

9   supervision of Jane Taylor and Marie Winder were being done in a manner to obtain lower

10   radioactive lab results to fraudulently obtain clearance for the release of soil with radioactivity

11   that exceeded the release levels. The fraudulent use of the towed array maps and soil sampling

12   for lab testing violated the rules, regulations, and contract between the United States Navy and

13   Tetra Tech EC, Inc.

14   50.   RASO Radiological Site Manager Laurie Lowman, the mother of Radiological

15   Data Analyst Thorpe Miller for Tetra Tech EC, Inc. sub-contractor IO Environmental &

16   Infrastructure, and mother-in-law of Karisa Miller also working for IO Environmental &

17   Infrastructure, had access to the towed array GPS information for Survey Units that provided

18   information as to the location and intensity of radioactive materials in the soil. RASO Lowman

19   also had access to the sample laboratory results for the soil from the Survey Units. Despite the

20   inconsistent information between the towed array radiological readings and the lower laboratory

21   results, RASO Lowman did not contest the accuracy of the soil Survey Unit sampling processes,

22   and the failed to call into question the processing of the soil samples, such processing now

23   influenced by the hiring and employment of RASO Lowman's son and daughter-in-law effected

24   by Defendants Tetra Tech EC, Inc. and Tetra Tech, Inc.

25   51.   Supervisors and management of Tetra Tech EC, Inc. observed the failures of Jane

26   Taylor, Marie Winder and the non-RTC laborers they supervised to test and sample the Survey

27   Unit soil according to the terms and conditions required by the United States Navy, and were

28   informed of the failures of Jane Taylor, Marie Winder and the non-RTC laborers they supervised.

- 29 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1    Supervisors and management of Tetra Tech EC, Inc. did not intercede and compel proper surveys

2    and sampling of Survey Unit soils by Jane Taylor and Marie Winder. The failure of supervisors

3    and management of Tetra Tech EC, Inc. to intercede and enforce proper surveys and sampling of

4    Survey Unit soil was due in part to a compelling emphasis of top management of Tetra Tech EC,

5    Inc. to process and complete the Hunters Point radioactive remediation quickly and with the

6    lowest costs possible to increase profits for the company, at the expense of proper radiological

7    remediation. Top managers including Project Manager Bill Dougherty and Construction

8    Superintendent Dennis McWade by their words, deeds and attitude dramatically emphasized

9    rapid, less expensive results at the expense of effective remediation procedures required under the

10   contract, rules, regulations, and procedures mandated by the United States Navy. The failure of

11   supervisors and management of Tetra Tech EC, Inc. to intercede and enforce proper surveys and

12   sampling of Survey Unit soil was due in part to the protected status of Jane Taylor due to her

13   sexual relationship with Tetra Tech EC, Inc. Construction Superintendent, Dennis McWade. The

14   fraudulent processing of the radiologically impacted soil permitted Tetra Tech EC, Inc. to quickly

15   and at less expense dispose of radiologically impacted soils above the Remediation Goal that

16   were fraudulently designated for "free release" to be used as clean fill at Hunters Point or to be

17   shipped off site as non-radiologically impacted soil. The free release of soil to be used at Hunters

18   Point was not subjected to subsequent testing, such as screening by the radiation detection portal

19   monitor, but rather was directed by Defendant Tetra Tech EC, Inc. with knowledge or a

20   reasonable basis to know that substantial amounts of the soils used as fill at Hunters Point still

21   contained radioactive materials that exceeded the Remediation Goals required for soil to be used

22   as clean fill at Hunters Point.

23          52.     Defendant Tetra Tech EC, Inc. had actual knowledge of the falsity and acted in

24   reckless disregard for the truth of the representation and implied certification to the United States

25   Navy that the survey, testing and designation of Survey Unit soils at Hunters Point were

26   performed consistent with the rules, regulations, and protocol required due to the contract with

27   the United States Navy. The surveys, sampling and testing of Survey Unit soil, if properly

28   performed with lab results below the Remediation Goal, permitted the Survey Unit soil to be

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 30 -

1   "free released" so that it could be used as clean back fill at Hunters Point, or shipped off Hunters
2   Point as soil that was not radioactive. Tetra Tech EC, Inc. was required by the terms of the
3   contract with the United States Navy to install a radiation detection Portal Monitor to survey soils
4   that were being shipped from Hunters Point. The United States Navy required that Tetra Tech
5   EC, Inc. utilize a portal monitor for all vehicles, equipment, dirt and waste to go through when
6   entering and leaving the Hunters Point Naval Shipyard. The portal monitor had sensors that
7   could be set at varying levels of sensitivity to alert if a vehicle and its load was emitting gamma
8   radioactivity above the pre-set radiation Remediation Goals "contamination alert" action alarms.
9   The United States Navy established requirements for the scanning, testing, approval and
10  certification that standards and procedures had been met for any vehicle and its load containing
11  potentially radioactive materials to leave the Hunters Point Naval Shipyard. The United States
12  Navy set standards and procedures to be followed if a vehicle and its load were seeking to leave
13  the Hunters Point Naval Shipyard and the radiation detection portal monitor alarms activated if
14  gamma radioactivity levels exceeded the pre-set Remediation Goal levels. The portal monitor was
15  used to screen trucks with Survey Unit soil loads that were to be shipped off Hunters Point that
16  had been sampled in the field and tested in the laboratory and rated for free release below
17  Remediation Goal levels, but possessed some other form of contamination. Survey Unit soil that
18  was rated for free release below Remediation Goal levels that did not have other forms of
19  contamination was not to leave Hunters Point but was to be used as back-fill soil at Hunters Point,
20  and this soil back-fill soil was not processed through the portal monitor. The Survey Unit soil
21  that was processed through the portal monitor in 2010 and thereafter for off-site disposal
22  regularly alarmed the portal monitor due to gamma radioactivity levels exceeding the pre-set
23  Remediation Goal levels. Prior to 2010 and until late 2011, Survey soil that alarmed the portal
24  monitor was surveyed and remediated further, and required to be again screened and pass the
25  portal monitor screening. Survey Unit soils designed for free release and to be used as clean back
26  fill soil at Hunters Point were processed in exactly the same manner as the soils radiologically
27  free released for off-site disposal. Tetra Tech EC, Inc. knew or acted in deliberate ignorance that
28  Survey Unit soils Tetra Tech EC, Inc. tested and designated for free release back-fill at Hunters

- 31 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1   Point were not eligible for free release due to the presence of radioactive materials that exceeded

2   the Remediation Goal levels.  The rejection by the portal monitor of similarly scanned, sampled

3   and tested soil designated for off-site disposal to the soil used for back-fill at Hunters Point that

4   was not screened through the portal monitor indicated that the certification and implied

5   certification that all soils used as back-fill at Hunters Point were below Remediation Goal levels

6   was not accurate.  On information and belief it is alleged that management of Tetra Tech EC, Inc.,

7   including but not limited to Construction Manager Dennis McWade knew beforehand if soils on

8   specific Survey Unit pads were eligible for use as backfill at Hunters Point with no radiological

9   screening through the portal monitor, or had to go through the portal monitor for off-site disposal

10   due to other contaminants, such as PCBs.  It is alleged that management of Tetra Tech EC, Inc.

