JOSEPH H. HUNT
Assistant Attorney General

DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
MICHAEL T. PYLE (CABN 172954)
KIRSTIN AULT (CABN 206052)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5087
FAX: (408) 535-5081
Email: michael.t.pyle@usdoj.gov

MICHAEL GRANSTON
MICHAL TINGLE
ROBERT CHANDLER
PATRICK KLEIN
Attorneys
Civil Division
United States Department of Justice
        P.O. Box 261
        Ben Franklin Station
        Washington, D.C. 20044
        Telephone: (202) 514-4678
        robert.chandler@usdoj.gov

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. ARTHUR R. JAHR, III, et al., ANTHONY SMITH, & DONALD K. WADSWORTH et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TETRA TECH EC, INC.<br><br>Defendant. | CASE NO: 3:13-CV-3835 JD<br><br>RELATED ACTIONS: 3:16-CV-1106 JD<br>　　　　　　　　　　3:16-CV-1107 JD<br><br>**UNITED STATES' FIRST AMENDED COMPLAINT IN INTERVENTION AGAINST TETRA TECH EC, INC.**<br><br>**DEMAND FOR JURY TRIAL** |

For its Complaint in Intervention against Tetra Tech EC, Inc., the United States of America alleges as follows:

## I.  NATURE OF ACTION

1.   The United States brings this action against Tetra Tech EC, Inc. ("Tetra Tech EC") to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law theory of breach of contract.

2.   This action concerns Tetra Tech EC's submission of false claims under contracts with the United States Navy to provide radiological remediation services at the Hunters Point Naval Shipyard ("Hunters Point") in San Francisco, California.

3.   Hunters Point was established as a commercial shipyard in 1870.  The Navy operated the shipyard from 1940 to 1974 and, during that time, it used Hunters Point to house the Naval Radiological Defense Laboratory and to decontaminate ships.  In 1989, Hunters Point was placed on the National Priorities List (NPL) under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), requiring a long-term cleanup plan.  In 1991, the Base Realignment and Closure Commission (BRAC) recommended Hunters Point for closure.  The Navy has agreed to convey Hunters Point on a parcel-by-parcel basis to the City and County of San Francisco for local reuse as the environmental cleanup is completed.

4.   From 2003 through 2014, Tetra Tech EC and certain of its predecessor companies (collectively, "Tetra Tech") entered into a series of contracts with the United States Navy to provide radiological remediation services at Hunters Point.  These contracts required Tetra Tech, among other things, to investigate radiological contamination of soil and buildings, remediate and remove waste as necessary, and provide status reports to the Navy documenting its activities to support the redevelopment of radiologically impacted sites and buildings at Hunters Point for non-military use.  The objective of these contracts was to achieve "free-release" of radiologically impacted areas by testing soil and buildings in those areas, and remediating as necessary, until test results demonstrated that radiation levels were below applicable release criteria and regulatory limits.  Pursuant to its agreement with the City and County of San Francisco, the Navy must complete the radiological remediation of Hunters Point before it can transfer the property to the City and County for redevelopment.  The Navy awarded

UNITED STATES' FIRST AMENDED COMPLAINT IN INTERVENTION AGAINST TETRA TECH EC, INC.
3:13-CV-3835 JD; 3:16-CV-1106 JD; 3:16-CV-1107 JD                                                                2

contracts to Tetra Tech to perform these services at certain areas of Hunters Point designated as Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and 3.[1]   The following map depicts the Parcels of Hunters Point, including those where Tetra Tech was to perform radiological remediation:



5.   As detailed below, Tetra Tech violated the False Claims Act and breached its contracts with the Navy by: (1) misrepresenting the source of soil samples submitted to the laboratory for testing; (2) manipulating data from radiological testing of buildings; and (3) reporting false results from the radiological soil and building tests.  Tetra Tech submitted false claims to the Navy for this work as if it

[1] The Navy awarded contracts to other contractors to perform testing and remediation in the other parcels of Hunters Point.

was properly performed when it was not.  The Navy relied on Tetra Tech's misrepresentations in concluding that the remediation of radiologically-impacted areas at Hunters Point was complete and made payments to Tetra Tech based on these material misrepresentations.

6.   During the period between at least June 2006 and January 2018, Tetra Tech submitted, or caused to be submitted, materially false claims to the Navy for fraudulent testing and reporting at Hunters Point, and made, or caused to be made, material false statements to the Navy in connection with the fraudulent testing and reporting.  In addition, Tetra Tech breached contracts with the Navy, causing disruption, uncertainty, and delays in the remediation and transfer of parcels of land at Hunters Point. Tetra Tech's conduct caused the United States to incur substantial additional costs, the magnitude of which is still increasing.

## II.  JURISDICTION AND VENUE

7.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a), and 31 U.S.C. § 3732.  The Court may exercise personal jurisdiction over Tetra Tech pursuant to 31 U.S.C. § 3732(a) because Tetra Tech transacts business in this District.

8.   Venue is proper in the Northern District of California under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Tetra Tech transacts business in this District.

## III.  PARTIES

9.   The United States brings this action on behalf of the Department of the Navy.

10. Tetra Tech EC, Inc. is a wholly-owned subsidiary of Tetra Tech Inc., with its principal place of business in Morris Plains, New Jersey.  At all times relevant to this complaint, Tetra Tech EC, Inc., and its predecessor companies, was a company providing remediation and construction services worldwide, including services in this District to the federal government.  Tetra Tech's predecessor companies include Foster Wheeler Environmental Corporation and Tetra Tech FW Inc.  Upon information and belief, Tetra Tech EC assumed all liabilities of its predecessor companies.

## IV.  THE FALSE CLAIMS ACT

11. The False Claims Act, 31 U.S.C. §§ 3729-33, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21 (May 20, 2009), provides, in pertinent part, that:

[A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410),    plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

12. Prior to the enactment of the Fraud Enforcement and Recovery Act of 2009, the False Claims Act provided, in pertinent part, that:

Any person who –

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

Is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

13. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 per false claim for violations occurring on or after September 29, 1999.  The penalty range was increased to $10,781 to $21,563 effective August 1, 2016, for violations occurring on or after November 2, 2015.  81 Fed. Reg 42491, 42494 (2016).

14. The False Claims Act defines "knowing" and "knowingly" as follows:

[T]he terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

    (i)      has actual knowledge of the information;

    (ii)     acts in deliberate ignorance of the truth or falsity of the information; or

    (iii)    acts in reckless disregard of the truth or falsity of the information;  and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

## V.  FACTUAL ALLEGATIONS

### A.  Radiological History of Hunters Point

15. Hunters Point is located in southeast San Francisco on a peninsula that extends east into the San Francisco Bay.  A subsidiary of the Bethlehem Steel Company operated it as a drydock facility for commercial and military ship maintenance and repair from 1868 until 1939, when the Navy purchased it.  On December 18, 1941, eleven days after the United States entered World War II, the Navy took full control of Hunters Point.  To support the war effort, the Navy constructed numerous buildings, and excavated surrounding hills to expand the shoreline into the Bay.  After World War II ended, the Navy used Hunters Point's expansive berthing facilities for reserve fleet ships returning from the Pacific.

