1   DAVID ANTON (SBN 94852)
    Margaret E. Roeckl (SBN 129783)
2   Steve Castleman (SBN 95764)
    1717 Redwood Lane
3   Davis, CA 95616
    Telephone: (530) 759-8421
4   davidantonlaw@gmail.com

5   Counsel for Qui Tam Relators, Arthur R. Jahr, III,
    Elbert G. Bowers, Susan V. Andrews, Archie R. Jackson,
6   Anthony Smith, Donald K. Wadsworth, and Robert McLean

7   JOHN HOUSTON SCOTT (SBN 72578)
    THE SCOTT LAW FIRM
8   1388 Sutter Street, Suite 715
    San Francisco, California 94109
9   Telephone:     (415) 561-9600
    John@scottlawfirm.net
10
    Counsel for Qui Tam Relators, Arthur R. Jahr, III,
11  Elbert G. Bowers, Susan V. Andrews, Archie R. Jackson,
    [not counsel for other relators]
12
                    UNITED STATES DISTRICT COURT
13                  NORTHERN DISTRICT OF CALIFORNIA
14
15  THE UNITED STATES OF AMERICA ex         Case No. 3:13-CV-3835 JD
    rel., ARTHUR R. JAHR, III, et al.,
16  ANTHONY SMITH, & DONALD K.
    WADSWORTH et al.,
17          Plaintiffs                      RELATED ACTIONS:
                                            3:16-CV-1106 JD
18              v.                          3:16-CV-1107 JD
19  TETRA TECH EC, INC.; TETRA TECH,
    INC., SHAW ENVIRONMENTAL AND            RELATORS' COMBINED SECOND
20  INFRASTRUCTURE, INC.; CHICAGO           AMENDED COMPLAINT -
    BRIDGE & IRON, INC., APTIM              FALSE CLAIMS ACT VIOLATIONS
21  ENVIRONMENTAL &                         PURSUANT TO 31 U.S.C. §3729 et seq.
    INFRASTRUCTURE, INC., APTIM
22  CORPORATION, APTIM FEDERAL
    SERVICES, LLC, RADIOLOGICAL
23  SURVEY & REMEDIAL SERVICES,            DEMAND FOR JURY TRIAL
    INC., IO ENVIRONMENTAL &
24  INFRASTRUCTURE INC., DARYL
    DeLONG, and BRIAN HENDERSON,
25
26          Defendants.
27
28
                              - 1 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

This complaint is formatted to meet the directive of Judge Donato to have all three complaints combined into one complaint, and to try to geographically organize allegations between the Hunters Point Naval Shipyard, the Naval Station Treasure Island, and the Alameda Naval Base.

## PARTIES - RELATOR PLAINTIFFS

1.  Qui Tam Relators Plaintiff SUSAN V. ANDREWS, (herein Andrews), Plaintiff ARTHUR R. JAHR III, (herein Jahr), Plaintiff ELBERT G. BOWERS, (herein Bowers) and ARCHIE R. JACKSON, (herein Jackson) are natural persons and competent to sue, herein jointly referred to as the JAHR plaintiffs.  The fraud information disclosed herein by the JAHR plaintiffs as to the fraud engaged in by defendants at the expense of the United States of America, and the United States Navy has not been publicly disclosed as defined by 31 USC §3730(e)(4)(A).  The JAHR plaintiffs are the original source for all JAHR plaintiff disclosed information. The JAHR plaintiffs have knowledge of the facts and fraud herein alleged by the JAHR plaintiffs. The knowledge of the JAHR plaintiffs is independent of any publicly disclosed fraudulent allegations or transaction, and materially adds to any publicly disclosed fraudulent allegations or transactions. The JAHR plaintiffs have provided the information to the government before filing suit, have filed complaints with government agencies, having submitted documents and have been interviewed by government agents, and agents for the JAHR plaintiffs have met and conferred with government representatives including the United States Attorney General's office and made disclosures prior to filing of suit.  Plaintiffs previously filed personal litigation against Defendant Tetra Tech, Inc. and Tetra Tech EC, Inc. in the Superior Court of California for wrongful termination due to the JAHR

plaintiffs' reports of unsafe and improper radiation remediation risking the health and safety of workers and the public in which some of the background facts but not the fraudulent allegations or transactions by Tetra Tech, Inc. and Tetra Tech EC, Inc., or any of the other defendants herein were alleged.  Federal jurisdiction is proper for this action is based on a federal statute 31 USC §3729 and §3730.

2.      Qui Tam Relator ANTHONY SMITH, hereinafter Smith, was trained as a radiation control technician.  Smith was employed at various periods of time, beginning in approximately 2002, as a radiation decontamination technician and later a radiation control technician.  Smith worked at Hunters Point Naval Shipyard initially for New World Environmental, Inc. doing business as New World Technology beginning in approximately 2002 for approximately a year as a radiation control technician.  Smith returned to Hunters Point Naval Shipyard as a radiation control technician in approximately 2006 for less than a full year.  Smith returned once again to the Hunters Point Naval Shipyard to work as a radiation control technician on or about March 28, 2008 and remained at Hunters Point Naval Shipyard as a radiation control technician until September 28, 2012.  When Smith was laid off with others in September of 2012, Smith was informed he would be returned to work at Hunters Point upon the initiation of work in other areas of Hunters Point for radiation surveys and remediation.

3.      In early 2010, Smith's employer, a sub-contractor to Tetra Tech EC, Inc. changed from New World Environmental, Inc. to another sub-contractor of Tetra Tech EC, Inc. named Radiological Survey & Remedial Services, Inc., herein referred to as RSRS.  Defendants Brian Henderson was the President of RSRS, and Daryl DeLong was the Vice President of RSRS. Both Henderson and DeLong worked a significant amount of their time at Hunters Point after the founding of RSRS. RSRS had been a sub-contractor of Tetra Tech EC, Inc. at Hunters Point during parts or all of Smith's last period of employment at Hunters Point which had begun on March 28, 2008.  Management of RSRS and supervisors of Tetra Tech

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

EC, Inc. informed Smith that he would be called back to work after the lay-off of September 28, 2012.  In early 2013, Smith learned that others had been called back to work at Hunters Point, but Smith had not received a call back to work.  Smith called supervisors of Tetra Tech EC, Inc. and inquired if he was going to be recalled to work. Smith was informed he would not be recalled.  Smith asked why he had not been recalled for work. Smith was told that he was not being recalled for work because the government had raised issues related to radiological work Smith and others had performed.

4.     Smith individually and through counsel of Smith conducted investigations into the radiological remediation that has been performed for the United States Navy in the California Bay Area, in particular Hunters Point Naval Shipyard, Treasure Island, and Alameda Naval Base.  Smith through his own personal knowledge and the investigation he and his counsel conducted have independent information regarding false claims submitted by the Defendants to the United States for payment, independent of information publicly disclosed.

5.     Smith became aware that Tetra Tech EC, Inc. produced a report titled "Investigation Conclusion Anomalous Soil Samples At Hunters Point Naval Shipyard".  The report implied that Smith had conducted false soil sampling at Hunters Point on his own and contrary to the directions of his supervisors.  Smith concluded that the report was not accurate, and it tried to falsely place blame on Smith and other co-workers.  Smith consulted with counsel to investigate matters related to radiological remediation conducted on behalf of the Navy and to explore ways to bring to light the true circumstances involved in radiological remediation conducted on behalf of the Navy in the California Bay Area.

6.     The information contained herein alleged by Smith pertaining to fraud engaged in by Defendants at the expense of the United State of America, and the United States Navy had not been publicly disclosed as defined by 31 USC §3730(e)(4)(A).  Smith is an original source for all information Smith alleges

- 4 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1   herein.  Smith has independent knowledge of facts and false statements herein

2   alleged.  Relator has met with the United States Attorney General's representatives,

3   as well as the United States Navy investigators, as well as provided written

4   disclosures prior to the filing of this False Claims Act suit.  Federal jurisdiction is

5   proper for this action and is based on a federal statute, 31 USC §3279 and §3730.

6   Subsequent to the initial filing of this lawsuit, Relator met with representatives of

7   the United States Attorney General's office, the Nuclear Regulatory Commission,

8   the Federal EPA, and a variety of Navy representatives.  Prior to amending Smith's

9   Complaint, Smith provided further disclosures to the United States Attorney

10  General's office. During these meetings and communications, Smith provided

11  independent information related to false claims submitted by Defendants to the

12  United States Navy.

13         7.     Qui Tam Relator Donald K. Wadsworth (herein Wadsworth), was the

14  President and CEO of New World Environmental, Incorporated (herein New

15  World), now closed. Wadsworth is trained in and has college degrees pertaining to

16  the testing and handling of radioactive materials. New World had been a company

17  specializing in the remediation of contaminated buildings and areas, including the

18  contamination by radioactive wastes. New World had performed remediation

19  services involving radioactive wastes for private, public and military clients.  New

20  World was initially engaged directly by the United States Navy in the late 1990 and

21  early 2000's to assist in the evaluation of Hunters Point Naval Shipyard for

22  contaminants, including radioactive contamination.

23         8.     In the early years of the 2000's New World was requested by the United

24  States Navy and Tetra Tech EC, Inc. to be a sub-contractor for Tetra Tech EC, Inc.

25  for the remediation of Hunters Point Naval Shipyard for radiological surveys,

26  screening, sampling, testing and remediation. In performing the radiological work

27  at Hunters Point in the early to mid 2000's, New World utilized its own Nuclear

28  Regulatory Commission radioactive materials license.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

9.     In or about 2007, Tetra Tech EC, Inc. obtained and invoked its own Nuclear Regulatory Agency license and became the responsible entity for the radiological work and handling of radiological materials at Hunters Point.  New World continued to operate as a sub-contractor for Tetra Tech EC, Inc. at Hunters Point by providing Radiation Control Technicians (RCT), and radiological laboratory and laboratory personnel, under the direction and supervision of Tetra Tech EC, Inc. On or about 2009 New World no longer provided Radiation Control Technicians to Tetra Tech EC, Inc., for other sub-contractors, including Defendant RSRS took over the function of supplying RCT personnel to Tetra Tech EC, Inc. On or about 2012, New World no longer provided the radiological laboratory to Tetra Tech EC, Inc. at Hunters Point. Although New World provided the personnel and equipment referenced, Defendant Tetra Tech EC, Inc. directed and managed the individuals and operations on the Navy base sites.

10.     New World was retained as a sub-contractor for Shaw Environmental and Infrastructure (Shaw) to perform surveys, scanning, testing, and remediation of radioactive materials at Treasure Island in the mid-2000's until approximately 2009, and provided an on-site radiological laboratory for those purposes, under the direction and supervision of Shaw.  New World was retained as a sub-contractor for Tetra Tech EC, Inc. to perform surveys, scanning, testing, and remediation of radioactive materials at the Alameda Naval Base from the mid-2000's until approximately 2009. The Hunters Point laboratory performed laboratory services for the Alameda Naval Base radiological remediation. The Hunters Point laboratory was utilized by Tetra Tech EC, Inc. to perform laboratory services for radiological purposes for the Treasure Island radiological remediation Tetra Tech EC, Inc. performed for the Navy.

11.     Qui Tam Relator Robert McLean (herein McLean) is an experienced and trained Radiation Control Technician.  McLean was employed by New World for a short period of time in the mid-2000's to work as an RCT at Hunters Point

- 6 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

under the sub-contract with Tetra Tech EC, Inc.  McLean was transferred as an RCT Supervisor to Treasure Island when New World obtained a radiological sub-contract with Shaw.  McLean discovered extensive radioactive material on Treasure Island that the Navy had represented was not present on Treasure Island.  Over the period of McLean's employment by New World at Treasure Island, McLean was a lead RCT responsible for overseeing the work of other RCTs at Treasure Island. McLean was subjected to extensive radioactive exposure and his employment ceased due to the level of radioactive exposure McLean incurred.

12.     Plaintiffs Wadsworth and McLean are original sources of the information herein provided as defined by 31 USC Section 3730(e)(4)(B). Plaintiffs Wadsworth and McLean are not aware of the allegations or transactions which are material to this suit having been publicly disclosed as defined by 31 USC Section 3730(e)(4)(A) prior to the filing of their FCA lawsuit. Prior to the filing of their lawsuit, Wadsworth and McLean voluntarily disclosed to the Government the information and that information is independent of the public disclosures and materially adds to any publicly disclosed allegations or transactions before filing this action under the False Claims Act. Wadsworth and McLean have also provided supplemental disclosures to the United States Attorney General's office prior to amendment of their action, and have talked with and met with federal government officials, as well as state of California officials, to assist in disclosure of information relevant to the radiological remediation fraud and false claims upon the Navy.

13.     Plaintiffs Wadsworth and McLean, with the assistance of counsel, have conducted investigations into the conduct of Tetra Tech EC, Inc., and others involved in the radiological remediation for the Navy in the California Bay Area. Wadsworth had concerns on behalf of the company New World to determine why New World was shut off from further remediation work on the former Navy bases in the Bay Area and around the United States despite having worked on the

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

radiological remediation at all three Bay Area sites during the 2000's. McLean had
concerns that he was terminated from employment with New World, and advised
that he was ordered to be terminated at the direction of a Navy RASO official. As a
result of the inquiries by the Relators, individually, jointly, and with the assistance
of counsel, the Relators and counsel have conducted an independent investigation
and have independent knowledge and information that has not been publicly
disclosed that is material to false claims made by the Defendants against the United
States of America, and the United States Navy, as set forth herein, and voluntarily
provided that information to the United States prior to suit and amendment of their
action.

## PARTIES - DEFENDANTS

14.    Defendant Tetra Tech EC, Inc. [herein also TTEC ] is a corporation
that has contracted with the United States Navy and the United States government
to perform clean-up and remediation services of hazardous wastes, including
radioactive materials, at the closed Hunters Point Naval Shipyard in San Francisco,
(herein "Hunters Point") the Treasure Island Naval Base in San Francisco, (herein
"Treasure Island") and the Alameda Naval Base in Alameda County, California.
On information and belief, it is alleged that the principal business office of TTEC
Inc. is in California.  Defendant TTEC is a wholly owned corporate subsidiary of
Tetra Tech, Inc.

15.    Tetra Tech, Inc. [herein also TT] is the parent company of TTEC and
other corporate subsidiaries. Tetra Tech, Inc. absorbed its subsidiary Tetra Tech
EM Inc., [herein TTEM]. TT assumed all liabilities of its subsidiary TTEM.
Allegations throughout this complaint that reference TTEM allege liability upon TT
due to TT having assumed all liability of TTEM.

16.     Defendants Radiological Survey & Remedial Services, LLC (herein RSRS), Defendant Daryl DeLong, and Defendant Brian Henderson, are related defendant entities. This suit seeks liability and remedies against both the company RSRS, and the individual defendants due to their direct involvement in the false records that resulted in false claims that each was involved in as sub-contractors for TTEC.

