1   David C. Anton (Cal. SBN 94852)
    Margaret E. Roeckl (Cal. SBN 129783)
2   Law Office of David Anton
    1717 Redwood Lane
3   Davis, CA 95616
    Tel: 530-220-4435
4   Email: davidantonlaw@gmail.com

5   Counsel for Qui Tam Relators Arthur R. Jahr, III
    Elbert G. Bowers, Susan V. Andrews, Archie R. Jackson
6   Anthony Smith, Donald K. Wadsworth and Robert McLean

7   John Houston Scott (Cal. SBN 72578)
    The Scott Law Firm
8   1388 Sutter Street, Suite 715
    San Francisco, CA 94109
9   Tel: 415-561-9600
    Email: John@scottlawfirm.net
10  Counsel for Qui Tam Relators, Arthur R. Jahr, III,
    Elbert G. Bowers, Susan V. Andrews, Archie R. Jackson
11  [not counsel for other Qui Tam relators]

12              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
13               SAN FRANCISCO DIVISION

14

15  UNITED STATES OF AMERICA, ex rel.,
    ARTHUR R. JAHR, III, et al.,
16  ANTHONY SMITH, & DONALD K.           CASE NO. 3:13-CV-03835- JD
    WADSWORTH et al.,
17                                        Related Actions: 3:16-CV-1106-JD
              Relators/Plaintiffs,                        3:16-CV-1107-JD
18
    vs.                                   RELATORS' COMBINED THIRD
19                                        AMENDED COMPLAINT-
    TETRA TECH EC, INC. ; TETRA TECH,     FALSE CLAIMS ACT VIOLATIONS
20  INC. ; SHAW ENVIRONMENTAL AND         PURSUANT TO 31 U.S.C. §3729 et seq.
    INFRASTRUCTURE, INC. ; CHICAGO
21  BRIDGE & IRON, INC. ; APTIM          DEMAND FOR JURY TRIAL
    ENVIRONMENTAL &
22  INFRASTRUCTURE, INC. ; APTIM
    CORPORATION ; APTIM FEDERAL
23  SERVICES, LLC ; RADIOLOGICAL
    SURVEY & REMEDIAL SERVICES,
24  INC. ; IO ENVIRONMENTAL &
    INFRASTRUCTURE INC. ; DARYL
25  DeLONG ; and BRIAN HENDERSON,

26              Defendants.

27

28

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

**INTRODUCTION**

This complaint is formatted to meet the directive of Judge Donato to have all three complaints combined into one complaint, to geographically organize allegations between the Hunters Point Naval Shipyard, the Naval Station Treasure Island, and the Alameda Naval Base where possible, and as to set forth the liability grounds for the claims as separate counts pursuant to FRCP Rule 10 (b).

This is a combined complaint setting forth the allegations of the *Jahr* case relators, brought by Relators SUSAN V. ANDREWS, ELBERT G. BOWERS, ARCHIE R. JACKSON and ARTHUR R. JAHR III, combined with the second separate *Smith* case 3:16-CV-1106-JD brought by Relator ANTHONY SMITH, combined with the third separate *Wadsworth* case 3:16-CV-1107-JD brought by Relators DONALD K. WADSWORTH and ROBERT L. McLEAN.

**I. NATURE OF THE ACTIONS**

1.      The Relators bring this action against the named defendants to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

2.      This action concerns the submission by defendants of false claims under contracts with the United States Navy to provide radiological remediation services per 31 U.S.C. §3729 (a)(1)(A), or the making, using, or causing to be made or used false records or statements material to the submission of false claims under the contracts with the United States Navy to provide radiological remediation services per 31 U.S.C. §3729 (a)(1)(B), or the conspiracy to commit violations of the false claims act per 31 U.S.C. §3729 (a)(1)(C), or having possession, custody, or control of property of the United States Navy, primarily copper and other metals, and failing to retain and deliver back to the United States all of that property per 31 U.S.C. §3729 (a)(1)(D), at the Hunters Point Naval Shipyard, the Naval Station Treasure Island, and the Naval Air Station Alameda.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

3.     Hunters Point Naval Shipyard was operated by the Navy from 1940 to 1974 as a Naval Shipyard and housed the Naval Radiological Defense Laboratory which conducted extensive radiological experiments, testing, and decontamination of ships for decades following World War II. In 1989, Hunters Point was placed on the National Priorities List (NPL) as a Superfund site under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) requiring a long-term clean-up plan. In 1991, the Base Realignment and Closure Commission (BRAC) recommended Hunters Point for closure. The Navy agreed to convey Hunters Point to the City and County of San Francisco for local reuse. The radiological clean-up of Hunters Point Naval Shipyard is part of the CERCLA clean-up and a condition of the agreement to convey the property to the City and County of San Francisco.

4.     The Naval Station Treasure Island (Treasure Island) is a human made island that was built for the Golden Gate International Exposition of 1939-1940. After the attack on Pearl Harbor on December 7, 1941, the Navy took action to take over ownership of Treasure Island. During World War II Treasure Island became a major naval station processing hundreds of thousands of military personnel for service overseas and on their return to the United States. Treasure Island was used for many purposes during World War II and after, including the repair or dismantling of naval vessels that had been subjected to radiological contamination at sea, as a radiological training center, as a Training Center for Nuclear Decontamination, as an optics repair center using highly radioactive radium and related radioactive materials, for a ship Hull Maintenance Technical Training School for Nuclear, Biological, Radiological and Chemical Warfare Training, for the experimentation and use of mobile mini-field nuclear power generators, and extensively used radioactive radium dials and paints for ships and land based buildings. In 1993 BRAC recommended closure of Treasure Island. Treasure Island was rated by the Environmental Protection Agency as qualifying as a Superfund

Site for placement on the NPL, but due to the then ongoing Department of Defense Installation Restoration Program under CERCLA, and the involvement of the State of California Environmental Protection Agency (Cal/EPA) Department of Toxic Substances input, Treasure Island was not placed on the NPL, but continued under the remediation oversite of the Navy and Cal/EPA. In addition to the CERCLA program and requirements, Treasure Island was also found to contain levels of toxins such that the Navy applied its Petroleum Program, the Polychlorinated Biphenyls (PCB) Program, the Residential Lead-Based (LBP) Program, the Asbestos-Containing Material (ACM) Program, and the Radiological Program to Treasure Island. The Navy ceased operations on Treasure Island on September 30, 1997. An initial agreement was reached between the Navy, the State of California, and the City and County of San Francisco for substantial portions of Treasure Island to be deeded to the City and County of San Francisco. Under the Treasure Island Conversion Act of 1997, the California Legislature designated the Treasure Island Development Authority (TIDA) with authority over the transfer and development of Treasure Island. Subsequently TIDA selected Treasure Island Community Development, LLC (TICD), a joint venture between Lennar, Kenwood Investments, and Wilson Meany, as the master developer of Treasure Island. In 2010, and agreement was reached with the Navy for the payment of $105 million dollars for the portions of Treasure Island, and related Yerba Buena Island that the Navy would transfer to the City and County of San Francisco. In 2014, the city agreed to pay $55 million for Treasure Island, with the promise of an additional $50 million if the development project is commercially successful. In May of 2015, the Navy transferred the first 159 acres to the city for redevelopment, and TICD began construction of infrastructure in 2016.  The agreements between the Navy and the City and County of San Francisco and CERCLA require the clean-up of hazardous materials, including radioactive contamination, prior to the transfer, and continued

Relators' Combined Third Amended Complaint - FCA 3:13-CV-3835 - JD

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

liability to the Navy if hazardous contamination, including radioactive contamination above specified levels, is discovered following transfer.

5.    The Naval Air Station Alameda (NAS Alameda) began operations in 1938 to house two aircraft carrier wings, seaplane squadrons, and utility squadrons. Naval operations began in 1940 and continued through 1997. The NAS Alameda occupied 2,700 acres of shoreline on the island City of Alameda. The NAS Alameda was the base for numerous nuclear aircraft carriers during its operation and employed thousands of civilian employees at the Naval Air Rework Facility and the Naval Aviation Depot.  The base was closed in 1997 pursuant to the Base Realignment and Closure Act.  NAS Alameda was listed as a Superfund cleanup site in 1999. At that time 25 locations on the base were identified as containing hazardous contaminants, including radioactive contamination of cesium-137, cobalt-60, strontium-90, thorium-232, and uranium-238. Radium-226 paint was extensively used in numerous buildings at NAS Alameda, and radioactive contamination was dumped in a number of landfill locations on NAS Alameda. As a Superfund site, CERCLA clean-up actions were required prior to the transfer of the NAS Alameda to the City of Alameda and other public entities. In 1992 the Navy, State of California Department of Health Services Toxic Substances Control Program, now titled the California Department of Toxic Substances Control (DTSC) entered into a Federal Facility Site Remediation Agreement. (FFSRA) The FFSRA defined the Navy's obligations for corrective action to remediate NAS Alameda in accordance with CERCLA and the Resource Conservation and Recovery Act (RCRA). Under CERCLA the Navy hired subcontractors to perform remediation of NAS Alameda. Parcels of NAS Alameda have been transferred to public entities with the largest transfers to date to the City of Alameda taking place in 2013 and to the U.S. Veteran's Administration in 2014. The Navy continues to be liable for radiological contamination that exceeds specified levels that may be exposed in the future.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PARTIES - RELATOR PLAINTIFFS**

6.     Qui Tam Relators SUSAN V. ANDREWS, (herein Andrews), Plaintiff ARTHUR R. JAHR III, (herein Jahr), ELBERT G. BOWERS, (herein Bowers) and ARCHIE R. JACKSON, (herein Jackson) are natural persons and competent to sue, herein jointly are referred to as the JAHR relators.  The fraud information disclosed herein by the JAHR relators as to the fraud engaged in by defendants at the expense of the United States of America, and the United States Navy had not been publicly disclosed as defined by 31 USC §3730(e)(4)(A) prior to the filing of the JAHR suit. The JAHR relators are original sources for all JAHR relator disclosed information. The JAHR relators have knowledge of the facts and fraud herein alleged by the JAHR relators. The knowledge of the JAHR relators is independent of any publicly disclosed fraudulent allegations or transaction, and materially adds to any publicly disclosed fraudulent allegations or transactions. The JAHR relators have provided the information to the government before filing suit, have filed complaints with government agencies, having submitted documents and have been interviewed by government agents, and agents for the JAHR relators have met and conferred with government representatives including the United States Attorney General's office and made disclosures prior to filing of suit.  Relators previously filed personal litigation against Defendant Tetra Tech, Inc. and Tetra Tech EC, Inc. in the Superior Court of California for wrongful termination due to their reports of unsafe and improper radiation remediation risking the health and safety of workers and the public.  In that litigation some of the background facts but not the fraudulent allegations or transactions by Tetra Tech, Inc. and Tetra Tech EC, Inc., or any of the other defendants herein were alleged.  Federal jurisdiction is proper for this action is based on a federal statute 31 USC §3729 and §3730.

7.     Qui Tam Relator ANTHONY SMITH, hereinafter Smith, was trained as a radiation control technician.  Smith was employed at various periods of time, beginning in approximately 2002, as a radiation decontamination technician and later a radiation control technician (RCT)  Smith worked as an RCT at Hunters Point Naval Shipyard initially for New World Environmental, Inc. doing business

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

as New World Technology beginning in approximately 2002 for approximately a year.  Smith returned to Hunters Point Naval Shipyard as an RCT in approximately 2006 for less than a full year.  Smith returned once again to the Hunters Point Naval Shipyard to work as an RCT on or about March 28, 2008 and remained at Hunters Point Naval Shipyard as a radiation control technician until September 28, 2012.  When Smith was laid off with others in September of 2012, Smith was informed he would be returned to work at Hunters Point upon the initiation of work in other areas of Hunters Point for radiation surveys and remediation.

8.      In early 2010, Smith's employer, a sub-contractor to Tetra Tech EC, Inc. changed from New World Environmental, Inc. to another sub-contractor of Tetra Tech EC, Inc. named Radiological Survey & Remedial Services, Inc., herein referred to as RSRS.  Defendant Brian Henderson was the President of RSRS, and Defendant Daryl DeLong was the Vice President of RSRS. Both Henderson and DeLong worked a significant amount of their time at Hunters Point after the founding of RSRS. RSRS had been a sub-contractor of Tetra Tech EC, Inc. at Hunters Point during parts or all of Smith's last period of employment at Hunters Point which had begun on March 28, 2008.  Management of RSRS and supervisors of Tetra Tech EC, Inc. informed Smith that he would be called back to work after the lay-off of September 28, 2012.  In early 2013, Smith learned that others had been called back to work at Hunters Point, but Smith had not received a call back to work.  Smith called supervisors of Tetra Tech EC, Inc. and inquired if he was going to be recalled to work. Smith was informed he would not be recalled.  Smith asked why he had not been recalled for work. Smith was told that he was not being recalled for work because the government had raised issues related to radiological work Smith and others had performed.

9.      Smith individually and through his counsel conducted investigations into the radiological remediation that has been performed for the United States Navy in the California Bay Area, in particular Hunters Point Naval Shipyard, Treasure Island, and Alameda Naval Base.  Smith through his own personal knowledge and the investigation he and his counsel conducted has information that is independent of publicly disclosed information regarding false claims submitted

by the Defendants to the United States for payment, based on his own experience and the investigation on the behalf of Smith as described in more detail infra.

10.     Smith became aware that Tetra Tech EC, Inc. produced a non-public report titled "Investigation Conclusion Anomalous Soil Samples At Hunters Point Naval Shipyard". The report implied that Smith had conducted false soil sampling at Hunters Point on his own and contrary to the directions of his supervisors. Smith concluded that the report was not accurate, and that the report tried to falsely place blame on Smith and other co-workers. Smith consulted with counsel to investigate matters related to radiological remediation conducted on behalf of the Navy and to explore ways to bring to light the true circumstances involved in radiological remediation conducted on behalf of the Navy in the California Bay Area.

11.     The information contained herein alleged by Smith pertaining to fraud engaged in by Defendants at the expense of the United State of America, and the United States Navy had not been publicly disclosed as defined by 31 USC §3730(e)(4)(A). Smith is an original source for essential material factual information Smith alleges herein. Smith has independent knowledge of facts and false statements related to the fraud upon the United States at Hunters Point as specified infra that is herein alleged. Relator Smith has met with the United States Attorney General's representatives, as well as the United States Navy investigators, as well as provided written information prior to the filing of this False Claims Act suit. Federal jurisdiction is proper for this action and is based on a federal statute, 31 USC §3279 and §3730. Subsequent to the initial filing of this lawsuit, Relator met with representatives of the United States Attorney General's office, the Nuclear Regulatory Commission, the Federal EPA, and a variety of Navy representatives. Prior to amending Smith's Complaint, Smith provided further disclosures to the United States Attorney General's office. During these meetings and communications, Smith provided independent information of the material facts pertaining to the frauds herein originally alleged and those that were alleged in amendments that related to false claims submitted by Defendants to the United States Navy.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

12. Qui Tam Relator Donald K. Wadsworth (herein Wadsworth), was the President and CEO of New World Environmental, Incorporated (herein New World), now closed. Wadsworth is trained in and has college degrees pertaining to the testing and handling of radioactive materials. New World had been a company specializing in the remediation of contaminated buildings and areas, including the contamination by radioactive wastes. New World had performed remediation services involving radioactive wastes for private, public and military clients. New World was initially engaged directly by the United States Navy in the late 1990 and early 2000's to assist in the evaluation of Hunters Point Naval Shipyard for contaminants, including radioactive contamination.

13. In the early years of the 2000's New World was requested by the United States Navy and Tetra Tech EC, Inc. to be a sub-contractor for Tetra Tech EC, Inc. for the remediation of Hunters Point Naval Shipyard for radiological surveys, screening, sampling, testing and remediation. In performing the radiological work at Hunters Point in the early to mid-2000's, New World utilized its own Nuclear Regulatory Commission radioactive materials license. In mid-2000's New World was sub-contracted by Tetra Tech EC, Inc. for the remediation of NAS Alameda for radiological surveys, screening, sampling, testing and remediation and continued to provide Radiation Control Technician personnel at NAS Alameda until approximately 2009.

14. In or about 2007, Tetra Tech EC, Inc. obtained and invoked its own Nuclear Regulatory Agency license and became the responsible entity for the radiological work and handling of radiological materials at Hunters Point and NAS Alameda. New World continued to operate as a sub-contractor for Tetra Tech EC, Inc. at Hunters Point and NAS Alameda by providing RCT personnel, and radiological laboratory and laboratory personnel, under the direction, supervision, and control of Tetra Tech EC, Inc. On or about 2009 New World no longer provided RCT personnel to Tetra Tech EC, Inc., for other sub-contractors, including Defendant RSRS took over the function of supplying RCT personnel to Tetra Tech EC, Inc. On or about 2012, New World no longer provided the radiological laboratory to Tetra Tech EC, Inc. at Hunters Point. Although New

World provided the personnel and equipment referenced, Defendant Tetra Tech EC, Inc. directed and managed the individuals and operations on the Navy base sites.

15.    New World was retained as a sub-contractor for Shaw Environmental and Infrastructure (Shaw) to perform surveys, scanning, testing, and remediation of radioactive materials at Treasure Island in the mid-2000's until approximately 2009, and provided an on-site radiological laboratory for those purposes, under the direction, supervision, and control of Shaw.  The Hunters Point laboratory provided by New World performed laboratory services for both Hunters Point and NAS Alameda for radiological remediation. The Hunters Point laboratory was utilized by Tetra Tech EC, Inc. to perform laboratory services for radiological purposes for the Treasure Island radiological remediation Tetra Tech EC, Inc. performed for the Navy.

16.    Qui Tam Relator Robert McLean (herein McLean) is an experienced and trained Radiation Control Technician.  McLean was employed by New World for a period of time in the mid-2000's to work as an RCT at Hunters Point under the sub-contract with Tetra Tech EC, Inc.  McLean was transferred as an RCT Supervisor to Treasure Island when New World obtained a radiological sub-contract with Shaw.  McLean discovered extensive radioactive material on Treasure Island that the Navy had represented was not present on Treasure Island.  Over the period of McLean's employment by New World at Treasure Island, McLean was a lead RCT responsible for overseeing the work of other RCTs at Treasure Island. McLean was subjected to extensive radioactive exposure and his employment ceased due to the level of radioactive exposure McLean incurred at Treasure Island.

