BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
MICHELLE LO (NYRN 4325163)
Chief, Civil Division
MICHAEL T. PYLE (CABN 172954)
SAVITH IYENGAR (CABN 268342)
Assistant United States Attorneys
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5087
Email: michael.t.pyle@usdoj.gov

JAMIE ANN YAVELBERG
PATRICK KLEIN
A. THOMAS MORRIS
JONATHAN K. HOERNER
JOHN F. SCHIFALACQUA
Attorneys
Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-6849
John.f.schifalacqua@usdoj.gov

Attorneys for the United States of America
(see next page for names of additional counsel)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ARTHUR R. JAHR, III, et al., ANTHONY SMITH, & DONALD K. WADSWORTH et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TETRA TECH EC, INC.<br><br>Defendant. | CASE NO: 3:13-CV-3835 JD<br><br>RELATED ACTIONS: 3:16-CV-1106 JD<br>3:16-CV-1107 JD<br><br>**UNITED STATES' SECOND AMENDED COMPLAINT IN INTERVENTION AGAINST TETRA TECH EC, INC.**<br><br>**DEMAND FOR JURY TRIAL ON CAUSES OF ACTION ONE THROUGH FOUR** |

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice
ELISE FELDMAN (MA BBO# 563187)
Senior Counsel
KAYCI G. HINES (NY_BAR #5474911)
SHEILA MCANANEY (IL Bar #6309635)
Trial Attorneys
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 415-744-6470
Email: Elise.Feldman@usdoj.gov
Kayci.Hines@usdoj.gov
Sheila.McAnaney@usdoj.gov

Attorneys for the United States of America

The United States brings this action against Tetra Tech EC, Inc. ("Tetra Tech EC") to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, to recover damages and other monetary relief under the common law theories of breach of contract and fraud, and to recover certain costs incurred and to be incurred by the United States, with accrued interest pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. 9601, et seq. ("CERCLA"). For its Complaint in Intervention against Tetra Tech EC, Inc., the United States of America alleges as follows:

## I. NATURE OF THE ACTION

1. This action is the result of Tetra Tech EC's knowing failure to fulfill its contractual obligations to test for and remediate potentially hazardous radiation at the Hunters Point Naval Shipyard ("Hunters Point" or "Site") in San Francisco, California. Instead of abiding by contractual terms designed to ensure that Hunters Point would be safe for public use, Tetra Tech EC and certain of its predecessor companies (collectively, "Tetra Tech") fabricated its work and falsified the data the U.S. Department of the Navy relied on to evaluate whether Hunters Point was free from harmful radiation. As a result of its fraud, Tetra Tech not only deprived the government of the services for which it contracted and paid, but Tetra Tech also injected severe disruption into and uncertainty about

remediation at Hunters Point. To this day – nearly twenty years since Tetra Tech and its predecessor companies began work – the Navy continues to spend enormous sums of money to check, and where necessary re-do, Tetra Tech's work.

2. This action also concerns Tetra Tech's liability pursuant to Section 107(a) of CERCLA for costs incurred by the United States to address the release or threat of release of hazardous substances at the Site. Tetra Tech's unreliable sampling and other activities at the Site left the Navy under a legal obligation to re-do the work at those portions of the Site where Tetra Tech had previously been performing the radiological waste response activities, ("Rework"). The CERCLA cause of action seeks recovery of costs currently being spent, as well as those costs that will be spent in the future by the United States for this repeat response action addressing radionuclides at the Site. The costs to be recovered under this claim would be directed to the Navy's Environmental Response Account for use in the cleanup of this or other hazardous waste sites.

3. Hunters Point was established as a commercial shipyard in 1870. The Navy operated the shipyard from 1940 to 1974 and, during that time, it used Hunters Point to house the Naval Radiological Defense Laboratory and to decontaminate ships. In 1989, Hunters Point was placed on the National Priorities List ("NPL") under CERCLA, requiring a long-term cleanup plan. In 1991, the Base Realignment and Closure Commission ("BRAC") recommended Hunters Point for closure. The Navy has agreed to convey Hunters Point on a parcel-by-parcel basis to the City and County of San Francisco for local reuse as the environmental cleanup is completed.

4. From 2003 through 2014, Tetra Tech entered into a series of contracts with the United States Navy to provide radiological remediation services at Hunters Point. These contracts required Tetra Tech to investigate, among other things, radiological contamination of soil and buildings, remediate and remove waste as necessary, and provide status reports to the Navy documenting its activities to support the redevelopment of radiologically impacted sites and buildings at Hunters Point for non-military use. The objective of these contracts was to achieve "free-release" of radiologically impacted areas by testing soil and buildings in those areas, and remediating as necessary, until test results demonstrated that radiation levels were below applicable release criteria and regulatory limits. Pursuant to its agreement with the City and County of San Francisco, the Navy must complete the radiological remediation of

Hunters Point before it can transfer the property to the City and County for redevelopment. The Navy awarded contracts to Tetra Tech to perform these services at certain areas of Hunters Point designated as Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and 3.[1] The following map (Figure A) depicts the Parcels of Hunters Point, including those where Tetra Tech was to perform radiological remediation:




***Figure A***: Map of Hunters Point Naval Shipyard, San Francisco, CA.

5. As detailed below, Tetra Tech violated the False Claims Act and breached its contracts with the Navy by: (1) misrepresenting the sources of soil samples submitted to the laboratory for testing; (2) manipulating data from radiological testing of buildings; and (3) reporting false results from the radiological soil and building tests. Tetra Tech submitted false claims to the Navy for this work as if it was properly performed when it was not. The Navy relied on Tetra Tech's misrepresentations in

[1] The Navy awarded contracts to other contractors to perform testing and remediation in the other parcels of Hunters Point.

concluding that the remediation of radiologically impacted areas at Hunters Point was complete and made payments to Tetra Tech based on these material misrepresentations.

6. During the period between at least June 2006 and January 2018, Tetra Tech submitted, or caused to be submitted, materially false claims to the Navy for fraudulent testing and reporting at Hunters Point, and made, or caused to be made, material false statements to the Navy in connection with the fraudulent testing and reporting. In addition, Tetra Tech breached contracts with the Navy, causing disruption, uncertainty, and delays in the remediation and transfer of parcels of land at Hunters Point. Further, Tetra Tech's fraud substantially undermined the Navy's regulators and the public's confidence in all of its work. Tetra Tech's conduct caused the United States to incur substantial additional costs – the magnitude of which continues to increase – that could have been avoided had Tetra Tech acted honestly.

7. Further, the release or threatened release of radionuclides at the Site has caused the Navy to incur cleanup costs, for which Tetra Tech is jointly and severally liable under CERCLA.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a), and 31 U.S.C. § 3732. The Court may exercise personal jurisdiction over Tetra Tech pursuant to 31 U.S.C. § 3732(a) because Tetra Tech transacts business in this District.

9. Venue is proper in the Northern District of California under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Tetra Tech transacts business in this District.

## III. PARTIES

10. The United States brings this action on behalf of the U.S. Department of the Navy.

11. Tetra Tech EC, Inc. is a wholly-owned subsidiary of Tetra Tech Inc., with its principal place of business in Morris Plains, New Jersey. At all times relevant to this complaint, Tetra Tech EC, Inc., and its predecessor companies, provided remediation and construction services worldwide, including services in this District to the federal government. Tetra Tech EC's predecessor companies include Foster Wheeler Environmental Corporation and Tetra Tech FW Inc. Upon information and belief, Tetra Tech EC assumed all liabilities of its predecessor companies.

## IV. STATUTORY AUTHORITIES

### THE FALSE CLAIMS ACT

12. The False Claims Act, 31 U.S.C. §§ 3729-33, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21 (May 20, 2009), provides, in pertinent part, that:

> [A]ny person who—
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

13. Prior to the enactment of the Fraud Enforcement and Recovery Act of 2009, the False Claims Act provided, in pertinent part, that:

> Any person who –
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> Is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

14. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 per false claim for violations occurring on or after September 29, 1999. The penalty range was increased to $10,781 to $21,563

effective August 1, 2016, for violations occurring on or after November 2, 2015. 81 Fed. Reg 42491, 42494 (2016).

15. The False Claims Act defines "knowing" and "knowingly" as follows:

> [T]he terms "knowing" and "knowingly"—
>
> (A) mean that a person, with respect to information—
>
> (i) has actual knowledge of the information;
>
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii) acts in reckless disregard of the truth or falsity of the information; and
>
> (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

16. The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**CERCLA, 42 U.S.C. § 9601 et seq.**

17. Congress enacted CERCLA in 1980 to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and other pollutants and contaminants, and for funding the costs of responding to releases of hazardous substances. See 42 U.S.C. §§ 9604(a), 9601(25).

18. 42 U.S.C. § 9607(a), provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this Section –
>
> * * *
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . .
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person
>
> * * *
>
> from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --

> (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the National Contingency Plan;
>
> (C) any other necessary costs of response incurred by any other person consistent with the National Contingency Plan; . . .

19. 42 U.S.C. § 9619 pertaining to the liability of response action contractors states that:

> (1) Liability of Response Action Contractors. A person who is a response action contractor with respect to any release or threatened release of a hazardous substance or pollutant or contaminant from a vessel or facility shall not be liable under this subchapter or under any other Federal law to any person for injuries, costs, damages, expenses, or other liability (including but not limited to claims for indemnification or contribution and claims by third parties for death, personal injury, illness or loss of or damage to property or economic loss) which results from such release or threatened release.
>
> (2) Negligence, etc.
> Paragraph (1) shall not apply in the case of a release that is caused by conduct of the response action contractor which is negligent, grossly negligent, or which constitutes intentional misconduct.

## V. FACTUAL ALLEGATIONS

### A. Radiological History of Hunters Point

20. Hunters Point is located in southeast San Francisco on a peninsula that extends east into the San Francisco Bay. A subsidiary of the Bethlehem Steel Company operated it as a drydock facility for commercial and military ship maintenance and repair from 1868 until 1939, when the Navy purchased it. On December 18, 1941, eleven days after the United States entered World War II, the Navy took full control of Hunters Point. To support the war effort, the Navy constructed numerous buildings and excavated surrounding hills to expand the shoreline into the Bay. After World War II ended, the Navy used Hunters Point's expansive berthing facilities for reserve fleet ships returning from the Pacific.

21. Shipyard operations by the Navy involved the use of general radioactive material. Such operations included refurbishment and handling of radioluminescent devices and paint, gamma radiography, calibration laboratory operations to ensure the accuracy of radiological survey instruments, and decontamination of ships (including ships returning from Operation Crossroads – atomic weapons testing in the Bikini Atoll in the Marshall Islands). In addition, in 1946, the Navy established at Hunters Point a laboratory that eventually became the Naval Radiological Defense Laboratory ("Defense Lab"). The Defense Lab, which occupied up to 20 buildings at Hunters Point, was a center for research into

decontamination and the effects of fallout and radiation on living organisms and on natural and synthetic materials. The Defense Lab used a large number of radionuclides, as well as machines that generated radiation and charged particles. The Navy closed the Defense Lab in 1969. The Navy also used Hunters Point's berthing and drydocking facilities for the maintenance and repair of nuclear-powered ships.

22. The Navy ceased operating Hunters Point as a Naval shipyard in 1974. From 1974 to 1986, the Navy leased facilities at Hunters Point to private tenants. The Navy resumed operation of the shipyard in 1986, when Hunters Point was designated as an annex to Naval Station Treasure Island. Shipyard operations were permanently terminated on December 29, 1989. In 1991, Hunters Point was identified for closure and reuse pursuant to the Base Realignment and Closure Act of 1988. On January 21, 1994, the Navy and the City and County of San Francisco executed a memorandum of understanding establishing a process for the transfer of Hunters Point to the City and County of San Francisco for redevelopment.

**B. Regulatory History at Hunters Point**

23. In 1989, the United States Environmental Protection Agency ("EPA") placed Hunters Point on the National Priorities List of Superfund sites pursuant to CERCLA, which required the Navy to conduct a preliminary assessment of contamination of the property.[2]

24. Department of Defense policy requires the Navy to identify, evaluate, and respond to the release or threat of release of hazardous substances, pollutants, or other contaminants into the environment from Navy facilities. DOD Instruction 4715.07, Defense Environmental Restoration Program ("DERP") at 2 (August 31, 2018). When the Navy takes such response actions, it is acting under delegated authority from the President of the United States granted in Section 104 of CERCLA, 42 U.S.C. § 9604. Executive Order 12580, 52 Fed. Reg. 2923 (Jan. 23, 1987). Congress has instructed the Navy to seek reimbursement for cleanup costs from potentially responsible parties. *See* S. Rep. 105-29, at 241 (1997) ("[I]nconsistent policies have contributed to a lack of focus and minimal cost-recovery or cost-sharing at third party sites, particularly at government-owned/contractor-operated facilities."); *see also* Policy Concerning Cost-Recovery/Cost-Sharing Activities Under the Defense Environmental

[2] Parcel A of Hunters Point was removed from the National Priorities List in February 1999, and transferred to the City and County of San Francisco in December 2004.

Restoration Program (DERP), Department of Defense, Feb. 27, 1998 ("The DoD Components shall . . . pursue cost-recovery/cost-sharing activities to the extent practicable if such activity appears to be potentially cost-effective by: . . . (3) initiating actions, where appropriate, to recover the environmental cleanup costs incurred or to be incurred by the Department.").

25. In 1991, the Base Realignment and Closure Commission recommended Hunters Point for closure. The Navy has agreed to convey Hunters Point on a parcel-by-parcel basis to the City and County of San Francisco for local reuse as the environmental cleanup is completed.

26. In 1992 the Navy, the United States Environmental Protection Agency and the California Department of Toxic Substances Control ("DTSC") entered into a Federal Facility Agreement ("FFA") to manage the cleanup of the Site. The FFA (1) establishes a framework for developing, implementing and monitoring environmental response actions at the Site; and (2) ensures that the site cleanup activities are appropriately investigated and remediated to protect human health and the environment. Under the FFA, the Navy leads management of the cleanup of the Site with oversight by EPA, and DTSC together as oversight agencies, ("Oversight Agencies"). The Oversight Agencies review and approve proposed plans and remedial activities at the Site.

27. In 1994, the Navy executed a memorandum of understanding with the City and County of San Francisco that established a process for the transfer of the Site to San Francisco for future redevelopment. Pursuant to this memorandum, the Navy must complete the radiological remediation of Hunters Point before it can transfer the property to the City and County for redevelopment.