11   gave this information to RCT Jane Taylor and Marie Winder so that Survey Unit pad soils that

12   were free of other contaminants would be sampled to avoid the lab actually testing samples from

13   the highest levels of radioactive contamination located in the Survey Units to falsely have Survey

14   Unit soil designated for free release and backfill at Hunters Point.

15   53.     On a monthly basis, Tetra Tech EC, Inc. requested from the United States Navy

16   NAVFAC SW Division contract office a monthly progress payment, and set forth progress and

17   expenses incurred during that period.  On a monthly basis, the RASO office of Radiological Site

18   Manager Laurie Lowman provided a recommendation to the contract office in response to the

19   Tetra Tech EC, Inc. request for monthly progress payments.  Tetra Tech EC, Inc. expressly

20   certified and implied certification that the rules and regulations under the contract were complied

21   with, which included a duty to disclose all conduct that was not in conformity with the contract

22   and its rules and regulations.  The failure of Tetra Tech EC, Inc. to disclose the lack of

23   qualifications of Jane Taylor, the failures of Jane Taylor, Marie Winder and the nonRCT laborers

24   they supervised to perform the surveys and sample taking of the Survey Unit soils, the failure to

25   disclose that similarly surveyed, sampled and tested Survey Unit soils cleared for free release as

26   having met the Remediation Goal standards regularly failed the portal monitor scanning, and the

27   certification and implied certification that all Survey Unit soils used as back-fill at Hunters Point

28   met the Remediation Goal standards was knowingly false and material in the monthly approval of

1 progress payments to Tetra Tech EC, Inc. The conduct of Defendant Tetra Tech EC, Inc. violated
2 31 USC §3729(a)(1)(A) and (B).

3    54.    The United States Navy required that Tetra Tech EC, Inc. utilize a radiation
4 detection portal monitor for all vehicles, equipment, soil and waste to go through when entering
5 and leaving the Hunters Point Naval Shipyard. The United States Navy set procedural
6 requirements for the use of the radiation detection portal monitor for vehicles and equipment that
7 could proceed through the monitor to be cleared to leave Hunters Point. The United States Navy
8 established requirements for the scanning, testing, approval and certification that standards and
9 procedures had been met for any vehicle and its load containing potentially radioactive materials
10 to leave the Hunters Point Naval Shipyard. The United States Navy set standards and procedures
11 to be followed if a vehicle and its load were seeking to leave the Hunters Point Naval Shipyard
12 and the portal monitor alarms activated if gamma radioactivity levels exceeded the Remediation
13 Goal pre-set levels "contamination alert" action alarms. Tetra Tech EC, Inc. certified to the
14 United States Navy that all procedures and requirements related to the exit of trucks and
15 equipment from the Hunters Point Naval Shipyard were met when Tetra Tech EC, Inc. and its
16 management knew and had reason to know that the procedures and requirements established by
17 the United States Navy had not been met.

18    55.    In December of 2010, Tetra Tech EC, Inc. had a shutdown period in which all
19 radiological remediation workers were given leave. The portal monitor was shut down and
20 packed away during the shutdown period. During the shutdown period, Tetra Tech EC, Inc.
21 arranged for and permitted two Baker Tanks loaded with chemical and liquid wastes from a
22 Radiologically Controlled Area, and a 40 yard roll off garbage bin containing metal debris that
23 had been involved in a fire at a Radiologically Controlled Area to be removed from Hunters Point
24 Naval Shipyard during the shutdown period. These vehicles and the loads were not processed
25 pursuant to the United States Navy's procedures and requirements, and were not subjected to
26 portal monitor screening, nor screening upon leaving the Hunters Point Shipyard by radiation
27 remediation RCT specialists contrary to the rules and directives under the contract with the
28 United States Navy. Management of Tetra Tech EC, Inc. was informed of the violation by a

- 33 -
COMPLAINT

1   manager of Tetra Tech EC, Inc., Radiation Safety Officer Representative Bert Bowers, related to

2   the processing and removal of the Baker Tanks and the 40 yard roll off garbage bin containing

3   metal debris, who urged notification of the United States Navy of the failure to follow protocol

4   and procedures, and was dismissed from working at Hunters Point Naval Shipyard shortly

5   thereafter. On information and belief it is alleged that Tetra Tech EC, Inc. did not disclose the

6   violation of procedures, protocols, and requirements imposed by the United States Navy

7   regarding the release of potentially radioactive materials from Hunters Point Naval Shipyard, and

8   the failure to screen all trucks and their loads through the portal monitor. On information and

9   belief it is alleged that Tetra Tech EC, Inc. falsely certified to the United States Navy that all

10  shipments leaving the Hunters Point Naval Shipyard had been properly screened, evaluated, and

11  approved for removal from the Hunters Point Naval Shipyard when that certification was

12  knowingly false and fraudulent. The information upon which this information and belief is based

13  on is that although Plaintiff Bowers continued employment with Tetra Tech EC, Inc. and contact

14  with United States Navy and RASO remained open, as well as reports made to United States

15  Nuclear Regulatory Commission, no disclosure by Tetra Tech EC, Inc. to RASO or the United

16  States Navy of these incidents were made. The failure to disclose the violation of the rules and

17  procedures under the contract by Tetra Tech EC, Inc. was part of a fraudulent scheme to not

18  disclose violations so that the requests for periodic progress payments to the contract

19  administration office of the United States Navy NAVFAC SW Division to authorize payment on