16. Shipyard operations by the Navy involved the use of general radioactive material.  Such operations included refurbishment and handling of radioluminescent devices and paint, gamma radiography, calibration laboratory operations to ensure the accuracy of radiological survey instruments, and decontamination of ships (including ships returning from Operation Crossroads -- atomic weapons testing in the Bikini Atoll in the Marshall Islands).  In addition, in 1946, the Navy established at Hunters Point a laboratory that eventually became the Naval Radiological Defense Laboratory ("Defense Lab").  The Defense Lab, which occupied up to 20 buildings at Hunters Point, was a center for research into decontamination and the effects of fallout and radiation on living organisms and on natural and synthetic materials.  The Defense Lab used a large number of radionuclides, as well as machines that generated radiation and charged particles.  The Navy closed the Defense Lab in 1969.  The Navy also used Hunters Point's berthing and drydocking facilities for the maintenance and repair of nuclear-powered ships.

17. The Navy ceased operating Hunters Point as a Naval shipyard in 1974.  From 1974 to 1986, the Navy leased facilities at Hunters Point to private tenants.  The Navy resumed operation of the shipyard in 1986, when Hunters Point was designated as an annex to Naval Station Treasure Island. Shipyard operations were permanently terminated on December 29, 1989.  In 1991, Hunters Point was identified for closure and reuse pursuant to the Base Realignment and Closure Act of 1988.  On January 21, 1994, the Navy and the City and County of San Francisco executed a memorandum of understanding establishing a process for the transfer of Hunters Point to the City and County of San Francisco for redevelopment.

18. In 1989, the United States Environmental Protection Agency (EPA) placed Hunters Point on the National Priorities List of Superfund sites pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), which required the Navy to conduct a preliminary assessment of contamination of the property.[2]  Accordingly, the Navy conducted and published a two-volume Historical Radiological Assessment (HRA).  Volume II, entitled *Final Historical Radiological Assessment, History of the Use of General Radioactive Materials, 1939 – 2003,* was published in August 2004.  It concluded that low levels of radioactive contamination existed within Hunters Point, and identified impacted sites for further investigation and remediation.

19. On January 22, 1992, the Navy, the EPA, and the State of California entered into a Federal Facility Agreement (FFA) for Hunters Point.  The FFA has a general purpose of ensuring that environmental impacts associated with activities at Hunters Point "are thoroughly investigated and appropriate remedial action taken as necessary to protect the public health, welfare, and the environment."  The FFA establishes a framework for developing, implementing and monitoring environmental response actions at Hunters Point and, in so doing, describes the roles the EPA and the California Department of Toxic Substances Control (DTSC) play in the radiological testing and remediation of Hunters Point.  The California Department of Public Health (CDPH) plays a role, as well, with signatory DTSC.  As discussed below, the Navy has had, and must continue to have,

---

[2] Parcel A of Hunters Point was removed from the National Priorities List in February 1999, and transferred to the City and County of San Francisco in December 2004.

1   concurrence from these agencies to move forward with plans and activities for the radiological testing

2   and remediation of Hunters Point.

3       20. On April 21, 2006, the Navy published the *Final Basewide Radiological Removal Action*

4   *Memorandum-Revision 2006, Hunters Point Shipyard, San Francisco, California* ("2006 Action

5   Memo").  The purpose of the 2006 Action Memo was to document for the administrative record the

6   Navy's "decision to undertake time-critical removal actions (TCRAs), at areas throughout the base that

7   may contain localized radioactive contamination in soils, debris/slag, and buildings [at Hunters Point],

8   as identified in [the HRA]."  Attached as Table 1 to the 2006 Action Memo were the "release criteria."

9   The release criteria established the cleanup goals for each radionuclide of concern for soil, surfaces, and

10  water.  The 2006 Action Memo prescribed that "[b]efore initiating a removal action per this [Action

11  Memo], the area being considered will be characterized using real-time radiation detection devices or

12  soil sampling and analysis."

13      21. Several radiological investigations and radiological removal actions have been conducted at

14  Hunters Point since the facility was placed on the NPL.  As discussed below, the Navy awarded several

15  contracts to Tetra Tech to perform these investigations and removal actions.

16      **B.  Contracts Awarded to Tetra Tech for Radiological Remediation at Hunters Point**

17      22. In order to conduct the necessary radiological investigation and remediation at Hunters Point,

18  the Navy solicited proposals from contractors pursuant to several Environmental Multiple Award

19  Contracts for Environmental Remediation Services for Radiological Contaminants.  As discussed below,

20  the Navy awarded several contracts (called "task orders") to Tetra Tech for the radiological investigation

21  and remediation of radiologically-impacted sites throughout Hunters Point.

22      23. The objective of the task orders was to achieve "free release" of the radiologically-impacted

23  areas at Hunters Point so that the Navy could transfer the property to the City and County of San

24  Francisco for redevelopment.  The HRA defines "free release" as a recommendation made after

25  investigations and surveys indicate all applicable release criteria have been met and the site is ready for

26  review by Navy and regulatory agencies for future non-radiological use.  The release criteria for each

27  radionuclide of concern for surfaces, soil and water, is set forth in Table 1 to the 2006 Action Memo and

28  incorporated by reference into each of the relevant task orders.

24. The task orders required the radiological investigation and remediation to be accomplished through testing and analysis of soil samples, and the scanning of building surfaces with radiological detection instruments.  Soil samples and radiological readings of building surfaces were conducted within designated "survey units," which are measured areas throughout Hunters Point.  Task orders awarded to Tetra Tech included both cost plus award fee contracts and firm fixed price contracts.

25. Tetra Tech was required by each task order to prepare Task-Specific Plans (TSPs) and/or Execution Plans as well as other work plan documents.  TSPs and Execution Plans detail the specific work plan for conducting soil samples and radiological surveys of building surfaces, as well as the standards applicable to the work.  Each TSP and Execution Plan was prepared by Tetra Tech, and approved by the Navy, with concurrence by the EPA, DTSC and CDPH.

**(1) Cost Plus Award Fee Contracts**

26. The cost plus award fee contracts awarded to Tetra Tech obligated the Navy to pay Tetra Tech its allowable costs for providing the services described in the scope of work, plus a discretionary award fee, up to a maximum amount.  Cost plus award fee contracts allow the payment of an award fee, based on a judgmental evaluation by the government, sufficient to provide motivation for excellence in contract performance.  *See* Federal Acquisition Regulation (FAR) § 16.305.  A contractor may earn an award fee if its overall cost, schedule, and technical performance is satisfactory.  FAR § 16.401.  For each of the cost plus award fee contracts identified below, Tetra Tech submitted progress reports and vouchers for its costs and fees.  A government official certified the vouchers for payment in reliance on Tetra Tech's representations.

27. On March 23, 2003, the Navy awarded contract number N68711-98-D-5713, task order 0072 ("Task Order 5713-0072"), to Foster Wheeler Environmental Corporation, a predecessor company of Tetra Tech EC, Inc.  The Navy's purpose in awarding Task Order 5713-0072 was to acquire radiological sampling and remediation services for Hunters Point.  Services required under Task Order 5713-0072 included radiological surveys and remedial activities of buildings, former building sites, sewer and drain systems, fill, and surrounding areas in Parcels C, D, and E of Hunters Point.  Task Order 5713-0072 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its allowable costs for providing

1  the required services, plus a discretionary award fee, not to exceed the maximum cost plus fee of

2  $31,397,209.  After 52 contract modifications, the total contract value awarded was $83,721,008.

3      28. On February 13, 2004, the Navy awarded contract number N68711-98-D-5713, task order

4  0084 ("Task Order 5713-0084"), to Tetra Tech FW Inc., a predecessor company of Tetra Tech EC, Inc.