17.     Radiological Survey & Remedial Services, LLC is a limited liability corporation owned by Daryl DeLong and Brian Henderson. RSRS provided technical workers and performed services related to the radiological remediation for the United States Navy at Hunters Point, Treasure Island, and Alameda Naval Station.  RSRS provided these services generally through sub-contracts with the prime contractors of the United States Navy, including Tetra Tech EC, Inc.

18.     Defendant Daryl DeLong is a natural person. DeLong was both a manager of Tetra Tech EC, and the Vice President of RSRS. DeLong is personally liable for his having knowingly made, used, and caused to be used false records and statements material to false and fraudulent claims, and his conspiracy to make, use, cause to be used, false records material to false claims made to the Navy by TTEC.

19.     Defendant Brian Henderson is a natural person. Henderson was both a manager of Tetra Tech EC, and the President of RSRS. Henderson is personally liable for his having knowingly made, used, and caused to be used false records and statements material to false and fraudulent claims, and his conspiracy to make, use, cause to be used, false records material to false claims to the Navy by TTEC.

20.     Shaw Environmental & Infrastructure, Inc., [herein also "Shaw E&I"] was a global construction and environmental services company, and a segment of the Shaw Group. Shaw E&I in 2012 had sales of approximately $2 billion per year. Shaw E&I will herein be referred to as "Shaw". Pursuant to a merger on February 13, 2013, The Shaw Group, including Shaw, was acquired by Chicago Bridge & Iron, N.V., [herein also "CB&I"] and operated under the CB&I umbrella as CB&I

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Capital Services in the federal services division business. CB&I was one of the worlds leading engineering and construction services providers. At relevant times CB&I had approximately 27,000 employees. CB&I worked on completing Shaw's contracts with the Navy at Hunters Point Shipyard and Treasure Island. CB&I agreed to acquire the assets and liabilities of Shaw, except for the Energy & Commercials Group. CB&I was a successor-in-interest to Shaw Environmental & Infrastructure. On or about February 27, 2017 CSVC Acquisition Corp. acquired the Chicago Bridge & Iron Company's Capital Services federal services division and assumed the assets and liabilities of that division, which included the assets and liabilities assumed by CB&I from Shaw E&I. In July of 2017, on information and belief, it is alleged that CSVC transferred to Veritas Capital the Chicago Bridge & Iron Company's Capital Services federal services division and assumed the assets and liabilities of that division, which included the assets and liabilities assumed by CB&I from Shaw E&I. Veritas Capital merged the Chicago Bridge & Iron federal services division, its assets and liabilities into wholly owned entity Aptim Corporation, which placed the assets and liabilities into Aptim Federal Services LLC, and Aptim Environmental & Infrastructure, Inc. These Aptim entities, on information and belief, are liable as successors to the liability of Shaw E&I and Chicago Bridge & Iron and are herein referred to as "Aptim".

21.     Defendant IO Environmental & Infrastructure Incorporate (IOEI) was incorporated in 2006. IOEI has provided data management, radiological test result management, and technical writing to TTEC for Hunters Point, Treasure Island, and Alameda Naval Base. Employees of IOEI knowingly made, used, and caused to be made or used false records and statements material to false claims submitted by TTEC for Hunters Point, Alameda Naval Base, and Treasure Island.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**HUNTERS POINT -**
**JAHR PLAINTIFF/RELATORS CASE #13-CV-3835-JD**

22.     For the JAHR Plaintiff/Relators, the United State's First Amended Complaint In Intervention Against Tetra Tech EC, Inc. filed on July 15, 2019 [herein "USFAC"] encompasses and subsumes the allegations and defendants for the JAHR Plaintiff/Relators. The JAHR Plaintiff/Relators bring no allegations and bring no claims against any defendants other than as set forth in the USFAC that were initially alleged in the August 19, 2013 JAHR complaint, Case Number CV-13-3835.

**HUNTERS POINT -**
**SMITH PLAINTIFF/RELATOR CASE #16-CV-1106-JD**

The USFAC encompasses and subsumes some of the allegations and defendants for the Smith Plaintiff/Relator, but not all. The following are the allegations and defendants for the Smith Plaintiff/Relator which do not appear to be encompassed by the USFAC.

**HUNTERS POINT PCB HOT SPOT SOIL FRAUD 2006-2007**
**Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD**

23.     Tetra Tech EC, Inc., through a predecessor was contracted to scan soils which contained chemical contamination, in particular PCBs, for radioactive materials and remove the radioactive material above-release levels, through Navy contract N68711-98-D-5713 Task Order 0084. The radioactive material was required by contract with the Navy to be properly segregated, stored in specialized containers for radioactive waste, and properly disposed of in one of the few

- 11 -

facilities licensed to receive low level radioactive waste.  Soil that was properly scanned and radioactive material above-release levels removed was deemed remediated and did not contain elevated levels of chemical contamination was given "free release" status for radiological hazards.  Soil that had some form of contamination but had received radiological free release status was permitted to be shipped off Hunters Point to landfills and entities that could receive such chemically tainted soils.

24.     In the later part of 2005 and into 2006, Tetra Tech EC, Inc. had three conveyor belt systems established in which excavated soil from Hunters Point was processed for radiological scanning and removal of radiological contamination. At Parcel E excavated PCB contaminated soil was placed on the conveyor belt in approximately 6 inches in depth.  The soil spread on the conveyor belt was to move slowly under a set of radioactive sensor arrays that were set to alarm if radioactive material above release levels moving on the conveyor belt were detected.   The Navy, in consultation with other governmental agencies, established a conveyor belt speed and incorporated the conveyor belt speed into requirements for performance of the contract with Tetra Tech EC, Inc., as well as sensitivity setting for the radiological scanning of the soils.  Tetra Tech EC, Inc. agreed to the set speeds for the conveyor system, and the radiological scanner settings, and certified and impliedly certified compliance with the conveyor speed setting, and that the sensors and alarms would be used at the set levels and kept functioning.

25.     The conveyor belt system processing soil from the PCB Hot Spot at Hunters Point on Parcel E had a very high frequency of the soil setting off the alarm in 2005 and the first quarter of 2006.  As a result of the frequent radiological alarms, substantial time was incurred by the HP RCT workers and others to remove the soil from the conveyor, scan and test the soil for radiological contamination, segregate the items and soil that had high radiological intensity for radioisotopes of concern, safely stockpile the radiological hazardous material, and have that low

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1   level radioactive material put into specialized containers for shipment to low level

2   radiological waste [LLRW] facilities.

3       26.     Management of Tetra Tech EC, Inc., including Neil Hart, Ulrika

4   Messer, and Joe Lavelle, perceived that the conveyor belt soil processing was

5   exceeding budget expectations, took actions to defraud the Navy, violate the

6   contractual terms, and submit false claims to the Navy for payment.  Tetra Tech EC

7   management had its on-site managers, including but not limited to Joseph Lavelle,

8   increase the speed of the conveyor belt well beyond the set speed established by the

9   Navy and concurred in by regulators. The conduct of increasing the conveyor belt

10  speed and submitting claims for payment that certified that the procedures,

11  including belt speed, had been followed, was a false statement and false claim and

12  material to the claim for payment and the decision by the Navy to make the

13  payment. HP RCTs tried to correct the speed in the field and complained to TTEC

14  management listed above that the speed had been increased beyond approved

15  limits.   Tetra Tech EC management, including Neil Hart, Ulrika Messer, and Joe

16  Lavelle, had supervisors, including Justin Hubbard, repeatedly increase the

17  conveyor belt speed during the day when HPs were at lunch and on break.  After a

18  series of arguments with HP RCTs over Tetra Tech EC increasing the conveyor belt

19  speed Tetra Tech EC management had a lock put on the conveyor belt speed

20  mechanism so that the conveyor belt ran at excessive speed and could not be

21  corrected by the HPs.  Tetra Tech EC, Inc. internal memorandum state that the

22  conveyor belt ran at twice the speed established by the Navy as part of the contract

23  provisions.  HP RCTs who worked with the conveyor belt estimate that the

24  conveyor belt ran at 6 to 9 times the speed established by the Navy, and that

25  statements that the belts only ran at twice the contractually required speed were

26  false. The running of the belt at excessive speeds took place from June of 2005

27  through March of 2006. The false reports were used to support false claims for

28  payment by TTEC that were submitted to the Navy Base Realignment and Closure

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

- 13 -

(BRAC) offices included demands for payment for these soils that were within 10 years from the filing of the Smith complaint in March of 2016, including monthly claims for payment to the Navy for these false claims extending from March 2006 through September of 2006. In addition, the later efforts to address the PCB Hot Spot soils as discussed below began after March 2006 and continued for approximately six months in the field and resulted in false claims for payment by TTEC to BRAC into early 2007.

27.     Tetra Tech EC management also pressured New World Environment General Manager Mike Wilson to have the conveyor belt system alarm less frequently to save costs.  Mike Wilson pressured his brother, Gary Wilson, and Jane Taylor, an HP who was in a sexual relationship with Gary Wilson at that time, to take steps so the conveyor belt system did not alarm properly in violation of the contractual terms with the Navy.  Gary Wilson and Jane Taylor were supervisory HPs over the PCB conveyor belt system in 2005 and 2006.  Due to the pressure from Tetra Tech EC management, Gary Wilson and Jane Taylor decreased the sensitivity and then later in late 2005 and early 2006 turned off the PCB Hot Spot alarm.

28.     As a result of the conduct of Tetra Tech EC, the PCB conveyor belt ran too fast for months, and ran with an insensitive and then disabled alarm for months.  Thousands of cubic yards of soil from the PCB Hot Spot were processed through the conveyor belt system fraudulently by TTEC in violation of the agreement with the Navy.  Soil was periodically pulled off the conveyor belt infrequently to make it appear that the system was operational, when in fact the conveyor belt system was not functioning and was being used in a fraudulent manner by TTEC to defraud the Navy regarding the Parcel E PCB Hot Spot remediation work.  Tetra Tech EC management, including Neil Hart, Ulrika Messer, and Joe Lavelle, was aware of the PCB Hot Spot conveyor belt fraud and had directed the fraud.  Newly arrived Project General Manager William Dougherty

- 14 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

learned of the PCB Conveyor Belt fraud soon after taking over management of the Hunters Point remediation project for TTEC. GM Dougherty took steps to insure that the Navy was not informed of the full extent of the radiological remediation fraud that TTEC had engaged in, and took steps to insure that the Navy did not learn that management of TTEC had directed the remediation fraud and been directly involved in carrying out the fraud by conduct such as installing the lock on the conveyor belt to assure that the belt ran at excessive speeds. During the statute of limitations period Tetra Tech EC reported to the Navy that the PCB Hot Spot conveyor belt system was properly functioning, which was a false statement.  The false statements of Tetra Tech EC were material statements related to the payment for services requested Tetra Tech EC, Inc. from the Navy. False statements and reports pertaining to the false operation of the PCB Hot Spot conveyor system resulted in False Claims in 2006 and 2007 under contract N68711-98-D-5713 Task Order 0084 and may have been included in other later contracts and task orders.

29.    In 2006, due to continued objections from HPs and tips given by HPs, the PCB Hot Spot conveyor and other conveyors were shut down due to the fraudulent operation by Tetra Tech EC. Tetra Tech EC,  management and agents confirmed that the PCB conveyor was operated for months at excessive speed, but in memos only admitted to the conveyor had been operated at twice the required speed.  Tetra Tech EC management, including Dougherty, confirmed that the radiological alarm on the conveyor for PCB Hot Spot on Parcel D had been disabled, but covered-up that action from disclosure to the Navy.

30.    Tetra Tech tried to cover-up the conveyor belt fraud from the Navy and regulators.  Tetra Tech had accumulated well over 3,000 cubic yards of fraudulently processed soil from the conveyor belt system that had not yet been shipped off Hunters Point when the conveyor belt system was discontinued.  Tetra Tech EC in approximately June of 2006 assigned Justin Hubbard to oversee the processing of the accumulated falsely processed soil with the intent of falsely scan

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

the soil to obtain fraudulent clearance to the PCB Hot Spot soil as non-LLRW for disposal to keep within budget.  Tetra Tech EC had Justin Hubbard have front-loaders and backhoes take large scoops of soil, then have an HP with a hand-held sensor scan over the face of the soil scoop.  If high radioactive readings were not registered, the soil was deemed by Justin Hubbard to be "clean" so it could leave Hunters Point as radiologically remediated soil when it was known that the sensors could not register the lack of radioactive contamination above release levels within the interior of the massive soil scoop.  RCTs including Anthony Smith, and Robert McLean were directed to perform the hand scanning by Justin Hubbard. Smith and McLean objected that the hand scanning through multiple feet of soil shielded by thick metal walls on the side and back, was ineffective in detecting radioactive contamination above release levels. Hubbard explained that TTEC wanted the soil processed and cleared in this ineffective cheap manner to try to make up for costs that had exceeded budget. The process used for clearing the 3,000 plus cubic yards of PCB and rad contaminated soil was contrary to the rules and requirements established by the Navy and standard operating procedures, including that scanning was to be done of the soil in 6 inch or less depths, and was done to obtain false clearance of the PCB Hot Spot soil as non-LLRW.  The soil in the front loader and backhoe scoops was too thick, often over four feet thick, and the sides of the scoops were thick dense steel, all of which effectively shielded radioactive contamination within the soil scoop from detection.  Hubbard, as expected by TTEC management pressured HPs to scan the loads at excessive speed and excessive distance so that loads would not be flagged as having excessive radioactive material intensity. Hubbard was pressured by Tetra Tech EC management to obtain fast clearance of the soil, with the false objective of having little soil designated as LLRW. Tetra Tech EC management knew from working with Hubbard that Hubbard was effective in threatening and forcing HPs to perform in manners contrary to contractually mandated and industry accepted practices and procedures. Tetra Tech

EC also took steps to obtain false portal monitor clearance of the PCB Hot Spot soil. Tetra Tech EC had Hubbard and Joe Lavelle harass HPs to give clearance to trucks processed through the portal monitor. Tetra Tech also falsely shut down the portal monitor under the guise of needs for repair when PCB Hot Spot soil shipments were planned to go through the portal monitor. TTEC had HPs hand scan the trucks in a manner too far and too fast to obtain readings that would indicate the presence of radiological contamination above release levels in order to obtain fake clearance of the PCB Hot Spot soil leaving Hunters Point as non-LLRW. Tetra Tech EC knew the process being used for the clearance of the PCB Hot Spot soil violated the terms and conditions of the agreement with the Navy, but certified and impliedly certified that all conditions were met.