17.    Plaintiffs Wadsworth and McLean are original sources of the information herein provided as defined by 31 USC Section 3730(e)(4)(B). Plaintiffs Wadsworth and McLean are aware of general news articles, but are not aware that news articles made allegations of fraud or the same frauds that Wadsworth and McLean allege herein. Prior to the filing of their lawsuit, Wadsworth and McLean voluntarily disclosed to the Government the information personally known or that they have obtained through their investigation with the assistance of counsel.  The information Wadsworth and McLean allege is derived

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

independent of media and other public information, and has come from their own personal knowledge and their investigation which uncovered the facts and information alleged herein. Wadsworth and McLean have also provided information in writing to the United States Attorney General's office prior to filing suit, subsequent to filing suit and prior to amendment of their action, and have talked with and met with federal government officials, as well as State of California officials, to assist in disclosure of information relevant to the radiological remediation fraud and false claims upon the Navy.

18.    Plaintiffs Wadsworth and McLean, with the assistance of counsel, have conducted investigations into the conduct of Tetra Tech EC, Inc., and others involved in the radiological remediation for the Navy in the California Bay Area. Wadsworth had concerns on behalf of the company New World to determine why New World was shut off from further remediation work on the former Navy bases in the Bay Area and around the United States despite having worked on the radiological remediation at all three Bay Area sites during the 2000's. McLean had concerns that he was terminated from employment with New World, and advised that he was ordered to be terminated at the direction of a Navy RASO official due to his personal exposure to high levels of radioactive contamination. As a result of the inquiries by the Relators, individually, jointly, and with the assistance of counsel, the Relators and counsel have conducted an independent investigation and have independent knowledge and information that has not been publicly disclosed that is material to false claims made by the Defendants against the United States of America, and the United States Navy, as set forth herein, and voluntarily provided that information to the United States prior to suit and amendment of their action.

///

///

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

**PARTIES - DEFENDANTS**

19.    Defendant Tetra Tech EC, Inc. [herein also TTEC] is a corporation that has contracted with the United States Navy and the United States government to perform clean-up and remediation services of hazardous wastes, including radioactive materials, at the closed Hunters Point Naval Shipyard in San Francisco, (herein "Hunters Point") the Treasure Island Naval Base in San Francisco, (herein "Treasure Island") and the Alameda Naval Base in Alameda County, California (herein "NAS Alameda").  On information and belief, it is alleged that the principal business office of TTEC Inc. is in California.  Defendant TTEC is a wholly owned corporate subsidiary of Tetra Tech, Inc.

20.    Tetra Tech, Inc. [herein also TT] is the parent company of TTEC and other corporate subsidiaries. Tetra Tech, Inc. absorbed its subsidiary Tetra Tech EM Inc., [herein TTEM]. TT assumed all liabilities of its subsidiary TTEM. Allegations throughout this complaint that reference TTEM allege liability upon TT due to TT having assumed all liability of TTEM.

21.    Defendants Radiological Survey & Remedial Services, LLC (herein also RSRS), Daryl DeLong, and Brian Henderson, are related defendant entities. This suit seeks liability and remedies against both the company RSRS, and the individual defendants due to their direct involvement in the false records that resulted in false claims that each was involved in as sub-contractors for TTEC.

22.    Radiological Survey & Remedial Services, LLC is a limited liability corporation owned by Defendants Daryl DeLong and Brian Henderson. RSRS provided technical workers and performed services related to the radiological remediation for the United States Navy at Hunters Point, Treasure Island, and NAS Alameda.  RSRS provided these services generally through sub-contracts with the prime contractors of the United States Navy, including Tetra Tech EC, Inc.

23.    Defendant Daryl DeLong is a natural person. DeLong was both a manager of Tetra Tech EC, and the Vice President of RSRS. DeLong is personally liable for his having knowingly made, used, and caused to be used false records and

statements material to false and fraudulent claims, and his conspiracy to make, use, cause to be used, false records material to false claims made to the Navy by TTEC.

24.    Defendant Brian Henderson is a natural person. Henderson was both a manager of Tetra Tech EC, and the President of RSRS. Henderson is personally liable for his having knowingly made, used, and caused to be used false records and statements material to false and fraudulent claims, and his conspiracy to make, use, cause to be used, false records material to false claims to the Navy by TTEC.

25.    Shaw Environmental & Infrastructure, Inc., [herein also "Shaw" and "Shaw E&I"] was a global construction and environmental services company, and a segment of the Shaw Group. Shaw E&I in 2012 had sales of approximately $2 billion per year. Pursuant to a merger on February 13, 2013, The Shaw Group, including Shaw, was acquired by Chicago Bridge & Iron, N.V., [herein also "CB&I"] and operated under the CB&I umbrella as CB&I Capital Services in the federal services division business. CB&I was one of the world's leading engineering and construction services providers. At relevant times CB&I had approximately 27,000 employees. CB&I worked on completing Shaw's contracts with the Navy at Hunters Point Shipyard and Treasure Island. CB&I agreed to acquire the assets and liabilities of Shaw, except for the Energy & Commercials Group. CB&I was a successor-in-interest to Shaw Environmental & Infrastructure. On or about February 27, 2017 CSVC Acquisition Corp. acquired the Chicago Bridge & Iron Company's Capital Services federal services division and assumed the assets and liabilities of that division, which included the assets and liabilities assumed by CB&I from Shaw E&I. In July of 2017, on information and belief, it is alleged that CSVC transferred to Veritas Capital the Chicago Bridge & Iron Company's Capital Services federal services division and assumed the assets and liabilities of that division, which included the assets and liabilities assumed by CB&I from Shaw E&I. Veritas Capital merged the Chicago Bridge & Iron federal services division, its assets and liabilities into wholly owned entity Aptim Corporation, which placed the assets and liabilities into Aptim Federal Services LLC, and Aptim Environmental & Infrastructure, Inc. These Aptim entities, on information and belief, are liable as successors to the liability of Shaw E&I and

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Relators' Combined Third Amended Complaint - FCA 3:13-CV-3835 - JD

Chicago Bridge & Iron and are herein referred to as "Aptim".  Employees of these Defendants knowingly made, used, and caused to be made or used false records and statements material to false claims for Hunters Point and Treasure Island.

26.    Defendant IO Environmental & Infrastructure Incorporate (IOEI) was incorporated in 2006. IOEI has provided data management, radiological test result management, and technical writing to TTEC for Hunters Point, Treasure Island, and Alameda Naval Base. Employees of IOEI knowingly made, used, and caused to be made or used false records and statements material to false claims submitted by TTEC for Hunters Point, Alameda Naval Base, and Treasure Island.

## HUNTERS POINT -
## JAHR PLAINTIFF/RELATORS CASE #13-CV-3835-JD

27.    For the JAHR Plaintiff/Relators, the United States' First Amended Complaint In Intervention Against Tetra Tech EC, Inc. filed on July 15, 2019 [herein "USFAC"] encompasses and subsumes the allegations and defendants for the JAHR Plaintiff/Relators. The JAHR Plaintiff/Relators bring no allegations and bring no claims against any defendants other than as set forth in the USFAC that were initially alleged in the August 19, 2013 JAHR complaint, Case Number CV-13-3835.

## HUNTERS POINT -
## SMITH PLAINTIFF/RELATOR CASE #16-CV-1106-JD

The USFAC encompasses and subsumes some of the allegations against defendants for the Smith Plaintiff/Relator, but not all. The following are the allegations, defendants and causes of action for the Smith Plaintiff/Relator which do not appear to be encompassed by the USFAC.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

**First Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1)(A) & (B)**

**Against Defendant Tetra Tech EC, Inc.**

**HUNTERS POINT PCB HOT SPOT SOIL FRAUD 2006-2007**

**Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD**

28.     Tetra Tech EC, Inc., through a predecessor was contracted to scan soils which contained chemical contamination, in particular PCBs, for radioactive materials and remove the radioactive material above Remediation Goal (RG) release levels, through Navy contract N68711-98-D-5713 Task Order 0084, at an area of Parcel E referred to as the PCB Hot Spot. The radioactive material was required by contract with the Navy to be properly screened, segregated, and stored in specialized containers for radioactive waste. Upon being segregated as radioactive contaminated waste and properly stored in specialized containers, possession and responsibility for that soil was to be transferred from TTEC to a specialized shipper of Low-Level Radioactive Wastes (LLRW) retained by the Navy. Due to the PCB contamination of the soils, if the soil was cleared of radioactive contamination as a result of scanning, screening, and removal of radioactive contaminants, such cleared soil qualified to be shipped off Hunters Point at the direction of TTEC to landfills and entities that could receive such PCB chemically tainted soils. The requirements for the processing of the PCB Hot Spot soil for radioactive contamination were set forth in the contract and work plans, including the Final Project Work Plan PCB Hot Spot Soil Excavation Site Parcels E & E2, November 10, 2005, the Final Addendum to the Final Sampling and Analysis Plan PCB Hot Spot Evacuation Site Parcels E and E-2, October 2005, and Final Addendum to the Final Sample and Analysis Plan (Field Sampling Plan and Quality Assurance Project Plan), May 18, 2006.

29.     In the later part of 2005 and into 2006, Tetra Tech EC, Inc. had three conveyor belt systems established in which excavated soil from Hunters Point

parcel E was processed for radiological scanning and removal of radiological contamination. Under the contractual terms of an established work plan the PCB Hot Spot soil was to be placed on a conveyor belt and moved at a very slow speed under radiological sensors. Soil that alarmed for elevated radioactive contamination was to be removed. The removed soil was to be put into specialized containers, and given over to the specialty Low Level Radioactive Waste (LLRW) shipper for disposal at facilities licensed by the Nuclear Regulatory Commission. Soil that cleared the conveyor belt process was to be loaded onto tractor trailer trucks and shipped at the direction of TTEC to standard landfills that could receive PCB contaminated soils.

30.     TTEC management took actions contrary to the contract and work requirements by directing and taking actions to have the conveyor belt system run in a manner contrary the specifications set by the Navy and incorporated into the work plans. TTEC management took actions to have the conveyor belt system operate at excessive speeds, and at decreased radiological sensor sensitivity levels. TTEC management took these fraudulent actions in order to decrease the costs to TTEC for the processing of the PCB Hot Spot soils from Parcel E.

31.     The TTEC managers that were involved in taking these actions contrary to the contract and work plans included Neil Hart, Ulrika Messer, and Joe Lavelle. The taking of actions to have the conveyor belt process operate at speeds and sensitivity contrary to the contract and work plans took place in 2005 through the first half of 2006.

32.     The processing of the PCB Hot Spot soil from Parcel E contrary to the contract and work plans resulted in false reports that expressly certified and impliedly certified that the soils had been processed as the contract and work plans required. The false reports of the PCB soil processing were used by TTEC to submit monthly false reports to the Navy and false monthly demands for payment

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

33.     The conduct of operating the PCB Hot Spot conveyor soil processing, and the resulting false reports as to the processing were used to support false claims for payment by TTEC from the Navy was a violation of 31 U.S.C. §3729 (a)(1)(A) and (B). The Navy has been harmed by the intentional fraud in the operation of the PCB Hot Spot soil processing for the Navy did not receive the benefit of the contract to have the PCB Hot Spot soil properly processed.

34.     The false reports of the PCB Hot Spot soil processing were used to support false claims for payment by TTEC that were submitted to the Navy Base Realignment and Closure Management Offices included demands for payment for these soils that were within 10 years from the filing of the Smith complaint in March of 2016. In addition, the later efforts to address the PCB Hot Spot soils as discussed below began after June 2006 and demands for payment continued into 2007 under contract N68711-98-D-5713, task order 0084.

35.     In mid-2006, TTEC stopped using the conveyor belt system for the processing of PCB Hot Spot soil from Parcel E. In place of the conveyor belt system, management of TTEC determined, with involvement of the Navy RASO office, to have the PCB Hot Spot soils hand scanned for radioactive contamination. The Navy, on information and belief, and TTEC set forth criteria for the hand scanning of the PCB Hot Spot soils after the conveyor belt processing was discontinued. The process required the hand scanning to be done at specified slow speeds, at specified distances, and though specified soil thickness densities so that the radiological sensors could reasonably detect radioactive contamination above free release levels.

36.     TTEC did not comply with the mandated scanning requirements for the hand scanning of the PCB Hot Spot soil. Due to pressure to cut corners by TTEC top management, TTEC supervisors had RCTs hand scan soil loads that were far in excess of the thickness density for the radiological sensors contrary to the contract, and hand scanned at speeds and distances that were greater than set

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

forth.  The TTEC managers responsible for the TTEC supervisors having the RCTs perform hand scanning contrary to the specific requirements were Neil Hart, Ulrika Messer, Joe Lavelle, and newly arrived General Manager William Dougherty.

37.     Beginning in the summer of 2006, TTEC management had TTEC supervisor Justin Hubbard oversee the processing of the PCB soils hand scanning with the intent of scanning the soil to obtain fraudulent clearance to the PCB Hot Spot soil as non-LLRW for disposal to keep within budget.  Tetra Tech EC, through supervisor Justin Hubbard, had large front-end loaders take large scoops of soil to be scanned by hand probes.  The amount of soil and the thickness density of the soil in the front-end loaders were far beyond the capacity of the hand probes to properly detect contamination levels in the soil.  Tetra Tech EC, through supervisor Justin Hubbard, had RCTs scan the overly large loads at excessive speeds and distances over the face of the large soil scoops.  If high radioactive readings were not registered, Justin Hubbard deemed the soil to be "clean" so it could leave Hunters Point as radiologically remediated soil meeting RG levels.  The soil was certified as "clean" of elevated radioactivity when it was known that the sensors could not register whether there was radioactive contamination above release levels due to the thickness density of the soil and the speed and distract from the soil that the scanning was performed.  The sensors were largely ineffective in detecting radioactivity through greater than six inches of soil so most of the soil within the interior of the massive soil scoop could not be detected by the scanners.

38.     RCTs, including Anthony Smith, and Robert McLean, were directed to perform the hand scanning by Justin Hubbard. Smith and McLean objected that the hand scanning was ineffective in detecting radioactive contamination above release levels through multiple feet of soil since most scoops contained soil that was 3 to 4 feet in depth.  Additionally, the thick metal walls on the side and back of the front-end loader scoops shielded the soil inside from being scanned.  This false process was used for clearing approximately 7,300 plus cubic yards of PCB and rad

- 17 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

contaminated soil from the PCB Hot Spot. This manner of hand scanning was contrary to the rules and requirements established by the Navy and standard operating procedures which required that hand scanning was to be done on soil that was 6 inches or less in depth or thickness, and was to be done at very slow speeds and at a very close distance to the soil being scanned.

39.    Tetra Tech EC, Inc. submitted false reports and billings to the Navy for the radioactive soil remediation at Hunters Point PCB Hot Spot section of Parcel E during the months the conveyor belt was fraudulently operated, and during the hand scanning process that began in the summer of 2006. TTEC submitted false reports regarding the clearance of the PCB soil to the Navy and submitted cost-plus submissions to the Navy for this work with monthly submissions during the statute of limitations period that begins March 4, 2006 and continued to submit monthly billings for the false PCB Hot Spot soil processing to the Navy into 2007. The reports and billings by Tetra Tech EC to the Navy certified and impliedly certified that the remediation for which Tetra Tech EC, Inc. submitted billings to the Navy was done according to established operating procedures, which was false.

40.    The fraudulent radiological scanning and processing of the PCB Hot Spot soils with the conveyor belt system, and the subsequent hand scanning by Tetra Tech EC as described in this FIRST CAUSE OF ACTION resulted in the creation of false records of the PCB Hot Spot soil processing which were used to support false claims for payment, which is a violation of the False Claims Act 31 U.S.C. §3729 (a)(1)(B) and resulted in the submission of false claims by Tetra Tech EC to the Navy for payment based on these false records is a violation of the False Claims Act 31 U.S.C. §3729(a)(1)(A). These representations were knowingly false and were material to the demands for payment made by Tetra Tech EC, Inc. and material to the decision to pay by the Navy in violation of the False Claims Act, 31 USC §3729 (a)(1)(A) and (B). Relief for the FIRST CAUSE OF ACTION is requested under the False Claims Act for each of the false reports and false invoices

submitted for the PCB Hot Spot soil remediation under contract N68711-98-D-5713 Task Order 0084 as set forth hereinafter under the Prayer For Relief.

**Second Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1)(A), (B) & (C) Against Defendant Tetra Tech EC, Inc. and Radiological Survey & Remedial Services, Inc.**

**HUNTERS POINT SOIL AND PIPE SAMPLE "VICINITY FRAUD"**
**Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD**

41.     The USFAC has alleged in paragraphs 56-59 two forms of soil sampling fraud, namely soil sample switching with "clean" soil, and false soil samples RCTs, such as Jane Taylor and Marie Winder, directed laborers to take from outside the survey area and label the sample as having been obtained from inside the survey area.  The soil sample switching with "clean" soil was alleged by Smith in his original complaint. The following allegations as to soil and pipe sampling frauds in the field were contained in Smith's original complaint and continue to be alleged by Smith, are not incorporated into the USFAC, and are set forth herein.

**Soil Sample "Vicinity Fraud"**

42.     The contracts between the Navy and TTEC for radiological remediation of areas of soil required soil sampling from an area referred to as a "survey unit". The contract and work plans required that the soil samples be taken from a specified number of locations within the survey unit. The soil samples were required to be taken from the highest radiological scan spots within the survey unit in order to determine whether the survey unit needed radiological remediation or had successfully been radiologically remediated.

- 19 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

43.     Pressure was applied by TTEC management to cut corners and violate required procedures in order to obtain false final clearance of soil survey units at Hunters Point.  In the spring of 2006, after the transfer of William "Bill" Dougherty as the Tetra Tech EC General Manager, and Construction Superintendent Dennis McWade to Hunters Point, the level of pressure to engage in false soil sampling increased from TTEC management. Pressure was applied to supervisors, including Radiation Field Supervisors Steven Rolfe and Justin Hubbard, and sub-contractor RSRS owner Daryl Delong, and others, to create false records and reports pertaining to the soil samples taken at Hunters Point for radioactive materials that were delivered to the laboratory.  RCTs from New World, Aleut World Solutions and RSRS, including relator Anthony Smith, Joe Cunningham, and others, were ordered to obtain soil and material samples for radiological testing in a manner that was intentionally and knowingly false. RCTs, including RSRS RCTs, did engage in false "vicinity fraud" soil sampling from mid-2007 through mid-2014, and possibly continued.