28. Accordingly, the Navy, as lead agency for the cleanup, conducted and published a two-volume Historical Radiological Assessment ("HRA") as one of its response activities. Volume II, entitled *Final Historical Radiological Assessment, History of the Use of General Radioactive Materials, 1939 – 2003,* was published in August 2004. It concluded that low levels of radioactive contamination existed within Hunters Point and identified impacted sites for further investigation and remediation.

29. On April 21, 2006, the Navy, as lead agency for cleanup, published the *Final Basewide Radiological Removal Action Memorandum-Revision 2006, Hunters Point Shipyard, San Francisco, California* ("2006 Action Memo"). The purpose of the 2006 Action Memo was to document for the administrative record the Navy's "decision to undertake time-critical removal actions ("TCRAs"), at

areas throughout the base that may contain localized radioactive contamination in soils, debris/slag, and buildings [at Hunters Point], as identified in [the HRA]." Attached as Table 1 to the 2006 Action Memo were the "release criteria." The release criteria established the cleanup goals for each Radionuclide of Concern for soil, surfaces, and water. The 2006 Action Memo prescribed that "[b]efore initiating a removal action per this [Action Memo], the area being considered will be characterized using real-time radiation detection devices or soil sampling and analysis."

30. Several radiological investigations and radiological removal actions have been conducted at Hunters Point since the facility was placed on the NPL. As discussed below, the Navy awarded several contracts to Tetra Tech to perform these investigations and removal actions.

31. The 2006 Action Memo was incorporated by reference in the records of decision that were issued by Navy selecting the remedial activities to be undertaken to address contamination at the Site on a parcel-by-parcel basis.

32. The Navy hired Tetra Tech as its environmental contractor to develop work plans and to undertake the on-site investigation and cleanup as selected pursuant to the CERCLA process set forth in the NPL.

33. From 2003 through 2014, Tetra Tech entered into a series of contracts with the Navy to provide radiological remediation services at Hunters Point. These contracts required Tetra Tech, among other things, to investigate the location and extent of radiological contamination, and to properly address contaminated soils and structures through off-site disposal. Soils that were not identified as containing radionuclides of concern ("ROCs") exceeding release criteria did not require off-site disposal and could be used as fill and deposited on the Site.

34. During the process of site investigation, Tetra Tech engaged in the process of surveying and sampling, described more fully below, some of which would appear to minimize the amount of hazardous substances found, rather than to accurately characterize and address the radionuclides on the Site. Tetra Tech employees mislabeled or misidentified the location from which samples were taken, misreported results and ran scanners in a manner that would result in inaccurate results.

**C. Contracts Awarded to Tetra Tech for Radiological Remediation at Hunters Point**

35. In order to conduct the necessary radiological investigation and remediation at Hunters Point, the Navy solicited proposals from contractors pursuant to several Environmental Multiple Award Contracts for Environmental Remediation Services for Radiological Contaminants. As discussed below, the Navy awarded several contracts (called "task orders") to Tetra Tech for the radiological investigation and remediation of radiologically impacted sites throughout Hunters Point.

36. The objective of the task orders was to achieve "free release" of the radiologically impacted areas at Hunters Point so that the Navy could transfer the property to the City and County of San Francisco for redevelopment. The HRA defines "free release" as a recommendation made after investigations and surveys indicate all applicable release criteria have been met and the Site is ready for review by Navy and regulatory agencies for future non-radiological use. The release criteria for each Radionuclide of Concern for surfaces, soil, and water, is set forth in Table 1 to the 2006 Action Memo and incorporated by reference into each of the relevant task orders.

37. The task orders required the radiological investigation and remediation to be accomplished through testing and analysis of soil samples, and the scanning of building surfaces with radiological detection instruments. Soil samples and radiological readings of building surfaces were conducted within designated "Survey Units," which are measured areas throughout Hunters Point. Task orders awarded to Tetra Tech included both cost plus award fee contracts and firm fixed price contracts.

38. Tetra Tech was required by each task order to prepare Task-Specific Plans ("TSPs") and/or Execution Plans as well as other work plan documents. TSPs and Execution Plans detail the specific work plan for conducting soil samples and radiological surveys of building surfaces, as well as the standards applicable to the work. Each TSP and Execution Plan was prepared by Tetra Tech, and approved by the Navy, with concurrence by the EPA, DTSC and CDPH.

(1) **Cost Plus Award Fee Contracts**

39. The cost plus award fee contracts awarded to Tetra Tech obligated the Navy to pay Tetra Tech its allowable costs for providing the services described in the scope of work, plus a discretionary award fee, up to a maximum amount. Cost plus award fee contracts allow the payment of an award fee, based on a judgmental evaluation by the government, sufficient to provide motivation for excellence in

contract performance. *See* Federal Acquisition Regulation ("FAR") § 16.305. A contractor may earn an award fee if its overall cost, schedule, and technical performance is satisfactory. FAR § 16.401. For each of the cost plus award fee contracts identified below, Tetra Tech submitted progress reports and vouchers for its costs and fees. A government official certified the vouchers for payment in reliance on Tetra Tech's representations.

40. On March 23, 2003, the Navy awarded contract number N68711-98-D-5713, task order 0072 ("Task Order 5713-0072"), to Foster Wheeler Environmental Corporation, a predecessor company of Tetra Tech EC, Inc. The Navy's purpose in awarding Task Order 5713-0072 was to acquire radiological sampling and remediation services for Hunters Point. Services required under Task Order 5713-0072 included radiological surveys and remedial activities of buildings, former building sites, sewer and drain systems, fill, and surrounding areas in Parcels C, D, and E of Hunters Point. Task Order 5713-0072 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its allowable costs for providing the required services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $31,397,209. After 52 contract modifications, the total contract value awarded was $83,721,008.

41. On February 13, 2004, the Navy awarded contract number N68711-98-D-5713, task order 0084 ("Task Order 5713-0084"), to Tetra Tech FW Inc., a predecessor company of Tetra Tech EC, Inc. The objective of Task Order 5713-0084 was to excavate and dispose of anthropogenic polychlorinated biphenyl ("PCB") soil contamination from a PCB Excavation Site in Parcel E of Hunters Point. Because low-level radiation was expected to be present in the soil, radiation screening of the soil was also required. Task Order 5713-0084 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its allowable costs for providing the required services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $1,368,238. After 27 contract modifications, the total contract value awarded was $10,248,848.

42. On March 28, 2006, the Navy awarded contract number N62473-06-D-2201, task order 006 ("Task Order 2201-006") to Tetra Tech EC, Inc. The scope of work in Task Order 2201-006 required Tetra Tech to perform radiological investigation and remediation to address radiologically impacted sites in Parcel B and one building in Parcel D. The primary objective of Task Order 2201-006 was for Tetra Tech EC, Inc. to complete all radiological work for each radiologically impacted site in Parcel B

that was identified in the HRA, and to provide general base-wide radiological support services. Task Order 2201-006 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $17,485,300. Task Order 2201-006 included an option to increase the costs by $2,351,058 and the fee by $213,728. After 13 contract modifications, the total contract value awarded was $32,742,848.

43. On December 18, 2006, the Navy awarded contract number N44255-01-D-2000, task order 0070 ("Task Order 2000-0070"), to Tetra Tech EC, Inc. The primary objective of Task Order 2000-0070 was for Tetra Tech EC, Inc. to complete all radiological work for each radiologically impacted site in Parcel D that was identified in the HRA, and some unfinished work in Parcel B. The task order required Tetra Tech to perform surveys and remediation of buildings, a pier, and sanitary sewer and storm drain sites. Task Order 2000-0070 was a cost plus award fee task order. The task order obligated the Navy to pay Tetra Tech its allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $14,990,147. After eight contract modifications, the total contract value awarded was $22,523,715.

44. On April 20, 2009, the Navy awarded contract number N62473-07-D-3211, task order 0018 ("Task Order 3211-0018"), to Tetra Tech EC, Inc. The objective of Task Order 3211-0018 was for Tetra Tech to provide base-wide support to contractors performing chemical and radiological removal and remediation at Hunters Point. Tetra Tech was required to maintain on-site laboratory services to test survey samples for Radionuclides of Concern, and to operate a Radiological Screening Yard to support radiological removal actions and investigations being performed under different task orders. Task Order 3211-0018 was a cost plus award fee contract that obligated the Navy to pay Tetra Tech its allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $13,882,869. After 12 contract modifications, the total contract value awarded was $19,126,849.

45. On June 3, 2009, the Navy awarded contract number N62473-07-D-3211, task order 0019 ("Task Order 3211-0019"), to Tetra Tech EC, Inc. The primary objective of Task Order 3211-0019 was for Tetra Tech to complete specified radiological remediation and surveys at remaining Parcel B sanitary sewer and storm drain sites. Task Order 3211-0019 was a cost plus award fee contract that obligated the

Navy to pay Tetra Tech its allowable costs for providing the services, plus a discretionary award fee, not to exceed the maximum cost plus fee of $884,716. After five contract modifications, the total contract value awarded was $876,764.

**(2) Fixed Price Contract Awards**

46. The firm fixed price contracts awarded to Tetra Tech obligated the Navy to pay a maximum fixed amount for the services required under the contracts, regardless of Tetra Tech's costs. Firm fixed price contracts place upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. *See* FAR § 16.202-1. Firm fixed price contracts provide maximum incentive for the contractor to control costs and perform effectively, and impose a minimum administrative burden on the contracting parties. *Id*. For each of the firm fixed price contracts awarded to Tetra Tech identified below, Tetra Tech submitted monthly progress reports and invoices based on the percentage of work completed. Tetra Tech certified the invoices for payment, and government officials authorized payment to Tetra Tech in reliance on Tetra Tech's representations.

47. On September 4, 2008, the Navy awarded contract number N62473-08-D-8823, task order 002 ("Task Order 8823-002"), to Tetra Tech EC, Inc. The primary objective of Task Order 8823-002 was to remove and remediate sewer and storm drain lines along Fisher and Spear Avenues. Task Order 8823-002 required Tetra Tech to remove, survey, remediate, clear, and dispose of appropriately all sewer and storm drain systems, including the peripheral soil, in these two areas in order to attain free release. Task Order 8823-002 was a firm fixed price task order that obligated the Navy to pay Tetra Tech a maximum fixed amount of $6,343,703 for providing the services required under the contract, regardless of Tetra Tech's costs. After six contract modifications, the total contract value awarded was $7,033,848.

48. On September 21, 2009, the Navy awarded contract number N62473-08-D-8823, task order 003 ("Task Order 8823-003"), to Tetra Tech EC, Inc. Task Order 8823-003 addressed the recommendations in the HRA for the radiologically impacted sites in Parcel E, specifically focusing on sanitary sewer and storm drain lines along Crisp Road, and radiologically impacted buildings and sites in the central portion of Parcel E. The primary objective of the solicitation was to achieve unrestricted free release of the sewer and storm line Survey Units along Crisp Road and the central areas of Parcel E.

Additional work required by Task Order 8823-003 included surveys, remediation, and reporting for certain radiological buildings and sites in Parcel E. Task Order 8823-003 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $13,070,672 for providing the services required under the contract, regardless of Tetra Tech's costs. After five contract modifications, the total contract value awarded was $13,019,641.

49. On June 23, 2010, the Navy awarded contract number N62473-10-D-0809, task order 002 ("Task Order 0809-002"), to Defendant Tetra Tech EC, Inc. The focus of Task Order 0809-002 was Parcel C. The primary objective of the scope of work in Task Order 0809-002 was to achieve free release of Buildings 203, 214, 241, 271, and 272, and unrestricted free release of the sewer and storm drain Survey Units in Parcel C. Task Order 0809-002 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $11,494,845 for providing the services required under the contract, regardless of Tetra Tech's costs. After nine contract modifications, the total contract value awarded was $12,082,759.

50. On September 9, 2010, the Navy awarded contract number N62473-10-D-0809, task order 0004 ("Task Order 0809-0004"), to Defendant Tetra Tech EC, Inc. Task Order 0809-0004 obligated Tetra Tech to provide base-wide radiological support to enable contractors to complete radiological removal and remediation work at Hunters Point, including the operation of radiological screening yards that accepted and processed radiologically impacted soil from the removal of storm and sanitary sewers, and the performance of routine surveys of radiologically impacted buildings and sites. Task Order 0809-0004 was a firm fixed price contract. The contract obligated the Navy to pay Tetra Tech a maximum fixed amount of $14,040,521 for the services required under the contract, regardless of Tetra Tech's costs. After 10 contract modifications, the total contract value awarded was $24,843,771.

51. On September 22, 2010, the Navy awarded contract number N62473-10-D-0809, task order 007 ("Task Order 0809-007"), to Tetra Tech EC, Inc. The solicitation for Task Order 0809-007 was for radiological remediation and support for the 500 series area of Parcel E. The objective was to achieve free release of sewer and storm drain Survey Units, buildings, building sites, and the 500 series site of Parcel E. Task Order 0809-007 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $9,984,979 for providing the services required under the contract,

regardless of Tetra Tech's costs. After 11 contract modifications, the total contract value awarded was $11,408,410.

52. On July 10, 2012, the Navy awarded contract number N62473-10-D-0809, task order 0012 ("Task Order 0809-0012"), to Tetra Tech EC, Inc. Task Order 0809-0012 was in support of Phase II of Parcel C remediation, focusing on sanitary sewer and storm drain lines and radiologically impacted ship berths and sites. The objective of the solicitation was to achieve unrestricted free release of the sewer and storm drain Survey Units and ship berths in Parcel C. For the ship berths, Tetra Tech was required to perform characterization surveys, remediation, remedial action surveys, and final status surveys, and submit a Final Status Survey Report. For the sanitary and sewer drain systems, Tetra Tech was responsible for removing the sewer and storm drain lines and the associated impacted soil, surveying the trench and remediating it as necessary, performing a final status survey, and submitting a Final Status Survey Report to the Navy. Task Order 0809-0012 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $9,846,298 for providing the services required under the contract, regardless of Tetra Tech's costs. After five contract modifications, the total contract value awarded was $10,487,802.

53. On September 19, 2012, the Navy awarded contract number N62473-12-D-2006, task order 0004 ("Task Order 2006-0004"), to Tetra Tech EC, Inc. Task Order 2006-0004 required Tetra Tech to perform and report on surveys to analyze the radiological contamination in Buildings 253 and 211 in Parcel C and to identify and bound the areas of contamination. Task Order 2006-0004 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $5,892,247 for the services required under the contract, regardless of Tetra Tech's costs. After two contract modifications, the total contract value awarded was $7,255,881.