20  a monthly basis to Tetra Tech EC, Inc. would not be adversely impacted, although Tetra Tech

21  EC, Inc. had expressly undertaken an agreement to follow the portal monitor procedures and had

22  also expressly agreed to comply with the rules and regulations to inform the United States Navy

23  of any failures to comply with those rules and procedures. The fraudulent failure of Defendant

24  Tetra Tech EC, Inc. to disclose the violations of the contract was material to the payment of the

25  monthly payment and the amount of the payment to Tetra Tech EC, Inc. The conduct of

26  Defendant Tetra Tech EC, Inc. violated 31 USC §3729(a)(1)(A) and (B).

27        56.    Management of Tetra Tech EC, Inc. took knowing actions to defeat the purpose

28  and effect of the protocols and procedures required by the United States Navy pertaining to the

- 34 -

1   radiation detection portal monitor to cut costs and increase profits despite these actions resulting

2   and potentially resulting in the uncontrolled release of radioactive contaminated materials above

3   the Remediation Goals established by the United States Navy being released from Hunters Point

4   and into the public arena. The rules, regulations and protocols for the use and standards of the

5   portal monitor were established and set forth in the Multi-Agency Radiation Survey and Site

6   Investigation Manual. The procedures required that when a vehicle and its load of soil and debris

7   were cleared by radiation surveys to leave Hunters Point, the truck and load had to first

8   successfully pass through the radiation detection portal monitor.

9   57.     The protocol and procedures for successfully passing the radiation detection portal

10   monitor required a truck to slowly pass between the portal monitor radiation detection sensors. If

11   the truck did not alarm the portal monitor radiation sensors, the truck and its load were permitted

12   to leave Hunters Point. If the truck and its load failed the first pass through the portal monitor the

13   truck was required to re-enter the portal monitor and if the truck failed the portal monitor scan

14   two out of three passes, the truck and its load were deemed to have failed the portal monitor

15   scanning and were not permitted to leave Hunters Point with the load of scanned soil and debris.

16   58.     When a truck and its load of soil and debris were deemed to have failed the

17   radiation detection portal monitor scan, the truck was directed to an area where scaffolding was

18   set up. The scaffolding were erected to permit tarps to be placed over truck beds that passed the

19   portal monitor scanning, and to also allow for detailed manual scanning of the soil and debris

20   following a portal monitor scan failure of a truckload. When a truckload had failed the portal

21   monitor scanning, two RCT radiation remediation safety specialists were assigned to scan the soil

22   and debris contents of the truck trailer bed to find the radioactive material that alarmed the portal

23   monitor. The RCT specialists used hand held gamma radiation screening devices to scan the

24   under carriage, back, and sides of the truck trailer bed, and then mounted the scaffolding and

25   crossed the top of the bed of the un-tarped truck trailer directly over the soil and debris without

26   the metal siding or bed shielding the radioactive material. Special attention was given to areas of

27   the truck bed where the portal monitor report indicated elevated radioactivity levels above the

28   Remediation Goal. The scanning from the top over the truck bed directly over the soil and debris

- 35 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  without the shielding from the metal trailer body was the most effective means of locating the

2  radioactive materials in the truck trailer. When the radioactive material that triggered the portal

3  monitor was located, the RCT specialists completed a truck survey that identified the radioactive

4  materials, and the survey report included detailed information of the radioactive readings obtained

5  from the radioactive sources located that exceeded the Remediation Goal levels. The truck with

6  the load of soil and debris that failed the portal monitor scanning was then directed to a Survey

7  Unit screening pad and directed to dump the soil and debris onto the pad. The soil was then

8  reprocessed for screening, remediation, and sampling by RCT specialists. If the RCT specialists

9  when scanning the truck trailer soil and debris were unable to locate by hand held scanning the

10  specific sources of radioactivity that triggered the portal monitor alarm the soil was also directed

11  to a Survey Unit screening pad, dumped, and reprocessed for screening, remediation, and

12  sampling. For all rejected soils, when the soil was dumped onto the screening pads, the soil was

13  smoothed out to about a 6 inch uniform depth and scanned until the radioactive materials that

14  registered above the Remediation Goal levels were located and removed. Once the radioactive

15  materials were located and removed, the Survey Unit pad was again processed for sampling of the

16  18 highest radioactive locations pursuant to the towed array GPS report. The 18 samples taken

17  were tested by the on-site laboratory and once again an evaluation was made whether the Survey

18  Unit soil met the Remediation Goal for free release to leave Hunters Point.

19       59.    On or about September 2011, Defendant Tetra Tech EC, Inc. significantly changed

20  and weakened the procedures for use of the radiation detection portal monitor and the procedures

21  and standards for review of a truck with a load of soil and debris that failed the portal monitor

22  screening. On information and belief it is alleged that although some of the changes implemented

23  by Defendant Tetra Tech EC, Inc. were discussed and disclosed to the United States Navy RASO

24  office, critical details and procedures that significantly weakened the effectiveness of the portal

25  monitor were fraudulently withheld from the United States Navy and United States agencies such

26  as the Environmental Protection Agency, Nuclear Regulatory Commission, and State of

27  California regulators. On information and belief it is alleged that Defendant Tetra Tech EC, Inc.

28  conspired with individuals, including but not limited to Navy RASO Radiological Site Manager

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 36 -

1   Laurie Lowman, who due to her conflict of interest did not object but assisted Defendant Tetra

2   Tech EC, Inc. in the effort to fraudulently hide from the United States Navy and the involved

3   regulators the extent in which the weakening of the portal monitor procedures and standards, and

4   the weakening of the post-portal monitor procedures and standards allowed hazardous radioactive

5   materials above the Remediation Goals to be free released.