5  The objective of Task Order 5713-0084 was to excavate and dispose of anthropogenic polychlorinated

6  biphenyl ("PCB") soil contamination from a PCB Excavation Site in Parcel E of Hunters Point.

7  Because low-level radiation was expected to be present in the soil, radiation screening of the soil was

8  also required.  Task Order 5713-0084 was a cost plus award fee contract that obligated the Navy to pay

9  Tetra Tech its allowable costs for providing the required services, plus a discretionary award fee, not to

10 exceed the maximum cost plus fee of $1,368,238.  After 27 contract modifications, the total contract

11 value awarded was $10,248,848.

12     29. On March 28, 2006, the Navy awarded contract number N62473-06-D-2201, task order 006

13 ("Task Order 2201-006") to Tetra Tech EC, Inc.  The scope of work in Task Order 2201-006 required

14 Tetra Tech to perform radiological investigation and remediation to address radiologically-impacted

15 sites in Parcel B and one building in Parcel D.  The primary objective of Task Order 2201-006 was for

16 Tetra Tech EC, Inc. to complete all radiological work for each radiologically-impacted site in Parcel B

17 that was identified in the HRA, and to provide general base-wide radiological support services.  Task

18 Order 2201-006 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its

19 allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum

20 cost plus fee of $17,485,300.  Task Order 2201-006 included an option to increase the costs by

21 $2,351,058 and the fee by $213,728.  After 13 contract modifications, the total contract value awarded

22 was $32,742,848.

23     30. On December 18, 2006, the Navy awarded contract number N44255-01-D-2000, task order

24 0070 ("Task Order 2000-0070"), to Tetra Tech EC, Inc.  The primary objective of Task Order 2000-

25 0070 was for Tetra Tech EC, Inc. to complete all radiological work for each radiologically-impacted site

26 in Parcel D that was identified in the HRA, and some unfinished work in Parcel B.  The task order

27 required Tetra Tech to perform surveys and remediation of buildings, a pier, and sanitary sewer and

28 storm drain sites.  Task Order 2000-0070 was a cost plus award fee task order.  The task order obligated

the Navy to pay Tetra Tech its allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $14,990,147.  After eight contract modifications, the total contract value awarded was $22,523,715.

31. On April 20, 2009, the Navy awarded contract number N62473-07-D-3211, task order 0018 ("Task Order 3211-0018"), to Tetra Tech EC, Inc.  The objective of Task Order 3211-0018 was for Tetra Tech to provide base-wide support to contractors performing chemical and radiological removal and remediation at Hunters Point.  Tetra Tech was required to maintain on-site laboratory services to test survey samples for radionuclides of concern, and to operate a Radiological Screening Yard to support radiological removal actions and investigations being performed under different task orders.  Task Order 3211-0018 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $13,882,869.  After 12 contract modifications, the total contract value awarded was $19,126,849.

32. On June 3, 2009, the Navy awarded contract number N62473-07-D-3211, task order 0019 ("Task Order 3211-0019"), to Tetra Tech EC, Inc.  The primary objective of Task Order 3211-19 was for Tetra Tech to complete specified radiological remediation and surveys at remaining Parcel B sanitary sewer and storm drain sites.  Task Order 3211-0019 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $884,716.  After five contract modifications, the total contract value awarded was $876,764.

**(2) Fixed Price Contract Awards**

33. The firm fixed price contracts awarded to Tetra Tech obligated the Navy to pay a maximum fixed amount for the services required under the contracts, regardless of Tetra Tech's costs.  Firm fixed price contracts place upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.  *See* FAR § 16.202-1.  Firm fixed price contracts provide maximum incentive for the contractor to control costs and perform effectively, and impose a minimum administrative burden on the contracting parties.  *Id*.  For each of the firm fixed price contracts awarded to Tetra Tech identified below, Tetra Tech submitted monthly progress reports and invoices based on the percentage of work

1   completed.  Tetra Tech certified the invoices for payment, and government officials authorized payment

2   to Tetra Tech in reliance on Tetra Tech's representations.

3       34. On September 4, 2008, the Navy awarded contract number N62473-08-D-8823, task order

4   002 ("Task Order 8823-002"), to Tetra Tech EC, Inc.  The primary objective of Task Order 8823-002

5   was to remove and remediate sewer and storm drain lines along Fisher and Spear Avenues.  Task Order

6   8823-002 required Tetra Tech to remove, survey, remediate, clear, and dispose of appropriately all

7   sewer and storm drain systems, including the peripheral soil, in these two areas in order to attain free

8   release.  Task Order 8823-002 was a firm fixed price task order that obligated the Navy to pay Tetra

9   Tech a maximum fixed amount of $6,343,703 for providing the services required under the contract,

10  regardless of Tetra Tech's costs.  After six contract modifications, the total contract value awarded was

11  $7,033,848.

12      35. On September 21, 2009, the Navy awarded contract number N62473-08-D-8823, task order

13  003 ("Task Order 8823-003"), to Tetra Tech EC, Inc.  Task Order 8823-003 addressed the

14  recommendations in the HRA for the radiologically-impacted sites in Parcel E, specifically focusing on

15  sanitary sewer and storm drain lines along Crisp Road, and radiologically-impacted buildings and sites

16  in the central portion of Parcel E.  The primary objective of the solicitation was to achieve unrestricted

17  free release of the sewer and storm line survey units along Crisp Road and the central areas of Parcel E.

18  Additional work required by Task Order 8823-003 included surveys, remediation, and reporting for

19  certain radiological buildings and sites in Parcel E.  Task Order 8823-003 was a firm fixed price contract

20  that obligated the Navy to pay Tetra Tech a maximum fixed amount of $13,070,672 for providing the

21  services required under the contract, regardless of Tetra Tech's costs.  After five contract modifications,

22  the total contract value awarded was $13,019,641.

23      36. On June 23, 2010, the Navy awarded contract number N62473-10-D-0809, task order 002

24  ("Task Order 0809-002"), to Defendant Tetra Tech EC, Inc.  The focus of Task Order 0809-002 was

25  Parcel C.  The primary objective of the scope of work in Task Order 0809-002 was to achieve free

26  release of Buildings 203, 214, 241, 271, and 272, and unrestricted free release of the sewer and storm

27  drain survey units in Parcel C.  Task Order 0809-002 was a firm fixed price contract that obligated the

28  Navy to pay Tetra Tech a maximum fixed amount of $11,494,845 for providing the services required

1 under the contract, regardless of Tetra Tech's costs.  After nine contract modifications, the total contract

2 value awarded was $12,082,759.

3       37. On September 9, 2010, the Navy awarded contract number N62473-10-D-0809, task order

4 0004 ("Task Order 0809-0004"), to Defendant Tetra Tech EC, Inc.  Task Order 0809-0004 obligated

5 Tetra Tech to provide base-wide radiological support to enable contractors to complete radiological

6 removal and remediation work at Hunters Point, including the operation of radiological screening yards

7 that accepted and processed radiologically impacted soil from the removal of storm and sanitary sewers,

8 and the performance of routine surveys of radiologically impacted buildings and sites.  Task Order

9 0809-0004 was a firm fixed price contract.  The contract obligated the Navy to pay Tetra Tech a

10 maximum fixed amount of $14,040,521 for the services required under the contract, regardless of Tetra

11 Tech's costs.  After 10 contract modifications, the total contract value awarded was $24,843,771.

12       38. On September 22, 2010, the Navy awarded contract number N62473-10-D-0809, task order

13 007 ("Task Order 0809-007"), to Tetra Tech EC, Inc.  The solicitation for Task Order 0809-007 was for

14 radiological remediation and support for the 500 series area of Parcel E.  The objective was to achieve

15 free release of sewer and storm drain survey units, buildings, building sites, and the 500 series site of

16 Parcel E.  Task Order 0809-007 was a firm fixed price contract that obligated the Navy to pay Tetra

17 Tech a maximum fixed amount of $9,984,979 for providing the services required under the contract,

18 regardless of Tetra Tech's costs.  After 11 contract modifications, the total contract value awarded was

19 $11,408,410.