31.    Tetra Tech EC, Inc. submitted false reports and billings to the Navy for the radioactive soil remediation at Hunters Point PCB Hot Spot during the months the conveyor was run after the running at excessive speeds of approximately two to nine times the established speed, which included cost-plus submissions to the Navy in March 2006 through no less than September 2006 on a regular monthly basis.  TTEC submitted false reports regarding the clearance of the stockpiled PCB soil to the Navy and submitted cost-plus submissions to the Navy for this work beginning mid-2006 and continuing to be included in the monthly submissions for payment from the Navy into mid-2007. The reports and billings by Tetra Tech EC to the Navy certified and impliedly certified that the remediation for which Tetra Tech EC, Inc. submitted billings to the Navy was done according to established operating procedures which included the conveyor belt speed and operational alarm.  On information and belief, it is alleged that the false invoices for the PCB Hot Spot soil processing were completed by June of 2007, but may have continued if TTEC submitted re-submissions, which happened from time to time. These representations were knowingly false and were material to the demands for

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

payment made by Tetra Tech EC, Inc. and material to the decision to pay by the Navy in violation of the False Claims Act, 31 USC §3729 (a)(1)(A) and (B).

## HUNTERS POINT SOIL SAMPLE "VICINITY FRAUD"
## Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD

32.     The USFAC has alleged in paragraphs 56-59 two forms of soil sampling fraud, namely soil sample switching with "clean" soil, and false soil samples taken at the directions by supervisors, such as Jane Taylor, to obtain samples from outside of the survey areas and falsely submit those outside survey area samples as having been obtained from the survey area. The soil sample switching with "clean" soil was alleged by Smith in his original complaint. The following allegation as to soil sample fraud in the field was contained in Smith's original complaint and continues to be alleged by Smith and was not incorporated into the USFAC and is set forth herein.

33.     Pressure was applied by TTEC management to cut corners and violate required procedures in order to obtain false final clearance of soil survey units at Hunters Point. After the transfer of William "Bill" Dougherty to Hunters Point as the Tetra Tech EC General Manager for Hunters Point, and Construction Superintendent Dennis McWade in the spring of 2006, the level of pressure to engage in false soil sampling increased from TTEC management. Pressure was applied to supervisors, including Radiation Field Supervisor Steven Rolfe, and Radiation Field Supervisor Justin Hubbard, and sub-contractor RSRS owner Daryl Delong, and others, to create false records and reports pertaining to the samples taken at Hunters Point for radioactive materials that were delivered to the laboratory.  The faked soil sampling took place for samples in areas that had been trenched, in areas that had once had buildings, and in surface areas of Hunters Point.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

34.     RSRS Radiation Control Technicians (RCT), also referred to as HPs, including but not limited to Anthony Smith, Ray Roberson, Joe Cunningham, Jeff Rolfe, Marie Winder, Jane Taylor, Blake Willet, and Rick Zahinski were ordered to obtain soil and material samples for radiological testing in a manner that was intentionally and knowingly false. These RSRS RCTs listed above did engage in false "vicinity fraud" soil sampling from mid-2007 through mid-2014, and possibly continuing, while each was employed at Hunters Point. RCTs were required by Navy approved procedures that samples be taken from specific locations that were marked in some manner, usually with orange spray paint by engineers working for Tetra Tech, EC and RSRS.  The marked spots were required to be the locations/spots that had been scanned for radiation and had the highest radiological emission readings for the survey unit.  The Navy's plan and orders and contractual requirements were that samples were to be taken from a specific number of the highest radiological reading areas in the survey unit. The samples were to be taken from the specifically designated spots marked along with an accurate and truthful Chain of Custody document to identify the location of the sample, the time the sample was taken, the identity of the person taking the samples, as well as truthfully listing all subsequent chains in custody.

35.     The soil samples delivered to the lab resulted in lab results.  If the samples of these scanned high level areas were tested by the lab and had radiation levels above "free release" standards, then further remediation efforts to remove radiation contamination were required by contract terms with the Navy, and another round of remediation and samples were required to be taken.  If all samples tested by the lab had results of less radioactivity than the "free release" standards, then the area could be processed forward as remediated of all hazardous radioactivity for full and final release.

36.     Under the Cost-Plus contracts between the Navy and TTEC, management of TTEC, including Dougherty, McWade, and Charles Taylor,

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

pressured supervisors and RCTs to take false samples to obtain false clearance so that Task Orders would come in close or under budget, in order to improve the potential for TTEC to obtain further Hunters Point and military remediation contracts with the Navy Base Realignment and Closure (BRAC) program. Under the Firm Fixed Price Contracts that became effective in 2009, Dougherty, McWade, and Taylor, and other managers of TTEC applied greater pressure on management, supervisors and RCTs to cut corners, cheat, and submit false reports to decrease costs, increase profits for TTEC, and obtain false "successful" clearance, that resulted in false reports used to support false claims for payment from the Navy.

37.    Beginning in late 2006 or early 2007 and increasing under pressure directed by TTEC management, including Ulrika Messer, Joe Lavelle, Bill Dougherty, Dennis McWade, Rick Weingarz, and  Charles "Chuck" Taylor, Radiation Control Technicians were ordered by their Tetra Tech EC supervisors to appear to take samples from spray painted marked sample spots, but to actually take samples from areas in the vicinity of the marked spots within the survey unit, usually within 25 feet or so, but were to avoid submitting dirt samples from the areas marked as having high radioactive readings, instead submitting dirt in the sample containers that came from areas in the vicinity of where the sample should have been taken within the survey unit.  The objective of this false vicinity sampling was to avoid the specifically high radiological contaminated areas contrary to the agreement with the Navy that required the samples to be taken from the highest radioactive reading locations, and instead and falsely take samples from areas lower in radiological contamination that would be below the "free release" levels set by the Navy.  For months prior to and in 2008 and early 2009 the Radiation Control Technicians took the samples using the "vicinity sample fraud". These false soil samples were used by TTEC to create false lab results, false summaries of lab results, and false reports that were used to support the claims for payment TTEC made on a monthly basis to the Navy for this false work. The false

samples, resulting false lab results, and resulting false reports used to support the TTEC demands for payment from the Navy BRAC offices were material to the claims for payment and material to the decisions of the Navy to pay the demands for payment by TTEC. The "vicinity sample fraud" did assist TTEC in reducing labor costs, lab costs, and time.  However, lab results of the vicinity sample fraud from time to time were over the "free release" standards for radioactive contamination despite the fraudulent efforts to avoid the elevated radioactive soil areas.  The samples, the chain of custody documents, and the lab results when "vicinity fraud" was used were all false documents used to make claims for payment to the Navy. Dozens of RCTs working at Hunters Point were compelled to engage in the vicinity fraud, including Anthony Smith, Ray Roberson, Joe Cunningham, Jeff Rolfe, Marie Winder, Jane Taylor, Blake Willet, Alan Campellone, Brian Cheek, Chris Fluty, Dee McFarland, John Polyak, Tina Rolfe, Ray Romanski, Nathan Smith, Dan Spicuzza, Pat Vigil, Gary Wilson, and Fredrick "Rick" Zahinski. On information and belief it is alleged that after the "soil swapping fraud" in the CONEX box previously alleged by Smith, and adopted by the UAFAC in paragraphs 56-59, was suspected by TTEC as being susceptible to discovery in late 2012, TTEC engaged again more frequently in the "vicinity sample fraud" to avoid fraud detection, and continued to use "vicinity sample fraud" through 2014 at Hunters Point. The RSRS employees engaged in the "vicinity sample fraud", including Anthony Smith, Ray Roberson, Joe Cunningham, Jeff Rolfe, Marie Winder, Jane Taylor, Blake Willet, and Rick Zahinski, created false Chain of Custody" (COC) documents, for the COC document was to accurately reflect the location of the soil sample. Due to the "vicinity sample fraud" the COC document was false for it misrepresented the location of the soil sample. The "vicinity sample fraud" resulted in false COC document, and reports that were used to support claims for payment by TTEC from approximately 2007 through 2014 that were false claims due to the soil "vicinity sampling fraud".

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

38.     The false samples were tested by the on-site laboratory, and a selection of the samples was submitted to a third-party laboratory.  The laboratory results, both from the Hunters Point laboratory and from the third-party lab were submitted to the Navy and regulators as part of submissions by TTEC seeking payment for services from the Navy.  The truth and accuracy of the laboratory results reflecting actual sampling of the areas the samples were purportedly taken from was material in the decisions of the Navy to make payments to defendants for the services. The representations by defendants TTEC as to the lab results, and RSRS on the chain of custody documents, were knowingly false and material to the process for submission for payment and the review and decisions by the United States in regards to the making of payments to TTEC under the contracts involved for the soil samples were not taken from the locations that were represented by TTEC in the reports and demands for payment.

39.     Defendants Tetra Tech EC, Inc., and RSRS management, including Daryl DeLong, Vice President of RSRS, conspired to engage in fraud and the submission of false statements regarding the taking of soil samples, by directing supervisors of TTEC and RSRS employees to obtain samples from the vicinity, but not the locations with the highest radioactive readings contrary to the contractual requirements with the Navy, and to create false COC documents as part of the vicinity sampling fraud by falsely reporting on the COC document that the sample was taken from the scanned and designated highest radioactive reading areas.  The false soil sampling was intentionally fraudulent, intended to obtain false "free release" designation of areas to be remediated of radioactive contamination. A "Free release designation was necessary for TTEC to obtain clearance for final and substantial payments, and was a critical portion of the document submissions leading up to final submission for "free release" clearance for a unit or parcel being remediated under the contract with the Navy. The false and fraudulent soil samples, the false COC documentation, the resulting false laboratory results due to the false

- 22 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

samples and COC documents were all false records and intended to cause the United States Navy to approve and make payments to TTEC. Relator Smith is personally aware that the "vicinity sample fraud" conducted by RSRS employees took place in 2008 and continued at least until Smith's release from work at Hunters Point due to work force cuts on September 28, 2012. Relator Smith was personally directed to engage in the "vicinity sampling fraud" by TTEC supervisors Rolfe and Hubbard. On information and belief it is alleged that the vicinity soil sampling fraud to defraud the United States began prior to Relator Smith's personal knowledge and observations due to Smith's awareness that other RCTs already knew and had engaged in the vicinity sample fraud when Smith was first directed to engage in that fraud in 2008. On information and belief, it is alleged that the vicinity soil sampling fraud continued in tandem with the soil switching fraud Smith initially alleged and that the United States has joined and intervened in as set forth in the United States' First Amended Complaint in Intervention Against Tetra Tech EC, Inc. at section D (1), and that the vicinity sample fraud by TTEC and RSRS continued through at least 2014 and 2015.

40.     The false records of soil samples tested for radioactivity were submitted on a regular and often daily basis to government officials of the United States, including Navy Radiological Affairs Support Office (RASO) members and the Base Realignment and Closure office members, as part of the reporting requirement under the contract with the Navy. The false records of soil samples were incorporated into progress reports submitted by Defendants to the United States for government review of the remediation progress of Hunters Point. The Defendants submitted Final Status Surveys to the United States containing the false records of vicinity soil sampling fraud samples tested for radioactivity to report final radioactive remediation meeting free release goals by the Navy for the radioactive clean-up of Hunters Point. These false records were material to the contract and to the demand for payment by TTEC for the radioactive remediation

work performed at Hunters Point.  Defendants certified and impliedly certified that the reports were true and correct, but such reports were in fact knowingly false and fraudulent. False demands for payment from TTEC, using vicinity soil sample fraud records, which RSRS assisted in creating, were submitted to the Navy BRAC office for payments on a regular monthly basis, on information and belief and the facts and allegations set forth herein, from the middle of 2007 through 2014 on a regular basis, and after 2014 the submissions using the false vicinity sampling fraud records were submitted on a less frequent basis in 2015, and very few in 2016 and 2017, with the delay for some of these later billings due to re-submission of the billings for a variety of reasons.

41.    The false records of soil samples tested for radioactivity due to vicinity fraud were submitted on a regular basis to the Navy's Radiological Affairs Support Office (RASO), and also to the Navy's Chief of Naval Operations Energy and Environmental Readiness Division (N45) Radiological Controls (RADCON) Branch Office with the Navy's Facilities Engineering Command Southwest (NAVFAC SW), the Naval Sea Systems Command (NAVSEA 04N) Radiological Controls Office, and finally the Navy's Base Realignment and Closure (BRAC) Program Management Office for payment.  The false records of soil samples tested for radioactivity were incorporated and attached to the Final Status Surveys of each unit area contracted to be remediated between the Navy and TTEC.  The Final Status Surveys were submitted with demands to BRAC for payments under the contract with the Navy by Tetra Tech EC, Inc.

42.    Each knowingly made false record of soil samples due to the "vicinity sample fraud" at Hunters Point caused to be made a false statement material to a false and fraudulent claim by Tetra Tech EC, Inc. for payment from the Navy, done by RSRS and by Tetra Tech EC, Inc. jointly and in conspiracy together, in violation of the False Claims Act 31 USC Section 3729.  Each and every chain of custody document submitted with a false "vicinity sample fraud" is a false record or

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

statement material to a false claim submitted by Tetra Tech EC to the Navy for payment in violation of 31 USC § 3729 (a)(1)(B).

43.     The United States of America has been damaged by the false claims submitted by Defendants.  The United States of America contracted with Defendant Tetra Tech EC, Inc. for the remediation and removal of radioactive materials above a specified level for the health and safety of the environment, the public, and future generations.  The fraudulent taking of soil samples due to vicinity fraud to obtain a false clearance of areas contracted to be properly remediated of radioactive wastes deprives the United States of America of the basic service that was contracted for with Defendants.  The fraudulent taking of soil samples due to vicinity fraud creates unlimited future liability for the United State of America for the agreements between the United States of America and the City and County of San Francisco provide that the United States will remain responsible and liable for the radioactive remediation of Hunters Point after the property is deeded over to San Francisco, should it be discovered that the remediation did not fully and properly remove radioactivity.  The Navy will and has incurred costs, expenses, and delays in the remediation of Hunters Point that should not have been incurred, but for the fraud of Defendants Tetra Tech EC, Inc. and RSRS in submitting fraudulent soil samples. The full costs directly and derivatively related to the fraud accomplished by Defendants Tetra Tech EC, Inc. and RSRS are extensive and yet not fully known and will be established at trial.

44.     Each false record of soil sample, false chain of custody, resulting false laboratory test, and resulting false report to the Navy in support of a claim for payment is a false claim under 31 USC Section 3729(a) for which a civil penalty is required, and three times the amount of damages that the United States has and will sustain because of the acts of Tetra Tech EC, Inc. and RSRS in fraudulently switching and fraudulently submitting soil samples.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

**HUNTERS POINT PIPE SCAN "VICINITY FRAUD"**
**Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD**

45.     Clay and concrete pipes were used by the Navy for sewer lines and stormwater drain lines. The contracts with the Navy and TTEC required these pipes to be excavated and removed. As part of that process earthmoving equipment would dig trenches down to these pipes, varying between 4 to 15 feet in depth. When the pipes were reached, while in place the pipes and surrounding dirt was to be radiologically scanned.