44.     TTEC violated the terms set forth by the contract and approved work plans for these soil samples. TTEC directed RCTs to take soil samples in the vicinity of the identified elevated radiological areas but not from the actual elevated radiological identified spots contrary to the contract and work plans, in order to obtain falsely lower laboratory results for the survey unit samples. Navy approved procedures required RCTs to take soil samples from specific locations that were marked in some manner, usually with orange spray paint by engineers working for Tetra Tech, EC and RSRS.  The marked spots were required to be the locations/spots that had been scanned for radiation and had the highest radiological emission readings for the survey unit.  The samples were to be taken from the specifically designated spots marked along with an accurate and truthful "Chain of Custody" (COC) document to identify the location of the sample, the time the sample was taken, the identity of the person taking the samples, as well as truthfully

listing all subsequent persons in possession of the sample in the chain in custody. RCTs were ordered to appear to take samples from spray painted marked sample spots, but to actually take samples from areas in the vicinity of the marked spots within the survey unit, usually within 25 feet from spots that had lower radiological scan readings.

45.     These false "vicinity fraud" soil samples were used by TTEC to create false lab results, false summaries of lab results, and false reports that were used to support the claims for payment TTEC made on a monthly basis to the Navy for this false work. The false samples, lab results, and reports that were used to support the TTEC demands for payment from the Navy BRAC offices were material to the claims for payment and material to the decisions of the Navy to pay the demands for payment by TTEC. On information and belief, it is alleged that after the "soil swapping fraud" in the CONEX box previously alleged by Smith, and adopted by the UAFAC in paragraphs 56-59, was suspected by TTEC as being susceptible to discovery in late 2012, TTEC engaged more frequently in the "vicinity sample fraud" to avoid fraud detection, and continued to use "vicinity sample fraud" through 2014 at Hunters Point.

46.     The "vicinity fraud" false samples were tested by the on-site laboratory, and a selection of the samples was submitted to a third-party laboratory. The laboratory results based on the false "vicinity fraud" soil samples from the Hunters Point laboratory and from the third-party lab were submitted to the Navy and regulators as part of submissions by TTEC seeking payment for services from the Navy.  The truth and accuracy of the laboratory results was material in the decisions of the Navy to make payments to TTEC for the services. The representations by defendant TTEC as to the soil sampling, lab results, and related "vicinity fraud" soil sample documents submitted to the Navy RSRS were knowingly false and material to the process for submission for payment and the review and decisions by the United States in regard to the making of payments to

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

TTEC under the contracts involved for the soil samples were not taken from the locations that were represented by TTEC in the reports and demands for payment.

47.     Defendants Tetra Tech EC, Inc., and RSRS management, including Daryl DeLong, Vice President of RSRS, conspired and took actions in support of the conspiracy to submit false statements regarding the taking of soil samples, by directing supervisors of TTEC and RSRS employees to obtain samples from the vicinity, but not the locations with the highest radioactive readings, contrary to the contractual requirements with the Navy, and to create false COC documents as part of the vicinity sampling fraud by falsely reporting on the COC document that the sample was taken from the scanned and designated highest radioactive reading areas.

48.     The false "vicinity fraud" soil samples tested for radioactivity were submitted on a regular basis to government officials of the United States, including Navy Radiological Affairs Support Office (RASO) members and the BRAC Program Management Office, and also to the Navy's Chief of Naval Operations Energy and Environmental Readiness Division (N45) Radiological Controls (RADCON) Branch Office with the Navy's Facilities Engineering Command Southwest (NAVFAC SW), and the Naval Sea Systems Command (NAVSEA 04N) Radiological Controls Office, as part of the reporting requirement under the contract with the Navy and when making demands for payment.  The false "vicinity fraud" soil sample records were incorporated into progress reports submitted by TTEC and RSRS to the United States for government review of the remediation progress of Hunters Point.  TTEC submitted Final Status Surveys to the United States containing the false records of "vicinity fraud" soil samples tested for radioactivity to report final radioactive remediation meeting free release goals set by the Navy for the radioactive clean-up of Hunters Point.  These false records were material to the contract and to the demand for payment by TTEC for the radioactive remediation work performed at Hunters Point.  Defendants TTEC and RSRS

certified and impliedly certified that the reports were true and correct, but such reports were in fact knowingly false and fraudulent. False demands for payment from TTEC, using vicinity fraud soil sample records, which RSRS assisted in creating, were submitted to the Navy BRAC office for payments on a regular monthly basis, on information and belief and the facts and allegations set forth herein, from the middle of 2007 through 2014 on a regular basis, and after 2014 the submissions using the false vicinity sampling fraud records were submitted on a less frequent basis in and after 2015.

49.     Each knowingly made false record of soil samples due to the "vicinity fraud" soil sampling at Hunters Point caused to be made a false statement material to a false and fraudulent claim by Tetra Tech EC, Inc. for payment from the Navy, done by RSRS and by Tetra Tech EC, Inc. jointly and in conspiracy together, in violation of the False Claims Act 31 USC Section 3729.  Each and every COC document submitted for a false "vicinity fraud" soil sample was a false record or statement material to a false claim submitted by Tetra Tech EC to the Navy for payment in violation of 31 USC § 3729 (a)(1)(B).

50.     The United States of America has been damaged by the false claims submitted by Defendants.  The United States of America contracted with Defendant Tetra Tech EC, Inc. for the remediation and removal of radioactive materials above a specified level for the health and safety of the environment, the public, and future generations.  The fraudulent taking of soil samples due to "vicinity fraud" to obtain false clearance of areas contracted to be properly remediated of radioactive wastes deprives the United States of America of the basic service that were contracted for with Defendants.  The fraudulent taking of soil samples due to vicinity fraud creates unlimited future liability for the United State of America for the agreements between the United States of America and the City and County of San Francisco provide that the United States will remain responsible and liable for the radioactive remediation of Hunters Point after the property is deeded over to San Francisco,

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

should it be discovered that the remediation did not fully and properly remove radioactivity.  The Navy will and has incurred costs, expenses, and delays in the remediation of Hunters Point that should not have been incurred, but for the fraud of Defendants Tetra Tech EC, Inc. and RSRS in submitting fraudulent "vicinity fraud" soil samples, records and claims for payment. The full costs directly and derivatively related to the fraud accomplished by Defendants Tetra Tech EC, Inc. and RSRS are extensive and yet not fully known and will be established at trial.

### Pipe Scan "Vicinity Fraud"

51.     Clay and concrete pipes were used by the Navy for sewer lines and stormwater drain lines. The contracts with the Navy and TTEC required these pipes to be excavated and removed. As part of that process earthmoving equipment would dig trenches down to these pipes, varying between 4 to 15 feet in depth. When the pipes were reached, while in place the pipes and surrounding dirt were to be radiologically scanned, and then removed and disposed of as either uncontaminated waste, or as radiologically impacted waste as either low-activity radioactive waste, or the higher designation of low-level radioactive waste that may only be lawfully disposed of in one of the four Nuclear Regulatory Commission licenses facilities to receive LLRW nationwide.

52.     After the arrival of Dougherty and McWade to Hunters Point in 2006, these managers increased pressure on other supervisors to cut corners which was applied by the supervisors to the RCTs. All piping was removed in order to be disposed. Pipes that were scanned and provided evidence of radioactive elevated contamination were to be tracked and remediated if possible. TTEC, through supervisors Hubbard and Rolfe, directed RCT under their team supervision, including relator Smith, Cunningham, Roberson, Jeff Rolfe, Tina Rolfe, Fredrick

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Zahensky, and others to falsely scan and sample removed pipes to minimize the number and extent of pipes to be remediated and/or disposed of as LLRW.

53.     A substantial number of the involved RCTs were employees of RSRS. The co-owners of RSRS knew of the pressures put upon the RCTs by Hubbard and Rolfe because DeLong and Henderson observed the pressures applied and were present during meetings in which TTEC supervisors and managers discussed the pressure put on the RCT as part of the efforts to reduce time and expense. Further the owners knew of the pressure being applied to shortcut the proper scanning and sampling procedures from the comments and objections expressed by RCTs to DeLong and Henderson.

54.     Requirements under the contract and work plans required detailed scanning and sampling of the extracted pipes. In order to submit false data and samples, RCTs were directed to not scan the entire pipe as required by the Navy approved Work Plans.  Instead RCTs were instructed to identify an area of low radiological readings on the pipe and leave the scan sensor on that area for an extended time to simulate that the entire pipe had been properly scanned. Further, smear sampling was to be taken from a specified number of the highest radioactive reading areas on the pipe so that there could be an evaluation based on the smear sample of whether the pipe needed to be remediated, or possibly treated as LLRW for some or all of the pipe. Rather than follow those requirements, RCTs were ordered by TTEC supervisors, including Rolfe and Hubbard, to take smear samples from areas that evidenced some of the lowest radioactive readings. The directions to RCTs by TTEC supervisors were in violation of the Navy rules and procedures and was done to limit the amount of work that would be required to remove radioactive contamination from the pipes. The directions to the RCTs by TTEC supervisors was also done to limit the amount of expense that would be incurred if the pipes were deemed LLRW and had to be disposed of as LLRW. [LLRW disposal dump fees ranged from approximately $30 a cubic foot to over $100 a cubic foot

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

depending on the nature of the radioactive waste, thousands of times more than if the concrete and clay pipe was deemed free of radioactive contamination.]

55.    Pipe waste that was falsely scanned and smeared was tracked by TTEC to assure false clearance for disposal. False clearance for disposal by hand scanning was achieved by the RCTs, due to the pressure from TTEC supervisors and Construction Superintendent McWade, by scanning faster and too far from the surface of the pipes than contractually required standards so that elevated radioactivity would not register resulting in false clearance for the concrete and clay pipes as if the material did not have elevated radioactive contamination.

56.    Each knowingly made false record of pipe scanning caused to be made a false statement material to a false and fraudulent claim by Tetra Tech EC, Inc. for payment from the Navy, done by RSRS and by Tetra Tech EC, Inc. jointly and in conspiracy together, in violation of the False Claims Act 31 USC Section 3729. Defendants DeLong and Henderson are liable under 31 USC Section 3729 (a) (1) (2) and (3) for conspiring to knowingly cause to be made false records that were material to false claims that TTEC submitted to the Navy. The chain of custody documents submitted with false record of pipe scanning is a false record or statement material to a false claim submitted by Tetra Tech EC to the Navy for payment in violation of 31 USC § 3729 (a)(1)(B).

57.    The false soil sampling and pipe scanning "vicinity frauds" above alleged in paragraphs 42 through 56 resulted in knowingly made and used false records, that were used as material elements for false claims that Tetra Tech EC submitted to the Navy for payment. The creation of the false records by the false soil sampling and pipe scanning "vicinity frauds" was part of a conspiracy between RSRS and Tetra Tech EC to create and use these false records to support knowingly false claims for payment to the Navy. The conspiracy and conduct of Tetra Tech EC and RSRS, DeLong and Henderson in the creation and use of these false "vicinity frauds" of soil sampling and pipe scanning, and the submission of the

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

knowingly false claims for payment to the Navy in which these false records were a material part of the demand for payment are violations of 31 U.S.C. §3729(a)(1)(A), (B), and (C). Relief for this SECOND CAUSE OF ACTION is requested under the False Claims Act for the false reports and false invoices submitted for soil sampling and pipe sampling and disposal as herein described for the relief as set forth hereinafter under the Prayer For Relief.

**Third Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1)(A) & (B) Against Defendant Tetra Tech EC, Inc.**

**HUNTERS POINT BUILDING SURVEY SCANNING FRAUD**
**Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD**

58.     The USFAC has alleged in paragraphs 65-70 forms of building data falsification, including versions that were contained in the original under-seal Smith complaint, identifying building data duplication fraud, and that RCTs were directed to "just get numbers" to turn the scanners on but not scan the buildings. Smith alleged other forms of building data fraud that are not set forth in the USFAC, which are set forth herein.

59.     Tetra Tech EC, Inc. was required by the contracts with the Navy to survey buildings at Hunters Point for radiological contamination at specified scanning speeds. RCTs were to take hand-held and cart mounted scanning instruments and scan the buildings for elevated radiological readings.  The scanning instruments contained electrical memory of the scan results that were retained and could be downloaded onto a computer.

60.     When scanning was done, if any of the scanned areas had readings above expected background radiological readings that exceeded a defined limit, the area would be required pursuant to the contract to be subjected to expensive and

time-consuming radiological remediation by TTEC to remove radioactive contaminants.

61.    RCTs were ordered by Tetra Tech EC managers and supervisors to fake building scans in ways in addition to and different from the fraud schemes described in the USFAC in paragraphs 65-70 of block copying data from one building area and inserting the block copied data for another area, and of just getting numbers by turning on a scanner and having the scanner remain in one spot. When scanning was performed, both in initial scans and more particularly when remediation of a building had been previously attempted and TTEC wanted the building to obtain results warranting radiological clearance, RCTs were ordered by TTEC supervisors, including Hubbard and Rolfe, at time to scan at speeds in excess of the Navy contract and work plan requirement and defined scanning speed. Top management of TTEC directed that the supervisors have the RCTs scan at speeds that exceeded the Task Specific Plan (TSP) requirements.

62.    When TTEC wanted to obtain building clearance, be it initially or after a round of remediation, TTEC supervisors ordered RCTs and TTEC employees to review the scanner downloads on a non-networked computer at the site before the results were downloaded into the company on-site computer. The RCTs and staff were directed to remove scan readings that were too high and to remove scan readings that were so low that results would possibly raise questions regarding scan data validity.   At the direction of TTEC management, RCTs and TTEC employees, including supervisors Rolfe and Hubbard, changed the scan data numbers of the building sites to create false data so the scan numbers fell within the acceptable range.  Virtually all building scan numbers for all but a few of the very first buildings scanned, were subjected to this data corruption process rendering the data false for virtually all buildings. The changing of individual readings that were specifically high or unusually low alleged herein is different and distinct from the block copying and duplication of scan results which the USFAC identified and

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

claimed as false records supporting false claims at paragraphs 65-70. Buildings 103, 113, 113A, 130, 146, 253, 272, 351, 351A, 365, 366, 401, 411, 439, 810, 140, 157, 203, 211, 214, 224, 241, 271, 813, 144, 406, 414, 521, and 707 had false data recorded by excessive speed and individual data manipulation as herein alleged.

63.    The fraudulent excessive speed building scanning took place for these buildings over a period of years, with most of the improper scanning and data manipulation occurring from 2009 through 2012.   The building survey scan information was falsified and material to claims for payment by TTEC to the Navy from at least 2008 through at least 2014. The reports and billings by Tetra Tech EC to the Navy represented, certified and impliedly certified that the building scans were properly done, followed required procedures, and accurately reflected real building scans.

64.    The scanning of the buildings at excessive speeds in violation of the contractual work plans and the changing of specific scan data created knowingly false records of the building's radiological status and remediation, that were used to support false claims for payment by Tetra Tech EC to the Navy for the remediation of the buildings. The creation and use of the false records of the building scans was a violation of 31§3729(a)(1) (A) and (B). Relief for this THIRD CAUSE OF ACTION is requested under the False Claims Act for the false reports and false invoices submitted for building scans and remediation as herein described for the relief as set forth hereinafter under the Prayer For Relief.


///


///

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

**Fourth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1)(D)**

**Against Defendant Tetra Tech EC, Inc.**

<u>**Hunters Point Copper Removal And Sale**</u>

<u>**Plaintiff/Relator Anthony Smith Allegation 3:16-cv-01106-JD**</u>

65.     A great number of the buildings at Hunters Point had substantial copper assets, tin, and valuable metals at the time that Tetra Tech EC, Inc. obtained the contracts with the United States Navy.  The copper assets included copper gutters, downspouts, large gauge copper wire, copper hoods, and a large variety of copper items in and on the buildings throughout Hunters Point.

66.     In or about 2007, RCT Donna Watson was staffing the Portal Monitor at Hunters Point.  TTEC Construction Superintendent Dennis McWade entered a discussion with Watson.  During the discussion Watson mentioned to McWade that she was surprised that the copper gutters and downspouts on the Navy buildings remained on the buildings after the Naval base has been closed, leased, and for some time had been unused and largely abandoned by the Navy.  McWade stated to Watson that the downspouts were not copper, but a metal with no real recycle value.  Watson told McWade he was mistaken, and Watson had McWade go with her to a downspout.  Watson took a metal object and scratched the downspout exposing the distinctive copper color under the patina surface.  McWade expressed surprise the metal was actually copper.

67.     Shortly after Watson had shown McWade that the downspouts were copper, Watson was again working the Portal Monitor.  As part of the contractual agreement and procedures established by the Navy, TTEC was to assure that all incoming and outgoing commercial vehicles that entered or left Hunters Point were to pass through the Portal Monitor as a gross last check scan for radioactive contamination.  Watson noticed that trucks with scrap metal loads were leaving Hunters Point and did not proceed through the Portal Monitor she was staffing,

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

which was the only portal monitor operating.  Watson approached McWade about the breach in the requirement that all trucks leaving Hunters Point RCAs were required to be processed through the Portal Monitor, and that the trucks containing scrap metal were leaving Hunters Point without going through the Portal Monitor. McWade ordered Watson to keep her eyes on the Portal Monitor and the trucks that went through the Portal Monitor, and to ignore any other activity of scrap metal trucks leaving Hunters Point.  McWade stated words to the effect of "You just need to keep your eyes where they need to be" and ignore the scrap metal trucks leaving Hunters Point RCAs that were not going through the Portal Monitor.  Watson indicated to McWade she would object to trucks leaving Hunters Point RCAs that did not go through the Portal Monitor. McWade made statements and gestures to Watson that she had better not object or there would be negative repercussions to Watson. TTEC removed Watson from the Portal Monitor shortly thereafter and assigned her to the office.

68.     Watson took the directive and the way McWade made the statements to her as a threat to her employment if she raised any further questions regarding the scrap metal leaving Hunters Point.  Watson observed that workers were stripping the copper gutters and downspouts on Hunters Point, along with removing other sources of copper, placing the scrapped copper and metals from sites throughout Hunters Point into the trucks and leaving Hunters Point without any processing that would have required the generation of records that the trucks were in Hunters Point and left with metal in their trailer loads.  Watson did mention the copper scavenging that was being done at Hunters Point and the statements of McWade to a few other workers at Hunters Point.  Workers informed Watson that they were aware that Tetra Tech management was having scrap metal scavengers come to Hunters Point to strip the copper and other metals from the Navy buildings. The workers referred to this process which was overseen by TTEC manager

McWade and General Manager Dougherty as the Tetra Tech managers' "HD television fund" or their "vacation fund".