54. On August 13, 2013, the Navy awarded contract number N62473-10-D-0809, task order 0015 ("Task Order 0809-0015"), to Tetra Tech EC, Inc. Task Order 0809-0015 addressed recommendations in the HRA for radiologically impacted sanitary sewer and storm drain lines in Parcel E. Tetra Tech was responsible for the excavation of the sanitary sewer and storm drain lines, as well as the sampling, analysis, and clearance of radiologically impacted soils. The primary objective of Task Order 0809-0015 was to complete the removal action and deliver a Final Status Survey Report

containing adequate information and data to achieve unrestricted free release. Task Order 0809-0015 was a firm fixed price contract that obligated the Navy to pay Tetra Tech a maximum fixed amount of $4,894,307 for the services required under the contract, regardless of Tetra Tech's costs. After two contract modifications, the total contract value awarded was $5,061,910.

55. On September 23, 2014, the Navy awarded contract number N62473-10-D-0809, task order 0016 ("Task Order 0809-0016"), to Tetra Tech EC, Inc. Task Order 0809-0016 was in support of Phase III of Radiological Remediation and Support of Parcel C. The objective of Task Order 0809-0016 was to achieve unrestricted free release of the remaining sewer and storm drain Survey Units in Parcel C, and unrestricted free release of Buildings 205 and 224. Task Order 0809-0016 was a firm fixed price contract that, as modified, obligated the Navy to pay Tetra Tech a maximum fixed amount of $669,812 for the services required under the contract, regardless of Tetra Tech's costs.

56. The contracts identified in paragraphs 39-55, including the TSPs, Execution Plans, and other planning documents mandated by the contracts identified in paragraphs 39-55 shall be referred to collectively as the "Relevant Contracts."

### D. Governing Contract Terms, Regulations, and Procedures to Ensure Proper Radiological Investigation of Soil and Buildings

57. Each of the Relevant Contracts required Tetra Tech to conduct radiological investigations of soil and buildings in accordance with the Multi-Agency Radiation Survey and Site Investigation Manual ("MARSSIM") guidance and other contract requirements. MARSSIM is a consensus document published by the EPA, the U.S. Department of Defense, the U.S. Department of Energy, and the U.S. Nuclear Regulatory Commission that provides detailed guidance for the investigation and remediation of radiologically impacted sites.

58. For the radiological investigation and remediation of soil at Hunters Point, the Relevant Contracts and MARSSIM required Tetra Tech to take the following steps, as described in detail below, for each Survey Unit: (1) determine the boundaries of the Survey Unit; (2) collect soil samples for laboratory analysis in order to characterize the Survey Unit; (3) if laboratory results demonstrate that the soil is above release criteria, remediate Survey Unit by removing and disposing of soil; (4) collect soil samples for laboratory analysis from locations that tested above release criteria to ensure that

remediation was effective; (5) further remediate if necessary; and (6) collect final status survey soil samples for laboratory analysis. The Relevant Contracts require Tetra Tech to "perform remediation and additional excavation until remediation goals have been met and or appropriate risk levels have been reached."

59. The Relevant Contracts required Tetra Tech to provide radiological investigation of buildings at Hunters Point by conducting alpha, beta, and gamma radiation scans of building surfaces using radiation detection instruments. As described in detail below, the Relevant Contracts and MARSSIM required Tetra Tech to take the following steps: (1) scan and remove material, equipment, and building debris; (2) determine the Class, and therefore size, of Survey Units (Class 1 Survey Units, defined as having reasonable potential for contamination above release criteria, are divided into areas up to 100 square meters surface area; Class 2 Survey Units, defined as having reasonable potential for contamination but not expected to exceed release criteria, are divided into areas less than 1,000 square meters surface area); (3) conduct radiation scans by moving detectors across surfaces at required speeds; (4) download data from detection instruments; (5) compare survey results for naturally occurring background radiation; (6) evaluate data to determine whether the Survey Unit exceeds release criteria; (7) remediate, remove and dispose of material, if necessary; and (8) repeat the above steps until release criteria are met. The Relevant Contracts often stated that the end result of such work should be a Final Status Survey Report, which summarizes and attests to the results of Tetra Tech's work.

**E. Tetra Tech's Soil Remediation Process**

60. To remove suspected sources of contamination and to facilitate the soil analyses required under the Relevant Contracts, Tetra Tech excavated storm drains and sanitary sewers across Hunters Point. The excavation created trenches from which Tetra Tech would analyze soil for contamination. Tetra Tech would analyze both soil remaining at the bottom and on the sides of the trenches and would also analyze soil removed from the trenches while excavating the drains and sewers. Soil removed from the trenches was spread on uniform "survey pads," each encompassing up to 1,000 square meters in surface area at the Radiological Screen Yard ("RSY"). As required by some TSPs, Tetra Tech also analyzed soil around certain buildings, including Building 500, which is an existing structure. Soil

samples were also collected from former building footprints, including from the area encompassing Building 157, which was demolished.

61. The number of samples and their spacing required for a given Survey Unit was determined using statistical tests in accordance with MARSSIM guidance. Appropriate sample spacing distance was used to develop a sampling grid pattern within each Survey Unit based on a randomly generated starting point. These statistical tests and sampling procedures are outlined in the Base-Wide Radiological Work Plan, Hunters Point Shipyard (October 2007) and the Final Project Work Plan, Base-Wide Storm Drain and Sanitary Sewer Removal, Hunters Point Shipyard (July 2010).

62. Regardless of location, soil was first measured for gamma radiation, which shows, among other things, background radionuclides that occur naturally in the environment and have not originated from human activity. Trenches, survey pads, and building soil were then divided into "Survey Units," each of which defined a discrete area from which Tetra Tech would collect data to determine if the soil from that area contained Radionuclides of Concern exceeding release criteria.

63. Tetra Tech used "Visual Sample Plan" software to systematically select soil sample locations, based on a random start point within each Survey Unit, at about 18 locations – each called a "Systematic Sample." These methods are also described in the Base-Wide Radiological Work Plan, Hunters Point Shipyard (October 2007) and the Final Project Work Plan, Base-Wide Storm Drain and Sanitary Sewer Removal, Hunters Point Shipyard (July 2010). Tetra Tech would then collect these samples, bag them for delivery along with Chain-of-Custody Records, and submit them for testing. If laboratory testing showed that none of the samples contained Radionuclides of Concern exceeding release criteria, then Tetra Tech would designate the set of 18 Systematic Samples as "Final Systematic Samples," and resolve the remediation process for the Survey Unit by backfilling a trench or disposing of removed soil.

64. Among other responsibilities, Tetra Tech selected the locations to be excavated, transported samples from these locations to be analyzed, handled the samples, performed and reported on the analyses, and decided based on scanning results whether to place soils on site or to haul them away for off-site disposal.

65. Tetra Tech selected the locations for backfilling or disposing of removed soil without guidance from the Navy.

66. If one or more of the 18 Systematic Samples in a Survey Unit contained radionuclides in an amount exceeding the release criteria, then Tetra Tech would collect additional samples around each exceedance to identify the perimeter of soil exceeding release criteria. After sampling enough soil to determine the extent of contamination, Tetra Tech was required to excavate and properly dispose of that soil. To confirm that it removed all contaminated soil from the Survey Unit, Tetra Tech was required to again use the Visual Sample Plan to generate a new set of 18 Systematic Samples randomly located across the Survey Unit.

67. When no Systematic Samples within a subsequent set of Systematic Samples contained Radionuclides of Concern exceeding release criteria, Tetra Tech would designate this subsequent set of 18 samples as Final Systematic Samples and would conclude the remediation process for the Survey Unit by again placing soils in locations on Site that were selected by Tetra Tech. As an example, the following graphic (Figure B) depicts the Systematic Sampling process for a survey pad. The green area shows where soil contains Radionuclides of Concern exceeding release criteria. Because one of the first Systematic Samples (sample "16") identified an exceedance, Tetra Tech supposedly remediated the affected soil within the green area and collected a second set of Systematic Samples ("Systematic 2"):




***Figure B***. Sampling plan for Excavated Soil Unit 625 from Tetra Tech's Final Survey Unit 235 Project Report, Parcel E storm drain and sanitary sewer removal, Hunters Point Naval Shipyard (March 2013).

68. In addition to the RSY pads screening system described above, another technique used by Tetra Tech to identify contaminated soils was to use a conveyor belt at the screening yard on Site.

69. Tetra Tech removed soil from locations that contained hazardous substances and subjected them to analysis as it ran through a conveyer belt.

70. By running the conveyer belt at a high speed, Tetra Tech prevented the scanner from detecting levels of contamination.

71. Even though the scanner could not, at times, identify the presence of contamination, upon information and belief, Tetra Tech proceeded as if the scanner had reliably identified some soil as clean.

72. By moving soils from one part of the Site to another without properly testing those soils, Tetra Tech deposited radionuclides at the Site, upon information and belief.

73. Tetra Tech's placement of contaminated samples into open trenches, its unreliable sampling and analyses, and its use of unreliably tested soils as fill at the Site resulted in radionuclides coming to be located at various locations at the Site and required the Navy to undertake a second investigation and cleanup at the Site, (*i.e.*, the Rework).

**F. Tetra Tech's Building Scan Process**

74. To identify and remediate contamination on existing buildings across Hunters Point, the Relevant Contracts, including, but not limited to, Task Order 5713-0072, also required Tetra Tech to survey building surfaces. Tetra Tech conducted radiological building surveys by using radiation detection instruments to scan surfaces in the buildings. The radiation detection instruments were either handheld or mounted on a cart. Tetra Tech surveyed building surfaces by conducting both scan and static measurements. Scan measurements involved steadily moving instruments above a surface while collecting radiation data. Static measurements required holding an instrument stationary above the surface while collecting radiation data. Both measurements would identify the magnitude of radiation – expressed in counts per minute ("CPM") – emitted by a surface area. Similar to the soil sampling process, buildings were divided into Survey Units for purposes of collecting data and remediating when necessary. And like the soil remediation process, Tetra Tech recorded the data after measuring building surfaces.

75. The data collected by the radiation detection instruments were downloaded by Tetra Tech personnel into two databases, each showing scan and static measurements as different types of radiation: gamma and alpha/beta radiation. Then, the data was imported into building report spreadsheets that were delivered to the Navy. The Navy relied on the results of Tetra Tech's building surveys to determine whether further remediation was necessary.

76. The building gamma scan and static database contains more than 400,000 rows of data. The building alpha/beta scan and static database contains more than 1,000,000 rows of data. In both

databases each row generally records (1) the reading number; (2) the technician; (3) the date/time of the reading; (4) the Survey Unit from which the reading was taken; (5) the associated building; and (6) the CPM value. For example, the following graphics (Figures C and D) depict rows of data represented in Tetra Tech's databases or exported into Tetra Tech's building reports to the Navy:

| ID | DataType | Bldg | SurveyUnit | Location | RdgNum | DateTime | GammaCPM |
|---|---|---|---|---|---|---|---|
| 45468 | GSC | 401 | 8 | W | 1 | 7/12/08 2:20 PM | 4205 |
| 45469 | GSC | 401 | 8 | W | 2 | 7/12/08 2:20 PM | 4619.766113 |
| 45470 | GSC | 401 | 8 | W | 3 | 7/12/08 2:20 PM | 4781.953125 |
| 45471 | GSC | 401 | 8 | W | 4 | 7/12/08 2:20 PM | 4508.905762 |
| 45472 | GSC | 401 | 8 | W | 5 | 7/12/08 2:20 PM | 4927.5 |
| 45473 | GSC | 401 | 8 | W | 6 | 7/12/08 2:21 PM | 4376.953125 |
| 45474 | GSC | 401 | 8 | W | 7 | 7/12/08 2:21 PM | 4671.094238 |
| 45475 | GSC | 401 | 8 | W | 8 | 7/12/08 2:21 PM | 4415.625 |
| 45476 | GSC | 401 | 8 | W | 9 | 7/12/08 2:21 PM | 4357.266113 |
| 45477 | GSC | 401 | 8 | W | 10 | 7/12/08 2:21 PM | 5321.954102 |