6        60.     For years prior to September 2011, the portal monitor pre-set sensitivity level was

7   set at 3 sigma plus mean background levels, which corresponded to the Remediation Goals set by

8   MARSIMM and required by rule and regulation under the contract. In 2011, due to the

9   fraudulently defective surveys, remediation, and sampling of Survey Unit soils by Jane Taylor,

10   Marie Winder and the non-RCT laborers under their supervision, as well as remediation of an

11   increased number of sewer lines contaminated with radioactivity being processed by Tetra Tech

12   EC, Inc., trucks containing Survey Unit soils sampled, tested and given free release clearance

13   increasingly failed to pass the portal monitor screening. The failures to pass the portal monitor

14   screening resulted in increased labor costs, laboratory testing costs, stockpiling costs, and delays

15   for Tetra Tech EC, Inc. that adversely impacted payments to Tetra Tech EC, Inc. by the United

16   States Navy and adversely affected the net profits to Tetra Tech EC, Inc. and Tetra Tech Inc.

17   Tetra Tech EC, Inc. management utilized the conflict of interests it had established with RASO

18   Radiological Site Manager Lorie Lowman to pressure Ms. Lowman to assist and not object to

19   Tetra Tech EC, Inc. significantly weakening the portal monitor testing which had been

20   established by multi-agency agreement through the MARSIMM. Tetra Tech EC, Inc. failed to

21   disclose to the United States Navy that a reason for the increased portal monitor failure rates of

22   the truck loads screened was due to the assignment of Jane Taylor and Marie Winder to conduct

23   the survey and sampling in a manner to intentionally obtain free release of soils that did not meet

24   the remediation goals as part of Tetra Tech EC, Inc. management's efforts to fraudulently

25   increase profit levels. On or about September of 2011, Tetra Tech EC, Inc. relaxed the portal

26   monitor sensitivity by a factor of 2.5 from 3 sigma plus mean background to a level of 8 sigma

27   plus mean background before the truck load would fail the portal monitor screening. On

28   information and belief it is alleged that this significant weakening of approximately 2 and ½ times

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  less sensitivity of the portal monitor screening standard was not approved by the MARSIMM nor

2  authorized by agencies vested with oversight responsibilities and authority under the procedures

3  and regulations involved with the contract between Tetra Tech EC, Inc. and the United States

4  Navy. On information and belief it is alleged that any consent or failure to object by agencies

5  involved in the oversight of the radioactivity remediation of Hunters Point was obtained due to

6  fraud and the conflict of interest created and taken advantage of by Tetra Tech EC, Inc. with

7  RASO's Laurie Lowman.

8      61.   Tetra Tech EC, Inc. further weakened the portal monitor screening and procedures

9  on or about September 2011. For years prior to September 2011, the rules, regulations,

10  procedures and practices required under the contract with the United States Navy required that all

11  truckloads of soil and debris that failed the portal monitor screening were to be hand surveyed by

12  two RCT specialists, with a detailed hand scanning including scanning over the top of the truck

13  bed directly over the soil and debris without the metal of the truck trailer shielding the radioactive

14  materials from the scanning. Further, the emphasis for the two RCT specialists was to find the

15  radioactive material that had triggered the portal monitor alarm. The great majority of post portal

16  monitor failure hand scans did locate radioactive materials that were above the remediation goal

17  release levels and which should have caused the portal monitor radioactivity sensors to be

18  alarmed. The RCT specialists and management of Tetra Tech EC, Inc. knew from experience

19  over the years of hand scanning the truck loads of soil and debris that failed the portal monitor

20  that the hand scanning directly over the soil from the top while the RCT specialists were on the

21  scaffolding was the most effective scanning for radioactive materials that exceeded the

22  Remediation Goals that would have caused the portal monitor alarms to be activated because the

23  metal sides of the truck trailer body significantly shielded the radioactivity when scanning from

24  the back, sides and under carriage from ground level. Beginning in September of 2011, Tetra

25  Tech EC, Inc. fundamentally changed and weakened the scanning procedures and standards for a

26  truck load of soil and debris that had failed the now less sensitive by a factor of 2 and ½ times

27  portal monitor scanning process. Beginning in September of 2011, Tetra Tech EC, Inc. directed

28  that one, not two RCT specialists, was to scan the truck trailer following a failure of the portal

- 38 -

1    monitor scanning. The RCT was directed to no longer utilize the scaffolding and was directed to

2    no longer perform a scan from the top of the trailer directly over the soil and debris. The RCT

3    specialist was directed that hand held sensor scanning was to only be done with the RCT

4    specialist standing on the ground and only scanning through the metal truck bed. The RCT

5    specialist was also directed that no longer was the objective to find the radioactive material that

6    triggered the portal monitor, but rather to perform the scan. Under the new weakened standards,

7    the RCT specialist was directed that if the hand held scanning of the sides and bottom of the

8    metal truck trailer body did not register radiation levels above 10,000 cpm then the truck with its

9    load of soil and debris that set off the portal monitor alarm was to be free released into the public

10   arena. At no time prior to September 2011 was a truck that failed the portal monitor screening

11   process permitted to leave with the load intact without remediation that had failed the portal

12   monitor. Prior to September of 2011, all soil and debris loads that failed the portal monitor

13   screening process were required after hand scanning by two RCT specialists for the load to be

14   dumped on a pad and efforts were taken to find and remove the radioactive materials that caused

15   the portal monitor alarms to be activated. Prior to September of 2011, the RCT specialist hand

16   scanning procedures of the soils in the truck and on the pad following a portal monitor failure

17   consistently found radioactive materials that exceeded the Remediation Goal levels. Management

18   of Tetra Tech EC, Inc. determined that the scanning and remediation of soils following a portal

19   monitor failure as required by MARSIMM and the rules, regulations and protocols under the

20   contract was a step that Tetra Tech EC, Inc. desired to minimize due to the adverse impact this

21   process had upon the profit levels desired by Tetra Tech EC, Inc. Tetra Tech EC, Inc.

22   management utilized the conflict of interests it had established with RASO Radiological Site

23   Manager Lorie Lowman to pressure Ms. Lowman to assist and not object to Tetra Tech EC, Inc.

24   significantly weakening the post portal monitor failure hand scanning by RCT specialists and

25   allowing for the free release of soils and debris that had failed the portal monitor scanning under

26   the weakened portal monitor sensitively levels without any radioactive remediation contrary to

27   the rules, procedures, and protocols that had been established by multi-agency agreement through

28   the MARSIMM that were required to be followed under the contract. On information and belief

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 39 -

1    it is alleged that this significant weakening and the fundamental changes to the RCT hand
2    scanning of loads that failed the portal monitor scan and the free release of the soil and debris
3    without remediation that had failed the portal monitor screening was not approved by the
4    MARSIMM and all agencies required under the procedures and regulations involved with the
5    contract between Tetra Tech EC, Inc. and the United States Navy. On information and belief it is
6    alleged that any consent or failure to object by agencies involved in the oversight of the
7    radioactivity remediation of Hunters Point to the changes in procedures, standards and objectives
8    of the RCT specialist hand scans and allowing the free release of the soils and debris that had
9    failed the portal monitor scanning without further radiation remediation was obtained due to fraud
10   and the conflict of interest created and taken advantage of by Tetra Tech EC, Inc. with RASO's
11   Laurie Lowman. The fraudulent failure of Defendant Tetra Tech EC, Inc. to disclose the
12   violations of the contract related to the portal monitor, hand scanning of failed radiation detection
13   portal monitor loads, and the free release of failed loads was material to the payment of the
14   monthly payment and the amount of the payment to Tetra Tech EC, Inc. The conduct of
15   Defendant Tetra Tech EC, Inc. violated 31 USC §3729(a)(1)(A) and (B).