20       39. On July 10, 2012, the Navy awarded contract number N62473-10-D-0809, task order 0012

21 ("Task Order 0809-0012"), to Tetra Tech EC, Inc.  Task Order 0809-0012 was in support of Phase II of

22 Parcel C remediation, focusing on sanitary sewer and storm drain lines and radiologically-impacted ship

23 berths and sites.  The objective of the solicitation was to achieve unrestricted free release of the sewer

24 and storm drain survey units and ship berths in Parcel C.  For the ship berths, Tetra Tech was required to

25 perform characterization surveys, remediation, remedial action surveys, and final status surveys, and

26 submit a final status survey report.  For the sanitary and sewer drain systems, Tetra Tech was

27 responsible for removing the sewer and storm drain lines and the associated impacted soil, surveying the

28 trench and remediating it as necessary,  performing a final status survey, and submitting a final status

1  survey report to the Navy.  Task Order 0809-0012 was a firm fixed price contract that obligated the

2  Navy to pay Tetra Tech a maximum fixed amount of $9,846,298 for providing the services required

3  under the contract, regardless of Tetra Tech's costs.  After five contract modifications, the total contract

4  value awarded was $10,487,802.

5       40. On September 19, 2012, the Navy awarded contract number N62473-12-D-2006, task order

6  0004 ("Task Order 2006-0004"), to Tetra Tech EC, Inc.  Task Order 2006-0004 required Tetra Tech to

7  perform and report on surveys to analyze the radiological contamination in Buildings 253 and 211 in

8  Parcel C and to identify and bound the areas of contamination.  Task Order 2006-0004 was a firm fixed

9  price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $5,892,247 for the

10  services required under the contract, regardless of Tetra Tech's costs.  After two contract modifications,

11  the total contract value awarded was $7,255,881.

12       41. On August 13, 2013, the Navy awarded contract number N62473-10-D-0809, task order

13  0015 ("Task Order 0809-0015"), to Tetra Tech EC, Inc.  Task Order 0809-0015 addressed

14  recommendations in the HRA for radiologically-impacted sanitary sewer and storm drain lines in Parcel

15  E.  Tetra Tech was responsible for the excavation of the sanitary sewer and storm drain lines, as well as

16  the sampling, analysis, and clearance of radiologically-impacted soils.  The primary objective of Task

17  Order 0809-0015 was to complete the removal action, and deliver a Final Status Survey Report

18  containing adequate information and data to achieve unrestricted free release.  Task Order 0809-0015

19  was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of

20  $4,894,307 for the services required under the contract, regardless of Tetra Tech's costs.  After two

21  contract modifications, the total contract value awarded was $5,061,910.

22       42. On September 23, 2014, the Navy awarded contract number N62473-10-D-0809, task order

23  0016 ("Task Order 0809-0016"), to Tetra Tech EC, Inc.  Task Order 0809-0016 was in support of Phase

24  III of Radiological Remediation and Support of Parcel C.  The objective of Task Order 0809-0016 was

25  to achieve unrestricted free release of the remaining sewer and storm drain survey units in Parcel C, and

26  unrestricted free release of Buildings 205 and 224. Task Order 0809-0016 was a firm fixed price

27  contract that, as modified, obligated the Navy to pay Tetra Tech a maximum fixed amount of $669,812

28  for the services required under the contract, regardless of Tetra Tech's costs.

43. The contracts identified in paragraphs 27-42, including the TSPs, Execution Plans, and other planning documents mandated by the contracts identified in paragraphs 27-42 shall be referred to collectively as the "Relevant Contracts."

### C. Governing Contract Terms, Regulations, and Procedures to Ensure Proper Radiological Investigation of Soil and Buildings

44. Each of the Relevant Contracts required Tetra Tech to conduct radiological investigation of soil and buildings in accordance with the Multi-Agency Radiation Survey and Site Investigation Manual (MARSSIM) guidance and other contract requirements. MARSSIM is a consensus document published by the EPA, the U.S. Department of Defense, the U.S. Department of Energy, and the U.S. Nuclear Regulatory Commission that provides detailed guidance for the investigation and remediation of radiologically impacted sites.

45. For the radiological investigation and remediation of soil at Hunters Point, the Relevant Contracts and MARSSIM required Tetra Tech to take the following steps for each survey unit: (1) determine the boundaries of the survey unit; (2) collect soil samples for laboratory analysis in order to characterize the survey unit; (3) if laboratory results demonstrate that the soil is above release criteria, remediate survey unit by removing and disposing of soil; (4) collect soil samples for laboratory analysis from locations that tested above release criteria to ensure that remediation was effective; (5) further remediate if necessary; and (6) collect final status survey soil samples for laboratory analysis. The Relevant Contracts require Tetra Tech to "perform remediation and additional excavation until remediation goals have been met and or appropriate risk levels have been reached."

46. The Relevant Contracts required Tetra Tech to provide radiological investigation of buildings at Hunters Point by conducting alpha, beta, and gamma radiation scans of building surfaces using radiation detection instruments. The Relevant Contracts and MARSSIM required Tetra Tech to take the following steps: (1) scan and remove material, equipment, and building debris; (2) determine the Class, and therefore size, of survey units (Class 1 survey units, defined as having reasonable potential for contamination above release criteria, are divided into areas of less than 100 square meters; Class 2 survey units, defined as having reasonable potential for contamination but below release criteria, are divided into areas less than 1,000 square meters); (3) conduct radiation scans by moving detectors across

1   surfaces at required speeds; (4) download data from detection instruments; (5) correct survey results for

2   naturally occurring background radiation; (6) evaluate data to determine whether the survey unit exceeds

3   release criteria; (7) remediate, remove and dispose of material, if necessary; and (8) repeat the above

4   steps until release criteria are met.

5       **D. Tetra Tech's Fraudulent Course of Conduct[3]**

6       47. At all times relevant to this Complaint, Tetra Tech contracted with New World Technology,

7   Inc. or Radiological Survey & Remedial Services, Inc. to provide Radiological Control Technicians

8   (RCT) to work on the radiological investigation and remediation of Hunters Point.  Tetra Tech

9   managers, including Stephen Rolfe and Justin Hubbard, supervised crews of RCTs who were collecting

10  soil samples and conducting building scans in Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and

11  3.

12      48. William Dougherty was the Project Manager for Tetra Tech between on or about March 1,

13  2006 and early 2014.  Dougherty worked on-site at Hunters Point, and was responsible for managing all

14  aspects of Tetra Tech's work.  Dougherty had daily contact with, and gave direction to, Rolfe and

15  Hubbard.

16      49. At all times relevant to the complaint, Dennis McWade was a Construction Manager for

17  Tetra Tech at Hunters Point.  McWade worked on-site at Hunters Point, and was responsible for

18  managing the crews performing radiological surveys and remediation at Hunters Point for Tetra Tech.