46.     After the arrival of Dougherty and McWade to Hunters Point in 2006, these managers increased pressure on other supervisors which was applied by the supervisors to the RCTs. All piping was removed to be disposed. Pipes that were scanned and provided evidence of radioactive elevated contamination were to be tracked and remediated if possible. TTEC, through supervisors Hubbard and Rolfe, directed RCT under their team supervision, including relator Smith, Cunningham, Roberson, Jeff Rolfe, Tina Rolfe, Marie Winder, Jane Taylor, Fredrick Zahensky, and others to falsely scan and sample removed pipes to minimize the number and extent of pipes to be remediated and/or disposed of as LLRW. A substantial number of the involved RCTs were employees of RSRS. RSRS co-owner Daryl DeLong knew of the pressures put upon the RCTs by Hubbard and Rolfe due to observing the pressures applied, as a result of meeting in which TTEC supervisors and managers discussed efforts to reduce time and expense in which these pressures were discussed in the presence of DeLong and Henderson, and due to comments and objections expressed by RCTs to DeLong and Henderson. Requirements under the contract and work plans required detailed scanning, and sampling taken of the extracted pipes. In order to submit false data and samples, RCTs were directed to not scan the entire pipe, but rather to identify an area of low readings on the pipe and leave the scan sensor on that area for an extended time to simulate that the pipe

- 26 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

had been properly scanned. Further, smear sampling was to be taken from a specified number of the highest radioactive reading areas on the pipe so that there could be an evaluation of whether the pipe needed to be remediated, or possibly treated as LLRW for some or all of the pipe. Rather that follow those requirements, RCTs were ordered by TTEC supervisors, including Rolfe and Hubbard to take smear samples from areas that evidenced some of the lowest radioactive readings. The directions to RCTs by TTEC supervisors that were in violation of the Navy rules and procedures was done to limit the amount of work that would be required to remove radioactive contamination from the pipes. The directions to the RCTs by TTEC supervisors was also done to limit the amount of work and expense that would be required if the pipe was deemed LLRW and had to be disposed of as LLRW. [LLRW disposal dump fees ranged from approximately $30 a cubic foot to over $100 a cubic foot depending on the nature of the radioactive waste, thousands of times more than if the concrete and clay pipe was deemed free of radioactive contamination.]

47.     Pipe waste that was falsely scanned and smeared was tracked by TTEC to assure false clearance through the portal monitor for disposal. Pipe that was falsely given clearance as non-radioactive waste was loaded into large tractor trailers. At times, when a large number of trucks of falsely scanned and cleared pipes and debris were to be shipped off Hunters Point, TTEC would not permit the portal monitor to operate claiming it was not working properly, so that RCTs would hand scan the truck in a manner to obtain false clearance for the truck to leave Hunters Point. False clearance by hand scanning was achieved by the RCT, due to the pressure from TTEC supervisors and Construction Superintendent McWade, by scanning faster and too far from the surface than contractually required standards so that elevated radioactivity would not register resulting in false clearance for the truck to leave with the concrete and clay pipes as if the material did not have elevated radioactive contamination. If the portal monitor was operating TTEC

- 27 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

supervisors, including Hubbard and Rolfe, took steps to see that RCTs that would assist with the fraud upon the Navy due to the pressures exerted upon the RCT were stationed at the portal monitor. If the truck failed the portal monitor sensors the RCT hand scanned the truck trailer too fast and too distant from the truck so that the truck obtained fraudulent clearance to leave Hunters Point as if the material did not contain elevated radioactive contamination.

48.   Each knowingly made false record of pipe scanning and scanning of trucks leaving Hunters Point containing pipe debris at Hunters Point caused to be made a false statement material to a false and fraudulent claim by Tetra Tech EC, Inc. for payment from the Navy, done by RSRS and by Tetra Tech EC, Inc. jointly and in conspiracy together, in violation of the False Claims Act 31 USC Section 3729.  Defendants DeLong and Henderson are liable under 31 USC Section 3729 (a) (1) (2) and (3) for conspiring, knowingly causing to be made false records that were material to false claims that TTEC submitted to the Navy. Each and every chain of custody documents submitted with false record of pipe scanning and scanning of trucks leaving Hunters Point containing pipe debris is a false record or statement material to a false claim submitted by Tetra Tech EC to the Navy for payment in violation of 31 USC § 3729 (a)(1)(B).

## HUNTERS POINT BUILDING SURVEY SCANNING FRAUD
### Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD

49.    The USFAC has alleged in paragraphs 65-70 forms of building data falsification, including versions that were contained in the original under-seal Smith complaint, identifying building data duplication fraud, and that RCTs were directed to "just get numbers" to turn the scanners on but not scan the buildings. Smith alleged and alleges other forms of building data fraud that are not set forth in the USFAC, which are set forth herein.

50.     Tetra Tech EC, Inc. was required by the contracts with the Navy to survey buildings at Hunters Point for radiological contamination at specified scanning speeds. RCTs were to take hand-held and cart mounted scanning instruments and scan the buildings for elevated radiological readings. The scanning instruments contained electrical memory of the scan results that were retained and could be downloaded onto a computer.

51.     When scanning was done, if any of the scanned areas has readings above expected background radiological readings more than a defined limit the area would be required to be subjected to expensive and time-consuming radiological remediation by TTEC to remove radioactive contaminants.

52.     RCTs were ordered by Tetra Tech EC managers and supervisors to fake building scans in ways in addition to the fraud schemes described in the USFAC in paragraphs 65-70. First, when scanning was performed, both in initial scans and more particularly when remediation of a building had been previously attempted and TTEC wanted the building to obtain results warranting clearance, RCT were ordered by TTEC supervisors, including Hubbard and Rolfe, to scan at speeds in excess of the Navy and regulator defined speed. Top management of TTEC directed that the supervisors have the RCTs scan at speeds that exceeded the Task Specific Plans (TSP) required. On site Management of TTEC and sub-contractor companies had arguments in which objections to excessive scanning speeds were raised, including by Donald Wadsworth of New World Environmental, and TTEC managers insisted on having the scan speeds done in an excessive manner. By scanning at excessive speeds, the instruments were less sensitive and would not register the elevated radioactivity that remained in the buildings. Scanning at excessive speeds was directed and a knowing violation of the contract, done to support false claims by TTEC to the Navy.

53.     When RCTs did perform scanning, even when at excessive speeds, when TTEC wanted to obtain building clearance, be it initially or after a round of

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

remediation, TTEC supervisors ordered RCTs and staff to review on a non-networked computer at the site the scanner downloads before the results were downloaded into the company on-site computer. The RCTs and staff were directed to remove scan readings that were too high and scan results that were so low the results would possibly raise questions whether the scan data validity. Relator Anthony Smith observed TTEC supervisor Steve Rolfe direct staff at the computer to change the building scan data. At the direction of TTEC management, RCTs and TTEC supervisors Rolfe and Hubbard changed the scan numbers at the building site to create false data so the scan numbers fell within the acceptable range.  Virtually all building scan numbers for all but a few of the very first buildings scanned were subjected to this data corruption process rendering the data false. At USFAC paragraph 68 a listing of buildings with false data of duplicate scan results and "just get number" fraud are listed, namely 103, 113, 113A, 130, 146, 253, 272, 351, 351A, 365, 366, 401, 411, 439, and 810. Those buildings also had false data recorded by excessive speed, and individual data manipulation as herein alleged, as well as Hunters point buildings 140, 157, 203, 211, 214, 224, 241, 271, 813, 144, 406, 414, 521, and 707. The fraudulent excessive speed building scan took place with these buildings over a period of years, with most during 2009 to 2012.

54.     The building survey scan information was falsified and material to claims for payment by TTEC to the Navy from at least 2008 through at least 2014. The reports and billings by Tetra Tech EC to the Navy represented, certified and impliedly certified that the building scans were properly done, followed required procedures, and accurately reflected real building scans.   These representations were knowingly false and were material to the demands for payment made by Tetra Tech EC, Inc. and material to the decision to pay by the Navy in violation of the False Claims Act, 31 USC §3729 (a)(1)(A) and (B).

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

## Hunters Point Copper Removal And Sale
## Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD

55.     A great number of the buildings at Hunters Point had substantial copper assets, tin, and valuable metals at the time that Tetra Tech EC, Inc. obtained the contracts with the United States Navy.  The copper assets included copper gutters, downspouts, large gauge copper wire, copper hoods, and a large variety of copper items in and on the buildings throughout Hunters Point.

56.     In or about 2007, RCT Donna Watson was staffing the Portal Monitor at Hunters Point.  TTEC Construction Superintendent Dennis McWade entered a discussion with Watson.  During the discussion Watson mentioned to McWade that she was surprised that the copper gutters and downspouts on the Navy buildings remained on the buildings after the Naval base has been closed, leased, and for some time had been unused and largely abandoned by the Navy.  McWade stated to Watson that the downspouts were not copper, but a metal with no real recycle value.  Watson told McWade he was mistaken, and Watson had McWade go with her to a downspout.  Watson took a metal object and scratched the downspout exposing the distinctive copper color under the patina surface.  McWade expressed surprise the metal was actually copper.

57.     Some time not too long after Watson had shown McWade that the downspouts were copper, Watson was again working the Portal Monitor.  As part of the contractual agreement and procedures established by the Navy, Tetra Tech was to assure that all incoming and outgoing commercial vehicles that entered or left Hunters Point were to pass through the Portal Monitor to be scanned for radioactive contamination.  Watson noticed that trucks with scrap metal loads were leaving Hunters Point and did not proceed through the Portal Monitor she was staffing, which was the only portal monitor operating.  Watson approached McWade about the breach in the requirement that all trucks leaving Hunters Point

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

RCAs were required to be processed through the Portal Monitor, and that the trucks containing scrap metal were leaving Hunters Point without going through the Portal Monitor.  McWade ordered Watson to keep her eyes on the Portal Monitor and the trucks that went through the Portal Monitor, and to ignore any other activity of scrap metal trucks leaving Hunters Point.  McWade stated words to the effect of "You just need to keep your eyes where they need to be" and ignore the scrap metal trucks leaving Hunters Point RCAs that were not going through the Portal Monitor. Watson indicated to McWade she would object to trucks leaving Hunters Point RCAs that did not go through the Portal Monitor. McWade made statements and gestures to Watson that she had better not object or there would be negative repercussions to Watson. Tetra Tech removed Watson from the Portal Monitor shortly thereafter and assigned her to the office.

58.     Watson took the directive and the way McWade made the statements to her as a threat to her employment if she raised any further questions regarding the scrap metal leaving Hunters Point.  Watson observed that workers were stripping the copper gutters and downspouts on Hunters Point, along with removing other sources of copper, placing the scrapped copper and metals from sites throughout Hunters Point into the trucks and leaving Hunters Point without going through the Portal Monitor that was required by Navy mandated rule and would have required the generation of records that the trucks were in Hunters Point and left with metal in their trailer loads.  Watson did mention the copper scavenging that was being done at Hunters Point and the statements of McWade to a few other workers at Hunters Point.  Workers informed Watson that they were aware that Tetra Tech management was having scrap metal scavengers come to Hunters Point, strip the copper and other metals from the Navy buildings, and the workers referred to the process overseen by the Tetra Tech managers McWade and General Manager Dougherty as the Tetra Tech managers' "HD television fund" or their "vacation fund".

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

59.     Relator Smith did not personally observe or know of the copper and scrap metal scavenging at Hunters Point by Tetra Tech and its management team, for personal gain at the time it took place.  Relator Smith did not personally observe or know that the metal scavenger trucks exited Hunters Point without having gone through the Portal Monitor in violation of standards required by the Navy.  As part of Relator Smith's efforts to uncover fraud and improper conduct by Tetra Tech at Hunters Point, Smith and his attorneys have discovered that Tetra Tech had metal scavengers strip copper and metals from Hunters Point for the personal gain of Tetra Tech managers, and that Tetra Tech managers ordered and approved of the metal scavengers coming on to Hunters Point, and leaving Hunters Point without processing through the Portal Monitor in violation of the procedures dictated by the Navy.  Relator's information is independent of any media report or government report and is based on his independent efforts t uncover this fraud upon the Navy.

60.     Tetra Tech certified and implied certification that it followed the rules and procedures required under the contract with the Navy, which included that all trucks entering and leaving Hunters Point with equipment and materials had to go through the Portal Monitor.  The portal monitor process and certification is important to the Navy for the Portal Monitor was the last check in the navy's effort to assure that hazardous radioactive contaminated materials inadvertently left Hunters Point or left Hunters Point in a manner that did not properly designate and dispose of the radioactive contaminated material as radioactive hazardous material or LLRW.  Tetra Tech EC certified or implied certification that it was protecting the assets of the Navy entrusted to it by the Navy and was not stealing the Navy assets at Hunters Point.  The certifications and implied certifications by Tetra Tech were false and was material to false claims submitted to the Navy.  These representations were knowingly false and material to the demands for payment made by Tetra Tech EC, Inc. and material to the Navy's decision to pay the false claims in violation of the False Claims Act, 31 USC §3729 (a)(1)(A), and (B). The

- 33 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

conduct of Defendant Tetra Tech EC, Inc. entrusted with possession of Navy property, such as copper, tin, and valuable metals, failed to protect and deliver back to the Navy all entrusted metals on Hunters Point, but converted the property of the Navy to its own, is a violation of 31 USC §3729(1) (D).

## HUNTERS POINT
## WADSWORTH/McLEAN PLAINTIFFS/RELATORS
## CASE #16-CV-1107-JD

The USFAC encompasses and subsumes some of the allegations and defendants for the Wadsworth/McLean Plaintiff/Relators, but not all. The following are the allegations and defendants for the Wadsworth/McLean Plaintiffs/Relators which do not appear to be encompassed by the USFAC.