69.    At the time it was taking place, Relator Smith did not personally observe or know that Tetra Tech and its management team were scavenging copper and metals at Hunters Point for personal gain.   As part of Relator Smith's efforts to uncover fraud and improper conduct by Tetra Tech at Hunters Point, Smith and his attorneys discovered that Tetra Tech managers ordered and approved of the metal scavengers coming on to Hunters Point to collect metals from the buildings and leave Hunters Point without any record of their activity.  Smith and his attorneys also discovered that Tetra Tech had metal scavengers strip copper and metals from Hunters Point for the personal gain of Tetra Tech managers.    Relator's information is independent of any media report or government report and is based on his independent efforts to uncover this fraud upon the Navy.

70.    Tetra Tech EC certified or impliedly certified that it was protecting the assets of the Navy entrusted to it by the Navy and was not stealing the Navy assets at Hunters Point.  The certifications and implied certifications by Tetra Tech that Tetra Tech was safeguarding the property of the Navy were false.

71.    Tetra Tech EC had possession, custody, or control of property of the United States Navy, including the metals on, in, or about the buildings and on Hunters Point. Tetra Tech EC did not deliver back to the United States Navy at the end of its tenure on Hunters Point all of the metals, including copper, that Tetra Tech EC managers had stripped from the property by metal scavengers. Tetra Tech EC managers personally received monies as a result of the scavenging of these metals that were the property of the Navy.

72.    The conduct of Defendant Tetra Tech EC, Inc., entrusted with possession of Navy property, such as copper, tin, and valuable metals, failed to protect and deliver back to the Navy all entrusted metals on Hunters Point, but converted the property of the Navy to its own, in violation of 31 USC §3729(1) (D).

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Relief for this FOURTH CAUSE OF ACTION is requested under the False Claims Act for receiving control of public property in the form of metals on, in, and around buildings at Hunters Point and having those metals scavenged and sold for the personal gain of the management of Tetra Tech EC, Inc. resulting in the Navy being delivered back less that all of the property entrusted to Tetra Tech EC, Inc. in violation of 31 USC §3729 (1) (D) as herein described for the relief as set forth hereinafter under the Prayer For Relief.

### Smith FCA Allegations Regarding Treasure Island

The USFAC did not incorporate allegations regarding the Tetra Tech EC, Inc., Tetra Tech Inc., RSRS, and Shaw Defendants pertaining to Treasure Island alleged by Smith. These Smith allegation and causes of action follow:

### Fifth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1)(A)(B) and (D) Against Defendant Shaw/CB&I/Aptim
### Treasure Island- Copper Removal And Sale While On The Clock In Violation Of FCA By Shaw/CB&I/Aptim
### Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD

73.     Beginning in approximately late 2006 and continuing, Shaw through the direction of its Project Manager, Peter Bourgeois, instructed laborers to work and unlawfully assist Mr. Bourgeois, in stealing copper from Navy property on Treasure Island by stripping the copper from buildings owned by the United States. The copper removal and sale by Shaw continued into 2009 and may have continued thereafter until Mr. Bourgeois left Treasure Island in approximately 2013. The work time of the Shaw laborers was falsely reported to the Navy as hours worked for the remediation of lead, PCBs and other contaminants on Treasure Island. The theft by stripping of copper by Shaw was usually done late in the workday and, on the weekends, and billed as overtime hours or weekend hours.  The false records of

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

reporting of the hours as time properly incurred in the remediation of lead, PCBs and other contaminants was material to the requests for payment by Shaw to the Navy.

74.   The copper obtained by the workers stripping the Treasure Island buildings was not reported to the Navy, was sold but not accounted for to the Navy, nor were the funds delivered to the Navy.  Shaw certified or impliedly certified that it was properly performing the services contracted for with the Navy, that the hours billed were worked for the benefit of the Navy, and falsely made those certifications when Shaw was effectively having the Navy pay for the wages of laborers to steal copper for Shaw and its management from the Navy's Treasure Island buildings.

75.   Shaw was required under the contract with the Navy to have all materials on Treasure Island scanned for radiological contamination prior to the materials being removed from Treasure Island.  Shaw failed to have the copper stripped from Treasure Island scanned and surveyed for radiological contamination, but rather intentionally avoided notice to the radiological subcontractors that it was stripping and removing copper from Treasure Island.  Shaw certified or impliedly certified that all materials removed from Treasure Island had been scanned for radiological contaminants and that certification was false.

76.   The conduct of Shaw related to the unlawful stripping of copper owned by the United States, selling the copper not for the benefit of the United States, the creation of records that the hours worked were for remediation purposes under the contract with the Navy, the failure of Shaw to report the possession, custody, and control of the copper which was the property of the United States, and the failure to Shaw to turn over the copper or the money derived from the sale of the copper to the United States violated 31 USC Section 3729 (a) (1) (A), (B), and (D).  The certification by Shaw that it had scanned all materials removed from

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Treasure Island was false. These false certifications were material to the Navy and in violation of 31 USC Section 3729 (a) (1) (A), and (B).

77.     Relator Smith is an original source under the standard set by 31 U.S.C. § 3730 (e)(4)(B) (2) for all allegations he has herein alleged, including the allegations contained in the Fifth Cause of Action. Relator Smith's knowledge of information alleged herein the Fifth Cause of Action has been obtained due to the investigation he directed his counsel to engage in that involved the interviews of individuals who worked at Treasure Island and the review of documents that were not public disclosures under 31 U.S.C. §3730 (e)(4)(A) (i) to (iii). As to the Fifth Cause of Action allegations, the investigation included interviews of workers who performed the tasks herein described, and of managers who had some responsibility for the remediation of Treasure Island who were aware of the conduct herein described. The information herein alleged materially adds to public disclosures regarding the Treasure Island conduct of Shaw and CB&I. Relator Smith voluntarily provided the information to the Government before filing his lawsuit under the FCA on March 4, 2016. Relator Smith had no legal obligation to provide the information about Treasure Island that his investigation had revealed. Relator Smith voluntarily met in person with representatives of the United States Attorney General's Office and the Navy Criminal Investigation Service on November 10, 2015 in the Federal Building at 450 Golden Gate Avenue, San Francisco. In addition to his personal meeting on November 10, 2015, Anthony Smith, provided written information via email to Sara Winslow, an Assistant United States Attorney stationed in San Francisco and Robert Chandler, an attorney with the United States Department of Justice stationed in Washington D.C. on February 22, 2016. In regard to the information provided by Anthony Smith that pertains to the Fifth Cause of Action, the February 22, 2016 email stated:

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

"1.    The Shaw Group, which has been purchased by Chicago Bridge & Iron, had a remediation contract with the Navy in the later years of the 2000's. Beginning in approximately late 2006 and continuing, the Project Manager for Shaw, Peter Bourgeois directed laborers to work on overtime hours stripping copper from Treasure Island.  The work time of the laborers was reported as hours worked for the remediation of lead and PCB on Treasure Island, and that reporting was fraudulent, and resulted in payments by the Navy for the false reported services. The copper obtained was not reported to the Navy, was sold but not accounted for to the Navy, nor were the funds delivered to the Navy. Shaw certified or impliedly certified that it was properly performing the services requested, and falsely made those certifications when Shaw was effectively having the Navy pay for the wages of laborers used to steal for Shaw copper that belonged to the Navy."

78.    Relief for this FIFTH CAUSE OF ACTION is requested under the False Claims Act because the false time records of workers who stripped copper from Treasure Island buildings were material to the demands for payment by defendants from the Navy.  Relief is further requested for the false express and implied certification that the Work Plans were being followed when the defendants intentionally violated the work plans by having loads of scavenged and stolen copper shipped off Treasure Island in violation of the Work Plans. That certification was material to the demands for payment to the Navy. The conduct of Defendants Shaw, CB&I, and their successor Aptim is in violation of U.S.C. Section 3729 (a)(A)(B) and (D) as herein described and relief is sought as set forth hereinafter under the Prayer For Relief.

///

///

**Sixth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**
**Against Shaw, CB&I, and Aptim For False Reports and**
**Certification For Payment That Radioactive Samples and Materials**
**Had Been Properly Handled, Retained, or Disposed**

79.     Shaw entered into remediation contracts with the Navy in the 2000's and thereafter to remediate the former Naval Station Treasure Island, including but not limited to N62473-10-D-0807. The Navy acquired Treasure Island for use as a naval base during World War II.  Treasure Island became a major naval facility during World War II, processing thousands of outgoing and incoming military personnel.  The Navy conducted a Historical Radiological Assessment (HRA) of Treasure Island that was completed in 2006.  The HRA assessed existing buildings and historical sites for radioactivity.  Approximately 18 sites were identified as requiring further review for radioactive contamination, and for Radium-226 that had been found in former bunkers on Treasure Island.  In addition to radioactive waste concerns, the Navy studies of Treasure Island revealed contamination by lead, PCBs, TCE, PCE, and petroleum among other chemical contaminants.

80.     The contracts between Shaw and the Navy to perform remediation services at Treasure Island included the requirement that further study and radiological surveys be conducted of Treasure Island for radioactive contamination. The contracts and the Basewide Radiological Management Plan, incorporated into the contracts, called for a Nuclear Regulatory Commission (NRC) licensed entity to conduct surveys of areas to be surveyed and remediated for removal of radioactive materials at Treasure Island.  The Navy contract and accompanying requirements provided that prior to any soils and materials being excavated, moved or removed from Treasure Island by Shaw and its subcontractors, that the material be scanned and evaluated by the NRC licensed entity and cleared for the presence of any radionuclides of concern, primarily Radium -226, and Cesium-137.  The Navy

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

requirements prohibited removal of soils and materials from Treasure Island that had not been screened and cleared for radioactive materials above release levels. The contract with the Navy required that if any soils or materials were scanned and found to have radioactive readings above contractually set limits, then the soil and material were to be treated as radiologically impacted Low-Level Radioactive Waste (LLRW). The contracts and incorporated provisions of the agreement with the Navy required that all LLRW be segregated, placed in LLRW bins and disposed of through the Department of the Navy's LLRW Disposal Program. The LLRW was required to be identified to the Navy's RASO office, with testing and a request for disposal through the Department of Defense LLRW Executive Agency and disposed of in one of the four disposal sites for LLRW in the United States by an authorized and specialized Navy contractor.

81. Under the contracts with the Navy for Treasure Island, Shaw/CB&I was to properly segregate and control radioactive samples and retain the samples for potential future evaluation. Shaw/CB&I certified that it was complying with the requirements established by the Navy contract. However, Shaw/CB&I did not properly segregate and control the radioactive samples but stored the samples in a manner contrary to contract, established Standard Operating Procedures (SOP), and accepted industry standards. Further, Shaw/CB&I failed to retain control of the radioactive samples, but had the radioactive samples moved and disposed of samples as if the samples were non-low-level radioactive waste. Samples from Treasure Island were improperly disposed of at standard landfills in 2008, 2009, 2010, and 2011 rather than retained. Shaw management knew it failed to properly segregate and control radioactive samples and retain control of the radioactive samples. Shaw's certification and implied certification that it had met the standards required by the Navy contracts were knowingly false. Shaw/CB&I falsely identified shipments off Treasure Island as non-LLRW when the shipments did contain confirmed LLRW above free release. These false implied certifications

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

were material to false claims for payment from the Navy in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

82.     The Navy's contract, rules and requirements provided detailed specification for the taking of radiological samples, the chain of custody for those samples, the testing of the samples, and the truthful reporting of those samples to the Navy and regulators.  Shaw management directed numerous times from 2007 through 2013, and possibly continued, that samples taken that were tested by the on-site laboratory for which the test results were that the sample was radioactively "hot" LLRW above free release levels be disposed of, and the records of the sample and their testing be destroyed.  The elimination of the samples and the record of the samples was intentional, fraudulent, and done to prevent areas from being properly designated as containing radiological contamination above free release.  The orders to destroy samples were primarily done when efforts to remediate had been done, and samples were taken in the hope of showing the remediation had been successful.  However, orders to destroy samples were also given to falsely avoid the designation of an area as radiologically impacted.  The orders to destroy samples was issued by management of Shaw, including but not limited to Pete Bourgeois and Jim Wittcomb.  Shaw falsely represented to the Navy that the contract, rules and procedures were followed regarding the taking of samples, the testing of samples, the retention of samples, and the reporting of sample results which were material to Shaw's demands for payment for these services to the Navy for this work in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

83.     Under the contracts with the Navy, radioactive material and devices were required to be properly stored in proper containers for radioactive materials, properly cleared for disposal, and disposed of in licensed low-level radioactive

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

disposal sites. Radioactive materials and devices were improperly stored by Shaw in sea-land type shipping containers on site rather than proper containers for LLRW. Shaw had one or more sea-land type containers loaded with radioactive material and devices that there determined to be LLRW above free release that Shaw had removed from Treasure Island and disposed of at a disposal site that was not licensed to receive low-level radioactive waste. The sea-land containers were not processed for removal as required, did not obtain required approval from the Navy for removal, and Shaw did not obtain an exception under the contractual requirements for disposal. Shaw's express and implied certification that it was complying with the terms of the contracts and the requirements therein that radioactive wastes would be properly scanned, tested, and LLRW properly disposed of as required by the Navy was false, and was material to the false claims made by Shaw to the Navy in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

84.    Shaw obtained and billed the Navy for approximately 600 intermodal containers for the shipment of low-level radiological wastes. The billing to the Navy was for the containers to be obtained, filled, and prepared for shipment to low level waste facilities licensed by the United States. Shaw billed the Navy for these intermodal containers as if Shaw had filled and prepared the intermodal containers for shipment, and the intermodal containers were cleared to be shipped to LLRW facilities. The billing for the 600 intermodal containers to the Navy was false for the 600 intermodal containers had not been filled, prepared, and cleared for shipment when the Navy was billed and paid the billings. Rather, the intermodal containers remained at Treasure Island and had not been processed and cleared for shipment when demands for payment were made to the Navy. The billing for the containers was submitted in approximately 2010 and the intermodal containers had not been filled and shipped off Treasure Island as required for the billing to be

submitted until approximately 2014 or 2015. The records and claims for payment by Shaw that contained the expenses for the intermodal containers for preparation and shipment were false. The false records were material to the decision of the Navy BRAC to pay the demand for payment. The demand for payment by Shaw was false and in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

85. Relator Smith is an original source under the standard set by 31 U.S.C. § 3730 (e)(4)(B) (2) for all allegations set forth herein, including the allegations contained in the Sixth Cause of Action. Relator Smith's knowledge of information alleged herein the Sixth Cause of Action has been obtained due to the investigation he directed his counsel to engage in that involved the interviews of individuals who worked at Treasure Island that included laborers, RCTs, and management involved in the remediation of Treasure Island, and the review of documents that were not public disclosures under 31 U.S.C. §3730 (e)(4)(A) (i) to (iii). The information herein alleged materially adds to public disclosures regarding Treasure Island conduct of Shaw and CB&I. Relator Smith voluntarily provided the information to the Government before filing his lawsuit under the FCA on March 4, 2016. Relator Smith had no legal obligation to provide the information about Treasure Island that his investigation had revealed. Relator Smith voluntarily met in person with representatives of the United States Attorney General's Office and the Navy Criminal Investigation Service on November 10, 2015 in the Federal Building at 450 Golden Gate Avenue, San Francisco. In addition to his personal meeting on November 10, 2015, Anthony Smith, provided written information via email to Sara Winslow, an Assistant United States Attorney stationed in San Francisco and Robert Chandler, an attorney with the United States Department of Justice stationed in Washington D.C. on February 22, 2016. In regard to the information provided by

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Anthony Smith that pertains to the Fifth Cause of Action, the February 22, 2016 email stated:

> "4)     Under the contract with the Navy, Shaw was to properly segregate and control radioactive samples and retain the samples for potential future evaluation. Shaw certified that it was complying with the requirements established by the Navy contract. However, Shaw did not properly segregate and control the radioactive samples but stored the samples in a manner contrary to accepted industry standards. Further, Shaw failed to retain the radioactive samples, but had the radioactive samples disposed of as if the samples were non-low level radioactive material and were improperly disposed of at level 2 landfills.
>
> 5)     Under the contract with the Navy, radioactive material and devices were required to be properly stored in proper containers for radioactive materials, properly cleared for disposal, and disposed of in licensed low level radioactive disposal sites. Radioactive materials and devices were improperly stored in sea-land type shipping containers on site rather than proper containers for radioactive materials. Shaw had a full sea-land type container removed and disposed of at a disposal site that was not licensed to receive low-level radioactive waste. The sea-land container was not processed for removal as required, did not obtain approval from the Navy for removal, and no exception for proper disposal was obtained by Shaw. Shaw certified and impliedly certified that it complied with the requirements of the contract with the Navy for the handling of hazardous waste and radioactive materials, and the certification was false.
>
> 7)     Shaw obtained and billed the Navy for approximately 600 intermodal containers for the shipment of low-level radiological wastes. The billing to the Navy was for the containers to be obtained, filled, and shipped to low level waste facilities licensed by the United States. The billing for the 600 intermodal containers to the Navy was false for the 600 intermodal containers had not been cleared and shipped when the Navy was filled and paid the billings, but rather the intermodal containers remained at Treasure Island. The records and claim for payment by Shaw that contained the expenses for the intermodal containers was false."

86.     The conduct of Defendants Shaw, CB&I, and Aptim alleged in this Sixth Cause of Action is a violation of 31 U.S.C. §3729 (a) (1) (A) for presenting

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

false claims for payment and subsection (B) for the knowingly making and using false records and statements material to the false claims for payment by submitting claims for payment based upon false reports that samples for radioactivity and radioactive materials had been properly handled, retained, and disposed of in proper methods and containers. As a result of the false or fraudulent records and claims presented, the United States has suffered damages in an amount to be determined at trial. Relief sought on behalf of the United States is set forth hereinafter in the Prayer for Relief.