***Figure C***. Excerpt from Tetra Tech's building gamma scan and static database.

TETRA TECH EC, INC.
Hunters Point Shipyard
San Francisco, CA

## Alpha/Beta Scan Measurement Report

**Building:** 113 **Survey Unit:** 20 **Class:** 1 **Area:** 55.43 m²

**Radioisotopes of Concern (ROCs):** Cs137 Pu239 Sr90

| Rdg # | Date | Time | Gross Alpha CPM | Net Alpha CPM | Net Alpha DPM* | Gross Beta CPM | Net Beta CPM | Net Beta DPM* | Background ID** | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 298 | 2/27/2009 | 9:17:11 AM | 0 | -2 | -3 | 948 | 109 | 118 | 139-128F1A | |
| 299 | 2/27/2009 | 9:17:23 AM | 0 | -2 | -3 | 966 | 127 | 138 | 139-128F1A | |
| 300 | 2/27/2009 | 9:17:35 AM | 11 | 9 | 12 | 1073 | 234 | 255 | 139-128F1A | |
| 301 | 2/27/2009 | 9:17:47 AM | 2 | 0 | -1 | 1000 | 161 | 175 | 139-128F1A | |
| 302 | 2/27/2009 | 9:17:58 AM | 0 | -2 | -3 | 1017 | 178 | 194 | 139-128F1A | |
| 303 | 2/27/2009 | 9:18:10 AM | 13 | 11 | 15 | 930 | 91 | 99 | 139-128F1A | |
| 304 | 2/27/2009 | 9:18:22 AM | 3 | 1 | 1 | 908 | 69 | 75 | 139-128F1A | |
| 305 | 2/27/2009 | 9:18:34 AM | 0 | -2 | -3 | 933 | 94 | 102 | 139-128F1A | |
| 306 | 2/27/2009 | 9:18:45 AM | 4 | 2 | 2 | 942 | 103 | 112 | 139-128F1A | |
| 307 | 2/27/2009 | 9:18:57 AM | 10 | 8 | 11 | 982 | 143 | 155 | 139-128F1A | |
| 308 | 2/27/2009 | 9:19:09 AM | 6 | 4 | 5 | 828 | -11 | -12 | 139-128F1A | |
| 309 | 2/27/2009 | 9:19:21 AM | 7 | 5 | 6 | 928 | 89 | 97 | 139-128F1A | |
| 310 | 2/27/2009 | 9:19:32 AM | 1 | -1 | -2 | 971 | 132 | 143 | 139-128F1A | |
| 311 | 2/27/2009 | 9:19:44 AM | 0 | -2 | -3 | 1064 | 225 | 245 | 139-128F1A | |
| 312 | 2/27/2009 | 9:19:56 AM | 0 | -2 | -3 | 902 | 63 | 68 | 139-128F1A | |
| 313 | 2/27/2009 | 9:20:08 AM | 0 | -2 | -3 | 894 | 55 | 59 | 139-128F1A | |
| 314 | 2/27/2009 | 9:20:19 AM | 0 | -2 | -3 | 915 | 76 | 82 | 139-128F1A | |
| 315 | 2/27/2009 | 9:20:31 AM | 3 | 1 | 1 | 956 | 117 | 127 | 139-128F1A | |
| 316 | 2/27/2009 | 9:20:43 AM | 7 | 5 | 6 | 852 | 13 | 14 | 139-128F1A | |
| 317 | 2/27/2009 | 9:20:55 AM | 8 | 6 | 8 | 870 | 31 | 33 | 139-128F1A | |
| 318 | 2/27/2009 | 9:21:07 AM | 2 | 0 | -1 | 820 | -19 | -21 | 139-128F1A | |
| 319 | 2/27/2009 | 9:21:18 AM | 0 | -2 | -3 | 1057 | 218 | 237 | 139-128F1A | |
| 320 | 2/27/2009 | 9:21:30 AM | 4 | 2 | 2 | 931 | 92 | 100 | 139-128F1A | |
| 321 | 2/27/2009 | 9:21:42 AM | 11 | 9 | 12 | 821 | -18 | -20 | 139-128F1A | |
| 322 | 2/27/2009 | 9:21:54 AM | 2 | 0 | -1 | 960 | 121 | 131 | 139-128F1A | |
| 323 | 2/27/2009 | 9:22:05 AM | 0 | -2 | -3 | 893 | 54 | 58 | 139-128F1A | |
| 324 | 2/27/2009 | 9:22:17 AM | 0 | -2 | -3 | 802 | -37 | -41 | 139-128F1A | |
| 325 | 2/27/2009 | 9:22:29 AM | 0 | -2 | -3 | 954 | 115 | 125 | 139-128F1A | |
| 326 | 2/27/2009 | 9:22:41 AM | 4 | 2 | 2 | 865 | 26 | 28 | 139-128F1A | |
| 327 | 2/27/2009 | 9:22:52 AM | 1 | -1 | -2 | 917 | 78 | 85 | 139-128F1A | |
| 328 | 2/27/2009 | 9:23:04 AM | 12 | 10 | 13 | 943 | 104 | 113 | 139-128F1A | |
| 329 | 2/27/2009 | 9:23:16 AM | 3 | 1 | 1 | 910 | 71 | 77 | 139-128F1A | |
| 330 | 2/27/2009 | 9:23:28 AM | 0 | -2 | -3 | 953 | 114 | 124 | 139-128F1A | |

***Figure D***. Example of alpha/beta scan data from Building 113 submitted to the Navy by Tetra Tech in their report: Final status survey results, Building 113, Hunters Point Naval Shipyard (April 2010).

**G. Tetra Tech's Fraudulent Course of Conduct**[3]

77. At all times relevant to this Complaint, Tetra Tech contracted with New World Technology, Inc., or Radiological Survey & Remedial Services, Inc., to provide Radiological Control Technicians ("RCT") to work on the radiological investigation and remediation of Hunters Point. Tetra Tech managers, including Stephen Rolfe and Justin Hubbard, supervised crews of RCTs who were collecting soil samples and conducting building scans in Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and 3.

78. William Dougherty was the Project Manager for Tetra Tech between on or about March 1, 2006 and early 2014. Dougherty worked on-site at Hunters Point, and was responsible for managing all aspects of Tetra Tech's work. Dougherty had daily contact with, and gave direction to, Rolfe and Hubbard.

79. At all times relevant to the complaint, Dennis McWade was a Construction Manager for Tetra Tech at Hunters Point. McWade worked on-site at Hunters Point, and was responsible for managing the crews performing radiological surveys and remediation at Hunters Point for Tetra Tech. McWade had daily contact with, and gave direction to, Rolfe and Hubbard.

80. At all times relevant to the complaint, Rick Weingarz was employed by Tetra Tech as an Assistant Project Manager at Hunters Point. Weingarz worked on-site at Hunters Point, and was responsible for managing the crews performing radiological surveys and remediation at Hunters Point for Tetra Tech. Weingarz had daily contact with, and gave direction to, Rolfe and Hubbard.

81. Andrew Bolt, who has been Tetra Tech's President since on or about July 2014, served as Tetra Tech's Senior Vice President, Remediation and Program Manager, from 1994 until 2014. Bolt, who was Dougherty's boss, provided Dougherty with monthly financial reports regarding Tetra Tech's profits from its contracts to perform remediation work at Hunters Point.

---

[3] Although the United States does assert certain facts pertaining to Tetra Tech's operation of the conveyor belt at Hunters Point as they pertain to the United States' CERCLA claim, it has not intervened in allegations regarding Tetra Tech's operation of a portal monitor or conveyor belt at Hunters Point.

82. Rolfe, Hubbard, Dougherty, McWade, Weingarz and Bolt were each employed by Tetra Tech EC in a managerial capacity at all times relevant to this Complaint, and each of them was acting within the scope of employment at all times relevant to this Complaint.

83. Tetra Tech's fraud was initiated and directed by Tetra Tech's corporate managers, including, but not limited to, Dougherty, Weingarz, McWade, Rolfe, and Hubbard.

(1) **When Investigating Soil Contamination, Tetra Tech Caused Technicians to Replace Collected Soil Samples with Clean Soil From a Different Location Before Submitting the Samples to the Lab for Analysis**

84. In performing the Relevant Contracts, Tetra Tech was responsible for conducting soil surveys, in accordance with MARSSIM and the Relevant Contracts, in order to identify and define the boundaries of radiological contamination. As described above, soil surveys were used to determine whether further remediation was necessary in Survey Units across Hunters Point.

85. If laboratory analysis demonstrated a higher-than-allowable concentration of radionuclides of concern in samples collected at locations selected by Tetra Tech within a particular Survey Unit, Tetra Tech was required to remediate the survey unit. Tetra Tech was then required to re-sample the Survey Unit and repeat the process until all samples collected within a Survey Unit passed laboratory analysis.

86. As detailed below, Tetra Tech managers instructed RCTs to discard soil samples collected from certain Survey Units at Hunters Point, replace the discarded samples with "clean" soil (*i.e.*, below the release criteria for Radionuclides of Concern) from other locations, and submit the replaced samples to the lab for analysis. Through this process, Tetra Tech misrepresented the location from which soil samples were collected and, thus, misrepresented the character of soil in the Survey Units from which it purported to have collected the samples.

87. In the course of conducting soil surveys under the Relevant Contracts, Tetra Tech managers, including Stephen Rolfe and Justin Hubbard, ordered RCTs to collect soil in buckets from a location where they knew the soil was "clean." Rolfe and Hubbard instructed the RCTs to keep the buckets of "clean" soil in a CONEX box (a trailer-sized container used to transport and store supplies) on site. After RCTs collected soil samples in Ziploc bags, Rolfe and Hubbard ordered the RCTs to bring the bagged samples to the CONEX box, where they were instructed to empty the bags, and fill new bags

with the "clean" soil from the buckets. Tetra Tech personnel labeled the new bags with the Survey Unit and Sample Identification Numbers of the discarded samples, and submitted the switched soil samples to the onsite lab for analysis. Tetra Tech submitted these falsified soil samples to the lab accompanied by a Tetra Tech Chain-of-Custody Record falsely identifying the Survey Unit (and therefore the location from which the soil was collected) of each sample. Each Chain-of-Custody Record was signed by the RCT or Tetra Tech representative relinquishing the samples, as well as the lab employee receiving the samples.

88. On the cost plus award fee contracts, Tetra Tech benefited from the falsification of soil surveys by billing for work it failed to perform in accordance with the Relevant Contracts, and by receiving award fees to which it was not entitled. On firm fixed price contracts, Tetra Tech benefited from the falsification of soil surveys by avoiding its obligation to remediate contaminated areas, thus decreasing its overall costs. Tetra Tech management at Hunters Point, including Project Manager Dougherty, was praised in performance evaluations for performing task orders under cost.

89. Former workers involved in the testing and remediation of soil at Hunters Point have provided additional details of Tetra Tech's soil sampling fraud. By way of example, individuals working under Jane Taylor frequently took soil samples from outside of the survey area and labeled the sample as if it came from the survey area. From 2009 to 2012, Steven Rolfe directed RCT Anthony Smith to take fake soil samples. Soil in a sewer trench in front of an area of the 500 series of buildings, as well as the soil underlying the foundation of the old Hunters Point movie theater, was clean serpentine or "green" dirt, and that soil underneath two palm trees was clean sandy soil. Smith would fill up a five-gallon bucket with clean soil and bring it back to the CONEX box, and the true soil samples would be emptied and replaced with clean soil from the bucket. The true soil samples would be dumped in open sewer trenches. Smith and his team switched real samples with fake clean dirt between 800 and 1000 times.

90. On March 15, 2017, Tetra Tech manager Stephen Rolfe pleaded guilty to destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. In pleading guilty, Rolfe admitted that on approximately 20 occasions in 2012 he instructed the RCTs on his team to get "clean dirt" from areas known to be clean and taken from outside the marked

Survey Unit areas to use as substitute samples for the dirt from the Survey Unit, and that he did this so that the Survey Unit would pass the laboratory analysis and not require further remediation. He further admitted that the switching of soil samples was done inside the CONEX box on site at Hunters Point and in his presence. He also admitted that, on these occasions, he knew that the soil locations reported on the Chain-of-Custody Record forms were false. Rolfe admitted that the motivation for his conduct came from pressure applied from his Tetra Tech management at Hunters Point, including Dougherty, Weingarz and McWade. Rolfe admitted that Tetra Tech management at Hunters Point directed him to get his crew "the hell out" of a Survey Unit that was testing above the release criteria, told him that they were "not remediating the whole goddam site," and directed him on numerous occasions to "get clean dirt."

91. On May 18, 2017, Tetra Tech manager Justin Hubbard pleaded guilty to destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. In pleading guilty, Hubbard admitted that in 2012 he obtained "clean" dirt from an area north of Buildings 253 and 211 at Hunters Point and substituted it for dirt taken from at least four Survey Units in the North Pier area of Hunters Point (*i.e.*, Survey Units 1, 8, 10, and 11). He further admitted that he filled a five-gallon bucket with "clean" serpentinite soil from an area outside the relevant Survey Unit, and brought the bucket back to the CONEX box. Hubbard admitted that, once inside the CONEX box, he emptied the "legitimate" soil samples previously collected by RCTs from their sampling bags into an empty bucket, and substituted the clean serpentinite soil into each sampling bag. He also admitted that by switching the soil, he knew that the data on the Chain-of-Custody Record forms was false. Hubbard further admitted that he knew that the false data on the Chain-of-Custody Record forms was incorporated into maps and reports submitted to the Navy for the purpose of demonstrating that the area had been successfully remediated.

92. In engaging in the conduct described above, Rolfe and Hubbard acted within the scope of their employment with Tetra Tech, and for the purpose of benefitting Tetra Tech. Tetra Tech Management at Hunters Point, including but not limited to Dougherty, McWade, and Weingarz also acted within the scope of their employment with Tetra Tech, and for the purpose of benefitting Tetra

Tech, when they knowingly directed and encouraged, and were aware of, the falsification of soil samples. Tetra Tech management did not alert the Navy of the fraud.

**(2) Tetra Tech's soil sampling fraud was more widespread in time and place than previously known**

93. Initially, the EPA, DTSC, and CDPH had a technical team of experts in health physics, geology and statistics who reviewed information regarding Tetra Tech's work at Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and 3. As to Parcels B and G, the EPA provided the Navy with information about examples of potential falsification, data manipulation or data quality concerns on December 29, 2017. The EPA found additional inconsistencies between gamma scan and static data that indicated that soil samples had not been sourced as Tetra Tech represented, as well as other inconsistencies in the data, and ultimately concluded that "the data analyzed demonstrate a widespread pattern of practices that appear to show deliberate falsification, failure to perform the work in a manner required to ensure the Records of Decision (ROD) were met, or both."

94. Subsequent analyses provide additional evidence supporting EPA's initial conclusion that Tetra Tech's work exhibits a widespread pattern of deliberate falsification, including data showing that Tetra Tech falsified its supposed remediation work. Specifically, a close review of Tetra Tech's data calls into question the veracity of that data. When Tetra Tech identified soil with radionuclides exceeding the release criteria, Tetra Tech claimed that it remediated the soil exhibiting the exceedance. But Tetra Tech submitted Final Systematic Samples from completely different areas of Hunters Point. Because the Final Systematic Samples constitute the record of remediation, the Navy cannot confirm the soil was remediated without otherwise re-testing the Survey Unit – a resource- and time-intensive re-testing process that continues, as described below, to this day.

95. The United States hired Exponent – a scientific consulting firm – to study Tetra Tech's soil sampling data. Exponent's review identified statistical signatures of falsification between sets of Systematic Samples Tetra Tech certified as having been collected from the same Survey Units. The consultants identified the marks of fraud by examining data from 292 Survey Units where Tetra Tech collected several sets of Systematic Samples.

96. As described above, Tetra Tech collected subsequent sets of Systematic Samples if its previous set identified Radionuclides of Concern exceeding the release criteria. After identifying and purportedly remediating the soil exhibiting an exceedance, Tetra Tech was required to collect an additional round of Systematic Samples to confirm that the Survey Unit was properly remediated. Because the subsequent set(s) of Systematic Samples should have been collected from the same Survey Unit – itself a discrete area of a trench, survey pad, or building area – as the previous set(s), it would be expected that all sets of samples would exhibit the same population of background radionuclides (Potassium-40 and Actinium-228), which consistently reflect the radiological characteristics of soil within a Survey Unit.

97. When comparing sets of Systematic Samples from the same Survey Unit, Exponent found dozens of Survey Units with samples showing statistically significant (unexplainable by random chance) differences in background radionuclides. These Survey Units, along with those not exhibiting such differences, are identified in Exhibit 1, which summarizes the Survey Units with samples showing significant differences identified by one or more proven statistical tests.