16       62.       Defendant Tetra Tech EC, Inc. knowingly made and caused to be made and used
17   false records material to monthly claims for payment to the United States Navy NAVFAC SW
18   Division Contract Office that certified or implied certification that all equipment leaving Hunters
19   Point Naval Shipyard had been scanned for radioactivity pursuant to specific rules, procedures
20   and protocols and were only released with radioactivity below levels specified by the rules,
21   procedures and regulations under the contract with the United States Navy. Defendant Tetra Tech
22   EC, Inc. management knew and had reason to know that equipment that was allowed to leave
23   Hunters Point Shipyard had radioactive levels above the standards established by the rules,
24   procedures and regulations required under the contract with the United States Navy.
25   Management of Tetra Tech EC, Inc. established a culture at Hunters Point Shipyard that RCT
26   specialists were encouraged and threatened to not find radioactivity above the levels for free
27   release of equipment. Construction Superintendent Dennis McWade berated and threatened RCT
28   specialists who properly conducted radiological survey scans to perform the scans at a rate faster

- 40 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  than the equipment was designed to perform. Construction Superintendent Dennis McWade

2  directed that RCT specialists destroy records of radiation surveys that had results above the

3  release levels. Construction Superintendent Dennis McWade directed that laboratory results of

4  samples and smears taken to test the radioactivity levels be destroyed and removed from the

5  computer system that had results over the free release levels. For example, rented fencing was

6  used at Hunters Point in an area with radioactive materials and was designated a Radiologically

7  Controlled Area. After the rental fencing was used in the Radiologically Controlled Area for

8  months, Tetra Tech EC, Inc. sought to return the rented fencing. Prior to the fencing being

9  returned, the rules, regulations and procedures under the contract required that an RCT specialist

10 perform a radiological survey of the fencing and take fixed readings and smears from the fencing

11 to establish that the fencing did not have radioactive materials on it that exceeded the radioactive

12 free release levels established. Plaintiff RCT specialist Susan Andrews performed fixed readings

13 and took smears from the fencing that had radioactive readings above release levels.

14 Management of Tetra Tech EC, Inc. threatened Plaintiff Andrews with termination of

15 employment due to her diligence in performing the fixed readings and taking smears that she

16 submitted to the laboratory for analysis of the rental fencing. Management of Tetra Tech EC, Inc.

17 did not want the rental fencing survey to have levels above free release readings due to the time

18 and costs associated with the efforts that would be needed to remove and remediate the fencing so

19 that it could be free released, or dispose of the fencing as radioactively contaminated material.

20 Tetra Tech EC, Inc. management challenged the results Plaintiff Andrews obtained, and initially

21 attacked her competence and manner of testing. Plaintiff Andrews demonstrated her knowledge

22 of the testing equipment and that the detector readings she properly obtained were above release

23 limits. Management of Tetra Tech EC, Inc. continued to try to invalidate the results by asserting

24 that the detector used must have been miscalibrated or broken. Plaintiff Andrews resisted the

25 efforts to invalidate the testing results she believed were valid. Plaintiff Andrews took like

26 detectors that other RCT specialists had been using, scanned the fencing and again obtained

27 radioactive results above release levels. The Tetra Tech EC, Inc. Construction Superintendent

28 Dennis McWade became very mad at Plaintiff Andrews due to her diligence and that the results

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  she was obtaining would result in delay and greater costs to Tetra Tech EC, Inc. in the handling
2  and processing of the fencing. Plaintiff Andrews turned in the hand held surveys of fixed
3  radioactive contamination to Tetra Tech EC, Inc. and submitted smears taken from the fencing to
4  the Tetra Tech EC, Inc. laboratory for radioactive analysis. The fixed radioactive survey readings
5  and the laboratory analysis of the smears submitted would not have permitted the fencing to be
6  free released. Tetra Tech EC, Inc. management and the management of New World
7  Environmental, Inc. directed Plaintiff Andrews to destroy the hand held surveys reports of the
8  fixed radioactive contamination that had results above free release levels. Tetra Tech EC, Inc.
9  management and management of New World Environmental, Inc. directed that the computer files
10  be deleted that contained any information of these survey results as well as the laboratory results
11  from the smears taken from the fencing. The destruction of the hand held survey reports, and the
12  destruction of the laboratory results was done so that Tetra Tech EC, Inc. could fraudulently
13  certify and imply that the fencing had not had survey readings and laboratory results above
14  releasable limits. The fencing was released without removal of the radioactive materials that had
15  caused the radioactive survey results above free release levels. Defendant Tetra Tech EC, Inc.
16  falsely certified and implied certification that all materials and equipment leaving Hunters Point
17  Naval Shipyard Radiologically Controlled Areas had been properly surveyed for radioactive
18  contamination and had not been allowed to leave Hunters Point with radioactive contamination
19  levels above established free release levels contrary to the rules, regulations, and protocols
20  required by MARSIMM and the contract between the United States Navy and Tetra Tech EC,
21  Inc. Defendant New World Environmental, Inc. and Defendant Tetra Tech EC, Inc. engaged in a
22  conspiracy to defraud the United States Navy by conspiring to deter RCT employees from
23  following the rules, regulations, and procedures for proper and effective radiological testing and
24  surveys, and by falsifying and destroying records material to the contract and to the payment
25  under the contract with the United States Navy. The fraudulent scheme to deter RCT employees
26  from following the rules, regulations, and procedures for proper and effective radiological testing
27  and surveys, and by falsifying and destroying records had a material effect in causing the contract
28  administration office of the United States Navy NAVFAC SW Division to authorize payment on

- 42 -

COMPLAINT

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  a monthly basis to Tetra Tech EC, Inc. for the invoices billed by New World Environmental, Inc.