19  McWade had daily contact with, and gave direction to, Rolfe and Hubbard.

20      50. At all times relevant to the complaint, Rick Weingarz was employed by Tetra Tech as an

21  Assistant Project Manager at Hunters Point.  Weingarz worked on-site at Hunters Point, and was

22  responsible for managing the crews performing radiological surveys and remediation at Hunters Point

23  for Tetra Tech.  Weingarz had daily contact with, and gave direction to, Rolfe and Hubbard.

24      51. Andrew Bolt, who has been Tetra Tech's President since on or about July 2014, served as

25  Tetra Tech's Senior Vice President, Remediation and Program Manager, from 1994 until 2014.  Bolt,

26

27

28      [3] The United States has not intervened in allegations regarding Tetra Tech's operation of a portal monitor or conveyor belt at Hunters Point.  This decision should not be construed as a statement about the merits of these allegations.

1   who was Dougherty's boss, provided Dougherty with monthly financial reports regarding Tetra Tech's

2   profits from its contracts to perform remediation work at Hunters Point.

3       52. Rolfe, Hubbard, Dougherty, McWade, Weingarz and Bolt were each employed by Tetra

4   Tech EC in a managerial capacity at all times relevant to this Complaint, and each of them was acting

5   within the scope of employment at all times relevant to this Complaint.

6       53. Tetra Tech's fraud was initiated and directed by Tetra Tech's corporate managers, including,

7   but not limited to, Dougherty, Weingarz, McWade, Rolfe, and Hubbard.

8       (1) **When Investigating Soil Contamination, Tetra Tech Caused Technicians to Replace
           Collected Soil Samples with Clean Soil From a Different Location Before Submitting
9          the Samples to the Lab for Analysis**

10      54. In performing the Relevant Contracts, Tetra Tech was responsible for conducting soil

11  surveys, in accordance with MARSSIM and the Relevant Contracts, in order to identify and define the

12  boundaries of radiological contamination.  Soil surveys were used to determine whether further

13  remediation was necessary.

14      55.    As part of the soil survey process, each parcel was divided into a number of "survey

15  units," each of which defined a discrete area for analysis.  Where feasible and practical, survey units

16  were defined with reference to fixed features within a parcel, such as a building, or a trench created from

17  the removal of a sewer or storm drain line.  For areas other than buildings, Tetra Tech was responsible

18  for collecting soil samples from designated points within each survey unit and submitting the samples to

19  a laboratory for analysis.   If the laboratory analysis demonstrated a higher-than-allowable concentration

20  of radionuclides of concern within a particular survey unit, Tetra Tech was required to remediate the

21  survey unit.  After completing the work it believed was necessary to remediate the area, Tetra Tech

22  would collect new samples (or building scan data) for another round of analysis.  This process was

23  repeated until all samples collected within a survey unit passed laboratory analysis, at which time the

24  survey unit was deemed to have met the release criteria.

25      56. As detailed below, Tetra Tech managers instructed RCTs to discard soil samples collected

26  from certain Survey Units at Hunters Point, replace the discarded samples with "clean" soil from other

27  locations, and submit the replaced samples to the lab for analysis.  Through this process, Tetra Tech

28

1  misrepresented the location from which soil samples were collected and, thus, misrepresented the

2  character of soil in the survey units from which it purported to have collected the samples.

3       57. In the course of conducting soil surveys under the Relevant Contracts, Tetra Tech managers,

4  including Stephen Rolfe and Justin Hubbard, ordered RCTs to collect soil in buckets from a location

5  where they knew the soil was "clean," *i.e.,* below the release criteria for radionuclides of concern.  Rolfe

6  and Hubbard instructed the RCTs to keep the buckets of "clean" soil in a CONEX box (a trailer-sized

7  container used to transport and store supplies) on site.  After RCTs collected soil samples in Ziploc bags,

8  Rolfe and Hubbard ordered the RCTs to bring the bagged samples to the CONEX box, where they were

9  instructed to empty the bags, and fill new bags with the "clean" soil from the buckets.  Tetra Tech

10  personnel labeled the new bags with the Survey Unit and Sample Identification Numbers of the

11  discarded samples, and submitted the switched soil samples to the onsite lab for analysis.  Tetra Tech

12  submitted these falsified soil samples to the lab accompanied by a Tetra Tech Chain-of-Custody Record

13  falsely identifying the Survey Unit (and therefore the location from which the soil was collected) of each

14  sample.  Each Chain-of-Custody Record was signed by the RCT or Tetra Tech representative

15  relinquishing the samples, as well as the lab employee receiving the samples.

16       58. On the cost plus award fee contracts, Tetra Tech benefited from the falsification of soil

17  surveys by billing for work it failed to perform in accordance with the Relevant Contracts, and by

18  receiving award fees to which it was not entitled.  On firm fixed price contracts, Tetra Tech benefited

19  from the falsification of soil surveys by avoiding its obligation to remediate contaminated areas, thus

20  decreasing its overall costs.  Tetra Tech management at Hunters Point, including Project Manager

21  Dougherty, was praised in performance evaluations for performing task orders under cost.

22       59. Former workers involved in the testing and remediation of soil at Hunters Point have

23  provided details of Tetra Tech's soil sampling fraud.  By way of example, individuals working under

24  Jane Taylor frequently took soil samples from outside of the survey area and labeled the sample as if it

25  came from the survey area.  From 2009 to 2012 Steven Rolfe directed RCT Anthony Smith to take fake

26  soil samples.  Soil in a sewer trench in front of an area of the 500 series of buildings, as well as the soil

27  underlying the foundation of the old Hunters Point movie theater was clean serpentine or "green" dirt,

28  and that soil underneath two palm trees was clean sandy soil.  Smith would fill up a five-gallon bucket

UNITED STATES' FIRST AMENDED COMPLAINT IN INTERVENTION AGAINST TETRA TECH EC, INC.
3:13-CV-3835 JD; 3:16-CV-1106 JD; 3:16-CV-1107 JD                                                                 18

1    with clean soil and bring it back to the CONEX box, and the true soil samples would be emptied and

2    replaced with clean soil from the bucket.  The true soil samples would be dumped in open sewer

3    trenches.  Smith and his team switched real samples with fake clean dirt between 800 and 1000 times.

4        60. The EPA, DTSC, and CDPH had a technical team of experts in health physics, geology and

5    statistics who reviewed information regarding Tetra Tech's work at Parcels B, C, D-2, E and G, and

6    Utility Corridors 1, 2, and 3.  As to Parcels B and G, the EPA provided the Navy with information about

7    examples of potential falsification, data manipulation or data quality concerns on December 29, 2017.

8    The EPA found additional inconsistencies between gamma scan and static data that indicated that soil

9    samples had not been sourced as Tetra Tech represented, as well as other inconsistencies in the data, and

10   ultimately concluded that "the data analyzed demonstrate a widespread pattern of practices that appear

11   to show deliberate falsification, failure to perform the work in a manner required to ensure the Record of

12   Decision (ROD) were met, or both."

13       61. Tetra Tech falsified or caused the falsification of soil surveys, as described above, and

14   falsified or caused the falsification of building surveys, as described below, in connection with its work

15   in Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and 3 at dozens of survey units identified in

16   Exhibit 1.  As a result, the reports Tetra Tech submitted to the Navy in connection with this work (which

17   are identified in Exhibit 1 and described in paragraphs 72-74 below) were false.  As the result of Tetra

18   Tech's falsification of soil samples and building surveys, Tetra Tech submitted dozens of false claims

19   for payment to the Navy between at least June 2006 and January 2018, as reflected in Exhibits 2 and 3

20   hereto.  As a result, Tetra Tech's soil sampling fraud was more widespread in time and place than is

21   established by the guilty pleas of Role and Hubbard, which provide additional evidence of Tetra Tech's

22   soil sampling fraud.