## HUNTERS POINT, TREASURE ISLAND, AND ALAMEDA NAVAL BASE
## CONSPIRACY BETWEEN TTEC, IOEI AND RSRS
## Plaintiffs/Relators Wadsworth/McLean Allegation 3:16-cv-01107-JD

61.     The prime contractor with the Navy for the remediation of Hunters Point Naval Shipyard as of 2006 was TTEC which installed Dougherty as a new General Manager over the Hunters Point Naval Shipyard on or about 2006. Dougherty on behalf of TTEC engaged in a conspiracy with the principles of Defendant RSRS, namely Defendant Brian Henderson and Defendant Daryl Delong, and with Mike Bilodeau who formed in 2006 Defendant IOEI to defraud the United States Navy and related agencies regarding the remediation services and accomplishments at Hunters Point in order to obtain unearned payments from the Navy for TTEC.  Under the remediation contracts with the Navy a change in the form of the contracts took place over the mid-to-late 2000's.  Early stage contracts

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

for remediation services were for surveys to identify the location and characterization of potential radioactive wastes were billed and paid largely on a time and material cost nature.  During the time and materials, cost-plus contract period, Dougherty, McWade, Taylor, and Weingarz determined it was beneficial to TTEC to obtain favor of the Navy and future contracts for remediation of military bases to complete contracts at or below planned budgets with the Navy. TTEC, through Dougherty, McWade, Taylor, and Weingarz managers, and supervisors Rolfe and Hubbard, worked with RSRS owners DeLong and Henderson and IOEI owners Bilodeau, and supervisory on-site IOEI employee Christine Dougherty during the cost-plus contracts to submit false records as the result of fraudulent cost cutting measures to stay under budget. For some of the conduct herein alleged against RSRS and its owners DeLong and Henderson, it is alleged that the false conduct was known and engaged in that resulted in false records that were material to the claims for payment to the Navy. For some of the conduct herein alleged against RSRS and its owners DeLong and Henderson, it is alleged that the actions of RSRS employees and its owners DeLong and Henderson were not done with actual knowledge that the information was false or that the steps taken would result in false information and records material to a claims by TTEC for payment from the Navy, but rather were taken in deliberate ignorance of the truth or falsity of the information or were taken in reckless disregard of the truth or falsity of the information. For some of the conduct herein alleged against IOEI, it is alleged that the false conduct was actually known and engaged in by Christine Dougherty, the on-site supervisor for IOEI that resulted in false records that were material to the claims for payment to the Navy. For some of the conduct herein alleged against IOEI, it is alleged that the actions of IOEI employees and its owner Bilodeau and its on-site supervisor Dougherty were not done with actual knowledge that the information was false or that the steps taken would result in false information and records material to a claims by TTEC for payment from the Navy, but rather were

taken in deliberate ignorance of the truth or falsity of the information or were taken in reckless disregard of the truth or falsity of the information. In the later-half of the 2000's as the Navy contracts evolved and changed to focus on testing, scanning, and remediation of radioactive wastes in buildings and land the contracts evolved to be more of a fixed price nature to the contract and included progress and completion requirements of radiological remediation objectives to obtain scheduled payments under the contracts from the later 2000's onward.

62.     TTEC management, particularly Dougherty, Dennis McWade, and Andy Bolt, cultivated sub-contractor companies to supply specialized manpower in a way to cause the sub-contractor to be indebted and co-opted by TTEC.  In 2006, Mike Bilodeau was a disabled veteran who was supplying drinking water to Hunters Point because standard utilities such a fresh water were not available to those working at Hunters Point.  Mr. Bilodeau was approached by managers of TTEC including Dougherty.  Dougherty offered to Mr. Bilodeau that if Mr. Bilodeau formed a Service-Disabled Veteran-Owned Small Business, and Bilodeau agreed to hire Mr. Dougherty's wife Christine Dougherty, that Dougherty would see that Mr. Bilodeau's company got sub-contracted work from TTEC of providing Christine Dougherty to perform technical writing for submission of TTEC reports to the Navy and related governmental entities regarding the radiological remediation work at Hunters Point.  Based on the arrangement proposed by Dougherty, Mr. Bilodeau did hire Christine Dougherty in approximately March of 2006, and incorporated IOEI in June of 2006, with Mr. Bilodeau taking the role of CEO of IOEI.  IOEI was negligent in the hiring of Christine Dougherty for the TTEC Hunters Point radiological remediation project. IOEI took no steps to assure that Christine Dougherty had the background, education, training and experience to be qualified to perform the services necessary for the radiological remediation duties involving evaluation of the validity of radiological data, radiological analysis and exposure of defects in data, critical radiological report analysis and writing.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

IOEI was also negligent in the hiring of Christine Dougherty in that IOEI knew or should have known that Christine Dougherty was the wife of Project General Manager William Dougherty and that there could be pressures due to their marriage for Christine Dougherty to take less than valid and proper actions due to potential pressure from her spouse, and that without an on-site IOEI top level manager to oversee both the work of Christine Dougherty and to assure that there was no improper pressures exerted by TTEC upon the work of Christine Dougherty, it was negligent to hire Christine Dougherty into the position at Hunters Point.   Christine Dougherty was utilized in a variety of roles by TTEC, with the acquiescence of IOEI, including data management, radiological data review, oversight of radiological data, and assisting in the technical writing of false reports for Tetra Tech EC, Inc. to submit to the Navy. The reports and records IOEI generated were known by IOEI would be used by TTEC to make demands for payment from the Navy for the radiological remediation work.  For some of the reports and records that IOEI generated for TTEC to submit to the Navy, IOEI employees, including Christine Dougherty, and later OEI hires IOEI Data Manager Thorpe Miller, IOEI Quality Control Manager Karisa Miller, it is alleged that these individuals did not have actual knowledge that the data and information provided to them regarding soil samples and building scan data were false. Rather, for some of the reports and records IOEI generated for TTEC to submit to the Navy, IOEI employees acted in deliberate ignorance of the truth or falsity of the information, or in reckless disregard for the truth or falsity of the information. It is alleged that for the "vicinity soil sampling fraud", and the building scan speed fraud, that took place spanning 2007 through 2014 at least, that IOEI employees may not have been personally aware and involved in the creation of these false records that were used in the document production and reports that IOEI generated that were material to TTEC claims for payment to the Navy. However, for the "vicinity soil sampling fraud" and the building scan speed fraud it is alleged that IOEI employees Christine

Dougherty, later joined by Thorpe Miller and Karisa Miller, acted in reckless disregard for the truth or falsity of the information which they used to create records and reports that TTEC used to submit claims for payment to the Navy. Thorpe Miller knew that he did not have the education, training, skills, and experience to perform the Data Manager position over the radiological remediation of Hunters Point, and that he was hired into the position in large part due to the request of his mother, a top Navy RASO official, Laura "Laurie" Lowman, responsible for oversight of the radiological remediation of Hunters Point. Thorpe Miller took and continued in the Data Manager position despite his awareness that he was not sufficiently qualified for the duties of the position in part because he realized he had difficulty obtaining well paying employment due to recent criminal felony involvement he had with a recent prior employer. Karisa Miller knew she did not have the education, training, skills, and experience to perform the Quality Control position for IOEI over the radiological remediation of Hunters Point. Karisa Miller knew she had no prior training or experience in radiological remediation, radiological laboratory result analysis, or radiological testing and reporting quality control. Karisa Miller knew that her education and experience was in a different field, and that she was offered the position due to the involvement of TTEC General Manager Dougherty due to her in-law relationship with RASO manager Laurie Lowman. Christine Dougherty, Thorpe Miller, and Karisa Miller of IOEI were negligent in accepting and working in the positions for IOEI knowing their lack of relevant radiological education, training, and experience. Christine Dougherty, Thorpe Miller, and Karisa Miller acted in reckless disregarding for the truth or falsity of the information that came to them regarding the "vicinity soil sampling fraud" and the building scan speed fraud, and acted in reckless disregard for the truth or falsity of the records and reports that they generated for TTEC pertaining to these two areas of fraud upon the Navy. It is alleged that for the "soil swapping" sample fraud, the radiological yard sampling fraud, and the building

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

alteration of scan data, that IOEI employees Christine Dougherty, Thorpe Miller, and Karisa Miller acted both with actual knowledge of the false records and at time in reckless disregard for the truth or falsity of the records. For the "soil swapping" sample fraud, it is alleged that these IOEI employees had actual knowledge in the later years that the "soil swapping" sample fraud took place by 2012. The "soil swapping" sample fraud had been ongoing for several years by 2012 and involved hundreds if not thousands of samples. When soil was obtained from areas with different character than the intended area, the radiological "fingerprint" of that soil often resulted in laboratory tests that were very, very different. Due to the way radiological remediation took place at Hunters Point, a specific "unit" would often be sampled and tested multiple times over time. The soil sample "fingerprint" should not change from samples taken one month to samples taken a later month. The removal of radioactive contamination from a unit would not change the basic laboratory "fingerprint" of the soil. Christine Dougherty, Thorpe Miller, and Karisa Miller were tasked with daily involvement in the laboratory test results, and were responsible for review, evaluation, and identifying any apparent data problems or issues. It is alleged that for the "soil swapping" sample fraud that there were so many occasions that the false "soil swapping" samples were to very, very different from the prior "fingerprint" of the unit soils that these IOEI employees had to have actual knowledge the records were false. If, in the alternative, these IOEI employees did not have actual knowledge of the falsity of the "soil swapping" laboratory sample results, then it is alleged for the reasons herein stated that these IOEI employees acted in deliberate ignorance or reckless disregard for the truth or falsity of the "soil swapping" data that IOEI used to create reports and records that it knew TTEC would use to submit claims for payment to the Navy. For the Radiological Survey Yard (RSY) fraud it is alleged that Thorpe Miller had actual knowledge that the RSY data IOEI used in creating reports and records that TTEC would use to submit claims for payment to the Navy were false. Miller obtained

data from a series of radiological sensors that were towed behind a small tractor, called a "towed array". The towed array sent data of radiological intensity and GPS coordinates for the elevated radiological locations on the RSY soil layout pad. Miller was to designate on a map were the most intense radiological readings were on the RSY pad as a result of the towed array scan. It is alleged that at time, due to pressure and conspiracy with TTEC management, including Dougherty and McWade, that Miller did not create an accurate map so that the RCTs would not obtain soil samples from the highest areas. Additionally, it is also alleged that due to pressures on RCTs working the RSY that the RCTs and the assigned laborers would not take soil samples from the designed highest elevated locations, but would avoid taking the samples from high location, instead take them from areas that were scanned to have low radiological reading, or obtain soil samples from locations off the RSY entirely. Miller reviewed the laboratory results from the soil samples and could tell and did conclude that areas that were supposed to have had the soil samples taken were not taken contrary to the rules and procedures required based on the Navy contract. Miller failed to alert IOEI top management, or the Navy that the soil sample taking on the RSY was false and not in compliance with the procedures required under the Navy contract. For the building data scan alteration, for some of that alteration it is alleged that IOEI employees were not directly involved and that they acted in reckless disregard for the truth or falsity of the information. It is also alleged that for some of the building data scan alteration that Christine Dougherty and Thorpe Miller oversaw or directed TTEC supervisors including Steve Rolfe and Justin Hubbard as to the need to change building scan data and directed as to how that data was to be falsely manipulated. The data manipulation with involvement and direction by Christine Dougherty and Thorpe Miller took place at least during 2010 through 2013 and may have extended in time both earlier and later, and included building scans at Hunters Point, Alameda Naval base, and Treasure Island.  IOEI management, including Bilodeau, did not take

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

active and competent oversight of the work of Christine Dougherty, Thorpe Miller, and Karisa Miller, and did not have actual knowledge that Christine Dougherty, Thorpe Miller, and Karisa Miller were participating at times in the creation of records and reports to the Navy that were based on false information that TTEC knew was false. IOEI management did not actively oversee thee IOEI employees to assure that TTEC management, including Christine Dougherty's husband William Dougherty, the General Manager of TTEC, did not coerce IOEI employees to ignore data that appeared false or suspect of being false and incorporate into reports for the Navy that were potentially false. IOEI management acted in reckless disregard of the truth or falsity of the information that was being provided to IOEI at Hunters Point for use in the drafting of reports and records, in part due to the lack of presence of any non-compromised IOEI management at Hunters Point, and in part due to the lack of experience, knowledge, and expertise in the radiological field of Bilodeau and any other owner or top manager of IOEI. The oversight and management of Christine Dougherty, Thorpe Miller, and Karisa Miller by the ownership of IOEI was grossly negligent and done in reckless disregard for the truth or falsity of the information and reports that these IOEI employees generated. Additionally, TTEC, through the offer of William Dougherty to assist Bilodeau in the start-up of IOEI, provided Bilodeau with an opportunity to start a potentially profitable business using TTEC as a foundation, and Bilodeau and other top managers of IOEI did not want to interfere, question, or disrupt the relationship with TTEC, and as a result, like an ostrich, put their collective corporate heads in the sand and failed to act in reckless disregard of the truth or falsity of the information provided to IOEI employees at Hunters Point that was used by IOEI to create false records and reports for TTEC for Hunters Point, Treasure Island, and Alameda Naval base.

63.    In 2006, management officials of TTEC, including Dougherty, approached Daryl DeLong and Brian Henderson about forming a separate company

to provide radiological support personnel and equipment to Tetra Tech EC, Inc. at Hunters Point and potentially other locations.  Dougherty represented that he could and would take effective steps to channel sub-contract radiological work to the new company if formed, if DeLong and Henderson would cooperate with TTEC as needed, including engaging in submission of false data and reports, to assure that TTEC's work came in close or under budget and/or made profits from the radiological work at Hunters Point, Alameda Naval Base, and Treasure Island, and other locations they might provided sub-contractor services to TTEC.  DeLong and Henderson agreed to cooperate with Tetra Tech EC, Inc. as needed and requested, formed RSRS, and provided to Tetra Tech EC, Inc. sub-contractor work by providing themselves working on the TTEC radiological remediation project, providing radiological support workers, RTCs, and radiological related equipment, and assisted in the submission of knowingly false data and reports to assist TTEC in obtaining false payments from the Navy.

64.    As part of the conspiracy between TTEC, RSRS, and IOEI, the three companies, including DeLong and Henderson for RSRS, worked in tandem by agreement to defraud the Navy regarding to the radiation remediation services performed at Hunters Point, Treasure Island, and Alameda Naval base. At the urging of management of TTEC, RSRS under the direction of DeLong, Henderson and TTEC supervisors and workers engaged in false soil sampling by delivering to the laboratory soil samples that falsely represented the location the soil was taken from at Hunters Point, Treasure Island, and Alameda Naval base. RSRS owner DeLong was involved in the direction of soil sample location marking so that soil samples for areas that TTEC wanted "free release" clearance, especially areas that had been difficult to obtain "free release" clearance, were marked to avoid high radiological reading areas contrary to the contract with the Navy. RSRS owners DeLong and Henderson were also aware of efforts by TTEC to have RSRS RCTs take false soil samples at Hunters Point, Alameda Naval Base, and Treasure Island

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

in order to obtain false "free release" of survey unit area, and although not directly involved in some of those direction they were aware of, DeLong and Henderson did not take steps to stop RSRS and other employees from taking false soil samples from 2007 through 2014. DeLong and Henderson in reckless disregard for the truth or falsity of the soil samples being from the locations claimed on the COC permitted laboratory testing of those samples and used those laboratory sample results in the data evaluation and reports that Henderson and DeLong generated for TTEC that Henderson and DeLong knew would be used to make claims for payment upon the Navy. DeLong and Henderson were also involved in the oversight of the scanning of buildings and the management of the scan data that resulted. DeLong and Henderson were negligent in the supervision of their RSRS RCT employees involved in the scanning of buildings at Hunters Point, Treasure Island, and Alameda Naval Base. DeLong and Henderson failed to assure that RSRS RCTs scanned the buildings at these sites at the specified speeds required by the Navy contracts. DeLong and Henderson were aware that TTEC management applied pressure on its supervisors for corners to be cut to reduce costs and reduce time in the radiological remediation. With the knowledge that TTEC was applying improper pressure on TTEC supervisors to have RSRS employees cut corners, DeLong and Henderson acted in reckless disregard for the truth or falsity of the building scan data generated. At the urging of management of TTEC, IOEI employees, including Christine Dougherty, Thorpe Miller, and Karisa Miller assisted in the identification of high radioactive soil areas so that contrary to the Navy requirements, soil samples would not be taken from the highest radioactive areas, but from lower radioactive areas. Navy contract requirements and procedures required the soil sample to be taken from the highest radioactive reading areas. The taking of samples from areas other than the highest radioactive reading areas resulted in false lab reports and false reports that IOEI, RSRS, and defendants DeLong and Henderson assisted in creating so that TTEC would submit false

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

reports for payment from the Navy. Defendants engaged in this fraudulent conduct of mis-directing the taking of soil samples no later than 2008 and continued with this process through 2014 and may have engaged in the conduct both earlier and later than herein described. Examples of the coordinated falsification of soil samples includes, but is not limited to the false soil samples taken for Hunters Point from under building 351A in 2008 and 2009, sewer and storm drain Survey Unit 3, 4, 12, 13, 16,  and 8 of Parcel B in 2006-2007, and Survey Units 20-23, 30-36, 45-50, and 63 of Parcel B in 2010-2011, Parcel C Survey Units 193-212, 311-330, and others in Parcels D-2, E, G, UC1, UC-2, and UC-3 from 2007 through 2015; for Treasure Island IR site 6 and IR site 12 from 2012-2016; and for Alameda Naval Air Station and Annex, soils from Site 17 - Seaplane Lagoon, Site 1 and 32, former dumps, Site 2, another former dump, and soil from excavated sewer and storm drain lines from buildings 5 and 400 draining south into the Seaplane Lagoon and north into the Oakland Estuary from 2009 through 2014.