**Seventh Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**
**<u>Treasure Island- Fraudulent Radiological Scans and Soil Samples</u>**
**<u>On Treasure Island By Shaw/CB&I/Aptim, TTEC and RSRS</u>**
**<u>Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD</u>**

87.    Shaw/CB&I, Tetra Tech EC, Inc. and RSRS falsified scanning and soil sample testing for radioactive contamination at Treasure Island by scanning and soil sampling to falsely avoid radioactive readings above free release levels.  These companies avoided taking soil samples from specific locations that were suspected to have the highest radioactive contamination due to prior scanning in order to minimize the determinations of which areas met the standards to be treated as radiologically controlled areas, and later to obtain remediation clearance with final status surveys. This false scanning and sampling were done to avoid higher levels of radiation in order to obtain unrestricted radiological release for the areas of Treasure Island reported to the Navy.

88.    The falsified scanning and soil sampling at Treasure Island to avoid radioactive readings for areas above free release levels took place in 2009 and continued thereafter to at least 2014 and may have continued.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

89.     The false scanning by Shaw/CB&I involved IR Site 12, Halyburton Court, Site 30, Site 31, the Avenue H and Avenue I athletic fields, and Building 3, among other areas.

90.     The false scanning by Tetra Tech EC, under the direction of General Manager Dougherty, Superintendent McWade, and supervisor Rolfe at Treasure Island included Site 6 in 2013 and again in 2016, Site 12 in 2013, building 343, and 344 in 2007, and building 233 in 2008. RSRS assisted in the false scanning and sampling in Site IR 12, including residential areas near waste disposal areas.

91.     Relator Smith is an original source under the standard set by 31 U.S.C. § 3730 (e)(4)(B) (2) for all allegations he has herein alleged, including the allegations contained in the Seventh Cause of Action. Relator Smith's knowledge of information alleged herein the Seventh Cause of Action has been obtained due to the investigation he directed his counsel to engage in that involved the interviews of individuals who worked at Treasure Island that included laborers, RCTs, and management involved in the remediation of Treasure Island, and the review of documents that were not public disclosures under 31 U.S.C. §3730 (e)(4)(A) (i) to (iii). The information herein alleged materially adds to public disclosures regarding Treasure Island conduct of Shaw and CB&I. Relator Smith voluntarily provided the information to the Government before filing his lawsuit under the FCA on March 4, 2016. Relator Smith had no legal obligation to provide the information about Treasure Island that his investigation had revealed. Relator Smith voluntarily met in person with representatives of the United States Attorney General's Office and the Navy Criminal Investigation Service on November 10, 2015 in the Federal Building at 450 Golden Gate Avenue, San Francisco.  On February 22, 2016, in addition to his personal meeting on November 10, 2015, on behalf of Anthony Smith, written information was provided via email to Sara Winslow, an Assistant United States Attorney and Robert Chandler, an attorney with the United States Department of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Justice. In regard to the information provided by Anthony Smith that pertains to the Seventh Cause of Action the February 22, 2016 email stated:

> "8.    Shaw, Tetra Tech EC, Inc. and RSRS falsified scanning and soil samples testing for radioactive contamination by scanning improperly to avoid radioactive readings above free release levels.  These companies also avoided taking soil samples from specific locations known or scanned that resulted in the highest radioactive readings in order to minimize the determinations of which areas met the standards to be treated as radiologically controlled areas, and later to obtain remediation clearance with final status surveys where the sampling and scanning was done to avoid higher levels of radiation to obtain unrestricted radiological release for the areas based on the false records.  The false records were material to the payments by the navy for the work performed."

92.    The false records of scanning and sampling were material to the payments by the Navy for the work performed.  The false records and demands for payment were in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations. As a result of the false or fraudulent records and claims presented the United States has suffered damages to be determined at trial. Relief sought on behalf of the United States is set forth hereinafter in the Prayer for Relief.

**Eighth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**
**Treasure Island Building 233 and Pandemonium Site II Demolition and**
**Disposal Contrary To Contract By Shaw/Aptim**
**Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

93.    The contract and procedures established by the Navy required that there be an approved work plan prior to the demolition of a building or structure on Treasure Island.  For buildings or structures that had radiological contamination above free release levels, work plans approved by the Navy required that Shaw

- 45 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

remediate the building or structure to below free release levels prior to demolition. By remediation to free release levels prior to demolition, the amount of material segregated, treated, and shipped as LLRW would be dramatically lower than if the entire building was demolished prior to radiological remediation and the radiological contamination was spread throughout the entire demolition causing most if not all material to be treated as LLRW. The costs involved in the containerization, shipment and disposal of LLRW is significantly greater than the costs associated with non-LLRW.

A.    Building 233 Treasure Island

94.    The Navy procedures and the work plan for the eventual demolition of Building 233 required that the structure be remediated to free release levels, that the removed LLRW be segregated and shipped to a LLRW facility, and that the building then be demolished and scanned, and all non-LLRW be disposed of at standard landfills.

95.    TTEC had been retained by the Navy to scan and remediate Building 233 well prior to the Shaw demolition of building 233. As described supra in Cause of Action Seven TTEC, with the assistance of RCTs, TTEC presented false scan data and reports concluding that building 233 was largely free of radioactive contamination above release levels. TTEC engaged in excessive scan speed when scanning building 233, resulting in falsely lower radiological readings than if the scans had been performed at the required slower scan speeds. The reports of TTEC to the Navy referenced in Cause of Action Seven that were used to seek payment for the scanning of building 233 were knowingly false and material to the decision by the Navy to pay TTEC. Shaw in part relied upon TTEC's false reports regarding building 233. At the direction of Shaw management, including Mr. Bourgeois and Mr. Wittcomb, Shaw also engaged in scanning of building 233 and had it scanned in a manner intended to avoid discovery of substantial amounts of radioactive contamination on and around the building in violation of the contract with the

Navy. Shaw violated the Navy's required procedures and demolished Building 233 prior to the building being fully and properly scanned and remediated and prior to LLRW being fully removed from the building and foundation.

96.     As a result of Shaw demolishing Building 233, contrary to the Work Plan and prior to full and effective remediation, the radioactive contamination in, under, and part of Building 233 was extensively mixed and commingled throughout the building debris.  The radioactive contamination so extensively mixed with the demolished debris that remediation was made much more difficult or nearly impossible.  Because the debris could not be effectively scanned, segregated and remediated following the improper demolition in violation of the contractual requirements with the Navy, virtually all the demolition debris was put into intermodal containers as LLRW.  For nearly two years, efforts were explored on how to handle this material and whether there was a feasible means to remediate the material rather than have all the material shipped as LLRW.

Pandemonium Site II – Treasure Island

97.     The contract with the Navy required that before and during work involving demolition being performed that radiological scans be done to determine whether the site was radiologically impacted, and whether radiological remediation was necessary to remove radioactive contamination and whether health and safety precautions were necessary to protect the workers and the public.  The contract with the Navy also required an approved work plan for work before actions were taken that involved demolition and removal of material from Treasure Island.  Shaw took action to demolish and remove the concrete and related structures that comprised the Pandemonium Site II. The orders to demolish the Pandemonium, which included barring RCTs from scanning the material, were given by Mr. Bourgeois and Mr. Wittcomb. Shaw intentionally violated the contract requirements with the Navy by prohibiting the radiological scanning of the Pandemonium Site II structures prior to and during the demolition and removal of the material from

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Treasure Island in 2009.  Shaw either did not have an approved work plan contrary to the contract requirements with the Navy or violated the work plan by failing to have radiological oversight of the demolition, among the violations of the work plan.

98.     RCTs assigned to Treasure Island were ordered to stay away from the Pandemonium Site by Mr. Bourgeois and Mr. Wittcomb of Shaw management and the RCTs were threatened with discharge if any of the RCTs came to the site with a radiological meter before and during the demolition activity. Shaw management, including Pete Bourgeois and Jim Wittcomb, made the decision to bar RCTs from scanning the Pandemonium Site II before, during, and after demolition due to a desire to avoid discovery that the material being demolished was contaminated with radioactive intensity above release levels, and to avoid the time, labor, equipment, and disposal expenses that would be incurred if there was radioactive contamination detected. The contract and approval of work plans and the following of the work plan requirements were violated by Shaw's decision to bar radiological scanning of the Pandemonium II before, during, and after demolition and the disposal of those materials without proper radiological scanning and clearance.

99.     Shaw expressly or impliedly represented that there were no radiological materials involved with the Pandemonium Site II and that the excavated materials could be and were shipped off Treasure Island as non-radiologically impacted wastes.  Shaw's representations were false. Shaw had not allowed full and complete radiological evaluation, survey, and scanning of the Pandemonium structures or excavated materials and did not have knowledge that the material did not contain radioactive waste exceeding free release standards.  The Navy contract required the establishment of an approved work plan for demolition of the Pandemonium Site II.  Shaw violated the contract with the Navy by not having an approved work plan for the Pandemonium Site II demolition in place at

the time, did not follow an approved work plan, and did not have radiological coverage for the demolition work and disposal process.

100.   Shaw submitted false express certifications and implied certifications that the demolition process for building 233 and the Pandemonium Site II had been done in compliance with contractual requirements and approved work plans, and such certifications were knowingly false. The false certifications were part of the demand for payment to the Navy and material to the decision of the Navy to pay the demands for payment by defendants Shaw and Chicago Bridge & Iron.  The false records and demands for payment were in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations. As a result of the false or fraudulent records and claims presented, the United States has suffered damages to be determined at trial. Relief sought for the Eighth Cause of Action on behalf of the United States is set forth hereinafter in the Prayer for Relief.

**Ninth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**
**Treasure Island - Soil Movement From Site 12 to Site 6**
**Violated The Navy Contract By Shaw/Aptim**
**Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

101.   In order to control and avoid the spread of contamination on Treasure Island and to protect the health and safety of the workers and residents the contract with the Navy required strict adherence to rules and procedures for the movement of soil on Treasure Island

102.   Shaw, at the direction of Mr. Bourgeois and Mr. Wittcomb, engaged in the excavation of soil from Site 12 that was known or suspected to be radiologically impacted.  In 2007 through 2009 and to a lesser regularity thereafter through 2013, in violation of the Navy's established rules and procedures for transit of potentially

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

contaminated soils, work plans, and environmental laws and regulations incorporated into the contract, Shaw transported radiologically impacted soils in open trucks, in front loaders, and other transport devices in an uncontrolled manner so that soil fell during transport onto the roads of Treasure Island while in transit. Soil was left open and uncovered in transit so that wind-swept soil blew off trucks and front loader loads while in transit. Front-end loaders lost substantial amounts of potentially radioactive soil while in transit, including loss from crossing speed bumps and potholes, starting and stopping, and from moving too fast. Vehicle tires loaded with soils that were potentially contaminated were not cleaned prior to transit over the roads and public areas of Treasure Island. This soil was improperly transported over areas that had not been found to have been radiologically impacted and through regularly travel transit areas and residential areas of Treasure Island. As a result of the conduct of Shaw that violated the rules and procedures established by the Navy, areas of Site 6 and roadways and residences in Site 12 became contaminated with Site 12 radiological waste and soil requiring expensive additional remediation.

103.   Shaw falsely represented, certified, and impliedly certified to the Navy that the work at Site 12 including excavation of soil, transportation of soil on Treasure Island, and the disposition  of the excavated material from that site was done according to contract terms as part of the demand for payment from the Navy, which was material to Shaw's demands for payment for these services to the Navy in violation of 31 USC Section 3729 (a) (1) (A) and (B). The false records and demands for payment related to the Ninth Cause of Action were in violation of 31 USC Section 3729 (a) (1) (A) and (B). Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations. As a result of the false or fraudulent records and claims presented the United States has suffered damages to be determined at trial. Relief sought on behalf of the United States for the Ninth Cause of Action is set forth hereinafter in the Prayer for Relief.

**Tenth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**

**Treasure Island - Softball Area Site Improperly Excavated**

**In Violation of Navy Contract By Shaw/CB&I/Aptim**

**Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

104.   The Navy contract and procedures required that for any excavation on Treasure Island there would be an approved work plan and radiological oversight of the excavation to assure that radiological waste was properly identified, segregated, and disposed of, and that the health and safety of the workers and public was protected.

105.   In and about 2009, in the relative center of Treasure Island near and involving sites 30, 31, 32, and 33, near the softball fields and athletic fields, Shaw excavated a massive area of Treasure Island in violation of the Navy's contract, rules and procedures.  Shaw excavated the field areas to a depth of about 3 feet in most parts, but to a depth of four feet in some places.   The Navy's contract, rules and procedures required that radiological scanning of the soil be done.  Contrary to the Navy's contract, rules and procedures, no radiological scanning of the massive excavation of this area was done. The radiological sub-contractor for Shaw was barred and prohibited from being involved in the excavation of this area, and Shaw management, Mr. Bourgeois and Mr. Wittcomb, took active steps not to include radiological oversight of the excavation.

106.   Relator Smith is an original source under the standard set by 31 U.S.C. § 3730 (e)(4)(B) (2) for all allegations set forth herein, including the allegations contained in the Tenth Cause of Action. Relator Smith's knowledge of information alleged herein the Tenth Cause of Action has been obtained due to the investigation he directed his counsel to engage in that involved the interviews of individuals who worked at Treasure Island that included laborers, RCTs for New World Environmental and RSRS, laborers of Shaw, management involved in the

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

remediation of Treasure Island, and the review of documents that were not public disclosures under 31 U.S.C. §3730 (e)(4)(A) (i) to (iii). The information herein is independently obtained through investigation and not through public disclosures and materially adds to public disclosures regarding the conduct of Shaw and CB&I at Treasure Island. The independent information not contained in known public disclosures includes information Mr. Pete Bourgeois and Mr. Jim Wittcomb were responsible for orchestrating the excavation of soils at Treasure Island in the areas listed in the Tenth Cause of Action without any radiological oversight. Relator Smith's independent information also provides material information as to where the improper soil excavation took place on Treasure Island, namely Sites 30, 31, 32, and 33. Relator Smith's independent information also provides materially important information as to why Pete Bourgeois and Jim Wittcomb took these improper actions, namely to cut costs and increase the profits of Shaw/CB&I by avoiding the added time, material, labor costs, and disposal costs of radioactive materials that would have been involved if radiological oversight disclosed radioactive materials above free release levels. Relator Smith's independent information also provides materially important information as to the intent or scienter involved by Pete Bourgeois and Jim Wittcomb, namely that these efforts were done intentionally to cheat the Navy by avoiding the costs and time associated with performing the contract requirements with the Navy. The public disclosures by news articles appear to support the idea that the lack of radioactive scanning and testing may have been due to the less than accurate 2006 "Final Treasure Island Naval Station Historical Radiological Assessment" being the foundation upon which the Treasure Island remediation was undertaken, and do not provide any allegation of fraud on the part of Shaw or information from which an inference of fraud on the part of Shaw would reasonably be drawn that the failure to properly scan for radioactive contamination was the result of intentional fraud by the upper management of Shaw. Further, the Navy at the time of these events and the public disclosure,

represented that these areas of Treasure Island were not believed to be radiologically impacted so the lack of radiological testing for some areas by Shaw was to be expected.  The Navy publicly responded: "The Navy does not concur that the entire base is radiologically impacted." [Treasure Island Radiation More Widespread than Reported, Bay Citizen August 17, 2012] Relator Smith provided information independent of the public disclosures as described above to the government. This information came from interviews of individuals who worked directly under Shaw and for sub-contractors of Shaw at the time of these events, including interviews with Gaetano Taibi.  Mr. Taibi was the manager of New World Environmental at Treasure Island while under sub-contract with Shaw to provide radiological support, and was responsible for providing the Radiological Control Technicians and the radiological laboratory at Treasure Island for Shaw. Mr. Taibi was thereafter an employee with the California Department of Public Health, Radiological Branch. The information set forth in this cause of action was obtained independent of the public disclosures. The information that Relator Smith voluntarily provided to the Government before filing his lawsuit under the FCA on March 4, 2016 materially adds to the information publicly disclosed as of that time. Relator Smith had no legal obligation to provide the information about Treasure Island that his investigation had revealed. Relator Smith voluntarily met in person with representatives of the United States Attorney General's Office and the Navy Criminal Investigation Service on November 10, 2015 in the Federal Building at 450 Golden Gate Avenue, San Francisco. In addition to voluntarily providing information to these government officials in person, Relator Smith also provided written information to government officials of his knowledge that is independent of and materially adds to publicly disclosed information before he filed suit under the False Claims Act.  After his personal meeting on November 10, 2015, Anthony Smith, provided written information via email to Sara Winslow, an Assistant United States Attorney stationed in San Francisco and Robert Chandler, an attorney

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

with the United States Department of Justice stationed in Washington D.C. on February 22, 2016.  In regard to the information provided by Anthony Smith that pertains to the Tenth Cause of Action the February 22, 2016 email stated:

> "2.    Under the contract with the Navy, Shaw was to have contaminants properly tested and properly removed from Treasure Island pursuant to SOP established by the Navy. The services of New World Environmental, Inc. and later RSRS, Inc. were retained to test for radioactive materials with intensity above release levels.  Areas that were determined by New World Environmental or RSRS as Radiologically Controlled Areas were not to have soils removed without first being surveyed, sampled and determined to have radioactivity levels below the Remediation Goal (RG).  Shaw intentionally removed soils from Treasure Island established radiologically controlled areas without having the soil first surveyed, sampled and determined to be below the RG.  Shaw's intentional removal of soils from radiologically controlled areas without following the SOP of having the soil determined to be below RG took place no later than early 2007 and continued thereafter.
>
> 3.    Under the contract with the Navy, Shaw was to have areas determined whether the area had radioactive contamination above RG before Shaw removed soils and transported the soils off Treasure Island.  After New World Environmental began finding radioactive materials above release levels at Treasure Island in areas that had not previously been reported as containing radioactive materials, Shaw took intentional actions to remove soils from Treasure Island that contained other contaminants such as lead and PCBs without having New World radiological control technicians oversee the soil extraction to determine of the soil contained radioactive wastes above RG.  Shaw did not comply with SOP of notifying New World and later RSRS of digs and soil removals to take place on Treasure Island, and appears to have planned and scheduled such digs for soil removal in areas that employees of New World and later RSRS were not present or in the vicinity to maximize the probability that extensive soil removal could take place and shipped off Treasure Island without the time and expense involved in having the soil tested for radioactivity above RG, and having the soil remediated if there was radioactivity above RG.  Shaw certified or impliedly certified that it was following set procedures for the testing and remediation of soil for radioactivity

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

above RG, when in fact Shaw was intentionally circumventing the SOP and requirements to test and remediate if necessary soils for radioactive contamination above RG levels."