98. In sum, Exponent found that 114 Survey Units – about 39% of the 292 analyzed by Exponent – showed statistically significant anomalies between the level of background radionuclides emitted by different sets of Systematic Samples from the same Survey Unit. In particular, data from 33 trench, 28 survey pad, and 53 building soil Survey Units exhibit these differences, which, as described in Exhibit 1, encompass Tetra Tech's work in Parcels B, C, D-2, E, G, and Utility Corridors 1, 2, and 3. Exponent concluded, based on these statistically significant differences and other analyses (which included an evaluation of available laboratory results, as described below), that the vast majority of soil samples from those Survey Units were sourced from different locations than those represented by Tetra Tech.

99. The full suite of radionuclide data contained within the soil analytical database was assessed by Exponent at the end of June 2023 to identify inconsistencies in results from the analyses described below that would likely not be caused by typical analytical (*e.g.*, instrumentation) variability. Tools used for this evaluation included (1) principal component analyses ("PCA") and cluster analyses, (2) trend analyses to assess changes over time and differences in the degree of sample variability, and (3) relative responses of paired radionuclides using scatterplots to highlight inconsistent results. The PCA,

cluster, and trend analyses, using additional radionuclide data to supplement the Potassium-40 and Actinium-228 results, were reviewed together with the statistical analyses described above and resulted in further identification of marks of fraud due to unusual data clusters and inconsistent temporal trends in sample variability. These data clusters are very tight, representing samples with common radionuclide activities indicative of common sources of soil (*e.g.*, substituted soil from sources other than the Survey Units), and the temporal trends in sample variability indicate distinct differences in radionuclide activities over time, indicative of fraud, as highlighted by inconsistent results between sampling events within a given soil Survey Unit that would be unlikely if the soil samples originated from the same area.

100. PCA is a multivariate statistical technique used to explore relationships between chemical patterns in environmental samples with multiple radionuclide constituents (*e.g.*, Potassium-40, Actinium-228, Lead-212, Thallium-208, etc.). PCA analyses included the available radionuclide constituents to explore similarities and differences between the radionuclide result profiles, or fingerprints, among samples. Similar to PCA, agglomerative hierarchical clustering ("AHC") is a multivariate statistical technique used to explore patterns in environmental samples with multiple constituents. AHC separates samples into groups based on their similarity to each other and differences to other samples. Together, the results of the PCA and AHC analyses were used to identify samples with radionuclide profiles that were more similar to each other than would be expected from the collection of soils in the same soil Survey Unit. The high degree of similarity is indicative of fraudulently replicated sample analyses that Tetra represented as coming from different locations.

101. Trend analyses were used to identify questionable result patterns based on the level of radionuclide activity (concentration) and its degree of variability between sampling dates. The results from individual trench soil Survey Units were evaluated to assess how the results differed over time within a single soil Survey Unit trench. Inconsistencies in sample variability with time provides another line of evidence for identifying time periods when a single replicate sample was likely analyzed in lieu of trench soil samples, further indicating fraud. The graph below is one example showing inconsistent results with time in Trench Unit B070721. On dates 4/4/2011 and 7/10/2012, the variability in the activity in Potassium-40 is reduced as compared to other sampling dates with a similar number of

samples analyzed. This finding shows that the soil analyzed on 4/4/2011 and 7/10/2012 was likely from a source other than a soil Survey Unit, which is indicative of fraud.




***Figure E***. Trend analysis of Trench Unit B070721.

102. Relative responses between radionuclide activities were also evaluated using scatterplots to aid with identifying inconsistent results, including results with greater similarity than would be expected from random sampling within a soil Survey Unit. The same soil Survey Unit trench samples presented in the graph above are shown below in a scatterplot of Actinium-228 compared to Potassium-40. The samples shaded in grey are associated with sample collection dates 4/4/2011 and 7/10/2012, and are inexplicably grouped much more tightly than similar samples collected at other times. The clustering of the grey shaded symbols as compared to the blue symbols provides an added indication of how similar these samples are even when a second constituent (Actimium-228) is added to the analysis.

The observed similarity shows that a single replicate sample was likely analyzed on these dates in lieu of trench soil samples, which is further indicative of fraud.




***Figure F***. Scatterplot of Trench Unit B070721.

103. Tetra Tech falsified or caused the falsification of soil surveys, as described above, and falsified or caused the falsification of building surveys, as described below, in connection with its work in Parcels B, C, D-2, E and G, and Utility Corridors 1, 2, and 3, which encompasses work represented on at least 513 invoices. As a result, the reports Tetra Tech submitted to the Navy in connection with this work included falsified data. As the result of Tetra Tech's falsification of soil samples and building surveys, Tetra Tech's invoices and claims for payment to the Navy were false between at least June 2006 and January 2018, including, but not limited to, those claims reflected in Exhibits 2 and 3 hereto.

As a result, Tetra Tech's soil sampling fraud was more widespread in time and place than is established by the guilty pleas of Rolfe and Hubbard.

**(3) When Investigating Building Contamination, Tetra Tech Falsified Data Collected from Radiation Detection Instruments**

104. In performing the Relevant Contracts, Tetra Tech was responsible for conducting surveys of existing buildings, in accordance with MARSSIM guidance and other contract requirements, in order to characterize areas of radiological contamination. The TSP prepared by Tetra Tech for each building survey was signed by Tetra Tech managers, including Dougherty as Tetra Tech's Project Manager at Hunters Point. Building surveys were used to determine whether further remediation was necessary.

105. Exponent found copious signatures of fraud within the building survey data. As described above, Tetra Tech uploaded its building survey data into two databases showing different radiation measurements: the gamma database and the alpha/beta database. Exponent analyzed data reported in Tetra Tech's building scan and static databases, which contain many sequential replicated CPM values. The probability of those CPM values repeating by random chance approach zero.

106. In the gamma database, manipulated strings of data were discovered in the results of building scans conducted in 18 of 102 buildings reported in the gamma database. When broken down by Survey Unit, 32 of 1,113 Survey Units listed within the gamma database include manipulated data indicating falsification. In the alpha/beta database, duplicated or otherwise anomalous strings of data were discovered in the results of surveys conducted in 16 of 66 buildings. When broken down by Survey Unit, 24 of 859 Survey Units listed within the alpha/beta database include manipulated data. Exhibit 4 summarizes buildings and Survey Units involved in manipulation of scan and static data. As explained below, Tetra Tech's data show several types of manipulation indicating falsification.

107. **Tetra Tech Exactly Replicated CPM Values from Different Survey Units Reportedly Collected at the Exact Same Time** – In addition to replication of CPM values in Tetra Tech's databases, the exact time, in many cases to the second, was often also replicated (and reported to the Navy). For example, in building 351A, Exponent found that Tetra Tech reported identical gamma CPM values at two different Survey Units. As shown in the below graphic, not only are the CPM values identical, but the dates and times are also identical. Impossibly, Tetra Tech reports that the same

surveyor (initial "PV") supposedly collected the identical data at the same time at two different Survey Units across the building, as shown in Figure G below:

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | Location | DateTime | GammaCPM |
|---|---|---|---|---|---|---|---|---|
| 93489 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 8:31 AM | 3740 |
| 93490 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:32 AM | 3836 |
| 93491 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:33 AM | 4015 |
| 93492 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 8:36 AM | 4243 |
| 93493 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:37 AM | 4273 |
| 93494 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:38 AM | 3586 |
| 93495 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:39 AM | 4161.000977 |
| 93496 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 8:40 AM | 4266 |
| 93497 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:41 AM | 4399 |
| 93498 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:42 AM | 4182.000977 |
| 93499 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:43 AM | 3594 |
| 93500 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 8:45 AM | 4188 |
| 93501 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 8:46 AM | 4351.000977 |
| 93502 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 8:47 AM | 4204 |
| 93503 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 9:24 AM | 3861 |
| 93504 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 9:25 AM | 3612 |
| 93505 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 9:26 AM | 3739 |
| 93506 | 369F1A | PV | GST | 351A | 20 | F | 9/11/08 9:27 AM | 4114 |
| 93507 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 9:28 AM | 3932.000977 |
| 93508 | 369F1A | PV | GST | 351A | 20 | W | 9/11/08 9:29 AM | 3478 |

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | Location | DateTime | GammaCPM |
|---|---|---|---|---|---|---|---|---|
| 93552 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 8:31 AM | 3740 |
| 93553 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 8:32 AM | 3836 |
| 93554 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 8:33 AM | 4015 |
| 93555 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:36 AM | 4243 |
| 93556 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:37 AM | 4273 |
| 93557 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 8:38 AM | 3586 |
| 93558 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:39 AM | 4161.000977 |
| 93559 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:40 AM | 4266 |
| 93560 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:41 AM | 4399 |
| 93561 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 8:42 AM | 4182.000977 |
| 93562 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 8:43 AM | 3594 |
| 93563 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:45 AM | 4188 |
| 93564 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:46 AM | 4351.000977 |
| 93565 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 8:47 AM | 4204 |
| 93566 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 9:24 AM | 3861 |
| 93567 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 9:25 AM | 3612 |
| 93568 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 9:26 AM | 3739 |
| 93569 | 400W2F | PV | GST | 351A | 24 | F | 9/11/08 9:27 AM | 4114 |
| 93570 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 9:28 AM | 3932.000977 |
| 93571 | 400W2F | PV | GST | 351A | 24 | W | 9/11/08 9:29 AM | 3478 |

Legend

Exact Replicates

***Figure G***. Example of replicated CPM data in Tetra Tech's building gamma scan and static database that indicates the same surveyor (PV) was collecting the same data in two survey units simultaneously.

108. **Tetra Tech Exactly Replicated CPM Values Across Different Dates –** Exponent discovered that Tetra Tech reported identical CPM values and related data for measurements from different Survey Units and dates. For example, Tetra Tech's alpha/beta database shows identical CPM values, surveyor initials, survey materials, time readings, and reading numbers for measurements taken at building 253. Considering the precise measurements, including the time readings, the below graphic (Figure H) illustrates an example of infeasible data collection where Tetra Tech claimed that the same surveyor collected identical data from two different areas of the Site on different dates at the same times:

| ID | Survey Material | Surveyor Initials | DataType | Bldg | SurveyUnit | RdgNum | Date | Time | AlphaCPM | BetaCPM |
|---|---|---|---|---|---|---|---|---|---|---|
| 563512 | 400F1A | GE | ABST | 253 | 522 | 1 | 1/31/14 | 1899-12-31T11:37:53Z | 1 | 236 |
| 563513 | 400F1A | GE | ABST | 253 | 522 | 2 | 1/31/14 | 1899-12-31T11:41:55Z | 1.5 | 245 |
| 563514 | 400F1A | GE | ABST | 253 | 522 | 3 | 1/31/14 | 1899-12-31T11:44:08Z | 1 | 249 |
| 563515 | 400F1A | GE | ABST | 253 | 522 | 4 | 1/31/14 | 1899-12-31T11:46:24Z | 1 | 265 |
| 563516 | 400F1A | GE | ABST | 253 | 522 | 5 | 1/31/14 | 1899-12-31T11:48:37Z | 1 | 256 |
| 563517 | 400F1A | GE | ABST | 253 | 522 | 6 | 1/31/14 | 1899-12-31T11:50:52Z | 1 | 265.5 |
| 563518 | 400F1A | GE | ABST | 253 | 522 | 7 | 1/31/14 | 1899-12-31T11:53:04Z | 0.5 | 253.5 |
| 563519 | 400F1A | GE | ABST | 253 | 522 | 8 | 1/31/14 | 1899-12-31T13:06:01Z | 1 | 238.5 |
| 563520 | 400F1A | GE | ABST | 253 | 522 | 9 | 1/31/14 | 1899-12-31T13:09:38Z | 0.5 | 262.5 |
| 563521 | 400F1A | GE | ABST | 253 | 522 | 10 | 1/31/14 | 1899-12-31T13:12:12Z | 0 | 234 |
| 563522 | 400F1A | GE | ABST | 253 | 522 | 11 | 1/31/14 | 1899-12-31T13:14:36Z | 0.5 | 229 |
| 563523 | 400F1A | GE | ABST | 253 | 522 | 12 | 1/31/14 | 1899-12-31T13:18:24Z | 2 | 250 |
| 563524 | 400F1A | GE | ABST | 253 | 522 | 13 | 1/31/14 | 1899-12-31T13:20:37Z | 2 | 227 |
| 563525 | 400F1A | GE | ABST | 253 | 522 | 14 | 1/31/14 | 1899-12-31T13:22:58Z | 2 | 240 |
| 563526 | 400F1A | GE | ABST | 253 | 522 | 15 | 1/31/14 | 1899-12-31T13:25:14Z | 1.5 | 221.5 |
| 563527 | 400F1A | GE | ABST | 253 | 522 | 16 | 1/31/14 | 1899-12-31T13:28:43Z | 0.5 | 230 |
| 563528 | 400F1A | GE | ABST | 253 | 522 | 17 | 1/31/14 | 1899-12-31T13:31:09Z | 1.5 | 234.5 |
| 563529 | 400F1A | GE | ABST | 253 | 522 | 18 | 1/31/14 | 1899-12-31T13:33:21Z | 4 | 231.5 |
| 563530 | 400F1A | GE | ABST | 253 | 522 | 19 | 1/31/14 | 1899-12-31T13:36:48Z | 1 | 245 |
| 563531 | 400F1A | GE | ABST | 253 | 522 | 20 | 1/31/14 | 1899-12-31T13:40:03Z | 0.5 | 243.5 |

| ID | Survey Material | Surveyor Initials | DataType | Bldg | Survey Unit | RdgNum | Date | Time | AlphaCPM | BetaCPM |
|---|---|---|---|---|---|---|---|---|---|---|
| 563539 | 400F1A | GE | ABST | 253 | 413 | 1 | 2/3/14 | 1899-12-31T11:37:53Z | 1 | 236 |
| 563540 | 400F1A | GE | ABST | 253 | 413 | 2 | 2/3/14 | 1899-12-31T11:41:55Z | 1.5 | 245 |
| 563541 | 400F1A | GE | ABST | 253 | 413 | 3 | 2/3/14 | 1899-12-31T11:44:08Z | 1 | 249 |
| 563542 | 400F1A | GE | ABST | 253 | 413 | 4 | 2/3/14 | 1899-12-31T11:46:24Z | 1 | 265 |
| 563543 | 400F1A | GE | ABST | 253 | 413 | 5 | 2/3/14 | 1899-12-31T11:48:37Z | 1 | 256 |
| 563544 | 400F1A | GE | ABST | 253 | 413 | 6 | 2/3/14 | 1899-12-31T11:50:52Z | 1 | 265.5 |
| 563545 | 400F1A | GE | ABST | 253 | 413 | 7 | 2/3/14 | 1899-12-31T11:53:04Z | 0.5 | 253.5 |
| 563546 | 400F1A | GE | ABST | 253 | 413 | 8 | 2/3/14 | 1899-12-31T13:06:01Z | 1 | 238.5 |
| 563547 | 400F1A | GE | ABST | 253 | 413 | 9 | 2/3/14 | 1899-12-31T13:09:38Z | 0.5 | 262.5 |
| 563548 | 400F1A | GE | ABST | 253 | 413 | 10 | 2/3/14 | 1899-12-31T13:12:12Z | 0 | 234 |
| 563549 | 400F1A | GE | ABST | 253 | 413 | 11 | 2/3/14 | 1899-12-31T13:14:36Z | 0.5 | 229 |
| 563550 | 400F1A | GE | ABST | 253 | 413 | 12 | 2/3/14 | 1899-12-31T13:18:24Z | 2 | 250 |
| 563551 | 400F1A | GE | ABST | 253 | 413 | 13 | 2/3/14 | 1899-12-31T13:20:37Z | 2 | 227 |
| 563552 | 400F1A | GE | ABST | 253 | 413 | 14 | 2/3/14 | 1899-12-31T13:22:58Z | 2 | 240 |
| 563553 | 400F1A | GE | ABST | 253 | 413 | 15 | 2/3/14 | 1899-12-31T13:25:14Z | 1.5 | 221.5 |
| 563554 | 400F1A | GE | ABST | 253 | 413 | 16 | 2/3/14 | 1899-12-31T13:28:43Z | 0.5 | 230 |
| 563555 | 400F1A | GE | ABST | 253 | 413 | 17 | 2/3/14 | 1899-12-31T13:31:09Z | 1.5 | 234.5 |
| 563556 | 400F1A | GE | ABST | 253 | 413 | 18 | 2/3/14 | 1899-12-31T13:33:21Z | 4 | 231.5 |
| 563557 | 400F1A | GE | ABST | 253 | 413 | 19 | 2/3/14 | 1899-12-31T13:36:48Z | 1 | 245 |
| 563558 | 400F1A | GE | ABST | 253 | 413 | 20 | 2/3/14 | 1899-12-31T13:40:03Z | 0.5 | 243.5 |