2  and the monthly progress payments to Tetra Tech EC, Inc. The conduct of Defendant New

3  World Environmental, Inc. and Tetra Tech EC, Inc. violated 31 USC §3729(a)(1)(A), (B) and

4  (C).

5  63.  Relators, on behalf of the United States of America and the United States Navy

6  seek through this action 3 times damages, a civil penalty, prejudgment interest, attorney fees and

7  costs as provided for by 31 USC §3729(a)(1)(3) and §3730.

8  **FACTS AND CLAIM FOR RETALIATORY ACTIONS UNDER §3730 (h)**

9  64.  Plaintiffs incorporate by reference each of the preceding paragraphs as though

10  herein fully set forth.

11  65.  Plaintiff Jahr was a direct employee of Defendants NEW WORLD

12  ENVIRONMENTAL, INC. dba NEW WORLD TECHNOLOGY, INC., and was contracted to

13  work for and performed services for Tetra Tech EC, Inc. and Tetra Tech, Inc.. Defendants Tetra

14  Tech EC, Inc. and Tetra Tech, Inc. exerted extensive control and authority over the employment

15  of Plaintiff Jahr so as to be joint employers of Plaintiff Jahr. Defendant Tetra Tech EC, Inc. and

16  Tetra Tech, Inc. directed Defendant NEW WORLD ENVIRONMENTAL, INC. to terminate

17  Plaintiff Jahr due to the report Plaintiff Jahr made to a supervisor of Defendant Tetra Tech EC,

18  Inc. on August 19, 2010. Plaintiff Jahr was interviewed on August 20, 2010 by management of

19  Defendant New World Environmental, Inc. regarding the report Plaintiff Jahr made and fired

20  Plaintiff Jahr on August 20, 2010.

21  66.  On August 19, 2010 Plaintiff Art Jahr made a report to supervisors of Tetra Tech

22  EC, Inc., that reported and complained that other sub-contractor employees of New World

23  Environmental, Inc. were engaged in improper and unsafe work practices related to radioactive

24  remediation clean up, that one of the New World Environmental, Inc. employees performing

25  supervisory services, Jane Taylor, was knowingly hired and sent to work for Tetra Tech, EC, Inc.

26  by New World Environmental, Inc. based on a false resumé and Ms. Taylor did not have the

27  extensive radiological remediation background listed on her false resumé, and that unskilled non-

28  RCT laborers were performing radioactive remediation services in an unsafe and improper

- 43 -

COMPLAINT

1  or responsibility in fraud detection, investigation or reporting, and as such was not a fraud alert

2  employee. Plaintiff Jahr's report to the supervisors of Tetra Tech EC, Inc. and New World

3  Environment, Inc. expressed concern to these employers that that there was a likelihood that there

4  was fraud against the government in the hire, and use of Jane Taylor as well as fraud in the

5  manner in which Jane Taylor and those she supervised performed the work functions on behalf of

6  the United States Navy contrary to the terms and conditions of the contract with the United States

7  Navy.

8  69.     Plaintiff Bowers at relevant times was a direct employee of Tetra Tech EC, Inc.

9  and Tetra Tech, Inc., and was the Radiological Safety Officer Representative responsible for

10  radiological remediation being performed under the Tetra Tech EC, Inc. and Tetra Tech, Inc.

11  Nuclear Regulatory Commission license at the Hunters Point Shipyard in a safe and effective

12  manner, in compliance with regulations and rules from the Nuclear Regulatory Commission, and

13  under the rules and regulations imposed by the United States Navy pursuant to the contract

14  between the United States Navy and Tetra Tech EC, Inc. Plaintiff Bowers worked under the

15  direction of off-site Radiological Safety Officer Erik Abkemeier.

16  70.     During Bowers' employment with Defendants Tetra Tech EC, Inc., Bowers raised

17  numerous reports of health and safety violations of the United States Navy rules and regulations

18  including issues with radiological compliance. Defendants' management grew progressively

19  more resistant in 2010 to compliance with following the United States Navy rules, regulations and

20  protocols that resulted in decreased profits. In late December of 2010, Tetra Tech EC, Inc. had a

21  shutdown period over the holidays in which all radiological remediation workers were given

22  leave. The portal monitor was shut down and packed away during the shutdown period. During

23  the shutdown period, without Plaintiff Bowers' knowledge, Tetra Tech EC, Inc. arranged for and

24  permitted two Baker Tanks loaded with chemical and liquid wastes from a Radiologically

25  Controlled Area, and a 40 yard roll off garbage bin containing metal debris that had been

26  involved in an earlier fire at a Radiologically Controlled Area to be removed from Hunters Point

27  Naval Shipyard during the shutdown period. These vehicles and the loads were not processed

28  pursuant to the United States Navy procedures and requirements, and were not subjected to portal

- 45 -

monitor screening, nor screening upon leaving the Hunters Point Shipyard by RCT radiation remediation safety and oversight specialists contrary to the rules and directives under the contract with the United States Navy. Management of Tetra Tech EC, Inc. was informed of the violation by Radiation Safety Office Representative Bert Bowers related to the processing and removal of the Baker Tanks and the 40 yard roll off garbage bin containing metal debris. Plaintiff Bowers urged Tetra Tech EC, Inc. to notify the United States Navy Radiological Affairs Support Office of the failure to follow protocol and procedures regarding the Baker Tanks and the 40 yard metal debris box, by contact with his supervisor Radiological Safety Officer Erik Abkemeier and other management of Tetra Tech EC, Inc. On information and belief it is alleged that Tetra Tech EC, Inc. did not disclose the violation of procedures, protocols, and requirements imposed by the United States Navy regarding the release of potentially radioactive materials from Hunters Point Naval Shipyard, and the failure to screen all trucks and their loads through the portal monitor. On information and belief it is alleged that Tetra Tech EC, Inc. falsely certified and implied certification to the United States Navy that both shipments leaving the Hunters Point Naval Shipyard had been properly screened, evaluated, and approved for removal from the Hunters Point Naval Shipyard when that certification was knowingly false and fraudulent. The information upon which this information and belief is based is that although Plaintiff Bowers continued employment with Tetra Tech EC, Inc. and contact with United States Navy and RASO remained open, as well as reports made to United States Nuclear Regulatory Commission offices, no disclosure by Tetra Tech EC, Inc. to RASO or the United States Navy of these incidents was made. The failure to disclose the violation of the rules and procedures under the contract by Tetra Tech EC, Inc. was part of a fraudulent scheme to not disclose violations so that the requests for periodic progress payments to the contract administration office of the United States Navy NAVFAC SW Division to authorize payment on a monthly basis to Tetra Tech EC, Inc. would not be adversely impacted, although Tetra Tech Ec. Inc. had expressly undertaken an agreement to follow the portal monitor procedures and had also expressly agreed to comply with the rules and regulations to inform the United States Navy of any failures to comply with those rules and procedures.