23       **(2)  Rolfe and Hubbard Plead Guilty to Charges of Destruction, Alteration, or Falsification
24          of Records in Federal Investigations**

25       62. On March 15, 2017, Tetra Tech manager Stephen Rolfe pleaded guilty to destruction,

26   alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C.

27   § 1519.  In pleading guilty, Rolfe admitted that on approximately 20 occasions in 2012 he instructed the

28   RCTs on his team to get "clean dirt" from areas known to be clean and taken from outside the marked

1   Survey Unit areas to use as substitute samples for the dirt from the Survey Unit, and that he did this so

2   that the Survey Unit would pass the laboratory analysis and not require further remediation.  He further

3   admitted that the switching of soil samples was done inside the CONEX box on site at Hunters Point and

4   in his presence.  He also admitted that, on these occasions, he knew that the soil locations reported on

5   the Chain-of-Custody Record forms were false.  Rolfe admitted that the motivation for his conduct came

6   from pressure applied from his Tetra Tech management at Hunters Point, including Dougherty,

7   Weingarz and McWade.  Rolfe admitted that Tetra Tech management at Hunters Point directed him to

8   get his crew "the hell out" of a survey unit that was testing above the release criteria, told him that they

9   were "not remediating the whole goddam site," and directed him on numerous occasions to "get clean

10  dirt."

11          63. On May 18, 2017, Tetra Tech manager Justin Hubbard pleaded guilty to destruction,

12  alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C.

13  § 1519.  In pleading guilty, Hubbard admitted that in 2012 he obtained "clean" dirt from an area north of

14  Buildings 253 and 211 at Hunters Point and substituted it for dirt taken from at least four Survey Units

15  in the North Pier area of Hunters Point (i.e., Survey Units 1, 8, 10, and 11).  He further admitted that he

16  filled a five-gallon bucket with "clean" serpentinite soil from an area outside the relevant Survey Unit,

17  and brought the bucket back to the CONEX box.  Hubbard admitted that, once inside the CONEX box,

18  he emptied the "legitimate" soil samples previously collected by RCTs from their sampling bags into an

19  empty bucket, and substituted the clean serpentinite soil into each sampling bag.  He also admitted that

20  by switching the soil, he knew that the data on the Chain-of-Custody Record forms was false.  Hubbard

21  further admitted that he knew that the false data on the Chain-of-Custody Record forms was

22  incorporated into maps and reports submitted to the Navy for the purpose of demonstrating that the area

23  had been successfully remediated.

24          64. In engaging in the conduct described above, Rolfe and Hubbard acted within the scope of

25  their employment with Tetra Tech, and for the purpose of benefitting Tetra Tech.  Tetra Tech

26  Management at Hunters Point, including but not limited to Dougherty, McWade, and Weingarz also

27  acted within the scope of their employment with Tetra Tech, and for the purpose of benefitting Tetra

28

Tech, when they knowingly directed and encouraged, and were aware of, the falsification of soil samples.  Tetra Tech management did not alert the Navy of the fraud.

### (3) When Investigating Building Contamination, Tetra Tech Falsified Data Collected from Radiation Detection Instruments

65. In performing the Relevant Contracts, Tetra Tech was responsible for conducting surveys of existing buildings, in accordance with MARSSIM guidance and other contract requirements, in order to characterize areas of radiological contamination.  The TSP prepared by Tetra Tech for each building survey was signed by Tetra Tech managers, including Dougherty as Tetra Tech's Project Manager at Hunters Point.  Building surveys were used to determine whether further remediation was necessary.

66. Tetra Tech conducted radiological building surveys by using radiation detection instruments to scan surfaces in the buildings.  The radiation detection instruments were either handheld or mounted on a cart.  The data collected by the radiation detection instruments was downloaded by Tetra Tech personnel into a database, and then imported into a spreadsheet that was delivered to the Navy.  The Navy relied on the results of Tetra Tech's building surveys to determine whether further remediation was necessary.

67. Following the discovery of the falsification of soil samples, the Navy retained independent consultants to review the data from radiological surveys performed by Tetra Tech in buildings at Hunters Point.  The Navy's consultants found that strings of data from readings from one instrument and surface were repeated for readings from other instruments and surfaces within a building.  Duplicated strings of data were discovered in the results of surveys conducted in 15 of 28 buildings.  In some instances, the exact time, to the second, that the reading was taken was also duplicated.  In other cases, duplicated data strings were altered slightly in an effort to conceal manipulation of the data.  The duplicated strings of data were found in building scans conducted in 2008-2010 and again in 2014.  Exhibits 4 and 5, which are Alpha/Beta Direct Measurement Reports submitted by Tetra Tech to the Navy in connection with scans supposedly performed at Building 113, contain representative examples of Tetra Tech's data duplication.  Each of these exhibits purports to show Alpha readings (in the column labeled "Gross Alpha CPM") and Beta readings (in the column labeled "Gross Beta CPM") resulting from scans performed by Tetra Tech, occurring at the dates and times shown in their respective columns.

Each reading is associated with a Reading Number (in the column labeled "Rdg #").  In these reports,
the same string of 250 Alpha and Beta readings appears three times, nearly identically.  *Compare* Exh.
4, Rdg # 1-250 (beginning at page 2 of 27) *to* Exh. 4, Rdg # 505-754 *and* Exh. 5, Rdg # 181-430 (for
ease of reference, the various iterations of this duplicated data set will be referred to as "Set 1," "Set 2,"
and "Set 3," respectively).  Moreover, the time stamp for all 250 readings is exactly the same across all
three sets, down to the second.  Indeed, although Tetra Tech represented that the same technician
performed the scans appearing in Set 2 and Set 3, the date and time entries match exactly for these two
portions of the data, even though the readings purportedly came from different survey units.  Finally, 17
of the highest Alpha readings appearing in Set 1 have been lowered in Set 2 and Set 3.  For example,
compare Set 1, Rdg # 5-7 to Set 2, Rdg # 509-511 and Set 3, Rdg # 185-187.[4]

68. Tetra Tech manipulated and falsified the building survey data that it provided to the Navy,
rather than providing actual radiation detection results from a full building survey.  Tetra Tech falsified
data collected from radiological scans of buildings throughout Hunters Point, including but not limited
to Buildings 103, 113, 113A, 130, 146, 253, 272, 351, 351A, 365, 366, 401, 411, 439, and 810.

69. In addition to this evidence of Tetra Tech's falsification of building survey data, former
workers at Hunters Point have provided details of a failure to properly perform building surveys.  As one
example, RCT Anthony Smith and his fellow workers were instructed by Rolfe to "just get numbers"
when doing building scans, which was accomplished by holding the radiation detection device in one
spot or just setting it down in one spot for up to 30 minutes while readings were recorded.  This occurred
in buildings 351, 351A, 411, 401, 414, 406, 144, 146, 130, 103, 113 and 521 at Hunters Point.  The
Relevant Contracts and MARSSIM required Tetra Tech to conduct building radiation scans by *moving*
detectors across surfaces at required speeds.