65.     As part of the conspiracy between TTEC, RSRS, DeLong and Henderson, and IOEI, the three companies worked in tandem and agreement to defraud the Navy in regards to the laboratory radiation remediation services performed at Hunters Point for the laboratory samples from 2007 on to 2014 for Hunters Point, Alameda Naval Station from 2009 through 2014, and for a limited period of time of 2007 to 2008, and 2013 for Treasure Island.  At the urging of management of TTEC, RSRS top management, DeLong and Henderson, with the assistance of IOEI managers Christine Dougherty, IOEI Data Manager Thorpe Miller, IOEI Quality Control Manager Karisa Miller, took efforts to avoid soil samples from being submitted and tested in the laboratory that could result in laboratory results exceeding "free release" levels set by the Navy. RSRS DeLong and IOEI Christine Dougherty and Thorpe Miller directed and assisted employees to intercept soil samples delivered to the laboratory by having samples hand scanned with a micro-r meter, and secretly reject samples that showed elevated

radioactivity before laboratory analysis. RSRS Vice-President DeLong was actively involved in overseeing the conduct of the lab clerical and RCT staff in the lab so that these staff individuals would hand scan the incoming soil samples with a hand held Ludlum Micro-R meter, and if the sample emitted a reading on the meter over a "5" DeLong directed the staff to designate that the sample had such an elevated reading. In the lab, staff scanned and designed the samples that gave a reading over a "5", and after hours the soil samples were switched with soils that had low Micro-R readings, and the COC was falsified to reflect that the substituted sample was the original sample. The substituted sample was then subjected to laboratory testing that generated false results due to the switching of the soil samples.  Field crews of RSRS RCTs at Hunters Point, Alameda Naval Base, and at Treasure Island when working for TTEC, and TTEC field supervisors from Hunters Point, Treasure Island, and Alameda Naval base were notified of the secretly scanned and rejected samples and were instructed to obtain replacement samples that would not have elevated radioactivity. After months of this fraudulent process to screen out possible elevated soil samples, field supervisors at Hunters Point, Treasure Island, and Alameda Naval base were provided Ludlum Micro-r meters and similar instruments, instructed on their use, and directed to pre-screen samples before the soil samples were sent to the laboratory so that elevated radioactive samples above a Micro-R meter reading would not screened out and not subjected to laboratory analysis contrary to the requirements of the Navy directed work plans that for a soil "unit" that the highest radiological reading soils be sampled and laboratory tested.

66.    The Navy contracts and process requirements at Hunters Point, Treasure Island, and Alameda provided that scanning of a survey unit was to be done and samples taken from a specified number of the highest radioactive reading locations, usually 18 location. Those elevated soil samples were to be submitted to the laboratory for analysis. If the lab results were all below "free release" levels the unit could be processed for survey unit clearance reports to the Navy. This process

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

was to be done and if there were elevated radioactive samples, the unit was to be subjected to costly remediation followed by another round of soil samples and repeated until the laboratory results all were below "free release" levels. TTEC, IOEI, and RSRS engaged in a conspiracy to identify samples that should be submitted to the lab, and block contractually required sample analysis by the lab, with false samples tested in their place, to submit false lab reports to support false demands for payment by TTEC to the Navy.

67.    The Navy contracts for Hunters Point, Treasure Island and Alameda required that a specified percentage of soil samples for a survey unit be randomly selected and sent to a third-party laboratory, for which TestAmerica, Inc. of St. Louis was usually used. TTEC, RSRS, and IOEI, through William Dougherty, McWade, Taylor, and Rick Weingarz of TTEC, DeLong and Henderson of RSRS, and Christine Dougherty and Thorpe Miller of IOEI conspired to defraud the Navy by interfering with the selection of "random" samples to be sent to TestAmerica for Hunters Point, Alameda Naval base, and Treasure Island. Rather, IOEI and RSRS took efforts to screen and block soil samples from being selected for shipment to TestAmerica that the data and scanning suggested the results would be above "release levels". As part of this process defendants DeLong and Henderson developed spreadsheets of samples they determined should be sent to TestAmerica based on review of data provided by IOEI employees Dougherty and Miller, and the hand scanning of samples by the Micro-r meter in the lab. Lists were created by DeLong and Henderson for the lab staff to specifically pick samples to be sent to TestAmerica, rather than random sample selection. Laboratory staff were chastised if random samples were inadvertently submitted to TestAmerica rather than the selected samples chosen by IOEI and RSRS, and defendants DeLong and Henderson. Soil samples that were subject to fraudulent manipulation control were sent to TestAmerica for Hunters Point for building 351A, sewer and storm drain Survey Unit 3, 4, 12, 13, 16,  and 8 of Parcel B in 2006-2007, and Survey Units 20-

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

- 46 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

23, 30-36, 45-50, and 63 of Parcel B in 2010-2011, Parcel C Survey Units 193-212, 311-330, and others in Parcels D-2, E, G, UC1, UC-2, and UC-3 from 2007 through 2015; and for Alameda Naval Air Station and Annex, soils from Site 17 - Seaplane Lagoon, Site 1 and 32, former dump, Site 2, another former dump, and soil from excavated sewer and storm drain lines from buildings 5 and 400 draining south into the Seaplane Lagoon and north into the Oakland Estuary from 2009 through 2014, and at Treasure Island in 2007-2008 for buildings 233, 343, 344 and soil areas, and 2013 for building 233 again and 1121 and 1323 and related soil areas.

68.    TTEC, IOEI, RSRS, DeLong and Henderson conspired together to submit false reports pertaining to building scans at Hunters Point, Treasure Island, and Alameda Naval base, to support false claims for payment by TTEC from the Navy. As part of this conspiracy, IOEI staff, including Christine Dougherty, Thorpe Miller, and Karisa Miller reviewed the data of building scans submitted by RSRS employees and other RCTs, along with DeLong and Henderson, and TTEC management. IOEI staff, Dougherty and Miller, and RSRS employees including DeLong and Henderson, reviewed the building scan data for elevated radioactive readings after submission from the field. IOEI and RSRS employees and managers combed the building scan data in and effort to change data to remove scan data that could result in Navy and regulatory review rejecting the claim that the building was qualified for radiological "free release". The changing of data after submission from the field included the changing of individual data entries, and the bulk changes of data entries for buildings. TTEC and RSRS directed RCT Raymond Zahensky, as part of this fraudulent process, to obtain building scan data on a thumb drive each day, take home with him a TTEC issued laptop computer, review the building scan data and change building scan data to eliminate elevated readings, and from time to time eliminate unusually low readings that could result in regulators deeming the data unreliable. Zahensky then returned the thumb drive with the fraudulently manipulated date to the TTEC office or TTEC supervisors Rolfe or Hubbard. The

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

building scan data manipulation by Zahensky took place in 2010 through 2012 and may have continued thereafter. The fraudulent changing of building data by all involved was reviewed and given final approvals by IOEI manager Christine Dougherty, and RSRS Vice President DeLong, and TTEC management, and then used by TTEC as false reports to support the false claim for payment for the building remediation by TTEC to the Navy. Fraudulent manipulation of building scan data at Hunters Point included nearly every building that TTEC submitted reports to the Navy after mid-2007 through 2014, including but not limited to buildings 103, 113, 113A, 130, 146, 253, 272, 351, 351A, 365, 366, 401, 411, 439, 810, 140, 157, 203, 211, 214, 224, 271, 813, 144, 406, 414, 521, and 707. At Treasure Island the buildings included 233, 343, 344, in 2007-2008, and 1121, and 1323 in 2012-2014, and Buildings 5 and 400 for Alameda Naval Air Station from 2010 to 2014.

69.    The United States of America has been damages by the conspiracy to submit false records material to false claims submitted by TTEC to the Navy BRAC. The United States of America Navy BRAC contracted with Defendant Tetra Tech EC, Inc. for the remediation and removal of radioactive materials above a specified level for the health and safety of the environment, the public, and future generations.  The fraudulent conspiracy actions herein alleged deprives the United States of America with the basic service that was contracted for with Defendant Tetra Tech EC, Inc.  The fraudulent conspiracy conduct alleged related to radiological contamination creates unlimited future liability for the United State of America for the agreements between the United States of America and the City and County of San Francisco and government entities in Alameda County that provide that the United States will remain responsible and liable for the radioactive remediation of Hunters Point, Treasure Island, and the Alameda Naval Base after the property is deeded over to local government agencies should it be discovered that the remediation did not fully and properly remove radioactivity.  The Navy will

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

and has incurred costs and expenses in the remediation of Hunters Point, Alameda Navy base, and Treasure Island that should not have been incurred, but for the fraud of Defendants.  The full and extensive costs directly related to the fraud accomplished by Defendants are extensive and yet not fully known and will be established and reasonably estimated at trial.

70.     Each false record and resulting false report to the Navy in support of a claim for payment is a false claim under 31 USC Section 3729(a) for which a civil penalty is required, and three times the amount of damages that the United States has and will sustain because of the acts of Defendants in submitting false claims.

**TREASURE ISLAND ALLEGATION**
**SHAW, CB&I, AND APTIM**
**Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

The USFAC did not incorporate allegations regarding the Shaw/CB&I/Aptim Defendants pertaining to Treasure Island alleged by Smith. These Smith allegations follow:

71.     Shaw entered into remediation contracts with the Navy in the 2000's and thereafter to remediate the former Naval Station Treasure Island, including but not limited to N62473-10-D-0807. The Navy acquired Treasure Island for use as a naval base during World War II.  Treasure Island became a major naval facility during World War II, processing thousands of outgoing and incoming military personnel.  The Navy conducted a Historical Radiological Assessment (HRA) of Treasure Island that was completed in 2006.  The HRA assessed existing buildings and historical sites for radioactivity.  Approximately 18 sites were identified as requiring further review, and Radium-226 had been found in former bunkers on Treasure Island.  In addition to radioactive waste concerns, the Navy studies of

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Treasure Island revealed contamination by lead, PCBs, TCE, PCE, and petroleum among other chemical contaminants.

72.     The contracts between Shaw and the Navy to perform remediation services at Treasure Island included the requirement that further study and surveys be conducted of Treasure Island for radioactive contamination.  The contracts and Basewide Radiological Management Plan incorporated into the contracts called for a Nuclear Regulatory Commission (NRC) licensed entity to conduct surveys of areas to be surveyed and remediated for radioactive materials at Treasure Island. The Navy contract and accompanying requirements provided that prior to any soils and materials being excavated, moved or removed from Treasure Island by Shaw and its subcontractors, that the material be scanned and evaluated by the NRC licensed entity and cleared for the presence of any radionuclides of concern, primarily Radium -226, and Cesium-137.  The Navy requirements prohibited the off-site removal of soils and material from Treasure Island that had not been screened and cleared for radioactive materials above release levels.  The contract with the Navy required that if any soils or material were scanned and found to have radioactive readings above contractually set limits, then the soil and material were to be treated as radiologically impacted Low-Level Radioactive Waste (LLRW). The contracts and incorporated provisions of the agreement with the Navy required that all LLRW be segregated, placed in LLRW bins and disposed of through the Department of the Navy's LLRW Disposal Program.  The LLRW was required to be identified to the Navy's RASO office, with testing and a request for disposal through the Department of Defense LLRW Executive Agency and disposed in one of the four disposal sites for LLRW in the United States.

73.     There is substantial time and expense to properly scan, and test for LLRW.  There is substantial time and expense to properly segregate and arrange for disposal of LLRW.  The contracts between Shaw and the Navy required that these very specific time consuming activities be carefully done to assure that Treasure

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Island was properly remediated of radioactive wastes, to assure that areas of Treasure Island, including residential areas, not be inadvertently contaminated with radioactive wastes, and to assure that LLRW was not improperly disposed of off Treasure Island in non-LLRW disposal sites, potentially jeopardizing the health and safety of individuals and the environment far beyond Treasure Island, and potentially exposing the United States to further liability for the improper disposal of LLRW soils and materials.  Shaw management at Treasure Island falsely certified or falsely implied certification that proper scanning, testing, segregation, and disposal of LLRW was done under the contracts for Treasure Island when it was not, as more fully set forth herein, along with other frauds resulting in false records material to false claims.  Shaw has been acquired by Chicago Bridge & Iron which then sold the portion of its business performing services on Treasure Island to Veritas Capital which transferred that business and the assets and liabilities to its related entity Aptim, Aptim Environmental & Infrastructure, Inc., Aptim Federal Services, LLC, jointly referred to as "Aptim" which are successors to Shaw and Chicago Bridge & Iron liability.

## Treasure Island -Excavation And Removal Of Treasure Island Soil In Violation Of Navy Contract Requirements By Shaw/Aptim Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

74.     Under the contract with the Navy, Shaw/CB&I was to have soil and material properly tested and cleared for radioactive contamination as a condition of the soil and material being moved or removed from Treasure Island. Soil and material that was properly scanned, tested and approved as non-LLRW was permitted under the contract to be disposed of at standard landfills. Soil and material that was properly scanned, tested, and determined to be LLRW was required to be carefully segregated, contained, and processed through the Navy and

Department of Defense LLRW processes and disposed of in the Grandview, Idaho's US Ecology LLRW site, or one of the other four approved LLRW disposal sites for Department of the Navy LLRW.