107.    Shaw falsely represented to the Navy that the contract, rules and procedures were followed regarding this excavation that included radiological oversight of the excavation which were material to Shaw's demands for payment to the Navy for these services in violation of 31 USC Section 3729 (a) (1) (A) and (B). As a result of the false or fraudulent records and claims presented the United States has suffered damages to be determined at trial. Relief sought on behalf of the United States for the Tenth Cause of Action is set forth hereinafter in the Prayer for Relief. Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations.

**Eleventh Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**
**<u>Treasure Island -Excavation And Removal Of Treasure Island Soil</u>**
**<u>In Violation Of Navy Contract Requirements By Shaw/CB&I/Aptim</u>**
**<u>Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD</u>**

108.    Under the contract with the Navy, Shaw/CB&I was to have soil and material properly tested and cleared for radioactive contamination as a condition of the soil and material being moved or removed from Treasure Island. Soil and material that was properly scanned, tested and approved as non-LLRW was permitted under the contract to be disposed of at standard landfills. Soil and material that was properly scanned, tested, and determined to be LLRW was required to be carefully segregated, contained, and processed through the Navy and Department of Defense LLRW processes and disposed of in the Grandview, Idaho's US Ecology LLRW site, or one of the other four approved LLRW disposal sites for Department of the Navy LLRW.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

109.   Shaw's Treasure Island contract with the Navy required testing for radioactive materials in soil, materials, and buildings that could have intensity above "release levels" set by the Remediation Goals (RG) for radioactivity, and be categorized as LLRW.  Areas that were determined as Radiologically Controlled Areas (RCAs) and areas that had not yet been evaluated for radiological concerns were not to have soils removed without first being subjected to radiological surveys, sampling, and testing to determine if the radioactivity levels were below the RG pursuant to the terms of the SOPs and contract with the Navy.  Shaw/CB&I was required to coordinate with the radiological subcontractors, New World Environmental and RSRS, and with its own later employed RCTs, regarding all work areas planned so that there could be RCTs present to monitor and scan for radiological hazards.

110.   Shaw/CB&I, under the direction of the Shaw General Manager Pete Bourgeois and Jim Wittcomb intentionally had soils excavated and materials removed from Treasure Island established Radiologically Controlled Areas (RCAs) and from areas that had not yet been evaluated for determination whether the area should be deemed a Radiologically Controlled Area without having the soil and materials first surveyed, sampled and determined to be below the RG.  The intentional conduct of Mr. Bourgeois and Mr. Wittcomb included withholding information from the New World Environmental and RSRS staff as to where removal actions were taking place with the intent of not having the New World Environmental and RSRS staff scan, evaluate, and potentially deem the excavation area as radiologically impacted and in need of radiological remediation. Mr. Bourgeois and Mr. Wittcomb planned these excavation removals to be done at times and places on Treasure Island where they would not be observed by the New World Environmental and RSRS radiological staff in order to hide the excavation taking place in violation of the Navy contract, work plans, and SOPs approved by the Navy.

111.   In 2008-2013 Shaw, under the direction of Pete Bourgeois and Jim Wittcomb, engaged in extensive efforts to remove soil from Treasure Island without first having radiological clearance as required by the Navy contract and related Navy requirements. Some of the excavated soils improperly removed were deposited onto other areas of Treasure Island contrary to the contract and terms established by the Navy.  The transfer of soil from one area at Treasure Island to other areas of Treasure Island without the soil first being subjected to radiological scans and testing to determine that the soil did not contain radioactive contamination above release levels was a violation of the contract with the Navy and the Work Plans and SOPs approved by the Navy. Some of the improperly excavated soils were shipped off Treasure Island and improperly disposed of without having been radiologically screened, tested, sampled, and remediated as required by the contract and terms established with the Navy.

112.   Shaw/CB&I submitted false records to the Navy that certified or impliedly certified that all soil and materials that were excavated and moved on Treasure Island or shipped off of Treasure Island had been properly surveyed, scanned, tested, and determined to be below RG and not LLRW.

113.   This conduct and the false records that were generated have resulted in an expanded requirement of remediating Treasure Island because radiologically hazardous materials were moved and spread into non-radiologically impacted areas of Treasure Island as a result of the frauds and process violations of Shaw. Radiologically hazardous materials have been spread into areas outside of Treasure Island due to the fraud and process violations by Shaw/CB&I potentially harming the environment and individuals beyond Treasure Island, and exposes the United States to liability for the radiological contamination to third persons and property off Treasure Island. The claims for payment by Shaw/CB&I for the processing and movement of soil were knowingly false, and the false statements, explicit and

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

implied, were material to the Navy BRAC office decision to make payment to Shaw/CB&I.

114.    Under the contracts with the Navy, Shaw/CB&I was to determine whether areas had radioactive contamination above RG before Shaw/CB&I removed soils, relocated soils on Treasure Island, or transported the soils off Treasure Island.  Shortly after being sub-contracted by Shaw in or about 2006, New World Environmental began finding radioactive materials above RG levels at Treasure Island in areas that had not previously been reported in the Navy's HRA as containing radioactive materials.  These newly discovered radioactive contaminated areas included Site 12 which contained extensive occupied residential housing, and sites 30-32. Shaw/CB&I management, to cut costs, increase profits, and falsely complete remediation services for the Navy, took intentional actions to excavate soils and materials from these areas of Treasure Island that contained other contaminants such as lead, and PCBs without having New World Environmental, RSRS, or any radiological control technicians oversee the soil extraction to determine whether the soil contained radioactive wastes above RG.

115.    Relator Smith is an original source under the standard set by 31 U.S.C. § 3730 (e)(4)(B) (2) for all allegations he has herein alleged, including the allegations contained in the Eleventh Cause of Action. Relator Smith's knowledge of information alleged herein the Eleventh Cause of Action has been obtained due to the investigation he directed his counsel to engage in that involved the interviews of individuals who worked at Treasure Island that included laborers, RCTs for New World Environmental and RSRS, and management involved in the remediation of Treasure Island, and the review of documents that were not public disclosures under 31 U.S.C. §3730 (e)(4)(A) (i) to (iii). The information herein is independently obtained through investigation and not through public disclosures and the alleged materially adds to public disclosures regarding Treasure Island conduct of Shaw and CB&I. The independent information not contained in known public disclosures

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

includes information that Mr. Pete Bourgeois and Mr. Jim Wittcomb were responsible for orchestrating the excavation of soils at Treasure Island without any radiological oversight and how the excavations of soils at Treasure Island were accomplished without radiological oversight by their scheduling the various subcontractors to work at locations where the improper excavations would not be revealed. Relator Smith's independent information also provides material information as to where the improper soil excavation took place on Treasure Island, namely Sites 12, 30, 31, and 32. Relator Smith's independent information also provides materially important information as to why Pete Bourgeois and Jim Wittcomb took these improper actions, namely to cut costs and increase the profits of Shaw/CB&I by avoiding the added time, material, labor costs, and costs of disposal of radioactive materials that would have been involved if radiological oversight disclosed radioactive materials above Remediation Goal levels. Relator Smith's independent information also provides materially important information as to the intent or scienter involved by Pete Bourgeois and Jim Wittcomb, namely that these efforts were done intentionally to cheat the Navy by avoiding the costs and time associated with performing the contract requirements with the Navy. The public disclosures by news articles appear to support the idea that the lack of radioactive scanning and testing may have been due to the less than accurate 2006 "Final Treasure Island Naval Station Historical Radiological Assessment" being the foundation upon which the Treasure Island remediation was undertaken, rather than as the result of intentional fraud by the upper management of Shaw. Further, the Navy at the time of these events and the public disclosure publicly represented that areas of Treasure Island were not believed to be radiologically impacted so the lack of radiological testing by Shaw was to be expected, the Navy publicly responded: "The Navy does not concur that the entire base is radiologically impacted." [Treasure Island Radiation More Widespread than Reported, Bay Citizen August 17, 2012] Relator Smith provided information independent of the public disclosures

as described above. This information came from interviews of individuals who worked directly under Shaw and for sub-contractors of Shaw at the time of these events, including interviews with Gaetano Taibi.  Mr. Taibi was the manager of New World Environmental at Treasure Island while under sub-contract with Shaw to provide radiological support, and was responsible for providing the Radiological Control Technician and the radiological laboratory at Treasure Island for Shaw. Mr. Taibi was thereafter an employee with the California Department of Public Health, Radiological Branch. The information set forth in this cause of action was obtained independent of the public disclosures. The information that Relator Smith voluntarily provided to the Government before filing his lawsuit under the FCA on March 4, 2016 materially adds to the information publicly disclosed as of that time. Relator Smith had no legal obligation to provide the information about Treasure Island that his investigation had revealed. Relator Smith voluntarily met in person with representatives of the United States Attorney General's Office and the Navy Criminal Investigation Service on November 10, 2015 in the Federal Building at 450 Golden Gate Avenue, San Francisco. In addition to voluntarily providing information to these government officials in person, Relator Smith also provided written information to these government officials of his knowledge that is independent of and materially adds to publicly disclosed information before he filed suit under the False Claims Act.  After his personal meeting on November 10, 2015, Anthony Smith, provided written information via email to Sara Winslow, an Assistant United States Attorney stationed in San Francisco and Robert Chandler, an attorney with the United States Department of Justice stationed in Washington D.C. on February 22, 2016.  In regard to the information provided by Anthony Smith that pertains to the Eleventh Cause of Action the February 22, 2016 email stated:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"3.     Under the contract with the Navy, Shaw was to have areas determined whether the area had radioactive contamination above RG before Shaw removed soils and transported the soils off Treasure Island.  After New World Environmental began finding radioactive materials above release levels at Treasure Island in areas that had not previously been reported as containing radioactive materials, Shaw took intentional actions to remove soils from Treasure Island that contained other contaminants such as lead and PCBs without having New World radiological control technicians oversee the soil extraction to determine of the soil contained radioactive wastes above RG.  Shaw did not comply with SOP of notifying New World and later RSRS of digs and soil removals to take place on Treasure Island, and appears to have planned and scheduled such digs for soil removal in areas that employees of New World and later RSRS were not present or in the vicinity to maximize the probability that extensive soil removal could take place and shipped off Treasure Island without the time and expense involved in having the soil tested for radioactivity above RG, and having the soil remediated if there was radioactivity above RG. Shaw certified or impliedly certified that it was following set procedures for the testing and remediation of soil for radioactivity above RG, when in fact Shaw was intentionally circumventing the SOP and requirements to test and remediate if necessary soils for radioactive contamination above RG levels."

116.   Shaw/CB&I certified or impliedly certified that Shaw/CB&I was following set procedures for the scanning, testing and remediation of soil and materials for radioactivity above Remediation Goal, when in fact Shaw/CB&I intentionally circumventing the SOP and requirements to test and remediate, if necessary, soils and materials for radioactive contamination above RG levels. Shaw/CB&I submitted false records and reports to support claims for payment from the Navy that certified and impliedly certified that Shaw/CB&I was following the established rules and procedures pertaining to the radiological oversight of the soil digging, moving, and removal on Treasure Island in violation of 31 USC Section 3729 (a) (1) (A) and (B). The false reports of Shaw/CB&I were material to the Navy BRAC payment decisions. Aptim, Aptim Environmental & Infrastructure, Inc., Aptim Federal Services, LLC, jointly referred to as "Aptim" are successors in

liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations. As a result of the false or fraudulent records and claims presented the United States has suffered damages to be determined at trial. Relief sought on behalf of the United States for the Eleventh Cause of Action is set forth hereinafter in the Prayer for Relief.

**Twelfth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**
**Treasure Island- False Shipment Of LLRW Using Manifests**
**For Non-Rad Material By Shaw/CB&I/Aptim**
**Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

117.   The Navy contract, Work Plans, federal laws and regulations regarding hazardous materials incorporated into the Navy contract with Shaw for Treasure Island required in 2008 through 2014 that soil from Radiologically Controlled Areas (RCAs) and areas with potential of radiological contamination be subjected to field scanning as the soil was removed and that the soil samples were analyzed by a laboratory designed to detect radioactivity. As part of that process, RCT were to be notified of the soil excavations to engage in scanning as part of the soil excavation process. As part of the process, the soils excavated were to be moved to Site 6 to await the on-site and off-site laboratory test results. It would take between a month a couple of months for the soils to be given radiological clearance while the soil underwent scanning, sampling, staging, receipt of laboratory results, and paperwork that would include production of a shipment manifest before the soil could be given clearance to be shipped off Treasure Island.

118.   Realtor Smith, as a result of investigation by Smith through counsel which included discussions with remediation workers at Treasure Island, that beginning no later than 2008, under the direction of Mr. Pete Bourgeois and Mr. Jim Wittcomb, Shaw had soils excavated from RCAs and from areas that had been

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

evaluated as having a potential of radiological contamination without the soil being scanned or laboratory tested for radiological contamination contrary to the contract, work plans, and laws incorporated into the contract. Remediation workers and management representatives of New World Environmental that were involved in the Treasure Island radiological remediation under contract with Shaw, including Gaetano Taibi, the New World Environmental manager over the Treasure Island radiological staff, and others interviewed as part of the Smith investigation, disclosed information of personal observations that Shaw had construction workers operating front-end loaders in Radiologically Controlled Areas that were surrounded by controlled and gated fencing. The witnesses interviewed described observations and photographs taken of front-end loaders loading soil into the trailers of tractor trailers with the loading being done over the locked RCAs fencing in violation of the rules, procedures, and requirements for the handling of soils in RCAs. The witnesses also described that areas that potentially had radioactive contamination, but had not yet been designated as RCAs also had soils excavated, loaded, and shipped off Treasure Island without any radiological oversight, scanning or testing as required by the contract with the Navy.

119.   In order for trucks to ship contaminated and potentially hazardous soils off Treasure Island onto the United States highway system, the trucks need to be issued a shipment manifest that met Department of Transportation and EPA rules and regulations. The manifests are required to specify the type of hazardous material contained in the shipment. Radiological waste is a form of hazardous material that is required to be designated on the Uniform Hazardous Waste Manifest, and the shipments properly labeled in relation to the intensity of the radioactive contamination in the shipment. 49 CFR Section 172 et seq.

120.   Landfills in California are classified by the Nuclear Regulatory Commission and State as to the type and intensity of radioactive material that each landfill can and cannot receive. 10 CFR 61 et seq. Many landfills are not licensed to

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

receive wastes with more than very minimal radioactive content. A few landfills in California are permitted and licensed by the NRC to receive wastes with very low radioactive content. Shipment of wastes that are deemed Low-Activity Radioactive Wastes and Low-Activity Mixed Wastes that contain radioactivity are limited to landfills that are specifically permitted to receive these wastes and the expense for disposal of these wastes in these specially licensed landfills is substantially more expensive than disposal of contaminated soil and wastes that are not radioactive at Class I and Class II landfills. Low Level Radioactive Waste has a greater radioactive intensity than Low-Activity Radioactive Waste and Low-Activity Mixed Waste. LLRW is required to be disposed of in one of the four federally licensed LLRW facilities nationwide, and disposal of waste as LLRW is significantly more expensive than Low-Activity wastes.

121.   Officials of the Navy as the Generator of the waste for disposal or a designated representative, were required to sign the shipment manifest and certify and declare that the contents of the manifest were accurate and described and properly classified the contents of the shipment, as well other matters such as the exterior labeling of the contents. The Navy Environmental Coordinator for Treasure Island, James Sullivan, or his designate, reviewed the supporting shipment paperwork and signed the certification on the Uniform Hazardous Waste Manifest for the shipment to leave Treasure Island for some early years. In or about 2008, Pete Bourgeois suggested to James Sullivan that Mr. Bourgeois could save Mr. Sullivan time by completing the manifest contents when shipments were ready to go out if Mr. Sullivan pre-signed the shipment manifests. James Sullivan apparently assumed or believed that Pete Bourgeois would truthfully and accurately fill out the pre-signed manifests and use them according to the terms of the Navy contract with Shaw. Mr. Sullivan pre-signed approximately 200 shipment manifests and placed those manifests in the possession of Mr. Pete Bourgeois.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

122.   Shaw, through the conduct of Pete Bourgeois and Jim Wittcomb, defrauded the Navy by mis-using the pre-signed shipment manifests. Soil from Radiologically Controlled Areas was removed and placed into trucks to leave Treasure Island without having been scanned, sampled, and lab tested for the intensity of the radioactive content as required. Truckers were given shipment manifests that contained coding and information supplied by Shaw that the shipments contained no elevated radioactive wastes, when it was not possible to truthfully represent that the shipments contained no low-activity mixed radioactive wastes or no low-level radioactive wastes. By falsely using the pre-signed shipment manifests to ship out soils from Radiologically Controlled Areas as if the soils had been determined not to contain any radioactive contamination, Shaw was able to avoid substantial time and expense, and increase its profits while defrauding the Navy. Shaw certified to the Navy that all soils shipments that left Treasure Island had been properly tested, categorized, and properly designated and shipped to appropriate disposal sites for the material. These representations by Shaw to the Navy were knowingly false.

123.   Shaw, through the conduct of Pete Bourgeois and Jim Wittcomb, also defrauded the Navy by mis-using the pre-signed shipment manifests regarding soils that came from areas that had not yet been designated as Radiologically Controlled Areas. Areas of Treasure Island were determined to potentially have radiological contamination at levels that were a hazard to health and were potentially above Remediation Goal levels established by the Navy. Soils from areas suspected to have this radioactive contamination, but not yet adequately scanned, tested, and evaluated were not to be shipped off Treasure Island for disposal. Shipment of these soils was required to be processed in this manner prior to a shipment manifest being completed, and the shipment manifest was to be completed and accurately describe whether the soils in the shipment contained low-activity radioactive wastes or mixed radioactive wastes, or could not be shipped using the standard Uniform

Hazardous Waste Manifest because the soil contained low-level radioactive waste. Shaw falsely used the pre-signed shipment manifests to ship out soils from areas suspected to potentially contain hazardous radioactive wastes but which had not yet been tested and so designated, as if the soils had been determined not to contain any radioactive contamination. Shaw was able to avoid substantial time and expense, and increase its profits by the false use of these pre-signed manifests. Shaw certified to the Navy that all soil shipments that left Treasure Island had been properly tested, categorized, and properly designated and shipped to appropriate disposal sites for the material. These representations by Shaw to the Navy were knowingly false.