Legend

Exact Replicates

***Figure H.*** Example of replicated alpha and beta CPM data in Tetra Tech's building alpha/beta scan and static database.

109. **Tetra Tech Interspersed Non-Matching CPM Values Between Identical CPM Values -** In other instances, to obscure data manipulation, Tetra Tech slightly altered CPM values by changing a digit or by inserting or deleting similar CPM values. The gamma data for building 146 illustrates one instance where rows of different CPM values are inserted between rows of otherwise replicated CPM values, to obscure falsification across Survey Units. The gamma database shows repeating CPM values separated by non-matching values across different Survey Units (repeating CPM values from Survey Units 3 and 5 are shown in Figure I):

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | Location | RdgNum | DateTime | GammaCPM |
|---|---|---|---|---|---|---|---|---|---|
| 158457 | 400F1E | TR | GST | 146 | 5 | W | 2 | 4/22/09 1:23 PM | 6705 |
| 158458 | 400F1E | TR | GST | 146 | 5 | F | 3 | 4/22/09 1:25 PM | 6631 |
| 158459 | 400F1E | TR | GST | 146 | 5 | F | 4 | 4/22/09 1:28 PM | 6763 |
| 158460 | 400F1E | TR | GST | 146 | 5 | F | 5 | 4/22/09 1:29 PM | 6678 |
| 158461 | 400F1E | TR | GST | 146 | 5 | W | 6 | 4/22/09 1:30 PM | 6780 |
| 158462 | 400F1E | TR | GST | 146 | 5 | F | 7 | 4/22/09 1:33 PM | 6754 |
| 158463 | 400F1E | TR | GST | 146 | 5 | F | 8 | 4/22/09 1:34 PM | 6763 |
| 158464 | 400F1E | TR | GST | 146 | 5 | F | 9 | 4/22/09 1:35 PM | 6833 |
| 158465 | 400F1E | TR | GST | 146 | 5 | F | 10 | 4/22/09 1:44 PM | 6858 |
| 158466 | 400F1E | TR | GST | 146 | 5 | F | 11 | 4/22/09 1:46 PM | 6699.000977 |
| 158467 | 400F1E | TR | GST | 146 | 5 | W | 12 | 4/22/09 1:47 PM | 6704 |

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | Location | RdgNum | DateTime | GammaCPM |
|---|---|---|---|---|---|---|---|---|---|
| 159072 | 400F1E | TR | GST | 146 | 3 | F | 2 | 4/24/09 2:23 PM | 6705 |
| 159073 | 400F1E | TR | GST | 146 | 3 | F | 3 | 4/24/09 2:25 PM | 6755 |
| 159074 | 400F1E | TR | GST | 146 | 3 | W | 4 | 4/24/09 2:28 PM | 6763 |
| 159075 | 400F1E | TR | GST | 146 | 3 | F | 5 | 4/24/09 2:29 PM | 6678 |
| 159076 | 400F1E | TR | GST | 146 | 3 | F | 6 | 4/24/09 2:30 PM | 6780 |
| 159077 | 400F1E | TR | GST | 146 | 3 | F | 7 | 4/24/09 2:33 PM | 6754 |
| 159078 | 400F1E | TR | GST | 146 | 3 | F | 8 | 4/24/09 2:34 PM | 6763 |
| 159079 | 400F1E | TR | GST | 146 | 3 | W | 9 | 4/24/09 2:35 PM | 6833 |
| 159080 | 400F1E | TR | GST | 146 | 3 | F | 10 | 4/24/09 2:44 PM | 6858 |
| 159081 | 400F1E | TR | GST | 146 | 3 | F | 11 | 4/24/09 2:46 PM | 6699.000977 |
| 159082 | 400F1E | TR | GST | 146 | 3 | F | 12 | 4/24/09 2:47 PM | 6704 |

Legend

Exact Replicates    Inserts/Deletions/Other

***Figure I.*** Example of replicated CPM data with interspersed non-replicated values from Tetra Tech's building gamma scan and static database.

110. **Tetra Tech Subtly Manipulated Data by Slightly Changing CPM Digits –** After a close study of Tetra Tech's building scan databases, Exponent discovered instances where measurements from different Survey Units show more complicated patterns of manipulation, including changing CPM values by a few digits or by consistent integers. For example, in Figure J, buildings 146 and 113A data show a repeating pattern of CPM values, some of which are identical between datasets and others which have been subtly changed, illustrating markers of intentional manipulation:

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | Location | DateTime | GammaCPM |
|---|---|---|---|---|---|---|---|---|
| 122726 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:30 AM | 6606.859863 |
| 122727 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6849.631836 |
| 122728 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6260.937988 |
| 122729 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6370.079102 |
| 122730 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6466.391113 |
| 122731 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6407.266113 |
| 122732 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6279.766113 |
| 122733 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6248.125977 |
| 122734 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6644.921875 |
| 122735 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:31 AM | 6127.266113 |
| 122736 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6102.187988 |
| 122737 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6069.141113 |
| 122738 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6633.759766 |
| 122739 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6602.187012 |
| 122740 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6816.48584 |
| 122741 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6009.608887 |
| 122742 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6774.062988 |
| 122743 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6337.969238 |
| 122744 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:32 AM | 6168.616211 |
| 122745 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:33 AM | 6966.259766 |
| 122746 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:33 AM | 6004.921875 |
| 122747 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:33 AM | 6391.796875 |
| 122748 | 400F1D | RZ | GSC | 113A | 1 | F | 2/9/09 11:33 AM | 6968.046875 |

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | Location | DateTime | GammaCPM |
|---|---|---|---|---|---|---|---|---|
| 114235 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:30 AM | 6605.859863 |
| 114236 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 5849.532227 |
| 114237 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 5250.937988 |
| 114238 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 6370.079102 |
| 114239 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 5465.391113 |
| 114240 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 5407.266113 |
| 114241 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 5279.766113 |
| 114242 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 5248.125977 |
| 114243 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 5644.921875 |
| 114244 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:31 AM | 6127.266113 |
| 114245 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 6102.187988 |
| 114246 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 6069.141113 |
| 114247 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 6633.75 |
| 114248 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 5502.187012 |
| 114249 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 5816.484863 |
| 114250 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 6009.608887 |
| 114251 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 5774.062988 |
| 114252 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 6337.969238 |
| 114253 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:32 AM | 5158.516113 |
| 114254 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:33 AM | 5966.25 |
| 114255 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:33 AM | 6004.921875 |
| 114256 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:33 AM | 5391.796875 |
| 114257 | 270F1C | AS | GSC | 146 | 24 | C | 1/21/09 11:33 AM | 5958.046875 |

| GammaCPM | GammaCPM |
|---|---|
| 6606.859863 | 6605.859863 |
| 6849.631836 | 5849.532227 |
| 6260.937988 | 5250.937988 |
| 6370.079102 | 6370.079102 |
| 6466.391113 | 5465.391113 |
| 6407.266113 | 5407.266113 |
| 6279.766113 | 5279.766113 |
| 6248.125977 | 5248.125977 |
| 6644.921875 | 5644.921875 |
| 6127.266113 | 6127.266113 |
| 6102.187988 | 6102.187988 |
| 6069.141113 | 6069.141113 |
| 6633.759766 | 6633.75 |
| 6602.187012 | 5502.187012 |
| 6816.48584 | 5816.484863 |
| 6009.608887 | 6009.608887 |
| 6774.062988 | 5774.062988 |
| 6337.969238 | 6337.969238 |
| 6168.616211 | 5158.516113 |
| 6966.259766 | 5966.25 |
| 6004.921875 | 6004.921875 |
| 6391.796875 | 5391.796875 |
| 6968.046875 | 5958.046875 |

Legend

Exact Replicates

Up to 2 digits out of >3 digits before decimal differ

Values after decimal differ; Up to 2 digits out of >3 digits before decimal differ

***Figure J***. Example of multiple types of CPM data anomalies occurring adjacent to one another in Tetra Tech's building gamma scan and static database.

111. **Tetra Tech Systematically Offset CPM Data by Consistent Integers –** Comparing CPM values from different Survey Units, Exponent identified many instances where the CPM data match or are offset by consistent integers. For example, in comparing measurements from Survey Units in buildings 272 and 810, Exponent discovered that beta CPM values differ by consistent integers. These differences indicate intentional offsetting of CPM values to obscure falsification. For example, in some instances, the beta CPM value differs by 400 for the same reading number at different Survey Units. The below graphic (Figure K) illustrates that this difference occurs at other reading numbers and sometimes varies by other integers. The graphic also illustrates that the time stamps consistently differ by four hours – a type of temporal offsetting that occurs in other data as well:

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | RdgNum | Date | Time | AlphaCPM | BetaCPM | Notes on Beta Results |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 412317 | 400W1B | AS | ABSC | 272 | 22 | 274 | 12/8/10 | 1899-12-31T10:07:47Z | 0 | 605 | Values differ by 400 |
| 412318 | 400W1B | AS | ABSC | 272 | 22 | 275 | 12/8/10 | 1899-12-31T10:07:59Z | 0 | 523 | Values differ by 500 |
| 412319 | 400W1B | AS | ABSC | 272 | 22 | 276 | 12/8/10 | 1899-12-31T10:08:11Z | 0 | 557 | Values differ by 500 |
| 412320 | 400W1B | AS | ABSC | 272 | 22 | 277 | 12/8/10 | 1899-12-31T10:08:22Z | 0 | 557 | Values differ by 500 |
| 412321 | 400W1B | AS | ABSC | 272 | 22 | 278 | 12/8/10 | 1899-12-31T10:08:34Z | 8 | 694 | Values differ by 300 |
| 412322 | 400W1B | AS | ABSC | 272 | 22 | 279 | 12/8/10 | 1899-12-31T10:08:46Z | 2 | 873 | |
| 412323 | 400W1B | AS | ABSC | 272 | 22 | 280 | 12/8/10 | 1899-12-31T10:08:57Z | 0 | 513 | Values differ by 400 |
| 412324 | 400W1B | AS | ABSC | 272 | 22 | 281 | 12/8/10 | 1899-12-31T10:09:09Z | 0 | 825 | |
| 412325 | 400W1B | AS | ABSC | 272 | 22 | 282 | 12/8/10 | 1899-12-31T10:09:20Z | 0 | 807 | |
| 412326 | 400W1B | AS | ABSC | 272 | 22 | 283 | 12/8/10 | 1899-12-31T10:09:32Z | 10 | 804 | |
| 412327 | 400W1B | AS | ABSC | 272 | 22 | 284 | 12/8/10 | 1899-12-31T10:09:44Z | 2 | 560 | Values differ by 400 |
| 412328 | 400W1B | AS | ABSC | 272 | 22 | 285 | 12/8/10 | 1899-12-31T10:09:55Z | 0 | 859 | |
| 412329 | 400W1B | AS | ABSC | 272 | 22 | 286 | 12/8/10 | 1899-12-31T10:10:07Z | 0 | 870 | |
| 412330 | 400W1B | AS | ABSC | 272 | 22 | 287 | 12/8/10 | 1899-12-31T10:10:19Z | 0 | 806 | |
| 412331 | 400W1B | AS | ABSC | 272 | 22 | 288 | 12/8/10 | 1899-12-31T10:10:30Z | 6 | 584 | Values differ by 400 |
| 412332 | 400W1B | AS | ABSC | 272 | 22 | 289 | 12/8/10 | 1899-12-31T10:10:42Z | 1 | 896 | |
| 412333 | 400W1B | AS | ABSC | 272 | 22 | 290 | 12/8/10 | 1899-12-31T10:10:54Z | 0 | 801 | |
| 412334 | 400W1B | AS | ABSC | 272 | 22 | 291 | 12/8/10 | 1899-12-31T10:11:05Z | 6 | 781 | |
| 412335 | 400W1B | AS | ABSC | 272 | 22 | 292 | 12/8/10 | 1899-12-31T10:11:17Z | 1 | 878 | |
| 412336 | 400W1B | AS | ABSC | 272 | 22 | 293 | 12/8/10 | 1899-12-31T10:11:29Z | 8 | 853 | |
| 412337 | 400W1B | AS | ABSC | 272 | 22 | 294 | 12/8/10 | 1899-12-31T10:11:40Z | 2 | 705 | |
| 412338 | 400W1B | AS | ABSC | 272 | 22 | 295 | 12/8/10 | 1899-12-31T10:11:52Z | 0 | 893 | |
| 412339 | 400W1B | AS | ABSC | 272 | 22 | 296 | 12/8/10 | 1899-12-31T10:12:04Z | 0 | 831 | |
| 412340 | 400W1B | AS | ABSC | 272 | 22 | 297 | 12/8/10 | 1899-12-31T10:12:15Z | 0 | 545 | Values differ by 400 |
| 412341 | 400W1B | AS | ABSC | 272 | 22 | 298 | 12/8/10 | 1899-12-31T10:12:27Z | 0 | 567 | Values differ by 400 |
| 412342 | 400W1B | AS | ABSC | 272 | 22 | 299 | 12/8/10 | 1899-12-31T10:12:39Z | 0 | 815 | |
| 412343 | 400W1B | AS | ABSC | 272 | 22 | 300 | 12/8/10 | 1899-12-31T10:12:50Z | 0 | 842 | |
| 412344 | 400W1B | AS | ABSC | 272 | 22 | 301 | 12/8/10 | 1899-12-31T10:13:02Z | 11 | 585 | Values differ by 400 |
| 412345 | 400W1B | AS | ABSC | 272 | 22 | 302 | 12/8/10 | 1899-12-31T10:13:14Z | 2 | 600 | Values differ by 300 |
| 412346 | 400W1B | AS | ABSC | 272 | 22 | 303 | 12/8/10 | 1899-12-31T10:13:25Z | 0 | 880 | |
| 412347 | 400W1B | AS | ABSC | 272 | 22 | 304 | 12/8/10 | 1899-12-31T10:13:37Z | 12 | 820 | |
| 412348 | 400W1B | AS | ABSC | 272 | 22 | 305 | 12/8/10 | 1899-12-31T10:13:48Z | 3 | 770 | |
| 412349 | 400W1B | AS | ABSC | 272 | 22 | 306 | 12/8/10 | 1899-12-31T10:14:00Z | 4 | 761 | |