- 46 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

71.     On or about late December of 2010 during the Hunters Point shut down period, rain caused flooding of Radiologically Controlled Areas of Hunters Point. Tetra Tech EC, Inc. did not control the flooding in the Radiologically Controlled Areas during the shutdown period, and potentially radioactive contaminated flood waters flowed into San Francisco Bay. Plaintiff Bowers reported the flooding of the Radiologically Controlled Areas to management of Hunters Point as required by protocol so that Tetra Tech EC, Inc. management could report to the Navy RASO offices the uncontrolled release of potentially radioactive contaminated flood waters from Radiologically Controlled Areas of Hunters Point into San Francisco Bay. On information and belief it is alleged that Tetra Tech EC, Inc. did not disclose the uncontrolled release of potentially radioactive contaminated flood waters into San Francisco Bay to RASO in violation of procedures, protocols, and reporting requirements imposed by the United States Navy. On information and belief it is alleged that Tetra Tech EC, Inc. falsely certified and implied certification to the United States Navy that all liquid, including rain water, was properly controlled from Radiologically Controlled Areas and not allowed to flow into San Francisco Bay. The information upon which this information and belief is based is that although Plaintiff Bowers continued employment with Tetra Tech EC, Inc. and contact with United States Navy and RASO remained open, as well as reports made to United States Nuclear Regulatory Commission offices, no disclosure by Tetra Tech EC, Inc. to RASO or the United States Navy of the uncontrolled flooding of Radiologically Controlled Areas in December of 2010 was made. The failure to disclose the uncontrolled flooding was a violation of the rules and procedures under the contract by Tetra Tech EC, Inc. was part of a fraudulent scheme to not disclose violations so that the requests for periodic progress payments to the contract administration office of the United States Navy NAVFAC SW Division to authorize payment on a monthly basis to Tetra Tech EC, Inc. would not be adversely impacted, although Tetra Tech Ec. Inc. had expressly undertaken an agreement to control all liquids in Radiologically Controlled Areas and to report and uncontrolled and unapproved release of water from such areas into San Francisco Bay.

72.     On or about January 12-13, 2011 Bowers reported to management of Tetra Tech EC, Inc. and Tetra Tech, Inc., conduct that Bowers reasonably and in good faith believed was

- 47 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1  contrary to the rules and regulations imposed by the contract between Tetra Tech EC, Inc. and the

2  United States Navy regarding access to radiologically controlled areas at Hunters Point.

3  Management of Tetra Tech EC, Inc. and Tetra Tech, Inc. disputed Bowers conclusions. Bowers

4  advised management of Tetra Tech EC, Inc. and Tetra Tech, Inc. that he would have to report the

5  conduct that Bowers believed violated rules, regulations, and the contract to the United States

6  Navy and to the Nuclear Regulatory Commission. Upon advising Tetra Tech EC, Inc. and Tetra

7  Tech, Inc. that Bowers would report the conduct to the United States government, Defendants

8  Tetra Tech EC, Inc. and Tetra Tech, Inc., discriminated against Plaintiff Bowers and subjected

9  Bowers to adverse actions. Defendants Tetra Tech EC, Inc. and Tetra Tech, Inc. initially

10  subjected Bowers to adverse employment action by transferring Bowers to the Alameda Naval

11  Station remediation project in a demoted position. Less than two months thereafter, Tetra Tech

12  EC, Inc. and Tetra Tech, Inc. subjected Bowers to further adverse employment action by

13  removing Bowers from active employment as of April 1, 2011.

14      73.    Upon removing Bowers from active employment as of April 1, 2011, Defendants

15  Tetra Tech EC, Inc. and Tetra Tech, Inc. stated and committed to Plaintiff Bowers that he would

16  be assigned to radiological positions that become available. On or about May 17, 2011, Plaintiff

17  Bowers appeared before a government agency as a supporter and witness in support of Plaintiff

18  Jahr's report that Tetra Tech EC, Inc. engaged in fraud in the hire and use of Jane Taylor contrary

19  to the rules and regulations of the United States Navy. The hearing was conducted by the

20  California Retaliation Unit of the California Labor Commissioner's office. Plaintiff Bowers had

21  also during that time met with investigators for the United States Nuclear Regulatory Commission

22  which was disclosed and known to Tetra Tech EC, Inc. Due to Bowers' objections to Tetra Tech

23  EC, Inc. and later reporting to the federal government his good faith belief that the conduct of

24  Defendants violated the rules and regulations imposed by the contract with the United States

25  Navy, and Bowers' support of the complaint by Plaintiff Jahr that Tetra Tech EC, Inc. was

26  defrauding the United States Navy by using Jane Taylor as a Senior RCT, Defendants Tetra Tech

27  EC, Inc. and Tetra Tech, Inc. failed and refused to select Bowers for open and available

28  radiological positions, including positions that reported to his prior supervisor Radiological

- 48 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1    Safety Officer Erik Abkemeier thereafter as adverse employment actions. The conduct of

2    Defendant Tetra Tech EC, Inc. and Tetra Tech Inc. are retaliatory actions against Plaintiff Bowers

3    in violation of 31 USC §3730(h).