70. On November 25, 2014, DTSC provided the Navy with notice that CDPH had suspended the
Radiological Unrestricted Release Recommendations (RURRs) it had previously provided to the Navy
for 22 buildings at Hunters Point: 103, 113, 113A, 130, 140, 146, 203, 214, 241, 271, 272, 406, 414,
439, 521, 810, 351, 351A, 365, 366, 401 and 411.  The Department of Health took this action because

---

[4] The United States has highlighted all of the Alpha readings that differ between the duplication
sets, including the examples described in the accompanying text.

Tetra Tech deviated "from approved work plans while performing the radiological surveys at these buildings."  On December 28, 2018, the EPA wrote to the Navy to state that the EPA, DTSC and CDPH agreed that the building radiation survey work done by Tetra Tech was "falsified and cannot be used to support a recommendation for unrestricted radiological release for HPNS radiologically-impacted buildings."  The agencies stated that the data "demonstrate a pattern of practices that appear to show deliberate falsification, failure to perform the work in a manner required to ensure Record of Decision (ROD) requirements were met, or both."  The consequence of the 2014 regulatory action by CDPH and subsequent determinations by EPA, DSTC and CDPH is that the Navy cannot rely upon any of the building survey work performed by Tetra Tech at Hunters Point for property transfer to the City and County of San Francisco.

71. Tetra Tech's falsification of data with regard to building surveys caused the Navy to pay Tetra Tech for building survey work that has become worthless.  The buildings as to which Tetra Tech's work was worthless include the following: Parcel B: Buildings 103, 113, 113A, 130, 140, 146 and 157; Parcel C: Buildings 203, 211, 214, 241, 253, 271 and 272; Parcel E: Buildings 406, 414, 521, and 810; Parcel D-2: Building 813; Parcel G: Buildings 351, 351A, 365, 366, 401, 411, and 439; and Parcel UC-1: Building 819.

### E. Final Status Survey Reports, Survey Unit Project Reports, and Removal Action Completion Reports

72. Pursuant to the Relevant Contracts, Tetra Tech prepared and submitted to the Navy Final Status Survey Reports, Final Survey Unit Project Reports, final Removal Action Completion Reports, and/or Characterization Survey Result Reports (collectively, the "Reports") upon completion of the investigation and remediation of a survey unit.  The Reports described the procedures and the results of the surveys performed to achieve unrestricted radiological release of the radiologically-impacted sites at Hunters Point.  The Reports were signed by Dougherty as Tetra Tech's Project Manager at Hunters Point, in addition to other Tetra Tech officials.

73. In the Reports, Tetra Tech falsely stated that soil samples were properly collected from designated survey units, when, in fact, samples of soil that Tetra Tech management knew to be "clean" were collected from locations outside of the designated survey units and submitted to the laboratory for

analysis.  In the Reports, Tetra Tech stated the soil sample analytical results as if the soil was properly collected.

74. In the Reports, Tetra Tech falsely stated that building surveys were completed and properly performed, when in fact the building scan data was manipulated.  In the Reports, Tetra Tech stated the building survey results as if the buildings were properly scanned and the data were properly recorded and reported.

**F.  Tetra Tech Knowingly Submitted Materially False Claims**

75. Tetra Tech submitted claims for payment to the United States under each of the Relevant Contracts knowing that the claims were false or fraudulent because they included claims for: (a) soil surveys in which Tetra Tech misrepresented the source of the soil samples collected; (b) building surveys in which Tetra Tech falsified the data collected by radiation detection instruments; and/or (c) preparing status survey reports containing falsified results from soil and building surveys.

76. Tetra Tech management, including but not limited to Dougherty and Bolt, submitted or caused to be submitted vouchers and invoices, accompanied by progress reports, representing that it fully and properly investigated and remediated radiological contamination in soil and buildings at Hunters Point.  As described above, these representations were false.

77. Tetra Tech "knowingly" submitted vouchers and invoices and accompanying progress reports containing material misrepresentations, within the meaning of the False Claims Act, 31 U.S.C. § 3729(b).

78.     Tetra Tech made false statements it knew were material to the Navy's decision to continue its contracting relationship with Tetra Tech, and intended those statements to influence the Navy's decision to pay Tetra Tech's false claims.  The natural, ordinary, and reasonable consequence of Tetra Tech's false statements was that the Navy would rely upon them in deciding to pay Tetra Tech's false claims, and, indeed, the Navy justifiably relied upon Tetra Tech's false statements in deciding to pay Tetra Tech's invoices and to award subsequent task orders.  In each case, had the Navy known the truth, it would not have paid Tetra Tech's invoices or awarded Tetra Tech subsequent task orders.  The

1   United States paid each of the false claims submitted by Tetra Tech, even though the non-conforming

2   services delivered by Tetra Tech were of no value to the United States Navy.

3       **G.  Tetra Tech's Breaches of Contract**

4       79.     Each of the Relevant Contracts required Tetra Tech to perform soil and building surveys

5   in accordance contractual specifications.  Based on the actions described above, Tetra Tech breached the

6   Relevant Contracts by falsifying soil samples, falsifying building scan data, and failing to perform full,

7   complete, and accurate investigations of radiological contamination, and failing to remediate where

8   necessary to achieve free release.  Tetra Tech's breaches of the Relevant Contracts include, but are not

9   limited to the following.

10      80.     For Task Order 2201-006, Tetra Tech's breaches include, but are not limited to, the

11  requirement in Section 1.3 to "complete all radiological work" on Parcel B and "to provide general base-

12  wide radiological support services."

13      81.     For Task Order 2000-0070, Tetra Tech's breaches include, but are not limited to, the

14  requirement in Section 1.3 to "complete all unfinished radiological work at Parcel B" as well certain

15  sites in Parcel D.

16      82.     For Task Order 3211-0019, Tetra Tech's breaches include, but are not limited to, the

17  requirement in Section 1.3 to complete "radiological remediation and surveys" at certain Parcel B sites;

18  and the requirement in Section 2.3 to perform remediation of sanitary sewers and storm drains in Parcel

19  B.

20      83.     For Task Order 8823-002, Tetra Tech's breaches include, but are not limited to, the

21  requirement in Section 1.3 to "remove, survey, remediate, clear, and dispose of appropriately all sewer

22  and storm drain systems in" the relevant areas to "attain a free release."

23      84.     For Task Order 8823-003, Tetra Tech's breaches include, but are not limited to, the

24  requirement in Section 1.3 to "achieve unrestricted free release of the sewer and storm line survey units

25  along Crisp Rd and the central areas of Parcel E" as well as to provide "surveys, remediation and

26  reporting for certain radiological buildings and sites in Parcel E".

27      85.     For Task Order 0809-002, Tetra Tech's breaches include, but are not limited to, the

28  requirement in the "Objective" section to achieve free release of various buildings in Parcel C as well as

1  sewer and storm drains; and the requirement in Work Element 5 to "conduct field operations" for Parcel

2  C removal actions and radiological surveys, including to excavate, sample, survey and remediate the

3  effected sites.

4        86.    For Task Order 0809-007, Tetra Tech's breaches include, but are not limited to, the

5  requirement in Section 1 to "achieve free-release of sewer and storm drain survey units, buildings,

6  building sites and the 500 series site of Parcel E"; and the requirement in Section 2.3 for site work,

7  including excavation, removal, sampling, surveys, and remediation of the relevant areas.