75.     Shaw's Treasure Island contract with the Navy required testing for radioactive materials in soil, materials, and buildings that could have intensity above "release levels" and be categorized as LLRW.  Areas that were determined as Radiologically Controlled Areas (RCA's) and areas that had not yet been evaluated for radiological concerns were not to have soils removed without first being subjected to radiological surveys, sampling, and testing to determine if the radioactivity levels were below the Remediation Goal (RG) pursuant to the terms of the Standard Operating Procedures (SOPs) and contract with the Navy. Shaw/CB&I was required to coordinate with the radiological subcontractors, New World Environmental and RSRS, and with its own later employed RCTs, regarding all work areas planned so that there could be RCTs present to monitor and scan for radiological hazards.

76.     Shaw/CB&I, under the direction of the Shaw General Manager Pete Bourgeois and Jim Wittcomb intentionally had soils excavated and materials removed from Treasure Island established Radiologically Controlled Areas and from areas that had not yet been evaluated for determination whether the area should be deemed a Radiologically Controlled Area without having the soil and materials first surveyed, sampled and determined to be below the RG.  The removal of soils from Radiologically Controlled Areas without following the SOPs of having the soil determined to be below RG before the soil was removed excavated was intentional and knowing, and at the direction of Pete Bourgeois and Jim Wittcomb, and others during 2008 through 2013, and may have begun earlier and extended later.  Shaw/CB&I intentionally removed soils from areas that were known to not yet have been determined whether the area was radiologically impacted and should be a Radiologically Controlled Area.  The intentional

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

- 52 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

excavating of soils from these two types of areas from Treasure Island is believed to have begun as early as 2006. In 2008-2013 Shaw, under the direction of Pete Bourgeois and Jim Wittcomb engaged in extensive efforts to remove soil from Treasure Island without first having radiological clearance as required by the Navy contract and related Navy requirements. Some of the excavated soils improperly removed were deposited into other areas of Treasure Island contrary to the contract and terms established by the Navy.  The improper transfer of soil from one area at Treasure Island to other areas of Treasure Island was in violation of the contract terms and increased the scope of radiological contamination of Treasure Island due to the improper conduct of Shaw/CB&I.  Some of the excavated soils improperly excavated were shipped off Treasure Island and improperly disposed of without having been radiologically screened, tested, sampled, and remediated as required by the contract and terms established with the Navy.  Shaw/CB&I submitted false records to the Navy that certified or impliedly certified that all soil and materials that were excavated and moved on Treasure Island or shipped off of Treasure Island had been properly surveyed, scanned, tested, and determined to be below RG and not LLRW when Shaw/CB&I had knowledge that soils and materials had been intentionally moved on Treasure Island and had been shipped off Treasure Island from areas and RCA's without having been properly surveyed, scanned, tested and determined to be below RG and not LLRW.  Shaw/CB&I had knowledge that Shaw/CB&I, under the direction of Pete Bourgeois and Jim Wittcomb had directed that soils and materials be excavated and moved on Treasure Island or shipped off Treasure Island in a manner to avoid being surveyed, scanned, and tested that were in RCA areas or in areas not yet evaluated for radiological contamination.  These conducts and false records have resulted in an expanded requirement of remediating Treasure Island because radiologically hazardous materials were moved and spread into non-radiologically impacted areas of Treasure Island as a result of the frauds and process violations of Shaw.  Radiologically hazardous materials have been

- 53 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

spread into areas outside of Treasure Island due to the fraud and process violations by Shaw/CB&I potentially harming the environment and individuals beyond Treasure Island, and exposes the United States to liability for the radiological contamination to third persons and property off Treasure Island. The claims for payment by Shaw/CB&I for the processing and movement of soil were knowingly false, and the false statements, explicit and implied, were material to the Navy BRAC office decision to make payment to Shaw/CB&I.

77.     Under the contracts with the Navy, Shaw/CB&I was to have areas determined whether the area had radioactive contamination above RG before Shaw/CB&I removed soils, relocated soils on Treasure Island, or transported the soils off Treasure Island.  Shortly after being sub-contracted by Shaw in or about 2006, New World Environmental began finding radioactive materials above release levels at Treasure Island in areas that had not previously been reported in the Navy's HRA as containing radioactive materials.  These newly discovered radioactive contaminated areas included Site 12 which contained extensive occupied residential housing, and site 30-32. Shaw/CB&I management, to cut costs, increase profits, and falsely complete remediation services for the Navy, took intentional actions to excavate soils and materials from Treasure Island that contained other contaminants such as lead, and PCBs without having New World Environmental, RSRS, or any radiological control technicians oversee the soil extraction to determine whether the soil contained radioactive wastes above RG. Shaw/CB&I did not comply with SOP and Navy required procedures of notifying New World Environmental, RSRS, or RCTs of digs, soil and material removals to take place on Treasure Island, and Shaw/CB&I management planned and scheduled digs for soil and material removal in areas that employees of New World Environmental, RSRS, and RCTs were not present or in the vicinity to maximize the probability that extensive soil extractions could take place and soils shipped off Treasure Island or relocated at Treasure Island without the time and expense

involved in having the soil and material scanned, sampled, and tested for radioactivity above RG LLRW standards, and having the soil remediated if there was radioactivity above RG, and avoid the time and costs associated with preparing the soil and material for disposal due to the remediation.  Shaw/CB&I certified or impliedly certified that Shaw/CB&I was following set procedures for the scanning, testing and remediation of soil and materials for radioactivity above RG, when in fact Shaw/CB&I was intentionally circumventing the SOP and requirements to test and remediate if necessary soils and materials for radioactive contamination above RG levels. Shaw/CB&I submitted false records and reports to support claims for payment from the Navy that certified and impliedly certified that Shaw/CB&I was following the established rules and procedures pertaining to the radiological oversight of the soil digging, moving, and removal on Treasure Island in violation of 31 USC Section 3729 (a) (1) (A) and (B). The false reports of Shaw/CB&I were material to the Navy BRAC payment decisions. Aptim, Aptim Environmental & Infrastructure, Inc., Aptim Federal Services, LLC, jointly referred to as "Aptim" are successors in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

### Treasure Island- Radioactive Sample Retention and Disposal Violated Navy Contract By Shaw/Aptim Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

78.     Under the contracts with the Navy for Treasure Island, Shaw/CB&I was to properly segregate and control radioactive samples and retain the samples for potential future evaluation.  Shaw/CB&I certified that it was complying with the requirements established by the Navy contract. However, Shaw/CB&I did not properly segregate and control the radioactive samples but stored the samples in a manner contrary to contract, established SOP, and accepted industry standards.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Further, Shaw/CB&I failed to retain control of the radioactive samples, but had the radioactive samples moved to disposed of the samples as if the samples were non-low-level radioactive waste. Samples and LLRW from Treasure Island was improperly disposed of at standard landfills in 2008, 2009, 2010, and 2011.  Shaw management knew it failed to properly segregate and control radioactive samples and retain control of the radioactive samples.  Shaw's certification and implied certification of meeting these standards were knowingly false.  Shaw/CB&I falsely identified shipments off Treasure Island as non-LLRW when the shipments did contain LLRW and LLRW that had been sampled and determined to be LLRW above RG.  These false implied certifications were material to false claims for payment from the Navy in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

## Treasure Island- Radioactive Material And Device Handling Violated Navy Contract By Shaw/Aptim Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

79.    Under the contracts with the Navy, radioactive material and devices were required to be properly stored in proper containers for radioactive materials, properly cleared for disposal, and disposed of in licensed low-level radioactive disposal sites.  Radioactive materials and devices were improperly stored by Shaw in sea-land type shipping containers on site rather than proper containers for LLRW.  Shaw had one or more sea-land type containers loaded with radioactive material and devices that there determined to be LLRW above RG that Shaw had removed from Treasure Island and disposed of at a disposal site that was not licensed to receive low-level radioactive waste.  The sea-land containers were not processed for removal as required, did not obtain approval from the Navy for

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

removal, and no exception for proper disposal was obtained by Shaw.  Shaw certified and impliedly certified that it complied with the requirements of the contract with the Navy for the handling of hazardous waste and radioactive materials, and the certification was false.  One or more sea-land type shipping containers were improperly removed and disposed of Treasure Island radioactive material and devices while New World Environmental, Inc. was a sub-contractor for Shaw on Treasure Island.  On or about 2009, Managers of New World Environmental, Inc. objected to management of Shaw regarding the removal and disposal of the sea-land containers loaded with radioactive material and devices that were LLRW without having the material processed and approved by the Navy as LLRW and disposed of as LLRW as required by the Navy.  Shaw's express and implied certification that it was complying with the terms of the contracts and the requirements therein that radioactive wastes would be properly scanned, tested, and LLRW properly disposed of as required by the Navy was false, and was material to the false claims made by Shaw to the Navy in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

### Treasure Island- False Shipment Of LLRW Using Manifests For Non-Rad Material By Shaw/Aptim Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

80.    Shaw obtained from a Navy representative manifests signed by Jim Sullivan for approximately 200 truck shipments of soil and debris to leave Treasure Island, before the truck shipments had been loaded.  The manifests were not for the shipment of low-level radioactive wastes and soil above RG levels, but for non-radioactive wastes.  Shaw fraudulently used the pre-signed manifests to load trucks with low level radioactive soils and materials above RG levels or soils for which

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

required radiological screening was not performed as required by the contract and shipped the soils off Treasure Island to standard landfills as if the soil and materials had been tested and determined to not have LLRW in the shipment.  Shaw management, at the direction of Mr. Bourgeois Mr. Wittcomb, used the pre-signed manifests to load trucks with soils and materials that had not been scanned, sampled, and tested for LLRW as required by the contracts with the Navy.  Shaw knowingly shipped the soils and materials off Treasure Island in violation of the contractual requirements that such material be properly scanned, sampled, and tested to determine if the material was LLRW.  Shaw certified or impliedly certified that the shipments met the standards for the manifests and the SOP set by the Navy, when the shipments violated these rules, regulations and SOPs.  The fraudulently used pre-signed manifests were utilized by Shaw in 2007 and thereafter through 2013 and may have continued to be used by Shaw.  Shaw represented to the Navy and certified and implied certification that all shipments leaving Treasure Island had been properly evaluated for radiological contamination and had been properly disposed.  Shaw's representations and certifications were knowingly false and material to the payment decisions of Navy BRAC and in violation of 31 USC Section 3729 (a) (1) (A) and (B).  Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

### Treasure Island- Shaw Fraudulently Billed The Navy For Intermodal Containers
### Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

81.    Shaw obtained and billed the Navy for approximately 200 intermodal containers for the shipment of low-level radiological wastes.  The billing to the Navy was for the containers to be obtained, filled, and prepared for shipment to low level waste facilities licensed by the United States.  Shaw billed the Navy for these intermodal containers as if Shaw had filled and prepared the shipments, and the

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

intermodal containers had been shipped to LLRW facilities.  The billing for the 200 intermodal containers to the Navy was false for the 200 intermodal containers had not been prepared, cleared and shipped when the Navy was billed and paid the billings.  Rather, the intermodal containers remained at Treasure Island and had not been processed and cleared for shipment when demands for payment were made to the Navy.  The billing for the containers was done approximately 2010 and the intermodal containers had not been filled and shipped off Treasure Island as required for the billing until approximately 2014 or 2015. The records and claim for payment by Shaw that contained the expenses for the intermodal containers for preparation and shipment were false.  The false records were material to the decision of the Navy BRAC to pay the demand for payment. The demand for payment by Shaw was false and in violation of 31 USC Section 3729 (a) (1) (A) and (B).  Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

### Treasure Island- Fraudulent Radiological Scans and Soil Samples
### On Treasure Island By Shaw/CB&I/Aptim, TTEC and RSRS
### Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

82.     Shaw/CB&I, Tetra Tech EC, Inc. and RSRS falsified scanning and soil sample testing for radioactive contamination at Treasure Island by scanning and soil sampling to falsely avoid radioactive readings above RG levels.  These companies avoided taking soil samples from specific locations known or scanned that resulted in the highest radioactive readings in order to minimize the determinations of which areas met the standards to be treated as radiologically controlled areas, and later to obtain remediation clearance with final status surveys where the sampling and scanning was done to avoid higher levels of radiation in order to obtain unrestricted radiological release for the areas of Treasure Island reported to the Navy.  The falsified scanning and soil sampling at Treasure Island to avoid radioactive readings

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

for areas above RG levels took place in 2009 and continued thereafter to at least 2014 and may be continuing.  The false scanning took place by Shaw/CB&I involved IR Site 12, Halyburton Court, Site 30, Site 31, and the Avenue H and Avenue I athletic fields, and Building 3, among other areas during 2009 through 2014. Tetra Tech EC, under the direction of General Manager Dougherty, Superintendent McWade, and supervisors Rolfe engaged in false scanning of at least seven soil areas of Treasure Island that included Site 6 in 2013 and again in 2016 and 12 in 2013, as well as building 233 in 2008 (with billings to the Navy for the 233 work spanning monthly from early 2009 into 2010), 343, and 344 in 2007 (with billings to the Navy spread into late 2009 due to California  Department of Toxic Substance Control and the California Department of Public Health reviews and requests for further documentation on these buildings). RSRS assisted in the false scanning and sampling in Site IR 12, including residential areas near waste disposal areas.  The false records of scanning and sampling were material to the payments by the Navy for the work performed.  The false records and demands for payment were in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

## Treasure Island- Pandemonium Site II Demolition and Disposal Contrary To Contract By Shaw/Aptim Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

83.     The contract with the Navy required that before and during demolition work being performed that radiological scans be done to determine whether the site was radiologically impacted, and often required that remediation be done to remove the radioactive contamination.  The contract with the Navy also required an approved work plan for work that involved demolition and removal of material from Treasure Island.  Shaw took action to demolish and remove the concrete and

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

related structures that comprised the Pandemonium Site II. The orders to demolish the Pandemonium, which included barring RCTs from scanning the material, was given by Mr. Bourgeois Mr. Wittcomb. Shaw intentionally violated the contract requirements with the Navy by prohibiting the radiological scanning of the Pandemonium Site II structures prior to and during the demolition and removal of the material from Treasure Island in 2009.  Shaw either did not have an approved work plan contrary to the contract requirements with the Navy or violated the work plan by failing to have radiological oversight of the demolition, among the violations of the work plan.  RCTs assigned to Treasure Island were ordered to stay away from the Pandemonium Site by Mr. Bourgeois Mr. Wittcomb of Shaw management and threatened with discharge if any RCTs came to the site with a radiological meter during the demolition activity. Shaw management, including Pete Bourgeois and Jim Wittcomb, made the decision to bar RCTs from scanning the Pandemonium Site II before, during, and after demolition due to a desire to avoid discovery that the material being demolished was contaminated with radioactive intensity above release levels, and the time, and labor, equipment, and disposal expenses that would be incurred. The contract and approved work plans and requirements were violated by Shaw's decision to bar radiological scanning of the Pandemonium II materials and the disposal of those materials without proper radiological scanning and clearance.