124.   Relator Smith is an original source under the standard set by 31 U.S.C. § 3730 (e)(4)(B) (2) for all allegations he has herein alleged, including the allegations contained in the Twelfth Cause of Action. Relator Smith's knowledge of information alleged herein the Twelfth Cause of Action has been obtained due to the investigation he directed his counsel to engage in that involved the interviews of individuals who worked at Treasure Island that included laborers, RCTs for New World Environmental and RSRS, and management involved in the remediation of Treasure Island, and the review of documents that were not public disclosures under 31 U.S.C. §3730 (e)(4)(A) (i) to (iii). The information herein is independently obtained through investigation and not through public disclosures and the allegations materially add to public disclosures regarding the conduct of Shaw and CB&I at Treasure Island. The independent information not contained in known public disclosures includes information as to who was responsible for obtaining and using the false shipment manifests namely Mr. Pete Bourgeois and Mr. Jim Wittcomb as well as what was done and how these Shaw managers defrauded the Navy using  pre-signed manifests, entering false information onto the pre-signed manifests, providing the pre-signed manifest to truckers with directions to dispose of the soil in inappropriate landfills; and the why the fraud was engaged in, namely

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to avoid the substantial time and costs to scan and test the soil and to avoid the high costs of disposal of radioactive contaminated soils. The independent information Relator Smith provided to the United States included information of the scienter of the management of Shaw to engage in the shipment manifest fraud. The public disclosures by news articles appear to support the idea that the lack of radioactive scanning and testing and possible incorrect shipment may have been due to the less than accurate 2006 "Final Treasure Island Naval Station Historical Radiological Assessment" being the foundation upon which the Treasure Island remediation was undertaken, and confusion on the part of those involved in the remediation, rather than as the result of intentional fraud by the upper management of Shaw. Further, the Navy at the time of these events and the public disclosure publicly represented that areas of Treasure Island were not believed to be radiologically impacted so the lack of radiological testing, and shipment to regular landfills by Shaw was to be expected. The Navy publicly responded: "The Navy does not concur that the entire base is radiologically impacted." [Treasure Island Radiation More Widespread than Reported, Bay Citizen August 17, 2012] Relator Smith provided information independent of the public disclosures as described above. This information came from interviews of individuals who worked directly under Shaw and for sub-contractors of Shaw at the time of these events, including interviews with Gaetano Taibi.   Mr. Taibi was the manager of New World Environmental at Treasure Island while under sub-contract with Shaw to provide radiological support, and was responsible for providing the Radiological Control Technician and the radiological laboratory at Treasure Island for Shaw.  Mr. Taibi was thereafter an employee with the California Department of Public Health, Radiological Branch. The information set forth in this cause of action was obtained independent of the public disclosures. The information that Relator Smith voluntarily provided to the Government before filing his lawsuit under the FCA on March 4, 2016 materially adds to the information publicly disclosed as of that time. Relator Smith had no legal

- 67 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

obligation to provide the information about Treasure Island that his investigation had revealed. Relator Smith voluntarily met in person with representatives of the United States Attorney General's Office and the Navy Criminal Investigation Service on November 10, 2015 in the Federal Building at 450 Golden Gate Avenue, San Francisco. In addition to voluntarily providing information to these government officials in person, Relator Smith also provided written information to these government officials of his knowledge that is independent of and materially adds to publicly disclosed information before he filed suit under the False Claims Act. After his personal meeting on November 10, 2015, Anthony Smith, provided written information via email to Sara Winslow, an Assistant United States Attorney stationed in San Francisco and Robert Chandler, an attorney with the United States Department of Justice stationed in Washington D.C. on February 22, 2016.  In regard to the information provided by Anthony Smith that pertains to the Twelfth Cause of Action the February 22, 2016 email stated:

> "6)    Shaw obtained from a Navy representative manifests signed by Jim Sullivan for approximately 200 truck shipments of soil and debris to leave Treasure Island, before the truck shipments had been loaded. The manifests were not for the shipment of low level radioactive wastes and soil above RG levels.  Shaw used the pre-signed manifests to load trucks with low level radioactive soils above RG levels and ship the soils off Treasure Island to standard level 2 landfills as if the soil did not have such radioactive soil in the shipment.  Shaw certified or impliedly certified that the shipments met the standards for the manifests and the SOP set by the Navy, when the shipments violated these rules, regulations and SOPs."

125.   The fraudulently used pre-signed manifests were utilized by Shaw in 2008 and thereafter through approximately 2013 and may have continued to be used by Shaw.  Shaw represented to the Navy and certified and implied certification that all shipments leaving Treasure Island had been properly evaluated for

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

radiological contamination and had been properly disposed.  Shaw's representations and certifications were knowingly false and material to the payment decisions of Navy BRAC and in violation of 31 USC Section 3729 (a) (1) (A) and (B).  Aptim is a successor in liability to Shaw and Chicago Bridge & Iron for these False Claims Act violations. As a result of the false or fraudulent records and claims presented the United States has suffered damages to be determined at trial. Relief sought on behalf of the United States for the Twelfth Cause of Action is set forth hereinafter in the Prayer for Relief.

**Thirteenth Cause Of Action For Violation of 31 U.S.C. §3729 (a)(1) (A) and (B)**
**Treasure Island - Fraud In Development And Approval Of The TI July 1, 2014**
**Final Historical Radiological Assessment**
**Supplement Technical Memorandum By Defendant TTEM/TT, Inc.**
**Plaintiff/Relator Smith Allegation 3:16-cv-01106-JD**

126.   Because the Historical Radiological Assessment done in 2006 by Weston Solutions was determined to be fundamentally deficient due to significant findings of serious levels of radiological wastes and hazards across Treasure Island, the Navy contracted with Tetra Tech EM Inc. and its joint venture TriEco-TT to prepare and produce a Supplement to Assessment.  As part of the contract requirements of the Navy, Tetra Tech EM Inc. through its joint venture was required to actively engage with and consult with the California Department of Public Health and the California Department of Toxic Substances.  After providing a draft of the Supplement to the state agencies, Tetra Tech EM Inc. through its joint venture, was to provide the State with a notice period so that it could engage with the State agencies to obtain comments and seek approval of the Supplement from these state departments prior to the issuance of the final Supplement.

127.   Tetra Tech EM, Inc. and its joint venture failed to provide the California Department of Public Health and the California Department of Toxic Substances with the required notice period and opportunities to consult, review and comment on the proposed Supplement as required by the contract with the Navy. Tetra Tech EM, Inc. and its joint venture failed and refused to involve the California Department of Public Health in the development of the Supplement. Tetra Tech EM, Inc. and its joint venture did not involve the California Department of Public Health in the drafting of the supplement.

128.   When Tetra Tech EM, Inc. and its joint venture had completed a draft of the Supplement, Tetra Tech EM informed the California Department of Public Health that it could send representatives to its offices in San Diego to read the Supplement, but it would not be provided with a copy of the Supplement, would not be allowed to copy the proposed Supplement, and would not be provided an electronic copy to review at the Department of Public Health's offices in Sacramento as required. Tetra Tech EM did not provide to the Department of Public Health the required allotted review and comment time period. Tetra Tech EM, Inc. and its joint venture took intentional actions to exclude and restrict the California Department of Public Health in the development and review of the Supplement and to preclude the California Department of Public Health from comment and from pointing out deficiencies and defects in the Supplement.  On information and belief, it is alleged that the California Department of Toxic Substances was similarly precluded for substantive development, review and comment on the Supplement prior to it being submitted to the Navy and issued as the 2014 HRA Supplement Technical Memorandum.

129.   The contract with the Navy, required the inclusion and involvement of these State agencies, required that these agencies be given a copy of the draft Supplement prior to issuance, required that these agencies be given a specified time to provide written comments, and required that those comments be incorporated

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

into the report. Due to the freezing out of these State agencies from meaningful involvement, there are not comments from the California Department of Public Health to the 2014 HRA Supplement Technical Memorandum. Tetra Tech EC took steps to hide the freezing out of these State agencies by including the 2006 comments of the State agencies as if these comments had been made related to the 2014 HRA Supplement Technical Memorandum and included comments made over the years by the State agencies that were made independent of the report drafted in 2014 and issued on July 1, 2014 as the Historical Radiological Assessment - Supplemental Technical Memorandum.

130.   Tetra Tech EM, Inc. and its joint venture made false statements, and certified and impliedly certified that it had engaged with the State of California Department of Health and the California Department of Toxic Substances in the development, review and comments for the Supplemental Technical Memorandum. These false statements and certifications to the Navy were material to the false claims to the Navy for payment for these services in violation of 31 USC Section 3729 (a) (1) (A) and (B). Tetra Tech, Inc. is a successor to Tetra Tech EM, Inc. and is liable for the conduct of Tetra Tech EM, Inc. As a result of the false or fraudulent records and claims presented the United States has suffered damages to be determined at trial. Relief sought on behalf of the United States for the Thirteenth Cause of Action is set forth hereinafter in the Prayer for Relief.

///

///

///

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

# HUNTERS POINT
# WADSWORTH/McLEAN PLAINTIFFS/RELATORS
# CASE #16-CV-1107-JD

The USFAC encompasses and subsumes some of the allegations and defendants for the Wadsworth/McLean Plaintiff/Relators, but not all. The following are the allegations and defendants for the Wadsworth/McLean Plaintiffs/Relators which do not appear to be encompassed by the USFAC.

**Fourteenth Cause Of Action For Conspiracies Under 31 U.S.C. §3729(a)(1)(C) To Commit Violations Of 31 U.S.C. §3729 (a) (1) (A) and (B), and For Violations of §3729 (a) (1) (A) and (B) pursuant to Conspiracy Against Defendants Tetra Tech EC, Inc., IO Environmental & Infrastructure Inc., Radiological Survey & Remedial Services, Inc., Daryl DeLong and Brian Henderson**

## HUNTERS POINT, TREASURE ISLAND, AND ALAMEDA NAVAL BASE CONSPIRACY BETWEEN TTEC, IOEI AND RSRS
### Plaintiffs/Relators Wadsworth/McLean Allegation 3:16-cv-01107-JD

131.   As of 2006 was TTEC was the prime contractor with the Navy for the remediation of Hunters Point Naval Shipyard and the NAS Alameda.  TTEC installed William Dougherty as a new General Manager over the Hunters Point Naval Shipyard on or about 2006.  Dougherty, on behalf of TTEC, engaged in a conspiracy with the principles of Defendant RSRS, namely Defendant Brian Henderson and Defendant Daryl Delong, and with Mike Bilodeau who formed Defendant IOEI in or about 2006 in order to defraud the United States Navy and obtain unearned payments from the Navy for radiological remediation services at

Hunters Point.  Under the remediation contracts with the Navy a change in the form of the contracts took place over the mid-to-late 2000's.  Early-stage contracts for remediation services were for radiological surveys to identify the location and characterization of potential radioactive wastes that were billed and paid largely on a time and material cost basis.  During the time and materials cost-plus contract period, Dougherty, McWade, Charles Taylor, and Rick Weingarz determined it was beneficial to TTEC to curry favor with the Navy in order to obtain future contracts for remediation of military bases by completing its contracts at or below planned budgets. TTEC, through managers Dougherty, McWade, Charles Taylor, and Weingarz, and supervisors Rolfe and Hubbard, worked with RSRS owners DeLong and Henderson and IOEI owner Bilodeau, and on-site IOEI employees during the cost-plus contracts to submit false records as the result of fraudulent cost cutting measures to stay under budget.

132.   For some of the conduct that resulted in false records that were material to the claims for payment to the Navy it is alleged that RSRS and its owners DeLong and Henderson had actual knowledge that the information was false or that the steps taken would result in false information and records. For some of the conduct that resulted in false records that were material to the claims for payment to the Navy it is alleged that the actions of RSRS employees and its owners DeLong and Henderson were not done with actual knowledge that the information was false or that the steps taken would result in false information and records,  but rather were taken in deliberate ignorance of the truth or falsity of the information or were taken in reckless disregard of the truth or falsity of the information due to the conspiracy for DeLong and Henderson expected information and records to be false in furtherance of the conspiracy. For some of the conduct herein alleged against IOEI, it is alleged that the false conduct was actually known and engaged in by IOEI on-site employees that resulted in false records that were material to the claims for payment to the Navy.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

133.   TTEC management, particularly Dougherty, Dennis McWade, and Andy Bolt, cultivated sub-contractor companies to supply specialized manpower in a way to cause the sub-contractor to be indebted to and co-opted by TTEC.  In 2006, Mike Bilodeau was a disabled veteran who was supplying drinking water to Hunters Point because standard utilities such a fresh water were unavailable to workers at Hunters Point.  Mr. Bilodeau was approached by managers of TTEC including Dougherty.  Dougherty promised that if Mr. Bilodeau formed a Service-Disabled Veteran-Owned Small Business to perform work in the radiological remediation arena and agreed to hire Mr. Dougherty's wife Christine Dougherty, that Dougherty would see that Mr. Bilodeau's company got sub-contracted work from TTEC.  This sub-contracted work would include having Christine Dougherty perform technical writing for submission of TTEC reports to the Navy and related governmental entities regarding the radiological remediation work at Hunters Point. The work of Christine Dougherty would be done independent of any oversight or confirmation of accuracy by Mr. Bilodeau or anyone else from IOEI, and Christine Dougherty would create such reports as desired by Mr. Dougherty, whether truthful or not.  Based on the arrangement proposed by Dougherty, Mr. Bilodeau did hire Christine Dougherty in approximately March of 2006, and incorporated IOEI and registered this new corporation with the California Secretary of State in or about June of 2006.  Mr. Bilodeau took on the position of CEO of IOEI.  IOEI knew or should have known that Christine Dougherty was the wife of TTEC Project General Manager William Dougherty and that there could be pressures due to their marriage for Christine Dougherty to take less than valid and proper actions in the creation of records and statements that TTEC could use to bill the Navy due to potential pressure from her spouse, William Dougherty. IOEI provided no on-site supervision of the work of Christine Dougherty. Christine Dougherty was utilized in a variety of roles by TTEC, with the acquiescence of IOEI, including data management, radiological data review, oversight of radiological data, and assisting

- 74 -

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

in the technical writing of false reports for Tetra Tech EC, Inc. to submit to the Navy. IOEI knew that the reports and records IOEI generated for Tetra Tech would be used by TTEC to make demands for payment from the Navy for the radiological remediation work.  Christine Dougherty, in the work of data management, radiological data review, oversight of radiological data, and assisting in the technical writing did falsify these records to assist TTEC in obtaining false radiological clearance from the Navy and payment from the Navy due in material part to the false reports and records Christine Dougherty generated for Tetra Tech EC, Inc.

134.   IOEI, through Mr. Bilodeau agreed impliedly and functionally to the use of employees of IOEI at Hunters Point to knowingly make and use false radiological records to assist TTEC in the submission of false claims for payment to the Navy for radiological remediation. Beginning in or about 2009 and in the years following, TTEC manager Dougherty made requests for IOEI to hire additional specific individuals to work at Hunters Point. Due to the co-opted nature of the relationship between TTEC and IOEI, Bilodeau hired each of the individuals that TTEC manager Dougherty requested without having conducted any due diligence review of the individuals before hiring or thereafter.  Bilodeau understood that IOEI employees would create records and reports in a manner prescribed by TTEC, even when TTEC desired the records to be falsified to assist TTEC in submitting those reports and records to support false claims for successful radiological remediation. The corporate owners of IOEI were not on-site at Hunters Point and did not oversee the work of the IOEI employees at Hunters Point nor were any steps taken to assure that the work and reports generated by IOEI employees at Hunters Point were true and accurate. Rather, due to the conspiracy agreement IOEI owners and top managers understood that TTEC, through Mr. Dougherty, would from time to time have IOEI employees falsify reports and records to assist TTEC in obtaining false radiological clearance and payment from the Navy.

135.   The false reports and records made, edited, and used that IOEI employees at Hunters Point, included reports regarding the radiological sampling and laboratory testing of soils at Hunters Point, radiological reports as to the scanning of buildings at Hunters Point, the radiological reports of the laboratory testing of soils at NAS Alameda, and the radiological reports of the laboratory testing of soils and building smears at Treasure Island. It is alleged that for the "vicinity soil sampling fraud" IOEI employees at Hunters Point had knowledge that laboratory samples of soil and smears from NAS Alameda and Treasure Island that were sent to the Hunters Point laboratory contained false samples that were not from the locations that the sample represented.   With the knowledge of the falsity of the laboratory samples the IOEI employees at Hunters Point made, used, and caused to be made and used false reports of the laboratory results for Tetra Tech EC as part of the conspiracy with management of TTE t submit false claims for payment to the Navy.

136.   The soil swapping fraud alleged by the United States' USFAC at ¶¶56-59, were known by IOEI, RSRS, and TTEC and that these fraudulent soil samples were used to generate false field and laboratory data, and with the knowledge of that falsity IOEI employees made, edited, and caused to be made and used false records that TTEC submitted as a material basis for claims for payment to the Navy. It is alleged that for the building scan frauds of excessive speed and the separate block copying of building scan date alleged by the United States' USFAC at ¶¶ 67-69, that the IOEI employees were aware that this information was false and the IOEI employees knowingly made, edited, and caused to be made and used these false records for Tetra Tech EC to submit as a material basis for claims for payment to the Navy as part of the conspiracy to defraud the Navy.

137.   On April 20, 2009, the Navy awarded contract number N62473-07-D-3211, task order 0018 to TTEC. One of the requirements of that contract was for TTEC to operate a Radiological Screening Yard (RSY). TTEC had used multiple

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

RSYs for its own radiological soil processing. Task Order 0018 required TTEC to operate one or more RSYs to take the soil of other contractors performing radiological remediation on Hunters Point, and for those under the employment, direction or control of TTEC to operate the RSY to process soils submitted to the RSY by other contractors. TTEC management, including Dougherty, pressured IOEI employees at Hunters Point to assist in false processing and report generation of the RSY processing as part of the conspiracy to defraud the Navy.  As part of the conspiracy to reduce the costs of properly processing soils on the RSY, IOEI employees engaged in false data processing. The RSY required a "towed array" of radiological sensors to be towed behind a small tractor over the RSY. Prior to the towed array being used, soil that was to be evaluated and potentially remediated for radioactive contamination was spread over an approximate 1,000 square yard area about 6 inches thick. The towed array was to be slowly pulled over the area of the soil that had been spread out on the RSY. The towed array radiological sensors sent data of radiological intensity in the soil and provided GPS coordinates for the elevated radiological locations on the RSY soil layout pad. IOEI employees received the towed array data. The Navy approved work plan provided that the towed array information was to be used to locate the highest radiological readings from an individual RSY pad so that soil samples from the highest radiological readings would be taken.  This soil was to be tested by the laboratory at Hunters Point and when TTEC reports from IOEI represented that the RSY pad had been effectively remediated of radiological contamination over free release levels it was then to be sent to an outside laboratory for confirmation.  IOEI employees, as part of the conspiracy with TTEC, intentionally falsified the map that was generated from the data from the towed array with the objective of having samples taken from areas that were not the highest radiological intensity as contractually required.  This would result in false laboratory results that would result in false radiological "free release" designation of the soil on the RSY pad.