| ID | SurveyMaterial | SurveyorInitials | DataType | Bldg | SurveyUnit | RdgNum | Date | Time | AlphaCPM | BetaCPM | Notes on Beta Results |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 378070 | 400W1A | AS | ABSC | 810 | 21 | 274 | 5/10/10 | 1899-12-31T14:07:47Z | 0 | 1005 | Values differ by 400 |
| 378071 | 400W1A | AS | ABSC | 810 | 21 | 275 | 5/10/10 | 1899-12-31T14:07:59Z | 0 | 1023 | Values differ by 500 |
| 378072 | 400W1A | AS | ABSC | 810 | 21 | 276 | 5/10/10 | 1899-12-31T14:08:11Z | 0 | 1057 | Values differ by 500 |
| 378073 | 400W1A | AS | ABSC | 810 | 21 | 277 | 5/10/10 | 1899-12-31T14:08:22Z | 0 | 1057 | Values differ by 500 |
| 378074 | 400W1A | AS | ABSC | 810 | 21 | 278 | 5/10/10 | 1899-12-31T14:08:34Z | 8 | 994 | Values differ by 300 |
| 378075 | 400W1A | AS | ABSC | 810 | 21 | 279 | 5/10/10 | 1899-12-31T14:08:46Z | 2 | 873 | |
| 378076 | 400W1A | AS | ABSC | 810 | 21 | 280 | 5/10/10 | 1899-12-31T14:08:57Z | 0 | 913 | Values differ by 400 |
| 378077 | 400W1A | AS | ABSC | 810 | 21 | 281 | 5/10/10 | 1899-12-31T14:09:09Z | 0 | 825 | |
| 378078 | 400W1A | AS | ABSC | 810 | 21 | 282 | 5/10/10 | 1899-12-31T14:09:20Z | 0 | 807 | |
| 378079 | 400W1A | AS | ABSC | 810 | 21 | 283 | 5/10/10 | 1899-12-31T14:09:32Z | 10 | 804 | |
| 378080 | 400W1A | AS | ABSC | 810 | 21 | 284 | 5/10/10 | 1899-12-31T14:09:44Z | 2 | 960 | Values differ by 400 |
| 378081 | 400W1A | AS | ABSC | 810 | 21 | 285 | 5/10/10 | 1899-12-31T14:09:55Z | 0 | 859 | |
| 378082 | 400W1A | AS | ABSC | 810 | 21 | 286 | 5/10/10 | 1899-12-31T14:10:07Z | 0 | 870 | |
| 378083 | 400W1A | AS | ABSC | 810 | 21 | 287 | 5/10/10 | 1899-12-31T14:10:19Z | 0 | 806 | |
| 378084 | 400W1A | AS | ABSC | 810 | 21 | 288 | 5/10/10 | 1899-12-31T14:10:30Z | 6 | 984 | Values differ by 400 |
| 378085 | 400W1A | AS | ABSC | 810 | 21 | 289 | 5/10/10 | 1899-12-31T14:10:42Z | 1 | 896 | |
| 378086 | 400W1A | AS | ABSC | 810 | 21 | 290 | 5/10/10 | 1899-12-31T14:10:54Z | 0 | 801 | |
| 378087 | 400W1A | AS | ABSC | 810 | 21 | 291 | 5/10/10 | 1899-12-31T14:11:05Z | 6 | 781 | |
| 378088 | 400W1A | AS | ABSC | 810 | 21 | 292 | 5/10/10 | 1899-12-31T14:11:17Z | 1 | 878 | |
| 378089 | 400W1A | AS | ABSC | 810 | 21 | 293 | 5/10/10 | 1899-12-31T14:11:29Z | 8 | 853 | |
| 378090 | 400W1A | AS | ABSC | 810 | 21 | 294 | 5/10/10 | 1899-12-31T14:11:40Z | 2 | 705 | |
| 378091 | 400W1A | AS | ABSC | 810 | 21 | 295 | 5/10/10 | 1899-12-31T14:11:52Z | 0 | 893 | |
| 378092 | 400W1A | AS | ABSC | 810 | 21 | 296 | 5/10/10 | 1899-12-31T14:12:04Z | 0 | 831 | |
| 378093 | 400W1A | AS | ABSC | 810 | 21 | 297 | 5/10/10 | 1899-12-31T14:12:15Z | 0 | 945 | Values differ by 400 |
| 378094 | 400W1A | AS | ABSC | 810 | 21 | 298 | 5/10/10 | 1899-12-31T14:12:27Z | 0 | 967 | Values differ by 400 |
| 378095 | 400W1A | AS | ABSC | 810 | 21 | 299 | 5/10/10 | 1899-12-31T14:12:39Z | 0 | 815 | |
| 378096 | 400W1A | AS | ABSC | 810 | 21 | 300 | 5/10/10 | 1899-12-31T14:12:50Z | 0 | 842 | |
| 378097 | 400W1A | AS | ABSC | 810 | 21 | 301 | 5/10/10 | 1899-12-31T14:13:02Z | 11 | 985 | Values differ by 400 |
| 378098 | 400W1A | AS | ABSC | 810 | 21 | 302 | 5/10/10 | 1899-12-31T14:13:14Z | 2 | 900 | Values differ by 300 |
| 378099 | 400W1A | AS | ABSC | 810 | 21 | 303 | 5/10/10 | 1899-12-31T14:13:25Z | 0 | 880 | |
| 378100 | 400W1A | AS | ABSC | 810 | 21 | 304 | 5/10/10 | 1899-12-31T14:13:37Z | 12 | 820 | |
| 378101 | 400W1A | AS | ABSC | 810 | 21 | 305 | 5/10/10 | 1899-12-31T14:13:48Z | 3 | 770 | |
| 378102 | 400W1A | AS | ABSC | 810 | 21 | 306 | 5/10/10 | 1899-12-31T14:14:00Z | 4 | 761 | |

Legend: Exact Replicates (blue shading) — Up to 2 digits out of >3 digits before decimal differ (yellow shading)

***Figure K.*** Example of data replication and CPM values offset by increments of 100 in Tetra Tech's building alpha/beta scan and static database. The "Notes on Beta Results" column was added by Exponent.

112. As illustrated above, Tetra Tech manipulated and reported to the Navy false building survey data, rather than providing actual radiation detection results from a full building survey. Exhibit 4 contains a summary of data manipulation in Tetra Tech's building scan and static databases. Exhibit 5 illustrates an example of how Tetra Tech's replicated data appear in reports submitted to the Navy. These exhibits demonstrate that Tetra Tech reported false data to the Navy collected from radiological scans of buildings throughout Hunters Point, including, but not necessarily limited to, Buildings 103, 113, 113A, 128, 130, 135, 146, 253, 270, 272, 351, 351A, 364, 365, 366, 400, 401, 411, 439, 506D, 707, C04, IR06, IRS6, and 810.

113. In addition to this evidence of Tetra Tech's falsification of building survey data, former workers at Hunters Point have provided details of a failure to properly perform building surveys. As one example, RCT Anthony Smith and his fellow workers were instructed by Rolfe to "just get numbers" when doing building scans, which was accomplished by holding the radiation detection device in one spot or just setting it down in one spot for up to 30 minutes while readings were recorded. This occurred in buildings 351, 351A, 411, 401, 414, 406, 146, 130, 103, 113 and 521 at Hunters Point. The Relevant Contracts and MARSSIM required Tetra Tech to conduct building radiation scans by *moving* detectors across surfaces at required speeds.

114. On November 25, 2014, DTSC provided the Navy with notice that CDPH had suspended the Radiological Unrestricted Release Recommendations ("RURRs") it had previously provided to the Navy for 22 buildings at Hunters Point: 103, 113, 113A, 130, 140, 146, 203, 214, 241, 271, 272, 406, 414, 439, 521, 810, 351, 351A, 365, 366, 401 and 411. The Department of Health took this action because Tetra Tech deviated "from approved work plans while performing the radiological surveys at these buildings." On December 28, 2018, the EPA wrote to the Navy to state that the EPA, DTSC and CDPH agreed that the building radiation survey work done by Tetra Tech was "falsified and cannot be used to support a recommendation for unrestricted radiological release for HPNS radiologically-impacted buildings." The agencies stated that the data "demonstrate a pattern of practices that appear to

show deliberate falsification, failure to perform the work in a manner required to ensure Record of Decision (ROD) requirements were met, or both." The consequence of the 2014 regulatory action by CDPH and subsequent determinations by EPA, DTSC and CDPH is that the Navy cannot rely upon any of the building survey work performed by Tetra Tech at Hunters Point for property transfer to the City and County of San Francisco.

115. In 2016, the EPA and Navy agreed not to propose any further transfers of Navy property at Hunters Point until regulators and the Navy assessed the scope of additional work necessary to accurately assess the extent of contamination. Following its determination that the Navy cannot rely on Tetra Tech's building scan work, including its Final Status Survey Reports as described below, the EPA, DTSC, and CDPH sought to formulate what would be necessary to protect public health and the environment. Pursuant to its authority under the FFA to establish and advance appropriate remedial action, the EPA determined that the Navy would need to re-survey and remediate all buildings owing to the pervasive unreliability of Tetra Tech's building survey data.

116. Tetra Tech's falsification of data with regard to building surveys caused the Navy to pay Tetra Tech for building survey work that has become worthless in light of the need to re-survey buildings. The buildings as to which Tetra Tech's work was worthless include, but are not limited to, the following: 103, 113, 113A, 128, 130, 135, 146, 253, 270, 272, 351, 351A, 364, 366, 400, 401, 411, 439, 506D, 707, 810, C04, IR06, and IRS6.

**H. Final Status Survey Reports, Survey Unit Project Reports, and Removal Action Completion Reports**

117. Pursuant to the Relevant Contracts, Tetra Tech prepared and submitted to the Navy Final Status Survey Reports, Final Survey Unit Project Reports, final Removal Action Completion Reports, and/or Characterization Survey Result Reports (collectively, the "Reports") upon completion of the investigation and remediation of a Survey Unit. The Reports described the procedures and the results of the surveys performed to achieve unrestricted radiological release of the radiologically impacted sites at Hunters Point. The Reports were signed by Dougherty as Tetra Tech's Project Manager at Hunters Point, in addition to other Tetra Tech officials.

118. In the Reports, Tetra Tech falsely stated that soil samples were properly collected from designated Survey Units, when, in fact, samples of soil that Tetra Tech management knew to be "clean" were collected from locations outside of the designated Survey Units and submitted to the laboratory for analysis. In the Reports, Tetra Tech stated the soil sample analytical results as if the soil was properly collected.

119. In the Reports, Tetra Tech falsely stated that building surveys were completed and properly performed, when in fact the building scan data was manipulated. In the Reports, Tetra Tech stated the building survey results as if the buildings were properly scanned and the data were properly recorded and reported. For example, the Final Status Survey Results for Buildings 130, 272, 351, 366, and 401 (dated May 20, 2010, March 21, 2012, March 5, 2010, December 30, 2009, and September 21, 2009, respectively) each state: "This report details the procedures and results of the surveys performed to facilitate unrestricted release of" the building in question. Additionally, the reports state that the surveys were "performed consistently with the requirements outlined in the final Base-wide Radiological Work Plan Revision 1 (Base-wide Plan Revision 1) (TtEC 2007)."

**I. Tetra Tech Knowingly Submitted Materially False Claims**

120. Tetra Tech submitted claims for payment to the United States under each of the Relevant Contracts knowing that the claims were false or fraudulent because they included claims for: (a) soil surveys in which Tetra Tech misrepresented the source of the soil samples collected; (b) building surveys in which Tetra Tech falsified the data collected by radiation detection instruments; and/or (c) preparing status survey reports containing falsified results from soil and building surveys.

121. Tetra Tech management, including but not limited to Dougherty and Bolt, submitted or caused to be submitted vouchers and invoices, accompanied by progress reports, representing that it fully and properly investigated and remediated radiological contamination in soil and buildings at Hunters Point. As described above, these representations were false.

122. Tetra Tech "knowingly" submitted vouchers and invoices and accompanying progress reports containing material misrepresentations, within the meaning of the False Claims Act, 31 U.S.C. § 3729(b).

123. Tetra Tech made false statements it knew were material to the Navy's decision to continue its contracting relationship with Tetra Tech, and intended those statements to influence the Navy's decision to pay Tetra Tech's false claims. The natural, ordinary, and reasonable consequence of Tetra Tech's false statements was that the Navy would rely upon them in deciding to pay Tetra Tech's false claims, and, indeed, the Navy justifiably relied upon Tetra Tech's false statements in deciding to pay Tetra Tech's invoices and to award subsequent task orders. In each case, had the Navy known the truth, it would not have paid Tetra Tech's invoices or awarded Tetra Tech subsequent task orders. The United States paid each of the false claims submitted by Tetra Tech, even though the non-conforming services delivered by Tetra Tech were of no value to the United States Navy.