4    74.    Plaintiff Andrews at all relevant times was a direct employee of ALEUT WORLD

5    SOLUTIONS, who was contracted to work for and performed services for Tetra Tech EC, Inc.

6    and Tetra Tech, Inc. Defendants Tetra Tech EC, Inc. and Tetra Tech, Inc. directed that

7    Defendants ALEUT WORLD SOLUTIONS terminate Plaintiff Andrews following Andrews'

8    reports to Tetra Tech EC, Inc. and Tetra Tech, Inc., supervisory staff of the unsafe, hazardous,

9    and improper practices relating to remediation of hazardous waste, including radioactive material,

10   that were in violation of the rules and procedures pursuant to the contract between the United

11   States Navy and Tetra Tech EC, Inc., and upon Andrews meeting with and supporting the report

12   of fraud by Tetra Tech EC, Inc. made by Plaintiff Art Jahr and supported and added to by

13   Plaintiff Bert Bowers to investigators of the United States Nuclear Regulatory Commission, and

14   the California Department of Labor. Andrews was subjected to adverse action of termination on

15   December 16, 2011 by Defendant ALEUT WORLD SOLUTIONS at the direction of Tetra Tech

16   EC, Inc. and Tetra Tech, Inc. due to her protected conduct of reporting to government agencies

17   and supporting before those government agencies the reports made by Plaintiff Jahr and Plaintiff

18   Bowers that could reasonably lead to a False Claims action and their efforts to stop one or more

19   violations of the False Claims Act, and due to her reports to Tetra Tech EC, Inc. in an effort to

20   stop one or more violations of the False Claims Act. On information and belief, it is alleged that

21   Tetra Tech EC, Inc. and Tetra Tech, Inc. have failed and refused to permit the hire and use of

22   Plaintiff Andrews by Radiological Survey & Remediation Services, LLC and by The Shaw

23   Group, Inc. as an RCT at Hunters Point Shipyard under their sub-contracts with Defendants Tetra

24   Tech EC, Inc. and Tetra Tech, Inc., and other locations as further adverse employment retaliation

25   despite her qualifications due to Andrews protected activity. The conduct of Defendant Tetra

26   Tech EC, Inc. and Tetra Tech Inc. are retaliatory actions against Plaintiff Andrews in violation of

27   31 USC §3730(h).

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 49 -

1    75.    Plaintiff Jackson at all relevant times was a direct employee of ALEUT WORLD

2    SOLUTIONS, who was contracted to work for and performed services for Tetra Tech EC, Inc.

3    and Tetra Tech, Inc.. Defendants Tetra Tech EC, Inc. and Tetra Tech, Inc. directed that

4    Defendants ALEUT WORLD SOLUTIONS terminate Plaintiff Jackson following Jackson's

5    reports to Tetra Tech EC, Inc. and Tetra Tech, Inc. supervisory staff, and the supervisory staff of

6    the subcontractors of these Defendants, that the employment and use of Jane Taylor was a fraud

7    and was a violation of rules with the Navy contract, and that Tetra Tech EC, Inc. engaged in

8    unsafe, hazardous, and improper practices relating to remediation of hazardous waste, including

9    radioactive material, that was contrary to the rules and procedures established under the contract

10   with the United States Navy. Jackson was subjected to the adverse action of termination on

11   December 16, 2011 by Defendant ALEUT WORLD SOLUTIONS at the direction of Tetra Tech

12   EC, Inc. and Tetra Tech, Inc. due to his protected conduct of reporting fraud against the United

13   States Navy, and reporting the unsafe, hazardous, and improper practices relating to remediation

14   of hazardous materials, including radioactive material contrary to the rules and regulations related

15   to the contract between the United States Navy and Tetra Tech EC, Inc. On information and

16   belief, it is alleged that Tetra Tech EC, Inc. and Tetra Tech, Inc. have failed and refused to permit

17   the hire and use of Plaintiff Jackson by Radiological Survey & Remediation Services, LLC and

18   by The Shaw Group, Inc. as an RCT at Hunters Point Shipyard and other locations under their

19   sub-contracts with Defendants Tetra Tech EC, Inc. and Tetra Tech, Inc., as further adverse

20   employment retaliation despite his qualifications due to Jackson's protected activity of reporting

21   and disclosing information to government agencies the unsafe, hazardous, and improper practices

22   relating to remediation of hazardous waste, including radioactive material by Tetra Tech EC, Inc.,

23   and Tetra Tech, Inc., and their subcontractors, that violate the rules and procedures under the

24   contract with the Navy, and due to his acting as a supporting witness for Plaintiff Jahr and

25   Plaintiff Bowers in actions which could lead to an action under the False Claims Act as well as

26   efforts to stop one or more violations under the False Claims Act. The conduct of Defendant

27   Tetra Tech EC, Inc. and Tetra Tech Inc. are retaliatory actions against Plaintiff Jackson in

28   violation of 31 USC §3730(h).

- 50 -

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

peripheral text

## DAMAGES TO PLAINTIFFS – RETALIATORY ACTIONS IN VIOLATION OF 31 USC §3730(h)

76.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint.

77.     As a result of the adverse actions of Defendants, Plaintiffs have sustained and will continue to sustain loss of income and loss of benefits.  Plaintiffs have also suffered and will suffer damage to their careers and reputations in amounts according to proof.  Pursuant to 31 USC §3730(h)(2) Plaintiffs pray for two times the amount of back pay, and interest on the back pay. Plaintiffs seek reinstatement, and if reinstatement is not directed, future lost wages and benefits according to proof.

78.     As a further result, Plaintiffs suffer and continue to suffer emotional distress in an amount according to proof.

79.     Plaintiffs were required to retain counsel and are entitled to reasonable attorneys' fees and litigation costs.

80.     Plaintiffs seek all civil penalties and statutory remedies to which they are entitled.

81.     The acts of Defendants, and each of them, were willful, reckless, malicious, and oppressive or done with a conscious disregard for the rights of Plaintiffs.  Plaintiffs pray for an award of punitive damages according to proof.

### PRAYER FOR RELIEF ON RETALIATION CLAIM

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows.

1.   For compensatory and economic damages according to proof and as provided for by law;

2.   For general damages according to proof;

3.   For an award of prejudgment interest at the legal rate according to proof;

4.   For an award of punitive and exemplary damages;

1      5.  For an award of attorneys' fees and costs as permitted by law;

2      6.  For reinstatement;

3      7.  For other and further relief as the Court may deem just, necessary and appropriate.

4  Dated: August 19, 2013

5                           **SCOTT LAW FIRM &**
                         **LAW OFFICE OF DAVID C. ANTON**

6

7                  By:

8                         John Houston Scott
                       David C. Anton

9                         Attorneys for Plaintiffs

10

11  **JURY TRIAL DEMAND**

12  A jury trial is demanded on all issues of fact.

13  Dated: August 19, 2013

14

15                  By:

16                         John Houston Scott
                       David C. Anton

17                         Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109