8        87.    For Task Order 0809-0012, Tetra Tech's breaches include, but are not limited to, the

9  requirement in Section 1.3 to "achieve unrestricted free release of the sewer and storm drain survey units

10  and ship berths."

11        88.    For Task Order 2006-0004, Tetra Tech's breaches include, but are not limited to, the

12  requirement in Section 1 to "characterize radiological contamination" in certain buildings in Parcel C

13  and to perform and report on surveys for radiological contamination; and the requirement in Section 2.3

14  for field work, including radiological characterization.

15        89.    For Task Order 0809-0015, Tetra Tech's breaches include, but are not limited to, the

16  requirement in Section 1.3 to provide a Final Status Survey of the sanitary sewer and storm drain system

17  in Parcel E sufficient to "achieve unrestricted free release."

18        90.    For Task Order 0809-0016, Tetra Tech's breaches include, but are not limited to, the

19  requirement in Section 1 to provide unrestricted free release of certain sewer and storm drains in Parcel

20  C, and certain buildings.

21        91.    The United States has incurred damages, including consequential damages, as a result of

22  Tetra Tech's breaches of the Relevant Contracts.

23      **H. Consequences of Tetra Tech's Misconduct**

24        92.    Because of Tetra Tech's breaches of contract in investigating the radiological

25  contamination at Hunters Point, the Navy must pay other contractors to re-test the soil and buildings in

26  the Parcels where Tetra Tech worked in order to determine whether remediation is necessary.  The Navy

27  will also have to pay for any further remediation.  The Navy has had to devote substantial resources to

28  work with the EPA, DTSC, and CDPH to create plans for re-testing and potential remediation.  The

Navy has had to devote substantial resources to address the health and safety concerns of San Francisco residents.  The United States has also had to devote substantial resources to investigate Tetra Tech's actions and inactions at Hunters Point over many years.

93. Tetra Tech's fraudulent course of conduct has caused substantial disruption, uncertainty, and delay in the plan to remediate and transfer Hunters Point to the City and County of San Francisco for redevelopment, as well as fear in the community regarding the effects of any continued contamination at the site.  As a result of Tetra Tech's fraud, the transfer of Hunters Point to the City and County of San Francisco will be delayed by many years.  On September 19, 2016, then-mayor of the City and County of San Francisco Edwin M. Lee and Supervisor Malia Cohen announced that: "San Francisco will not accept the transfer of any land until federal and state regulators are satisfied that the land is clean and safe, and our own Department of Public Health validates that decision."  As these leaders explained, the environmental cleanup of Hunters Point is necessary to "deliver desperately needed housing and long-overdue public benefits to the Hunters Point community."

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1)(A))

94.    The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

95.    Tetra Tech knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A), by submitting claims for payment based upon falsified soil surveys, building surveys, and status survey reports.  Tetra Tech's false or fraudulent claims include, but are not limited to, the invoices identified on Exhibits 2 and 3.

96. As a result of the false or fraudulent claims presented or caused to be presented by Tetra Tech, the United States paid Tetra Tech and suffered damages to be determined at trial.  Under the False Claims Act, the United States is entitled to three times the amount of damages it sustained, plus civil

penalties of not less than $5,500 and not more than $11,000 for each false claim.

## SECOND CAUSE OF ACTION

(False Claims Act: False Statement Material to a False Claim)

(31 U.S.C. § 3729(a)(1)(B))

97.     The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

98.     Tetra Tech made, used, or caused to be made or used, false records or statements material to false claims, in violation of 31 U.S.C. § 3729(a)(1)(B), by reporting false results from soil and building surveys.  Tetra Tech's false records or statements material to false claims include, but are not limited to those reports identified on Exhibit 1.

99.     As a result of the false records or statements made or used, or cause to be made or used, by Tetra Tech, the United States paid Tetra Tech and suffered damages to be determined at trial.  Under the False Claims Act, the United States is entitled to three times the amount of damages it sustained, plus civil penalties of not less than $5,500 and not more than $11,000 for each violation.

## THIRD CAUSE OF ACTION

(Breach of Contract)

100.     The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

101.     Each of the Relevant Contracts required Tetra Tech to perform soil and building surveys in accordance with MARSSIM and other contract specifications.

102.     Based on the actions described above, Tetra Tech breached the Relevant Contracts by falsifying soil samples, falsifying building scan data, and failing to perform full, complete, and accurate investigations of radiological contamination.

103.     The United States has incurred damages, including consequential damages, as a result of Tetra Tech's breaches of the Relevant Contracts.

1

## PRAYER FOR RELIEF

2

WHEREFORE, the United States demands and prays that judgment be entered in its favor

3

against Defendant Tetra Tech EC, Inc. as follows:

4

1.  On the First Cause of Action under the False Claims Act, for the amount of the United States'

5

damages, trebled as required by law, and such civil penalties as are required by law, together with such

6

further relief as may be just and proper.

7

2.  On the Second Cause of Action under the False Claims Act, for the amount of the United

8

States' damages, trebled as required by law, and such civil penalties as are required by law, together

9

with such further relief as may be just and proper.

10

3.  On the Third Cause of Action for breach of contract, for an amount equivalent to the loss

11

sustained by the United States, including consequential damages, plus interest, costs, and expenses, and

12

for such further relief as may be just and proper.

13

DATED: July 15, 2019                             Respectfully submitted,

14

15

DAVID L. ANDERSON
United States Attorney

16

/s/ *Michael T. Pyle*

17

MICHAEL T. PYLE (CABN 172954)
Assistant United States Attorney

18

150 Almaden Boulevard, Suite 900
San Jose, California 95113

19

Telephone: (408) 535-5087
FAX: (408) 535-5081

20

Email: michael.t.pyle@usdoj.gov

21

22

MICHAEL GRANSTON
MICHAL TINGLE

23

ROBERT CHANDLER
PATRICK KLEIN

24

Attorneys, Civil Division
United States Department of Justice

25

P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044

26

Telephone: (202) 514-4678
robert.chandler@usdoj.gov

27

28

Attorneys for the United States of America

UNITED STATES' FIRST AMENDED COMPLAINT IN INTERVENTION AGAINST TETRA TECH EC, INC.
3:13-CV-3835 JD; 3:16-CV-1106 JD; 3:16-CV-1107 JD                                                  29

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2

3          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a jury

trial in this action.

4      DATED: July 15, 2019                           Respectfully submitted,

5

6                                                      DAVID L. ANDERSON
                                                       United States Attorney

7                                                      /s/ *Michael T. Pyle*
8                                                      MICHAEL T. PYLE (CABN 172954)
                                                       Assistant United States Attorney
9                                                      150 Almaden Boulevard, Suite 900
                                                       San Jose, California 95113
10                                                     Telephone: (408) 535-5087
                                                       FAX: (408) 535-5081
11                                                     Email: michael.t.pyle@usdoj.gov

12

13                                                     MICHAEL GRANSTON
                                                       MICHAL TINGLE
14                                                     ROBERT CHANDLER
                                                       PATRICK KLEIN
15                                                     Attorneys, Civil Division
                                                       United States Department of Justice
16                                                     P.O. Box 261, Ben Franklin Station
                                                       Washington, D.C. 20044
17                                                     Telephone: (202) 514-4678
                                                       robert.chandler@usdoj.gov
18

19                                                     Attorneys for the United States of America

20

21

22

23

24

25

26

27

28