84.    Shaw expressly or implied representations that there were no radiological materials involved with the Pandemonium Site II and that the excavated materials could be and were shipped off Treasure Island as non-radiologically impacted wastes.  Shaw's representations were false for Shaw had not allowed any radiological evaluation, survey, or scanning of the Pandemonium structures or excavated materials to represent that the material did not contain radioactive waste exceeding RG standards.  The Navy contract required the establishment of an approved work plan for work such as the demolition of the

Pandemonium Site II involved.  Shaw violated the contract with the Navy by not having a work plan for the Pandemonium Site II demolition in place at the time, did not follow an approved work plan, and did not have radiological coverage for the work. Shaw falsely represented, certified, and implied certification to the Navy that the work involved with the Pandemonium Site II demolition and the disposal of the excavated material from that site was done according to contract terms, which was material to Shaw's demands for payment for these services to the Navy in violation of  31 USC Section 3729 (a) (1) (A) and (B).  Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

### Treasure Island - Soil Movement From Site 12 to Site 6
### Violated The Navy Contract By Shaw/Aptim
### Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

85.    The contract with the Navy required strict adherence to rules and procedures for the movement of soil on Treasure Island to control and avoid the spread of contamination on Treasure Island and to protect the health and safety of the workers and residents.

86.    Shaw, at the direction of Mr. Bourgeois Mr. Wittcomb, engaged in the excavation of soil from Site 12 that was known or suspected to be radiologically impacted.  In violation of the Navy's established rules and procedures, in 2007 and 2009 and to a lesser regularity through 2013, Shaw transported radiologically impacted soils in open trucks, in front loaders, and other transport devices in an uncontrolled manner so that soil fell during transport onto the roads of Treasure Island while in transit.  Soil was left open and uncovered in transit so that wind-swept soil blew off trucks and front loader loads while in transit.  Front loaders lost substantial amounts of potentially radioactive soil while in transit, including loss from crossing speed bumps and potholes. Vehicle tires loaded with soils were not

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

cleaned prior to transit over the roads of Treasure Island. The areas the soil was improperly transported to included areas that had not been found to have been radiologically impacted and were regular transit and residential areas of Treasure Island. As a result of the conduct of Shaw that violated the rules and procedures established by the Navy, areas of Site 6 and roadways and residences in Site 12 became contaminated with Site 12 radiological waste and soil requiring expensive additional remediation. Shaw falsely represented, certified, and implied certification to the Navy that the work involved with Site 12 and the disposal of the excavated material from that site was done according to contract terms, which was material to Shaw's demands for payment for these services to the Navy in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

### Treasure Island - Demolition Of Building 233 By Shaw/Aptim And False Reports By TTEC Violated Navy Contract Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

87.     The contract and procedures established by the Navy required that prior to the demolition of a building on Treasure Island there be an approved work plan. For buildings that had radiological contamination above RG levels, work plans approved by the Navy required that Shaw remediate the building to below RG levels prior to demolition of the building. By remediation of the building to RG levels prior to demolition, the amount of material segregated, treated, and shipped as LLRW would be dramatically lower than if the entire building was demolished prior to radiological remediation and the radiological contamination was spread throughout the entire demolition causing all material to be treated as LLRW. The costs involved in the containerization, shipment and disposal of LLRW is significantly greater than the costs associated with non-LLRW.

88.    The Navy required procedures and a work plan for Building 233 that required that the structure be remediated to RG levels, the removed LLRW segregated and shipped to a LLRW facility, and the building then demolished, scanned, and all non-LLRW disposed of at standard landfills.

89.    TTEC had been retained by the Navy to scan and remediate Building 233 well prior to the Shaw demolition of building 233. TTEC, with the assistance of RCTs presented false scan data and reports concluding that building 233 was largely free of radioactive contamination above release levels. TTEC engaged in excessive scan speed when scanning building 233, resulting in falsely lower radiological readings than if the scans had been performed as the required low scan speeds. The reports of TTEC to the Navy that were used to seek payment for the scanning of building 233 were knowingly false and material to the decision by the Navy to pay TTEC. Shaw in part relied upon TTEC's false reports regarding building 233. Shaw also engaged in limited scanning of building 233 in a manner intended to avoid discovery of substantial amounts of radioactive contamination on and around the building to avoid costs, at the direction of Shaw management, including Mr. Bourgeois Mr. Wittcomb, in violation of the contract with the Navy. Shaw violated the Navy's required procedures and demolished Building 233 prior to the building being fully and properly scanned, and remediated and LLRW removed from the building.  As a result of Shaw demolishing Building 233 prior to full and effective remediation. The radioactive contamination in, under, and part of Building 233 was extensively mixed and commingled throughout the building debris.  The radioactive contamination so extensively mixed with the demolished debris that remediation was made much more difficult or impossible.  Because the debris could not be effectively scanned, segregated and remediated following the improper demolition in violation of the contractual requirements with the Navy, virtually all the demolition debris was put into intermodal containers as LLRW.  For nearly two years, efforts were explored on how to handle this material and whether there was a

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

feasible means to remediate the material rather than have all the material shipped as LLRW. Shaw falsely represented, certified, and implied certification to the Navy that the work involved with the Building 233 demolition was done according to contract terms, which was material to Shaw's demands for payment for these services to the Navy in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

### Treasure Island - Softball Area Site Improperly Excavated
### In Violation of Navy Contract By Shaw/Aptim
### Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

90.     The Navy contract and procedures required that for any excavation on Treasure Island there would be an approved work plan and radiological oversight of the excavation to assure that radiological waste was properly identified, segregated, and disposed of, and that the health and safety of the workers and public was protected.

91.     In the relative center of Treasure Island near and involving sites 30, 31, 32, and 33, near the softball fields and athletic fields, Shaw excavated a massive area of Treasure Island in violation of the Navy's contract, rules and procedures in and about 2009.  Shaw excavated the area of the fields down at points to a depth of four feet.  The Navy's contract, rules and procedures required that radiological scanning of the soil be done.  Contrary to the Navy's contract, rules and procedures, no radiological scanning of the massive excavation was done. The radiological sub-contractor for Shaw was barred and prohibited from being involved in the excavation of this area, and Shaw management, Mr. Bourgeois Mr. Wittcomb, took active steps not to include radiological oversight of the excavation.  Shaw falsely represented to the Navy that the contract, rules and procedures were followed

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

regarding this excavation that included radiological oversight of the excavation which was material to Shaw's demands for payment for these services to the Navy for this work in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

**Treasure Island- Fraudulent Destruction Of Radioactive Hot Samples In Violation Of Navy Contract By Shaw/Aptim Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

92.     The Navy's contract, rules and requirements provided detailed specification for the taking of radiological samples, the chain of custody for those samples, the testing of the samples, and the truthful reporting of those samples to the Navy and regulators.  Shaw management directed numerous times from 2007 through 2013, and possibly continuing, that samples taken that were tested by the on-site laboratory that came as radioactively 'hot" above RG levels be disposed of, and the records of the sample and their testing be destroyed.  The elimination of the samples and the record of the samples was intentional, fraudulent, and done to prevent areas from being properly designated as containing radiological contamination above RG.  The orders to destroy samples were primarily done when efforts to remediate had been done, and samples were taken in the hope of showing the remediation had been successful.  However, orders to destroy samples were also given to falsely avoid the designation of an area as radiologically impacted.  The orders to destroy samples was issued by management of Shaw, including but not limited to Pete Bourgeois and Jim Wittcomb.  Shaw falsely represented to the Navy that the contract, rules and procedures were followed regarding the taking of samples, the testing of samples, and the reporting of sample results which were material to Shaw's demands for payment for these services to the Navy for this work in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor

- 66 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

**Treasure Island - Fraud In Development And Approval Of The TI July 1, 2014 Final Historical Radiological Assessment Supplement Technical Memorandum By Defendant TTEM/TT, Inc. Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

93.     The Navy contracted with Tetra Tech EM Inc. and its joint venture TriEco-TT to prepare and produce a supplement to the Historical Radiological Assessment done in 2006 by Weston Solutions that was determined to be fundamentally deficient due to significant findings of serious levels of radiological wastes and hazards across Treasure Island.  As part of the contract requirements of the Navy, Tetra Tech EM Inc. through its joint venture was required to actively engage with and consult with State of California representatives in the California Department of Public Health and the California Department of Toxic Substances, to provide a specified period of time after draft completion of the report to provide written comments, and engage with the State agencies to obtain comments and seek approval of the supplement from these state departments prior to the issuance of the supplement.

94.     Tetra Tech EM, Inc. and its joint venture failed to provide the California Department of Public Health and the California Department of Toxic Substances with required notice period and opportunities to consult, review and comment of the proposed supplement as required by the contract with the Navy. Tetra Tech EM, Inc. and its joint venture failed and refused to involve the California Department of Public Health in the development of the supplement. Tetra Tech EM, Inc. and its joint venture did not involve the California Department of Public Health in the drafting of the supplement.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

95.     When Tetra Tech EM, Inc. and its joint venture had completed a draft of the supplement, Tetra Tech EM informed the California Department of Public Health that it could send representatives to its offices in San Diego, that they could read the supplement, but would not be provided a copy of the supplement, would not be allowed to copy the proposed supplement, and would not be provided an electronic copy to review at the Department of Public Health's offices in Sacramento as required. Tetra Tech EM did not provide to the Department of Public Health the required allotted review and comment time period. Tetra Tech EM, Inc. and its joint venture took intentional actions to exclude the California Department of Public Health in the supplement development, review and comments to preclude the California Department of Public Health from pointing out deficiencies and defects in the supplement.  On information and belief, it is alleged that the California Department of Toxic Substances was similarly precluded for substantive development, review and comment on the supplement prior to it being submitted to the Navy and issued as the 2014 HRA Supplement Technical Memorandum. The contract with the Navy, and required steps including the involvement of these State agencies, that these agencies be given a copy of the draft report prior to issuance, that these agencies be given a specified time to provide written comments, and that those comments be incorporated into the report. Due to the freezing out of these State agencies from meaningful involvement, there are not comments from the California Department of Public Health to the 2014 report. Tetra Tech EC took steps to hide the freezing out of these State agencies by including the 2006 comments of the State agencies as if these comments had been made related to the 2014 HRA Supplement Technical Memorandum report, and included comments made over the years by the State agencies that were made independent of the report drafted in 2014 and issued July 1, 2014 as the Historical Radiological Assessment - Supplemental Technical Memorandum.

- 68 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

96.     Tetra Tech EM, Inc. and its joint venture made false statements, and certified and implied certification that it had involved as required, including time period for draft review and comment, the State of California Department of Health and the California Department of Toxic Substances in the development, review and comments for the Supplemental Technical Memorandum.  These false statements and certifications to the Navy were material to false claims to the Navy for payment for these services to the Navy for this work in violation of 31 USC Section 3729 (a) (1) (A) and (B). Tetra Tech, Inc. is a successor to Tetra Tech EM, Inc. and is liable for the conduct of Tetra Tech EM, Inc.

### Treasure Island- Copper Removal And Sale While On The Clock
### In Violation Of FCA By Shaw/Aptim
### Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

97.     Beginning in approximately late 2006 and continuing, the Project Manager for Shaw, Peter Bourgeois directed laborers to work and unlawfully assist Shaw and Mr. Bourgeois personally, in stealing copper from Treasure Island by stripping the copper from buildings owned by the United States.  The copper removal and sale by Shaw continued into 2009 and may have continued thereafter until Mr. Bourgeois left Treasure Island approximately 2013. The work time of the Shaw laborers was falsely reported to the Navy as hours worked for the remediation of lead, PCBs and other contaminants on Treasure Island. The false stripping of copper by Shaw was usually done late and on the weekends and billed as overtime hours.  The false reporting of the hours as time properly incurred in the remediation of lead, PCBs and other contaminants was material to the requests for payment by Shaw to the Navy for the services on the early cost-plus contracts, and was false and material on the later contracts.  The copper obtained by the workers stripping the Treasure Island buildings was not reported to the Navy, was sold but not accounted for to the Navy, nor were the funds delivered to the Navy.  Shaw

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

certified or impliedly certified that it was properly performing the services contracted for with the Navy, and falsely made those certifications when Shaw was effectively having the Navy pay for the wages of laborers used to steal for Shaw copper from the Treasure Island buildings that belonged to the Navy.  The conduct of Shaw related to the unlawful stripping of copper owned by the United States, selling the copper for private gain, the creation of records that the hours worked were for remediation purposes under the contract with the Navy, the failure of Shaw to report the possession, custody, and control of the copper which was the property of the United States, and the failure to Shaw to turn over the copper or the money derived from the sale of the copper to the United States violated 31 USC Section 3729 (a) (1) (A), (B), and (D).  Shaw was required under the contract with the Navy to have all materials on Treasure Island scanned for radiological contamination prior to the materials being removed from Treasure Island.  Shaw failed to have the copper stripped from Treasure Island scanned and surveyed for radiological contamination, but rather intentionally avoided notice to the radiological subcontractors that it was stripping and removing copper from Treasure Island.  Shaw certified or implied certification that all materials removed from Treasure Island were being and had been scanned for radiological contaminants and that certification was untrue.  The certification was material to the demand for payment by the Navy.  The false certification was in violation of 31 USC Section 3729 (a) (1) (A), and (B).  The reporting of time billed to the Navy was required to be for time incurred in the remediation of Treasure Island as called for in the contracts with the Navy.  Shaw submitted false time records and billed the Navy falsely based on those time records that included time for the stripping of copper from the Treasure Island buildings in violation of 31 USC Section 3729 (a) (1) (A), and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron.

1

2

**PRAYER FOR RELIEF**

3

4      98.    Relators, on behalf of the United States of America and the United

5   States Navy seek through this action 3 times the damages the government has and

6   will sustain because of the acts of defendants;

7      99.    Relators, on behalf of the United States of America and the United

8   States Navy seek through this action a civil penalty as provided by 31 USC Section

9   3729(a)(1)(G) for each false claim and each false record or false statement material

10  to a false claim;

11     100.   For an award to the qui tam plaintiffs as provided for by 31 USC

12  Section 3730(d);

13     101.   For an award of reasonable attorney fees and costs.

14  A jury trial is demanded.

15  Dated: February 27, 2020              Law Office of David Anton &

16                                        Scott Law Firm

17

                                          By:     David Anton                    .
18
                                                David Anton
19                                        Attorney for Relators,
20                                        Arthur R. Jahr, III, Elbert G. Bowers,
                                          Susan V. Andrews, and Archie R. Jackson
21

22                                        By:     David Anton                    _

23                                              David Anton
24                                        Attorney for Relator, Anthony Smith

25                                        By:     David Anton                    _

26                                              David Anton
27                                        Attorney for Relators,
                                          Donald K. Wadsworth, and Robert McLean
28

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616