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

138.   In 2006, management officials of TTEC, including Dougherty, approached Daryl DeLong and Brian Henderson about forming a separate company to provide radiological support personnel and equipment to Tetra Tech EC, Inc. at Hunters Point and potentially other locations.  Dougherty represented that he could and would take effective steps to channel sub-contract radiological work to the new company if formed, if DeLong and Henderson would cooperate with TTEC as needed, including engaging in submission of false data and reports, to assure that TTEC's work came in close or under budget and/or made profits from the radiological work at Hunters Point, NAS Alameda, and Treasure Island, and other locations they might provide sub-contractor services to TTEC.  DeLong and Henderson agreed to cooperate with Tetra Tech EC, Inc. as needed and requested, and formed RSRS.   RSRS provided subcontractor work to TTEC radiological remediation projects, provided radiological support workers, provided RCTs, and radiological related equipment, and assisted in the submission of knowingly false data and reports to assist TTEC in obtaining false payments from the Navy.

139.   As part of the conspiracy between TTEC, RSRS, and IOEI, the three companies, including DeLong and Henderson for RSRS, worked in tandem by agreement to defraud the Navy regarding to the radiation remediation services performed at Hunters Point, Treasure Island, and NAS Alameda. At the urging of management of TTEC, RSRS under the direction of DeLong, Henderson and supervisors and workers engaged in false soil sampling by delivering to the laboratory soil samples that falsely represented the location the soil was taken from at Hunters Point, Treasure Island, and NAS Alameda. RSRS owner DeLong was involved in oversight of soil sample location marking.  This allowed DeLong to mark the soil samples for areas that TTEC wanted "free release" clearance, especially areas that had been difficult to obtain "free release" clearance.  DeLong ensured that soil sample areas were marked to avoid high radiological reading areas contrary to the contract with the Navy. RSRS owners DeLong and Henderson were

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

also aware of efforts by TTEC to have RSRS RCTs take false soil samples at Hunters Point, NAS Alameda, and Treasure Island in order to obtain false "free release" of survey unit areas. Although not directly involved in some of those activities, DeLong and Henderson cooperated with and did not take steps to stop RSRS and other employees from taking false soil samples from 2007 through 2014. DeLong and Henderson in reckless disregard for the truth or falsity of the soil samples being taken from the locations as claimed on the COC documents, permitted laboratory testing of those samples and used those laboratory sample results in the data evaluation and reports that Henderson and DeLong generated along with IOEI for TTEC.   Additionally, Henderson and DeLong knew those laboratory sample results in the data evaluation and reports would also be used by Shaw, and Engineering/Remediation Resources Group, Inc. (ERRG) to make claims for payment upon the Navy.

140.   At the urging of management of TTEC, IOEI employees and DeLong and Henderson assisted in the identification of high radioactive soil areas so that contrary to the Navy requirements, soil samples would not be taken from the highest radioactive areas, but from lower radioactive areas. Navy contract requirements and procedures required the soil sample to be taken from the highest radioactive reading areas. The taking of samples from areas other than the highest radioactive reading areas resulted in false lab reports and false reports that IOEI, RSRS, and defendants DeLong and Henderson assisted in creating so that TTEC would submit false reports for payment from the Navy. Defendants engaged in this fraudulent conduct of mis-directing the taking of soil samples no later than 2008 and continued with this process through 2014 and may have engaged in the conduct both earlier and later than herein described. Examples of the coordinated falsification of soil samples includes, but is not limited to the false soil samples taken for Hunters Point from under building 351A in 2008 and 2009, sewer and storm drain Survey Units 3, 4, 12, 13, 16,  and 8 of Parcel B in 2006-2007, and

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Survey Units 20-23, 30-36, 45-50, and 63 of Parcel B in 2010-2011, Parcel C Survey Units 193-212, 311-330, others in Parcels D-2, E, G, UC-1, UC-2, and UC-3 from 2007 through 2015, and for most if not all of the RSY soils processed for Hunters Point for TTEC as well as other prime contractors that submitted soil to the RSY for processing by TTEC; for Treasure Island IR site 6 and IR site 12 from 2012-2016; and for NAS Alameda and Annex, soils from Site 17 - Seaplane Lagoon, Site 1 and 32, former dumps, Site 2, another former dump, and soil from excavated sewer and storm drain lines from buildings 5 and 400 draining south into the Seaplane Lagoon and north into the Oakland Estuary from 2009 through 2014.

141.    As part of the conspiracy between TTEC, RSRS, DeLong and Henderson, and IOEI, the three companies worked in tandem and agreement to defraud the Navy regarding the laboratory radiation remediation services performed at Hunters Point for the laboratory samples from 2007 on to 2014 for Hunters Point, NAS Alameda from 2009 through 2014, and for a limited period of time of 2007 to 2008, and 2013 for Treasure Island.  At the urging of management of TTEC, RSRS top management, DeLong and Henderson, with the assistance of IOEI employees at Hunters Point, took efforts to avoid soil samples from being submitted and tested in the laboratory that could result in laboratory results exceeding "free release" levels set by the Navy, especially so after a survey unit had been subjected to prior scans and remediation efforts that had not resulted in a free release designation. RSRS DeLong and IOEI employees directed and assisted employees to intercept soil samples delivered to the laboratory by having samples hand scanned with a Micro-R meter, and secretly reject samples that showed elevated radioactivity before laboratory analysis. RSRS Vice-President DeLong was actively involved in overseeing the conduct of the lab clerical and RCT staff in the lab so that these staff individuals would hand scan the incoming soil samples with a handheld Ludlum Micro-R meter, and if the sample emitted a reading on the meter over a "5" DeLong directed the staff to designate that the sample had such an elevated reading. In the

lab, staff scanned and designed the samples that gave a reading over a "5", and after hours those soil samples were switched with soils that had low Micro-R readings, and the COC was falsified to reflect that the substituted sample was the original sample. The substituted sample was then subjected to laboratory testing that generated false results due to the switching of the soil samples.  Field crews of RSRS RCTs at Hunters Point, NAS Alameda, and at Treasure Island when working for TTEC, and TTEC field supervisors from Hunters Point, Treasure Island, and Alameda Naval base were notified of the secretly scanned and rejected samples and were instructed to obtain replacement samples that would not have elevated radioactivity. After months of this fraudulent process to screen out possible elevated soil samples, field supervisors at Hunters Point, Treasure Island, and Alameda Naval base were provided Ludlum Micro-R meters and similar instruments, instructed on their use, and directed to pre-screen samples before the soil samples were sent to the laboratory so that elevated radioactive samples above a Micro-R meter reading would be screened out and not subjected to laboratory analysis contrary to the requirements of the Navy directed work plans that for a soil "unit" that the highest radiological reading soils be sampled and laboratory tested.

142.   The Navy contracts for Hunters Point, Treasure Island and NAS Alameda required that a specified percentage of soil samples for a survey unit be randomly selected and sent to a third-party laboratory, for which TestAmerica, Inc. of St. Louis was usually used. TTEC, RSRS, and IOEI, through William Dougherty, McWade, Charles Taylor, and Rick Weingarz of TTEC, DeLong and Henderson of RSRS, and IOEI employees at Hunters Point conspired to defraud the Navy by interfering with the selection of "random" samples to be sent to TestAmerica for Hunters Point, NAS Alameda, and Treasure Island. Rather, IOEI and RSRS employees took efforts to screen and block soil samples from being selected for shipment to TestAmerica if the data and scanning suggested the results would be above "release levels". As part of this process defendants DeLong and

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

Henderson developed spreadsheets of samples they determined should be sent to TestAmerica based on review of data provided by IOEI employees, and the hand scanning of samples by the Micro-R meter in the lab. Lists were created by DeLong and Henderson for the lab staff to specifically pick samples to be sent to TestAmerica, rather than random sample selection as required by the Work Rules with the Navy. Laboratory staff were chastised if random samples were inadvertently submitted to TestAmerica rather than the selected samples chosen by IOEI and RSRS, and defendants DeLong and Henderson. Soil samples that were subject to fraudulent manipulation were sent to TestAmerica for Hunters Point for building 351A, sewer and storm drain Survey Unit 3, 4, 12, 13, 16,  and 8 of Parcel B in 2006-2007, and Survey Units 20-23, 30-36, 45-50, and 63 of Parcel B in 2010-2011, Parcel C Survey Units 193-212, 311-330, and others in Parcels D-2, E, G, UC1, UC-2, and UC-3 from 2007 through 2015; and for Alameda Naval Air Station and Annex, soils from Site 17 - Seaplane Lagoon, Site 1 and 32, former dump, Site 2, another former dump, and soil from excavated sewer and storm drain lines from buildings 5 and 400 draining south into the Seaplane Lagoon and north into the Oakland Estuary from 2009 through 2014, and at Treasure Island in 2007-2008 for buildings 233, 343, 344 and soil areas, and 2013 for building 233 again and 1121 and 1323 and related soil areas.

143.   DeLong and Henderson were involved in the oversight of the scanning of buildings and the management of the scan data that resulted from those building scans.  DeLong and Henderson allowed RSRS RCT employees involved in the scanning of buildings at Hunters Point, Treasure Island, and NAS Alameda to engage in building scans contrary to the Navy requirements, such as allowing scans at excessive speed, allowing scan data to be submitted when the scanners were on but not moved, and allowing scan data to be submitted and used which was known to have been tampered with and changed.  DeLong and Henderson failed to ensure that RSRS RCTs scanned the buildings at these sites at the specified speeds

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

required by the Navy contracts. DeLong and Henderson were aware that TTEC management applied pressure on its RSRS supervisors to cut corners in violation of the contract with the Navy to reduce costs and reduce time in the radiological remediation. With the knowledge that TTEC was applying improper pressure on TTEC supervisors to have RSRS employees cut corners, DeLong and Henderson intentionally allowed the false building scan data to go forward, or acted in reckless disregard for the truth or falsity of the building scan data generated.

144.   TTEC, IOEI, RSRS, DeLong and Henderson conspired together to submit false reports pertaining to building scans at Hunters Point, Treasure Island, and NAS Alameda, to support false claims for payment by TTEC from the Navy. As part of this conspiracy, IOEI staff reviewed data of building scans submitted by RSRS employees and other RCTs, along with DeLong and Henderson, and TTEC management. IOEI employees at Hunters Point and RSRS employees including DeLong and Henderson, reviewed the building scan data for elevated radioactive readings after submission from the field. IOEI and RSRS employees and managers combed the building scan data in an effort to change data to remove scan data that could result in Navy and regulatory review rejecting the claim that the building was qualified for radiological "free release". The changing of data after submission from the field included the changing of individual data entries, and bulk changes of data entries for buildings. In addition to the changing of data by IOEI and TTEC employees, and by DeLong and Henderson, TTEC and RSRS directed RCT Raymond Zahensky, as part of this fraudulent process, to obtain building scan data on a thumb drive each day, take home with him a TTEC issued laptop computer, review the building scan data and change building scan data to eliminate elevated readings, and from time to time eliminate unusually low readings that could result in regulators deeming the data unreliable. Zahensky then returned the thumb drive with the fraudulently manipulated date to the TTEC office or TTEC supervisors Rolfe or Hubbard. The building scan data manipulation by Zahensky took place in

2010 through 2012 and may have continued thereafter. The fraudulent changing of building data by all involved was reviewed and given final approvals although knowingly false by management of IOEI, RSRS, and TTEC, and then used by TTEC as false reports to support the false claim for payment for the building remediation by TTEC to the Navy. Fraudulent manipulation of building scan data at Hunters Point included nearly every building that TTEC submitted reports to the Navy after mid-2007 through 2014, including but not limited to buildings 103, 113, 113A, 130, 146, 253, 272, 351, 351A, 365, 366, 401, 411, 439, 810, 140, 157, 203, 211, 214, 224, 271, 813, 144, 406, 414, 521, and 707. At Treasure Island the buildings included 233, 343, 344 in 2007-2008, and 1121, and 1323 in 2012-2014, and Buildings 5 and 400 for Alameda Naval Air Station from 2010 to 2014.

145.   Relators Wadsworth and McLean are originals sources of the information contained in this Fourteenth Cause of Action under the standard set by 31 U.S.C. § 3730 (e)(4)(B) (2) for all allegations herein alleged in the Fourteenth Cause of Action. Relators Wadsworth's and McLean's knowledge of information alleged herein the Fourteenth Cause of Action has been obtained due to the investigation they directed their counsel to engage in that involved the interviews of individuals who worked at Hunters Point, NAS Alameda and Treasure Island that included laborers, RCTs for New World Environmental and RSRS, and management involved in the remediation of Hunters Point, NAS Alameda and Treasure Island, and the review of documents that were not public disclosures under 31 U.S.C. §3730 (e)(4)(A) (i) to (iii). The information herein is independently obtained through investigation and not through public disclosures and the alleged information materially adds to public disclosures regarding Hunters Point, NAS Alameda and Treasure Island regarding the conduct and conspiracy of TTEC, IOEI, RSRS, and the owners of RSRS DeLong and Henderson. The independent information critical to the conspiracy not contained in known public disclosures includes information as to who was responsible for orchestrating the conspiracy,

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

who were involved in the conspiracy, how the conspiracy was carried out in the creation of false records to support false claims for payment, and why the conspiracy was initiated and carried out by the parties to the conspiracy. Relators Wadsworth's and McLean's independent information also provides materially important information as to the intent or scienter involved by management of Tetra Tech EC, RSRS, and the employees of IOEI at Hunters Point and the owner of IOEI, that the conspiracy was agreed to and actions were done intentionally to cheat the Navy by avoiding the costs and time associated with performing the contractual requirements imposed by the Navy. The information set forth in this cause of action was obtained independent of the public disclosures. Relators Wadsworth and McLean voluntarily provided detailed information as to the conspiracy set forth in the Fourteenth Cause of Action that materially adds to the information publicly disclosed as of that time to the Government on February 22, 2016, before filing their lawsuit under the FCA on March 4, 2016. Relators Wadsworth and McLean had no legal obligation to provide the information about the conspiracy that their investigation had revealed. On February 22, 2016, written information was provided via email to Sara Winslow, an Assistant United States Attorney and Robert Chandler, an attorney with the United States Department of Justice on behalf of Relators Wadsworth and McLean regarding the conspiracy now alleged in the Fourteenth Cause of Action, including 8 single spaced pages of information. Wadsworth and McLean are original sources of the conspiracy allegations against TTEC, IOEI, RSRS and its owners DeLong and Henderson under 31 U.S.C. §3730 (e) (4)(B)(1) and (2).

146.   The United States of America has been damaged by the conspiracy to submit false records material to false claims submitted by TTEC to the Navy BRAC. The United States of America Navy BRAC contracted with Defendant Tetra Tech EC, Inc. for the remediation and removal of radioactive materials above a specified level for the health and safety of the environment, the public, and future

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

generations.  The fraudulent conspiracy actions herein alleged deprives the United States of America with the basic service that was contracted for with Defendant Tetra Tech EC, Inc.  The fraudulent conspiracy conduct alleged related to radiological contamination creates unlimited future liability for the United State of America for the agreements between the United States of America and the City and County of San Francisco and government entities in Alameda County provide that the United States will remain responsible and liable for the radioactive remediation of Hunters Point, Treasure Island, and NAS Alameda after the property is deeded over to local government agencies should it be discovered that the remediation did not fully and properly remove radioactivity.  The Navy will and has incurred costs and expenses in the remediation of Hunters Point, NAS Alameda, and Treasure Island that should not have been incurred, but for the fraud of Defendants.  The full and extensive costs directly related to the fraud accomplished by Defendants are extensive and yet not fully known and will be established and reasonably estimated at trial.

147.   The conspiracy in violation of 31 U.S.C. §3729 (a)(1)(C) between TTEC, IOEI, RSRS, Daryl DeLong, and Brian Henderson resulted in false records being made and used by these defendants in violation of 31 U.S.C. §3729 (a)(1) (B) to support false claims for payment by TTEC to the Navy in violation of 31 U.S.C. §3729 (a)(1)(A). Relief for this FOURTEENTH CAUSE OF ACTION is requested under the False Claims Act for each false record and resulting false report to the Navy in support of a false claim for payment, and each false claim for payment is a false claim under 31 USC Section 3729(a) for which relief as set forth herein after under the Prayer For Relief.

*///*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# PRAYER FOR RELIEF

148.   Relators, on behalf of the United States of America and the United States Navy seek through this action 3 times the damages the government has and will sustain because of the acts of defendants;

149.   Relators, on behalf of the United States of America and the United States Navy seek through this action a civil penalty as provided by 31 USC Section 3729(a)(1)(G) for each false claim and each false record or false statement material to a false claim;

150.   For an award to the qui tam plaintiffs as provided for by 31 USC Section 3730(d);

151.   For an award of reasonable attorney fees and costs.

A jury trial is demanded.

Dated: August 21, 2022                  Law Office of David Anton &
                                        Scott Law Firm

                                        By:_____David Anton_____

                                            David Anton
                                        Attorney for Relators,
                                        Arthur R. Jahr, III, Elbert G. Bowers,
                                        Susan V. Andrews, and Archie R. Jackson


                                        By:_____David Anton_____

                                            David Anton
                                        Attorney for Relator, Anthony Smith


                                        By:_____David Anton_____

                                            David Anton
                                        Attorney for Relators,
                                        Donald K. Wadsworth, and Robert McLean

- 87 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICE OF DAVID ANTON
1717 REDWOOD LANE
DAVIS, CA 95616

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which provided notice to all parties hereto appearing in the actions and of which Relator is aware.

Dated: August 21, 2022

_____David Anton_____

David Anton
Attorney for Relators

Relators' Combined Third Amended Complaint - FCA 3:13-CV-3835 - JD