**J. Tetra Tech's Breaches of Contract**

124. Each of the Relevant Contracts required Tetra Tech to perform soil and building surveys in accordance contractual specifications. Based on the actions described above, Tetra Tech breached the Relevant Contracts by falsifying soil samples, falsifying building scan data, and failing to perform full, complete, and accurate investigations of radiological contamination, and failing to remediate where necessary to achieve free release. Tetra Tech's breaches of the Relevant Contracts include, but are not limited to the following.

125. For Task Order 2201-006, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1.3 to "complete all radiological work" on Parcel B and "to provide general base-wide radiological support services."

126. For Task Order 2000-0070, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1.3 to "complete all unfinished radiological work at Parcel B" as well certain sites in Parcel D.

127. For Task Order 3211-0019, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1.3 to complete "radiological remediation and surveys" at certain Parcel B sites; and the requirement in Section 2.3 to perform remediation of sanitary sewers and storm drains in Parcel B.

128. For Task Order 8823-002, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1.3 to "remove, survey, remediate, clear, and dispose of appropriately all sewer and storm drain systems in" the relevant areas to "attain a free release."

129. For Task Order 8823-003, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1.3 to "achieve unrestricted free release of the sewer and storm line Survey Units along Crisp Rd and the central areas of Parcel E" as well as to provide "surveys, remediation and reporting for certain radiological buildings and sites in Parcel E".

130. For Task Order 0809-002, Tetra Tech's breaches include, but are not limited to, the requirement in the "Objective" section to achieve free release of various buildings in Parcel C as well as sewer and storm drains; and the requirement in Work Element 5 to "conduct field operations" for Parcel C removal actions and radiological surveys, including to excavate, sample, survey and remediate the effected sites.

131. For Task Order 0809-007, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1 to "achieve free-release of sewer and storm drain Survey Units, buildings, building sites and the 500 series site of Parcel E"; and the requirement in Section 2.3 for site work, including excavation, removal, sampling, surveys, and remediation of the relevant areas.

132. For Task Order 0809-0012, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1.3 to "achieve unrestricted free release of the sewer and storm drain survey units and ship berths."

133. For Task Order 2006-0004, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1 to "characterize radiological contamination" in certain buildings in Parcel C and to perform and report on surveys for radiological contamination; and the requirement in Section 2.3 for field work, including radiological characterization.

134. For Task Order 0809-0015, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1.3 to provide a Final Status Survey of the sanitary sewer and storm drain system in Parcel E sufficient to "achieve unrestricted free release."

135. For Task Order 0809-0016, Tetra Tech's breaches include, but are not limited to, the requirement in Section 1 to provide unrestricted free release of certain sewer and storm drains in Parcel C, and certain buildings.

136. The United States has incurred damages, including consequential damages, as a result of Tetra Tech's breaches of the Relevant Contracts.

**K. Consequences of Tetra Tech's Misconduct**

137. The Navy and the oversight agencies determined that the negligent or intentionally misleading practices by Tetra Tech employees rendered Tetra Tech's work unreliable, and forced the Navy to undertake a new site investigation and cleanup at the Site, incurring significant costs, in order to protect human health and the environment.

138. The Navy is required to complete the investigation and cleanup to comply with statutory and regulatory standards, and cannot do so relying on Tetra Tech's unreliable work.

139. Because of Tetra Tech's breaches of contract in investigating the radiological contamination at Hunters Point, the Navy must pay other contractors to re-test the soil and buildings in the Parcels where Tetra Tech worked in order to determine whether cleanup activities are required. The Navy will also have to pay for any further cleanup activities. The Navy has had to devote substantial resources to work with the EPA, DTSC, and CDPH to create plans for re-testing and potential further cleanup. The Navy has also had to devote substantial resources to address the health and safety concerns of San Francisco residents. The United States has also had to devote substantial resources to investigate Tetra Tech's actions and inactions at Hunters Point over many years.

140. Tetra Tech's fraudulent course of conduct has caused substantial disruption, uncertainty, and delay in the plan to remediate and transfer Hunters Point to the City and County of San Francisco for redevelopment, as well as fear in the community regarding the effects of any continued contamination at the Site. As a result of Tetra Tech's fraud, the transfer of Hunters Point to the City and County of San Francisco will be delayed by many years. On September 19, 2016, then-mayor of the City and County of San Francisco Edwin M. Lee and Supervisor Malia Cohen announced that: "San Francisco will not accept the transfer of any land until federal and state regulators are satisfied that the land is clean and safe, and our own Department of Public Health validates that decision." As these

leaders explained, the environmental cleanup of Hunters Point is necessary to "deliver desperately needed housing and long-overdue public benefits to the Hunters Point community."

141. Among other activities, the Rework primarily includes sampling 33% of the soil at each parcel to determine whether radionuclides of concern exceeding release criteria are present. If no contaminated soils are identified in the first 33% of soils reviewed at a parcel, then there will be soil sampling and scanning at the other 67%, without excavation. If such contamination is identified within the first 33% then excavation of the remaining 67% will be required, as well as excavation of the first 33%. Any soils containing radionuclides of concern exceeding release criteria are to be treated and disposed of properly. Work Plans for Rework are developed separately for each parcel. Rework in the field began in Parcel G and proceeds to the next parcels as Work Plans are finalized. This process will continue until the cleanup standards have been met site-wide, following the process required by CERCLA.

142. Navy has incurred over $30 million in unreimbursed Rework costs pertaining particularly to soil investigation so far, and work is on-going at the Site.

**FIRST CAUSE OF ACTION**

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1)(A))

143. The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

144. Tetra Tech knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A), by submitting claims for payment based upon falsified soil surveys, building surveys, and status survey reports. Tetra Tech's false or fraudulent claims include, but are not limited to, the invoices identified on Exhibits 2 and 3.

145. The falsified soil surveys, building surveys, status survey reports, and other false representations described herein were material to the United States' decision to pay Tetra Tech and had a natural tendency to influence and did influence those decisions.

146. As a result of the false or fraudulent claims presented or caused to be presented by Tetra Tech, the United States paid Tetra Tech and suffered damages to be determined at trial. Under the False Claims Act, the United States is entitled to three times the amount of damages it sustained, plus civil penalties of not less than $5,500 and not more than $11,000 for each false claim.

**SECOND CAUSE OF ACTION**

(False Claims Act: False Statement Material to a False Claim)

(31 U.S.C. § 3729(a)(1)(B))

147. The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

148. Tetra Tech made, used, or caused to be made or used, false records or statements material to false claims, in violation of 31 U.S.C. § 3729(a)(1)(B), by reporting false results from soil and building surveys. Tetra Tech's false records or statements material to false claims include, but are not limited to, statements made within reports identified in Exhibit 6.

149. The false records or statements described herein were material to the United States' decision to pay Tetra Tech and had a natural tendency to influence and did influence those decisions.

150. As a result of the false records or statements made or used, or cause to be made or used, by Tetra Tech, the United States paid Tetra Tech and suffered damages to be determined at trial. Under the False Claims Act, the United States is entitled to three times the amount of damages it sustained, plus civil penalties of not less than $5,500 and not more than $11,000 for each violation.

**THIRD CAUSE OF ACTION**

(Common Law Fraud)

151. The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

152. The false statements and material omissions, which occurred between June 2006 and January 2018, made by Tetra Tech were misrepresentations of material fact.

153. Tetra Tech made these representations of material fact with knowledge of their falsity or with reckless disregard to their truth.

154. Tetra Tech made these misrepresentations of material fact intending that the United States would rely on their accuracy in paying claims or fees.

155. The United States justifiably relied on Tetra Tech's misrepresentations in paying claims and fees.

156. Tetra Tech's actions caused the United States to suffer damages in an amount, including punitive damages, to be determined at trial.

**FOURTH CAUSE OF ACTION**

(Breach of Contract)

157. The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

158. Each of the Relevant Contracts required Tetra Tech to perform soil and building surveys in accordance with MARSSIM and other contract specifications.

159. Based on the actions described above, Tetra Tech breached the Relevant Contracts by falsifying soil samples, falsifying building scan data, and failing to perform full, complete, and accurate investigations of radiological contamination.

160. The United States has incurred damages, including consequential damages, as a result of Tetra Tech's breaches of the Relevant Contracts.

**FIFTH CAUSE OF ACTION**

(CERCLA: Recovery of Response Costs)

(42 U.S.C. § 9607(a))

161. The United States repeats and re-alleges the preceding paragraphs as if fully set forth herein.

162. Tetra Tech is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21) because it is a corporation.

163. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9) because it is a place where hazardous substances came to be located.

164. Radionuclides americium 241, cobalt 60, strontium 90, cesium 137 (and daughter products), europium 152, europium 154, plutonium 239, radium 226, tritium, thorium 232, and uranium

235 (and daughter products) are hazardous substances within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) and 40 C.F.R. 302.4.

165. Radionuclides including at least some of those listed in the paragraph above have come to be located at the Site, both through historical releases at the Site and, upon information and belief, through movement of contaminated soil by Tetra Tech during its investigation described above.

166. There has been a "release" and/or threatened "release" of a hazardous substance at or from the Site, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) because of the movement or threatened movement of radionuclides at the Site.

167. The release or threat of release of hazardous substances at the Site caused the United States to incur more than $30 million of response costs for the Rework, and costs are continuing to accrue as work is on-going.

168. As described above, Tetra Tech encouraged its workers on Site to reduce its work by taking steps to avoid finding or treating hazardous substances on site.

169. As described above, Tetra Tech switched soil samples and deposited untested soil samples into open trenches while testing soil that it already believed to be "clean."

170. As described above, Tetra Tech analyzed soil samples in a manner that would not provide accurate information, and reported sampling results in an unreliable manner, identifying the samples as clean.

171. As described above, Tetra Tech was permitted to use clean samples as fill on the Site, but the soil Tetra Tech identified as clean included some soil that was either mislabeled, untested or inaccurately tested; and also as described above, Tetra Tech encouraged activities on the Site to minimize the amount of clean up expenses; therefore, upon information and belief, Tetra Tech used some soils containing hazardous substances as fill on the Site and deposited some soils containing hazardous substances into open trenches on site. The placement of contaminated soils as fill and in open trenches as described above is, upon information and belief, a disposal of a hazardous substance within the meaning of Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), at the Site at the time that Tetra Tech was engaged in its work at the Site.

172. The United States' response costs are not inconsistent with the NCP.

173. Tetra Tech is not protected from liability as a Response Action Contractor because the conduct of Tetra Tech through its corporate managers and employees was negligent, grossly negligent or constitutes intentional misconduct, within the meaning of 42 U.S.C. 9619(a)(2).

174. Based on the actions described above, Tetra Tech exercised control or otherwise managed or conducted the affairs of the Site as related to pollution and disposal of contaminated materials during the period that it served as the Navy's contractor.

175. Based on the actions described above, and upon information and belief, Tetra Tech is a person who, at the time of disposal of radionuclides, operated the Site, and is therefore liable pursuant to 42 U.S.C. § 9607(a)(2).

176. Based on the actions described above, Tetra Tech, accepted hazardous substances from the Navy, specifically radionuclides, for transport to locations selected by Tetra Tech on the Site, and is therefore liable pursuant 42 U.S.C. § 9607(a)(4).

177. Pursuant to Section 107(a) of CERCLA, Tetra Tech is liable to the United States for all response costs, with interest, incurred in connection with soil in the Rework.

178. Pursuant to Section 113(g) of CERCLA, the United States is entitled to a declaratory judgment on liability for response costs incurred in connection with soil in the Rework, that will be binding on any subsequent action or actions to recover further response costs.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendant Tetra Tech EC, Inc. as follows:

1. On the First Cause of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

2. On the Second Cause of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

3. On the Third Cause of Action for common law fraud, for the amount of the United States' damages, including punitive damages, and for such further relief as may be just and proper.

4. On the Fourth Cause of Action for breach of contract, for an amount equivalent to the loss sustained by the United States, including consequential damages, plus interest, costs, and expenses, and for such further relief as may be just and proper.

5. On the Fifth Cause of Action under CERCLA, for all response costs, with interest, incurred in connection with soils in the Rework, together with such further relief as may be just and proper.

6. On the Fifth Cause of Action under CERCLA, enter a declaratory judgment against Tetra Tech EC that will be binding in any subsequent action or actions to recover further response costs or damages incurred in connection with soil in the Rework pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) together with such further relief as may be just and proper.

DATED: March 8, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

*/s/ Michael T. Pyle*
MICHAEL T. PYLE (CABN 172954)
SAVITH IYENGAR (CABN 268342)
Assistant United States Attorneys
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5087
FAX: (408) 535-5081
Email: michael.t.pyle@usdoj.gov

*/s/ John F. Schifalacqua*
*/s/ A. Thomas Morris*
JAMIE ANN YAVELBERG
PATRICK KLEIN
A. THOMAS MORRIS
JONATHAN K. HOERNER
JOHN F. SCHIFALACQUA
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-6849
John.f.schifalacqua@usdoj.gov

Attorneys for the United States of America as to the First, Second, Third, and Fourth Causes of Action regarding FCA and Common Law claims

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*/s/ Elise Feldman*
ELISE FELDMAN
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
450 Golden Gate Avenue
Suite 07-6714
San Francisco, CA 94102
(415) 744-6470 office
(415) 264-3539 mobile

KAYCI HINES
SHEILA MCANANEY
Trial Attorneys
Environment & Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611 Ben Franklin Station,
Washington, D.C. 20044

Attorneys for the United States of America as to the Fifth Cause of Action regarding the CERCLA claim

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a jury trial in this action with respect of Causes of Action One, Two, Three, and Four.

DATED: March 8, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

/s/ *Michael T. Pyle*
MICHAEL T. PYLE (CABN 172954)
SAVITH IYENGAR (CABN 268342)
Assistant United States Attorneys
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5087
FAX: (408) 535-5081
Email: michael.t.pyle@usdoj.gov

/s/ *John F. Schifalacqua*
/s/ *A. Thomas Morris*
JAMIE ANN YAVELBERG
PATRICK KLEIN
ROBERT CHANDLER
JONATHAN K. HOERNER
JOHN F. SCHIFALACQUA
A. THOMAS MORRIS
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-6849
John.f.schifalacqua@usdoj.gov

Attorneys for the United States of America as to the First, Second, Third, and Fourth Causes of Action regarding FCA and Common Law claims