BRETT A. SHUMATE
Assistant Attorney General

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
MICHAEL T. PYLE (CABN 172954)
SAVITH IYENGAR (CABN 268342)
Assistant United States Attorneys

    60 South Market, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-5087
    Facsimile: (408) 535-5081
    Email: savith.iyengar@usdoj.gov

JAMIE YAVELBERG
PATRICK M. KLEIN
A. THOMAS MORRIS
JONATHAN K. HOERNER
ADAM J. DICLEMENTE
Attorneys, Civil Division
United States Department of Justice

    P.O. Box 261
    Ben Franklin Station
    Washington, D.C. 20044
    Telephone: (202) 307-6971
    Email: adam.diclemente@usdoj.gov

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ARTHUR R. JAHR, III, *et al.*, ANTHONY SMITH, & DONALD K. WADSWORTH *et al.*,<br><br>             Plaintiffs,<br><br>    v.<br><br>TETRA TECH EC, INC.,<br><br>             Defendant. | CASE NOS: 3:13-CV-3835 JD<br><br>RELATED ACTIONS: 3:16-CV-1106 JD<br>                       3:16-CV-1107 JD<br><br>**UNITED STATES' SUPPLEMENTAL BRIEF REGARDING FCA SETTLEMENT APPROVAL AND RELATORS' SHARES** |

# **TABLE OF CONTENTS**

INTRODUCTION & SUMMARY .................................................................................................1

SUPPLEMENTAL ARGUMENT ...............................................................................................2

I.    Relators No Longer Object to the FCA Settlement ..............................................................2

II.   The False Claims Act Settlement is Fair, Adequate and Reasonable Under 31 U.S.C.
      § 3730(c)(2)(B) ...................................................................................................................3

      A.    The $57 Million Settlement Amount Is Fair, Adequate and Reasonable Based
            on the Factual Record and Assessment of Litigation Risks.......................................3

            1.    The $57 Million FCA Settlement Amount Is Directly Supported by
                  Scientific Analysis of Tetra Tech's Work at HPNS Survey Units and
                  Financial Analysis of its Invoices to the Navy ..............................................3

                  (i)     The FCA Settlement is Based on the "Benefit of the Bargain,"
                          Which is the Typical FCA Measure of Damages ............................4

                  (ii)    The Scope of Tetra Tech's Misconduct is Contested ....................5

                  (iii)   Science and Statistics Consultant, Exponent, Assessed Which
                          HPNS Survey Units were Marked by a Statistical Indicator of
                          Falsity...........................................................................................6

                  (iv)    Financial and Damages Analyst StoneTurn Valued Tetra
                          Tech's Work at these Survey Units Using Tetra Tech's
                          Invoices to the Navy ......................................................................7

            2.    The $57 Million Settlement Provides an Excellent Recovery for the
                  United States and Relators Alike ...................................................................8

      B.    Standards of Law for "Fair, Reasonable, and Adequate" Under 31 U.S.C.
            § 3730(c)(2)(B) .....................................................................................................9

      C.    The FCA Settlement Should Be Approved As Fair, Adequate, and Reasonable
            Under Any Approach ...........................................................................................11

      1.    The FCA Settlement Satisfies the *Everglades College* Approach....................11

      2.    The FCA Settlement Satisfies the *Sequoia Orange* Approach .........................11

      3.    The FCA Settlement Satisfies Rule 23(e)(2) Standards ...................................12

III.  The United States' Positions Regarding Relators' Shares ................................................13

      A.    Relators and the United States Have Agreed to a Share Percentage ...............................13

      B.    Operative Legal Standards Governing Relators' Shares ........................................13

            1.    Claim-by-Claim Analysis of Relators' Shares.......................................15

            2.    Relators' Shares of the Soil Fraud Claim ...........................................16

(i)    The First-To-File Bar Prevents Relator Smith and the Wadsworth Relators from Obtaining a Share of the Soil Fraud Claim ......................................................................................16

(ii)   A Relators' Share of 21% Is Appropriate for the Soil Fraud Claim ......................................................................................17

(iii)  The Court May Properly Award a Relators' Share Jointly to the *Jahr* Relators ...........................................................19

3.    Relator's Shares of the Building Scan Fraud Claim ...............................................20

(i)    The First-to-File Bar Prevents the *Wadsworth* Relators from Obtaining a Share Under the Building Scan Fraud Claim ......................20

(ii)   A Relator's Share of 21% is Appropriate for the Building Scan Fraud Claim .............................................................................21

C.   The DOJ Has Already Segregated and Will Retain Sufficient Settlement Funds to Pay Relators' Shares ............................................................................22

CONCLUSION ...................................................................................................................22

**INTRODUCTION & SUMMARY**

The United States of America ("United States") respectfully submits this supplemental brief in response to the Court's November 7, 2025 Order Regarding the United States' Settlement and Relators' Shares Under False Claims Act. ECF No. 509 ("Order"). On January 17, 2025 the United States entered a False Claims Act ("FCA") settlement agreement with Tetra Tech EC, Inc. ("Tetra Tech") resolving the first through fourth causes of action in the United States' Second Amended Complaint in Intervention, ECF No. 372 ("SAC"). *See* ECF No. 452 (the "FCA Settlement"). This settlement returns $57 million to the government and will return funds to the United States Navy to support its work at the former Hunters Point Navy Shipyard ("HPNS"). This is an excellent recovery based on the record developed through years of discovery and substantial litigation efforts.

Indeed, Relators have now withdrawn all objections and concede that the FCA Settlement (as it always was) is fair, adequate and reasonable. *See infra* Part I. Relators have also agreed on a share payment percentage (21%). The only remaining dispute is the United States' application of the first-to-file bar in distributing relators' share: the United States will only agree to pay the relators' share to the first-to-file relator(s) for the settled claims, and Relators disagree with this determination.

As shown below, and in the United States' previous response to Relators' Objections (ECF No. 472), the FCA Settlement is fair, adequate, reasonable, and represents an excellent result for HPNS. The $57 million settlement is supported by the record developed in fact discovery, including analysis provided by litigation consultants retained by the Department of Justice ("DOJ") to assist with proving and valuing the case. The FCA Settlement now has the support of all parties to the FCA case, including all Relators, which eliminates the need for this Court to review the FCA Settlement over a relator's objection. *See* 31 U.S.C. § 3730(c)(2)(B). In any event, Relators' consent aside, the record supports approving the FCA Settlement. Immediately obtaining $57 million without risks of loss through continued litigation, including time-consuming appeals, is strong stewardship of public funds for public benefit, returning essential capital to the Navy to be used for continued improvement of HPNS. The United States respectfully submits that it has "***advanced a reasonable basis*** for concluding the settlement is in the best interests of the United States" and has shown that the settlement ***does not "unfairly reduc[e] the relator's potential qui tam recovery."*** *United States v. Everglades College, Inc.*, 885 F.3d 1279, 1288–89 (11th Cir.

1  2017) (emphasis added).  As such, the United States respectfully requests that the Court enter an order

2  permitting the United States to perform the FCA Settlement.

3       With respect to the fairness of the FCA Settlement, the United States first addresses the Relators'

4  withdrawal of their objections and explains that there is no longer a mechanism to conduct any review

5  pursuant to Section 3730(c)(2)(B).  *Infra* Part I.  Second, the United States reviews the factual background

6  for the $57 million FCA Settlement, describes the basis for calculating the settlement amount, and shows

7  that these factors satisfy any standard applicable to a Section 3730(c)(2)(B) challenge.  *Infra* Part II.  With

8  respect to the issues identified in the Order concerning Relators' shares, the United States first describes

9  the Relators' agreement to a 21% share and the only remaining challenge: to the application of the first-

10  to-file rule.  *Infra* Part III.A.  Next, on a claim-by-claim basis, the United States describes the "soil

11  swapping" and "building scan" claims in the case, explains the application of the first-to-file bar, and

12  explains how the Relators' contributions to the case justify a 21% share payment.  *Infra* Part II.B.  Last,

13  the United States explains that it has segregated sufficient funds to ensure full payment of any relator's

14  share award.  *Infra* Part III.C.

15                      **SUPPLEMENTAL ARGUMENT**

16  **I.     Relators No Longer Object to the FCA Settlement**

17       Each of Relators' previous challenges to the FCA Settlement was rooted in their argument that any

18  share payments calculation must also include the $40 million the Navy obtained through the separate

19  consent decree that resolved the separate CERCLA claim.  The CERCLA claim sought unreimbursed

20  costs being incurred and to be incurred by the United States for the rework pertaining to radiological

21  contamination of soils.  SAC ECF No. 342 at 4.  The funds recovered pursuant to the CERCLA consent

22  decree were deposited directly to the Navy's Environmental Response Program account to be used at "this

23  [HPNS] and other environmental cleanups at base redevelopment projects[.]"  *Id.* at 4–5.

24       The Court rejected Relators' argument, holding that they "do not have an entitlement to receive a

25  share of the $40 million paid by Tetra Tech EC as part of the CERCLA consent decree."  ECF No. 509 at

26  2.  As a result, on November 24, 2025, counsel for the Relators informed the DOJ that "each of the relators,

27  after review of the November 7, 2025 Order of the Court and full disclosure by [relators' counsel] of the

28  benefits and risks, agree that the $57 million False Claims Act settlement at Hunters Point is fair, adequate,

and reasonable under all the circumstance." *See* Declaration of Jonathan Hoerner ¶ 2 & Ex. 1 ("Hoerner Dec."). All Relators share a common interest in maximizing the FCA recovery, and they, as well as their counsel, now agree that the $57 million FCA settlement does so.

Relators previously objected pursuant to Section 3730(c)(2)(B) of the FCA, which provides that the United States "may settle the action with the defendant ***notwithstanding the objections of the person initiating the action*** if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." 31 U.S.C. § 3730(c)(2)(B) (emphasis added). In this, an objection by the "person initiating" the lawsuit (i.e., a relator) is the triggering mechanism for any judicial review of an FCA Settlement. If Relators had not objected, the FCA case would have been resolved through a stipulation of dismissal. The purpose of a fairness hearing is to offer "plaintiff-relators an opportunity to direct the court's attention to facts or allegations that would suggest the settlement was unreasonable." *Everglades College*, 855 F. 3d. at 1290 (citing *U.S. ex rel. Schweizer v. Oce N. Am., Inc.*, 956 F.Supp.2d 1, 11 (D.D.C. 2013)). Because Relators do not assert that the settlement is unreasonable and have withdrawn their objections, the United States respectfully requests that the Court enter an order permitting the United States to perform the FCA Settlement. The United States further respectfully submits that, absent a pending objection from the Relators, Section (c)(2)(B) of the FCA does not provide a mechanism for judicial review of whether the FCA Settlement is "fair, adequate and reasonable." However, desiring to show that the FCA Settlement is proper, the government nonetheless responds to the Order to show how the FCA Settlement is indeed fair, adequate, and reasonable.

## II.    The False Claims Act Settlement is Fair, Adequate and Reasonable Under 31 U.S.C. § 3730(c)(2)(B)

### A.    The $57 Million Settlement Amount Is Fair, Adequate and Reasonable Based on the Factual Record and Assessment of Litigation Risks

#### 1.    The $57 Million FCA Settlement Amount Is Directly Supported by Scientific Analysis of Tetra Tech's Work at HPNS Survey Units and Financial Analysis of its Invoices to the Navy

The FCA Settlement derives directly from extensive analysis the DOJ undertook in conjunction with retained litigation consultants in this case. At the DOJ's direction, these professional consultants reviewed relevant portions of the voluminous discovery record and prepared analyses to support the government's litigation. These materials substantially informed the government's approach to assessing

liability and damages.  They were also used by the United States in mediations in 2023 (before Judge Symchych (ret.)) and 2024 (before Judge Newmann (ret.)).  Hoerner Dec. ¶ 15.  This analysis provided the United States with a strong basis for ascertaining its potential damages under the "benefit of the bargain" standard for FCA cases.  Moreover, the settlement recovered $25.6 million in restitution, and a total of $57 million, which provides an excellent recovery for the United States and is an amount that is supported by the Navy Base Realignment and Closure Program Management Office.  *See infra* Part II.a.2. Against this, the FCA Settlement should be deemed fair, adequate, and reasonable against Relators' now-withdrawn objection under Section (c)(2)(B).

### (i)    The FCA Settlement is Based on the "Benefit of the Bargain," Which is the Typical FCA Measure of Damages

The FCA creates liability for any person who submits false claims to the federal government concerning money or property.  *See* 31 U.S.C. § 3729(a)(1).  The FCA was enacted to combat "widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government."  *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996) (citing *U.S. v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).  Therefore, liability attaches "***not to underlying fraudulent activity, but to the 'claim for payment'***" presented to the government.  *Id.* (emphasis added).  An FCA offense "is the knowing presentation of a claim that is either fraudulent or simply false."  *Id.* at 1266 (citing *U.S. ex rel. Hagood v. Sonoma Cnty Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)).  Following this statutory purpose, the FCA case turns on Tetra Tech's past claims for payment under its Navy contracts.  *See* SAC ¶ 6 (describing invoices and claims Tetra Tech submitted "between at least June 2006 and January 2018"). As this Court explained during the March 27, 2025 fairness hearing, the "essence of the False Claims Act is exactly that, that false claims were submitted to the Government."  ECF No. 481 at 7:24–8:1 (March 27 Hrg. Tr.).

The benefit of the bargain represents the typical measure of FCA single damages in which the "actual damages are equal to the difference between the market value of the [services the government] received . . . and the market value that the [services] would have had if they had been of the specified quality."  *U.S. ex rel. Humane Soc. Of U.S. v. Hallmark Meat Packing Co.*, No. 08-cv-221, 2013 WL 5753784, at *10 (C.D. Cal. Apr. 30, 2013); *see also U.S. v. Bornstein*, 423 U.S. 303, 316 & n.13 (1976)

("The Government's actual damages are equal to the difference between the market value of the tubes it received and retained and the market value that the tubes would have had if they had been of the specified quality.").

The United States' FCA Settlement analysis operates from a benefit of the bargain methodology, with the single damages amount (restitution to the Navy) based on the dollar amount of Tetra Tech's false invoices allocated to its work at testing areas at HPNS (called "Survey Units" under the contracts) with an indica of fraud—that is, the difference in value between what the Navy should have received under Tetra Tech's contracts and what the Navy actually received. As discussed immediately below, the parties (Tetra Tech and the United States) dispute the scope of the alleged fraud and which Survey Units were impacted by the alleged misconduct. Against this, the United States used scientific experts to ascertain the areas likely impacted by Tetra Tech's alleged misconduct to prepare its case and value the settlement.

### (ii)    The Scope of Tetra Tech's Misconduct is Contested

Through fact discovery, and during both mediations, Tetra Tech has indicated its intention to challenge the United States' case by arguing that the scope of any misconduct at HPNS is limited—and certainly not so pervasive as to render the entirety of Tetra Tech's services under its contracts subject to FCA liability. If this case proceeds toward trial, this issue is likely to be the primary vector of dispute and the jury's decision of this question is likely the greatest variable in determining what potential damages the United States could expect to receive by rejecting the settlement and continuing to litigate. The United States' evaluation of the fact discovery record did not reveal documentary or testimonial evidence that clearly establishes the scope of misconduct. Notably, even the Relators themselves did not assert or establish that Tetra Tech's misconduct extended to every Survey Unit or every contract requirement. At their depositions, Relators were generally unable to identify the locations or frequency of Tetra Tech's alleged soil swapping and building scan manipulation. *See* Hoerner Dec. Ex. 2, Anthony Smith Dep. Tr. 236:23–241-25 (unable to identify specific survey units connected with the soil swapping near the Series 500 buildings); Tr. 257:12–260:6 (unable to identify specific survey units connected with the soil swapping at the Building 707 triangle area); Tr. 842:21–844:18 (discussing "palm tree area" where clean soil obtained for swapping); *id*. at 863–67 (discussing soil swapping at Survey Unit 22 directed by Stephen Rolfe); Ex. 3, Susan Andrews Dep. Tr. 472:3–11 (testifying "I have no idea" when asked "[f]rom what

area were they getting the soil that was originally in the jars that was swapped out?"); Ex. 4, Elbert Bowers Dep. Tr. 482:14–485:18 (acknowledging no contemporaneous or personal knowledge about soil sample switching or building survey data manipulation); Ex. 5, Robert McLean Dep. Tr. 276:17–279:13 (acknowledging no contemporaneous or personal knowledge of soil sampling or building scan fraud claims); Ex. 6, Donald Wadsworth Dep. Tr. 326:1–328:11 (acknowledging no contemporaneous or personal knowledge of soil sampling or building scan fraud). Likewise, the guilty pleas and criminal proffers of Stephen C. Rolfe and Justin E. Hubbard describe only a narrow range of misconduct. Collectively, Mr. Rolfe and Mr. Hubbard admitted to falsifying data on "approximately 20 occasions" and at "four survey units." Hoerner Dec, Ex. 7 ¶ 2 & Ex. 8 ¶ 2.

Faced with this, the United States turned to scientific and statistical analysis to develop its case on damages and liability. This work substantially informed and supports the FCA Settlement.

### (iii) Science and Statistics Consultant, Exponent, Assessed Which HPNS Survey Units were Marked by a Statistical Indicator of Falsity

The DOJ retained environmental remediation scientists at Exponent, Inc. in 2020. The United States enlisted Exponent to assist in reviewing radiation survey reports, which require specialized expertise and education to properly contextualize, and to help the government establish a concrete list of Survey Units where Tetra Tech's misconduct likely occurred. The United States tasked Exponent with using statistical and scientific methods to evaluate which Survey Units were subject to Tetra Tech's alleged misconduct. Because witness accounts concerning the scope and location of Tetra Tech's alleged misconduct at HPNS differ substantially, the United States requested that Exponent use objective methods and to produce results that are repeatable and testable. Exponent performed detailed analysis of the data Tetra Tech provided to the Navy and regularly apprised the United States of its preliminary conclusions. Hoerner Dec. ¶ 13.

Exponent's work included data review for every Survey Unit at HPNS, and, in this, covered each HPNS Parcel and every Navy contract at issue in this lawsuit. As further explained in the Declaration of Kristin Robrock submitted herewith, Exponent developed statistical methodologies to assess whether the radiation testing Tetra Tech recorded and reported to the Navy was actually conducted in the manner Tetra Tech certified with its invoices to the Navy. Robrock Dec. ¶¶ 6–12. To do this, Exponent looked at HPNS

Survey Units where Tetra Tech performed and recorded more than one round of radiation testing.  *Id.* ¶ 7.  The existence of more than one set of radiation test results for a designated Survey Unit allowed Exponent to assess background radiological markers in the results to determine, within a degree of statistical certainty, whether Tetra Tech actually performed the tests using soil from the same location.  *Id.*  If the background markers did not fall within a statistically expected range of similarity, Exponent concluded that Tetra Tech's data showed an "anomaly" for that Survey Unit.  *Id.*  Exponent also reviewed Tetra Tech's building scan data, reviewing the database of survey reports to look for anomalous entries that do not likely correspond to the reported location or time Tetra Tech reported.  *Id.* ¶¶ 9–11.

Applying this approach, Exponent reviewed Tetra Tech's work at 1,003 HPNS Survey Units.  It determined that 292 of the Survey Units could be evaluated using its methodology.  Of those, the statistical analysis showed that 114 HPNS Survey Units indicated Tetra Tech anomalies.  *Id.* ¶ 8.  In other words, Exponent found that the radiological information recorded by Tetra Tech for those 114 Survey Units was not internally consistent to a high degree of statistical certainty and thus represented an indicia of falsity.  *Id.* ¶ 8–9.  Exponent provided the DOJ with reports of its findings including a list of the 114 Survey Units where statistical anomalies were found.  *Id.* ¶ 8; *see also* Hoerner Dec. ¶ 13.  These results are summarized in Exhibits 3 and 5 to the Declaration of Kristin Robrock.

### (iv)    Financial and Damages Analyst StoneTurn Valued Tetra Tech's Work at these Survey Units Using Tetra Tech's Invoices to the Navy

The DOJ retained analysts at StoneTurn, an economics and damages consulting firm, to assess how proof of Tetra Tech's misconduct maps to its claims for payment from the Navy.  Hoerner Dec. ¶ 14.  As further explained in the Declaration of Eric Hines, submitted herewith, StoneTurn's primary task was to analyze Tetra Tech's invoices and identify Tetra Tech's charges for work performed at the Survey Units marked by indicia of fraud.  The DOJ furnished StoneTurn with a list of the 114 Survey Units identified by Exponent with indicia of falsity and instructed StoneTurn to assume that Tetra Tech's charges for work performed at those Survey Units were recoverable false claims.  Hines Dec. ¶ 7.

In performing this analysis, StoneTurn was required to apply a series of assumptions and allocations to Tetra Tech's invoices.  This is because the invoices frequently charged the Navy for work on a contract-basis and not by the location where the work was conducted.  In this, the invoices did not

1    isolate Tetra Tech's charges to the Navy for individual Survey Units. *Id.* ¶ 8.  There is no allegation in this

2    case that the form (as compared to the contents) of Tetra Tech's invoices to the Navy was improper, false,

3    or fraudulent.  StoneTurn's calculations were based on review of contracts and modifications with the

4    Navy explaining the scope and value of the contracted work, Navy documents logging the invoice

5    received, paid, and the funding amounts available per contract, Tetra Tech's invoices, and data provided

6    by the DOJ (including results from Exponent's work). *Id.* ¶ 9.  StoneTurn's methodology, including the

7    use of allocations to determine which portion of an invoice is related to a false claim by Tetra Tech is

8    described in Paragraphs 10 to 13 of the Hines Declaration.  The United States utilized the analysis provided

9    by its consultants to help inform its position while negotiating the FCA Settlement. Hoerner Dec. ¶ 15.

10                    **2.      The $57 Million Settlement Provides an Excellent Recovery for the United
                                States and Relators Alike**

11

12            The United States has invested substantial resources in litigating this case.  Specifically, the DOJ

13    invested substantial funds, in addition to valuable attorney time, in procuring the case-critical work from

14    its litigation consultants.  *See* Hoerner Dec. ¶¶ 13–14.  If this case continued without a settlement, the

15    United States would likely seek to establish liability and assess damages under the approach it developed

16    with Exponent and StoneTurn.  This would, at the least, require the United States to commit substantial

17    additional funding for Exponent and StoneTurn to transform their analyses into final conclusions and to

18    support them with fully-fledged expert reports.   These efforts and expenses would not likely generate a

19    greater recovery than the FCA Settlement already returns to the government.  The Department of Navy

20    Base Realignment and Closure Program Management Office West (BRAC PMO West), the Navy office

21    responsible for the environmental remediation at HPNS, participated in the October 2024 mediation and

22    agrees that this amount is an appropriate settlement.  *See* Declaration of Anthony Megliola ("BRAC Dec.")

23    ¶¶ 8, 11.

24            Moreover, the FCA Settlement provides a fair, adequate, and reasonable recovery for Relators,

25    who have now withdrawn all objections to the settlement and agreed to receive a 21% share.  To the extent

26    Relators' now-withdrawn objections previously challenged the $57 million as "a small settlement

27    compared to the FCA damages the United States claimed" in the litigation, ECF No. 458 at 11, Relators

28    were asserting that the United States should have valued the case at a higher amount using some alternate

1  damages theory.  Based on its analysis of the record, the United States believes that the case is best

2  approached using the methods described above.  In any event, forcing the government to adopt a litigation

3  position (whether for trial or settlement purposes), would disturb the fundamental allocation of

4  responsibilities in an intervened FCA case.  The FCA establishes that the United States—and not the

5  relator—controls the conduct of litigation after intervention.  The statute is clear: "If the Government

6  proceeds with the action, *it shall have the primary responsibility for prosecuting the action, and shall*

7  *not be bound by an act of the person bringing the action*." 31 U.S.C. § 3730(c)(1) (emphasis added).

8  Courts, therefore, "will not assume that the *qui tam* provisions of the False Claims Act were intended to

9  curtail the prosecutorial discretion of the Attorney General." *U.S. ex rel. Killingsworth v. Northrop Corp.*,

10  25 F.3d 715, 724 (9th Cir. 1994) (quoting *Juliano v. Federal Asset Disposition Ass'n*, 736 F. Supp. 348,

11  351 (D.D.C. 1990)).  Indeed, the Supreme Court recently clarified that, when the government intervenes,

12  "*nothing about the statute's objectives suggest that the Government should have to take a back seat to*

13  *its co-party relator*" because the "*suit remains . . . one to vindicate the Government's interests.*"

14  *Polansky*, 599 U.S. at 435 (emphasis added).  Under these basic principles, Relators would not have been

15  allowed to force the United States to argue for damages under a different theory, or using different

16  evidence, if the United States had proceeded to trial instead of electing to settle.

17  **B.    Standards of Law for "Fair, Reasonable, and Adequate" Under 31 U.S.C.**
     **§ 3730(c)(2)(B)**

18

19  Following the Court's direction to "explain in a meaningful way the rationale for entering into this

20  particular settlement," ECF No. 509 at 3, this filing primarily focuses on the factual record.  As shown

21  above, that record supports finding the FCA Settlement "fair, adequate, and reasonable under all the

22  circumstances" pursuant to 31 U.S.C. § 3730(c)(2)(B).  The controlling legal standards further support

23  that outcome.

24  The "[g]overnment is always the real party in interest" under the FCA.  *U.S. v. Sprint Commc'ns,*

25  *Inc.*, 855 F.3d 985, 994 (9th Cir. 2017).  Because the United States' interest "is the predominant one," and

26  because the injury is "exclusively to the [g]overnment," the FCA grants "the [g]overnment *uncommon,*

27  *even extraordinary, power . . . to dismiss and settle an action over the person who brought it*."  *U.S. ex*

28  *rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 130 (2023) (emphasis added).  When a

relator objects to a proposed settlement under Section (c)(2)(B), the question before the reviewing court is whether the settlement is "fair, adequate, and reasonable under all the circumstances." *Id.* The Ninth Circuit has not defined "fair, adequate, and reasonable under all the circumstances," but recognizes that it "should not pose a significant burden for the government or courts." *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 754 & n.11 (9th Cir. 1993). There are several approaches to that question in practice, each of which is satisfied here.

The ***Everglades College* Approach**: Following the Supreme Court's *Polansky* decision, review of a challenged FCA settlement at this stage of litigation must be guided by the rule that the United States' decision to end a litigation (in *Polansky,* through dismissal, and here, through a monetary settlement) should be approved so long as the United States "***offers a reasonable argument*** for why the burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 437 (emphasis added). Indeed, the "reasonable argument" standard described in *Polansky* was applied pre-*Polansky* in the Eleventh Circuit's *Everglades College* decision. There, in approving a proposed settlement between the United States and the defendant over the relator's objection, the court used the following standard: "[W]e ask whether the government has advanced a reasonable basis for concluding the settlement is in the best interests of the United States, and whether the settlement unfairly reduces the relator's potential *qui tam* recovery." 855 F.3d at 1289. The *Everglades College* relator objected to a settlement because, "[i]n their view, the potential recovery of billions of dollars is so large that the 'expected value' [of the claims] dwarfs the $335,000 settlement figure, rendering the government's settlement decision unreasonable." *Id.* The court overruled the objection because continuing to prosecute the case was subject to litigation risks—there, appellate risks—concerning whether the defendant was legally responsible for the volume of false claims that would support the relator's pursuit of "billions" in damages. *Id.* The court recognized that the United States may consider non-monetary reasons to settle a litigation and concluded that the "government was not unreasonable in hedging its bets" based on its evaluation of risks of continuing litigation. *Id.* Ultimately, the court overruled the objections because the government had "advanced a reasonable basis for concluding this proposed settlement furthers its best interests without unfairly reducing Relator's *qui tam* recovery (in fact, it guarantees a higher recovery for them)." *Id.* The same result should follow here.

The ***Sequoia Orange* and Rule 23(e) Approaches**: Prior to *Polansky*, district courts in the Ninth

Circuit have used one of two approaches: (1) the *Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) standard concerning the United States' power to dismiss *qui tam* complaints (without an accompanying settlement) under 31 U.S.C. §3730 (c)(2)(A), and; (2) the Federal Rule of Civil Procedure 23(e)(2) class action fairness factors, expressly modified to afford deference to the government. *See U.S. ex rel. Ling v. City of Los Angeles,* No. Cv 11-00974 PSG (JCX), 2024 WL 5431493, at *2 & n.2 (C.D. Cal. Aug. 22, 2024) (finding the government's settlement fair over relator's objection, applying both the *Sequoia Orange* and Rule 23(e) standards).

**C.    The FCA Settlement Should Be Approved As Fair, Adequate, and Reasonable Under Any Approach**

**1.    The FCA Settlement Satisfies the *Everglades College* Approach**

In *Polansky*, the Supreme Court determined that, for a case at this stage of litigation, the government's dismissal of a case pursuant to 31 U.S.C. § 3730(c)(2)(A) is afforded a high level of deference and should be approved over a relator's objection if the United States "***offers a reasonable argument*** for why the burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 437 (emphasis added).  Courts should afford the government the same level of deference under 31 U.S.C. § 3730(c)(2)(B) when the government settles a case—that is, when the government seeks to dismiss a case in exchange for consideration.  Here, the government has shown a reasonable basis for concluding that the settlement is in the best interests of the United States.  *Everglades College*, 885 F.3d at 1289.  The result achieved a strong financial recovery and will return funds to the Navy, which is critical for the Navy's continuing work at HPNS (*see* BRAC Dec. ¶ 8) and avoids the risks of asking a jury to have the final say on the scope of Tetra Tech's alleged fraud in light of conflicting record evidence.  31 U.S.C. 3730(d)(1).  There is simply no guarantee that a trial will produce more than the settlement amount, which likely explains Relators' decision to withdraw their objections.  The United States respectfully submits that this Court should order the FCA Settlement to be fair, adequate, and reasonable for the same reasons advanced by the Eleventh Circuit in *Everglades College*.  *See* 885 F.3d at 1289.

**2.    The FCA Settlement Satisfies the *Sequoia Orange* Approach**

If analysis proceeds under *Sequoia Orange*, dismissal requires the government to show: "(1) a valid governmental purpose; and (2) a rational relation between dismissal and accomplishment of the

purpose." 151 F.3d at 1145. The burden then shifts to the objecting relator to establish that the dismissal is "fraudulent, arbitrary or capricious, or illegal." *Id.* This test is "highly deferential" because "to significantly hamper the government's ability to settle may run afoul of the separation of powers doctrine." *U.S. ex. rel. Shepard v. Grand Junction Reg'l Airport Auth.*, No. 13-cv-00736-CMA, 2017 WL 749070, at *1, 3 (D. Colo. Feb. 27, 2017). As described above, the FCA Settlement is rationally related to accomplishing several valid governmental purposes, including protecting a prompt and substantial financial recovery ($57 million) against the uncertainty of summary judgment, trial, and appeals on some of the damages theories; the desire to avoid expending additional governmental resources on consultants; and the significant deterrent message the settlement will send to other contractors.

### 3.    The FCA Settlement Satisfies Rule 23(e)(2) Standards

The Order explained that "the usual settlement approval factors under Federal Rule of Civil Procedure 23 are of limited guidance" in the context of evaluating an FCA settlement under 31 U.S.C. § 3730(C)(2)(B). ECF No. 509 at 3. That is especially so after *Polansky*. Accordingly, the United States will not re-argue its analysis of these factors in this supplemental brief. *See* ECF No. 472 at 6–11 (United States' application of the Rule 23(e) factors applied to the FCA Settlement). Instead, the government will address how additional information provided in this filing about the factual basis for the $57 million settlement amount impacts its previous analysis of the fourth Rule 23(e) factor, the "amount offered in the settlement." *Norcia v. Samsung*, 14-CV-00582-JD, 2021 WL 3053018, at *1 (N.D. Cal. July 20, 2021).

Under this factor, a "proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice v. Civil Serv. Com'n of City and Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Analysis of the settlement amount must consider the risk of further litigation and trial, and the expenses and delays associated therewith. Simply comparing the settlement amount with the outer limits of damages is not a valid basis to deem a FCA settlement unreasonable. "The reasonableness of a settlement is not dependent upon it approaching the potential recovery plaintiffs might receive if successful at trial." *Edwards v. City of Long Beach*, No. CV 05-8990-GW(PLAx), 2011 WL 13180208, at *3 n.4 (C.D. Cal. Oct. 31, 2011). Here, the FCA Settlement recovers damages identified through the government's analysis of Tetra Tech's misconduct plus a multiplier as permitted under the FCA.

III.     **The United States' Positions Regarding Relators' Shares**

The Order required the United States to address the appropriate share for each Relator and explain what should happen to the contested portion of the Relators' shares if the FCA Settlement is approved before the outstanding share disputes are resolved.  ECF No. 509 at 4.

A.     **Relators and the United States Have Agreed to a Share Percentage**

The United States will address the specific questions posed by the Court regarding Relator share and allocation, but before doing so respectfully informs the Court of several developments on these issues. Following the Order, the United States and all Relators continued negotiations and have now reached a handshake agreement on a 21% relators' share on the soil fraud claim and a 21% relators' share on the building scan fraud claim (as defined below), subject to obtaining the necessary approvals from the authorized government officials.  Regarding allocation of these shares among Relators, Relators' counsel has informed the United States that all Relators have reached an agreement on how to allocate any share payment among themselves.  The United States takes no position as to any private agreement among Relators and later redistribution.  The United States proposes to pay a Relator's Share to the first-to-file relator for each of the settled claims (the soil claims and building claims), and Relators disagree with the United States' application of the first-to-file bar.  Thus, the application of the first-to-file bar is the only remaining issue in dispute in this matter.

B.     **Operative Legal Standards Governing Relators' Shares**

***Share Payment Factor and Guidelines:*** The FCA provides for a relator's share of "at least 15 percent but not more than 25 percent" when the United States has intervened, as the United States has done here.  31 U.S.C. § 3730(d)(1).  The legislative history of the Senate version of the 1986 amendments to the FCA identified three factors to consider when determining share payments: "[(1)] the significance of the information provided by the relator, [(2)] the relator's contribution to the final outcome, and [(3)] whether the [g]overnment previously knew such information."  *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 844 F. Supp. 2d 78, 81–82 (D.D.C. 2012) (citing S. Rep. 99-345, at 28 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5293) (the "Senate Factors").  Additionally, the DOJ's December 1996 "Relator's Share Guidelines" have also been applied by courts asked to assess share payments.  *See*

*Id*. at 83–84. ("DOJ Guidelines").[1]

**The First-to-File Rule:**  The FCA first-to-file rule states that "[w]hen a person brings a [qui tam] action, no person other than the Government may . . . bring a related action based on the facts underlying the pending action."  31 U.S.C. § 3730(b)(5).  The rule essentially prevents later-filing relators from bringing repetitive *qui tam* actions.  *U.S. ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 302-03 (4th Cir. 2017).  To determine whether a later-filed action is barred, the Ninth Circuit has held that the FCA bars recovery for "later-filed actions alleging ***the same material elements of fraud*** described in an earlier suit, regardless of whether the allegations incorporate somewhat different details."  *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1188 (9th Cir. 2001) (emphasis added).  Allegations are barred by the rule even if they cover "a different time period or location within a company." *Id.*

At the March 27, 2025 fairness hearing, the Court ordered the United States and Relators to each submit a brief of no more than five pages containing their respective positions on the issue of relator's share.  The Order requested additional briefing on the share issues identified by those filings.  ECF No. 509 at 4–5.  Specifically, the Court requested that the United States and Relator address the following

---

[1] The factors from the DOJ Guidelines to consider for a possible increase of the relator's share percentage are: (1) The relator reported the fraud promptly; (2) When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the Government; (3) The qui tam filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) The complaint warned the Government of a significant safety issue; (5) The complaint exposed a nationwide practice; (6) The relator provided extensive, first-hand details of the fraud to the Government; (7) The Government had no knowledge of the fraud; (8) The relator provided substantial assistance during the investigation and/or pretrial phases of the case; (9) At his deposition and/or trial, the relator was an excellent, credible witness; (10) The relator's counsel provided substantial assistance to the Government; (11) The relator and his counsel supported and cooperated with the Government during the entire proceeding. (12) The case went to trial. (13) The FCA recovery was relatively small; and (14) The filing of the complaint had a substantial adverse impact on the relator.

The factors from the DOJ Guidelines to consider for a possible decrease of the relator's share percentage are: (1) The relator participated in the fraud; (2) The relator substantially delayed in reporting the fraud or filing the complaint; (3) The relator, or relator's counsel, violated FCA procedures: a. complaint served on defendant or not filed under seal b. the relator publicized the case while it was under seal c. statement of material facts and evidence not provided; (4) The relator had little knowledge of the fraud or only suspicions; (5) The relator's knowledge was based primarily on public information; (6) The relator learned of the fraud in the course of his Government employment; (7) The Government already knew of the fraud. (8) The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Government's positions in litigation; (9) The case required a substantial effort by the Government to develop the facts to win the lawsuit; (10) The case settled shortly after the complaint was filed or with little need for discovery; and (11) The FCA recovery was relatively large.

1   items: (1) claim-by-claim analysis for relators' share; (2) first-to-file rule and other FCA statutory bars;

2   (3) which relators have substantially contributed to the prosecution of this action or failed to do so; and

3   (4) whether the Court may properly award any recovery jointly to the pertinent relators or whether it must

4   specify each relators' award.  The United States addresses each item below.

### 1.  Claim-by-Claim Analysis of Relators' Shares

6       The SAC alleged and the FCA Settlement with Tetra Tech resolves two distinct fraudulent

7   schemes by Tetra Tech at HPNS.  The first scheme involved allegedly fraudulent soil testing (the "Soil

8   Fraud Claim").  The second scheme involved allegedly fraudulent building scans (the "Building Scan

9   Fraud Claim").  The SAC describes the Soil Fraud Claim as "soil surveys in which Tetra Tech

10  misrepresented the source of the soil samples collected," and describes the Building Scan Fraud Claim as

11  "building surveys in which Tetra Tech falsified the data collected by radiation detection instruments."

12  SAC ¶ 120.

13      The first and second causes of action in the SAC arise under the FCA.  Both causes of action

14  address fraud perpetrated through soil testing and building scan work.  The first cause of action

15  (Presentation of False Claims, 31 U.S.C. § 3729(a)(1)(A)) alleges that "Tetra Tech knowingly presented,

16  or caused to be presented, false or fraudulent claims for payment or approval to the United States, in

17  violation of 31 U.S.C. § 3729(a)(1)(A), by submitting claims for payment based upon *falsified soil*

18  *surveys*, *building surveys*, and status survey reports."  SAC ¶ 144 (emphasis added).  Similarly, the second

19  cause of action (False Statement Material to a False Claim, 31 U.S.C. § 3729(a)(1)(B)) alleges that "Tetra

20  Tech made, used, or caused to be made or used, false records or statements material to false claims, in

21  violation of 31 U.S.C. § 3729(a)(1)(B), by reporting false results *from soil and building surveys*."  SAC

22  ¶ 148 (emphasis added).

23      The Order directed the government's attention to *U.S. ex rel. Merena v. SmithKline Beecham*

24  *Corp.*, 205 F.3d 97 (3d Cir. 2000).  ECF No. 509 at 4.  The government agrees that the claim-by-claim

25  analysis discussed in *Merena* is correct.  However, there is a material difference between this proceeding

26  and the settlement agreement at issue in *Merena*.  In *Merena*, the settlement agreement "did not break

27  down the settlement on a claim-by-claim basis," but here, the FCA Settlement agreement specifically

28  allocated $51,870,000 of settlement amount to the Soil Fraud Claim and the remaining $5,130,000 to the

UNITED STATES' SUPPLEMENTAL BR. RE. FCA SETTLEMENT APPROVAL & RELATORS' SHARES
3:13-CV-3835 JD                              15

1  Building Scan Fraud Claim.  Relators have never objected to this allocation and do not presently object to

2  it.

3       To assist the Court's review with a claim-by-claim analysis, the United States will discuss share

4  considerations for the Soil Fraud Claim and the Building Scan Fraud Claim separately.

5              **2.      Relators' Shares of the Soil Fraud Claim**

6                   **(i)      The First-To-File Bar Prevents Relator Smith and the Wadsworth**
                           **Relators from Obtaining a Share of the Soil Fraud Claim**
7

8       Three separate groups of relators filed three separate *qui tam* complaints alleging fraud by Tetra

9  Tech at HPNS.  Arthur R. Jahr III, Elbert G. Bowers, Susan V. Andrews, and Archie R. Jackson (the "*Jahr*

10  Relators") filed their *qui tam* complaint on August 19, 2013 (Case No. 3:13-cv-3835) (the "*Jahr*

11  Complaint").  At 12:40 p.m. on March 4, 2015, Anthony Smith filed his *qui tam* complaint (Case No.

12  3:16-cv-01106) (the "*Smith* Complaint).  Approximately 4 minutes later at 12:44 p.m. on the same day,

13  Donald K. Wadsworth and Robert McLead (the "*Wadsworth* Relators") filed their *qui tam* complaint

14  (Case No. 3:16-cv-01107) (the "*Wadsworth* Complaint").  All of the relators were (and continue to be)

15  represented by David Anton.  All three *qui tam* complaints contain allegations of soil fraud against Tetra

16  Tech as shown by the examples below:

| *Jahr* Complaint ¶ 48 | "For example, Plaintiff Archie Jackson informed Tetra Tech EC, Inc. management that Jane Taylor directed laborers to just take any soil, not even from the Survey Unit, and place the soil in the sample containers for radioactive isotope testing rather than use the towed array GPS mapping coordinates provided by Thorpe Miller to extract representative radioactive material for testing as identified by the towed array." |
|---|---|
| *Smith* Complaint ¶ 16 | "The Tetra Tech EC, Inc. supervisors at the connex involved in receiving the soil in the connex engaged in having the soil samples fraudulently switched." |
| *Wadsworth* Complaint ¶ 11 | "The destruction of the building 351A soil samples and laboratory results, and the direction and plan to only take soil samples from areas known to be low in radioactive content, and to intentionally avoid areas of known high radioactive content was directly contrary to the contract with the Navy, the operating procedures set by the Navy to be followed as part of the contract, and was intentionally fraudulent." |

The *Jahr* complaint was the first complaint to allege that Tetra Tech submitted false claims by falsifying soil sample testing. Because all three *qui tam* complaints contain allegations and facts relating to the Soil Fraud Claim, the "material elements test" is used to determine if the first-to-file bar applies to the *Smith* and *Wadsworth* complaints. The material elements of the Soil Fraud Claim are straightforward: Tetra Tech falsified soil sample testing by misrepresenting the locations at HPNS from which the soil was collected and then submitted invoices to the Navy for its soil sample testing. These elements were alleged in the *Jahr* Complaint. While the *Smith* and *Wadsworth* complaints add some additional facts about the alleged soil fraud, those facts are not sufficient to except their second- and third-in-time complaints from the first-to-file bar because the soil fraud allegations in those complaints address the same material facts as the *Jahr* complaint, namely that Tetra Tech misrepresented the location from where soil samples were collected. *See, e.g.,* S*tein v. Kaiser Found. Health Plan, Inc.,* No. 22-15862, 2024 U.S. App. LEXIS 28922, at *5 (9th Cir. Nov. 14, 2024) (holding that the first-to-file bar applied because later relators "simply provide more details about a few diagnoses 'within the' overall upcoding scheme alleged in the prior actions").

### (ii) A Relators' Share of 21% Is Appropriate for the Soil Fraud Claim

The United States believes that the Senate Factors support a relators' share for the *Jahr* Relators of 21% of the $51,870,000 FCA Settlement for the Soil Fraud Claim.

***Factor 1: The Significance of the Information Provided by the Relators:*** Each of the *Jahr* Relators provided helpful information to the United States during the pre-litigation investigation by relaying their knowledge of Tetra Tech's operations as well as their observations and experiences working at HPNS. Each of the *Jahr* Relators also helped the United States understand the working relationships between Tetra Tech and the various subcontractors that assisted Tetra Tech with soil testing. However, the *Jahr* Relators lacked specific and detailed knowledge about the soil fraud. None of the *Jahr* Relators were able to identify dates or specific locations at HPNS where the soil fraud occurred. Thus, this factor supports a 21% share, which is near the mid-point in the allowable range.

***Factor 2: Relators' Contribution to the Final Outcome***: The United States needed to devote substantial effort and resources to develop the facts and evidence to support the Soil Fraud Claim against Tetra Tech because the *Jahr* Relators lacked insight as to the time and location of the soil fraud. This

included interviewing dozens of witnesses, analyzing voluminous email and document productions from Tetra Tech, and engaging a specialized consulting firm to perform a complex analysis of detailed soil data to identify areas of potential fraud as explained above.  While the *Jahr* Relators provided some assistance during the investigation phase, they provided only limited assistance during the years of litigation following the United States' intervention.  For example, counsel for the *Jahr* Relators asked the United States on multiple occasions to review and sort documents from the voluminous document productions for them (to assist with their non-intervened claims) because they did not obtain sufficient document review capabilities. Moreover, the United States engaged the specialized consulting firms that were ultimately able to identify the potentially fraudulent soil samples; the *Jahr* Relators did not identify or engage any experts.  *See United States ex rel. Fowler v. Evercare Hospice, Inc.*, Civil Action No. 11-cv-00642-PAB-NYW, 2017 U.S. Dist. LEXIS 17061, at *9 (D. Colo. Feb. 7, 2017) (holding "the substantial investigation by the United States undermines relators' request for a high-range reward").

**Factor 3: Whether the Government Previously Knew Such Information**: The United States already had some knowledge of the potential soil data issues because in October 2012 Navy personnel identified anomalous data submitted by Tetra Tech.  However, the *Jahr* Relators provided additional information in their complaint that contributed to the United States' eventual understanding that the anomalous soil data was indeed fraudulent.

* * *

The United States believes that the DOJ Guidelines also support finding that the *Jahr* Relators should receive a 21 percent share of the $51,870,000 FCA Settlement for the Soil Fraud Claim.

**Guidelines Supporting an Upward Adjustment**:  Some of the DOJ Guidelines support an upward adjustment of the relators' share above the 15% minimum.  First, the *Jahr* Relators warned the government of a potential safety issue involving radiological cleanup activities.  Second, the *Jahr* Relators tried to stop the fraud by reporting it to their supervisors and the United States.

**Guidelines Supporting a Downward Adjustment**: Other DOJ Guidelines support a downward adjustment of the share percentage.  At the outset, as discussed above, this case required substantial effort by the United States to develop the facts and data needed to prevail in this litigation.  Additionally, all of the Relators (including the *Jahr* Relators) unreasonably opposed the government's positions in this

1   litigation on multiple occasions, creating additional burdens and delays on the government.  *See, e.g.*, ECF

2   No. 443; *CPHP Development, LP, et al., v. Tetra Tech EC, Inc., et al.*, Case No. 3:20-CV-01485-JD, ECF

3   No. 271 (co-signed by relators' counsel).

4           **(iii)    The Court May Properly Award a Relators' Share Jointly to the *Jahr***

5                     **Relators**

6           The relator's share provisions of the FCA do not specify how courts should handle awarding a

7   relator's share when multiple relators file a *qui tam* action together.  *See* 31 U.S.C. § 3730(d).  In practice,

8   courts commonly award a relator's share to multiple co-relators (in a single case) without directly

9   specifying the allocation between the co-relators.  *See, e.g., U.S. v. Anesthesia Servs. Assocs., PLLC*, No.

10  3:16-cv-0549, 2021 U.S. Dist. LEXIS 136744 (M.D. Tenn. July 22, 2021) (awarding a share to two co-

11  relators without a specific allocation); *U.S. ex rel. Bibby v. Wells Fargo Bank N.A.*, 369 F. Supp. 3d 1346,

12  1355 (N.D. Ga. 2019) (awarding a share to two co-relators without a specific allocation); *U.S. ex rel.*

13  *Fowler v. Evercare Hospice, Inc.*, No. 11-cv-00642-PAB-NYW, 2017 U.S. Dist. LEXIS 17061, at *13–

14  14 (D. Colo. Feb. 7, 2017) (awarding a 20% relators' share to two co-relators without a specific

15  allocation); *U.S. ex rel. Rille v. Hewlett-Packard Co.*, 784 F. Supp. 2d 1097, 1102 (E.D. Ark. 2011)

16  (awarding co-relators a 21% share of one claim and a 15% share of another claim without a specific

17  allocation).

18          Courts have addressed other unique situations involving co-relators in a similar manner.  In *United*

19  *States v. Universal Health Servs.*, 889 F. Supp. 2d 791, 798 (W.D. Va. 2012), the court ordered that relators

20  "share equally" the awarded twenty percent share while noting that relators already had agreement among

21  themselves to share equally.  The court in *United States ex rel. Toelkes v. TOA Corp.*, No. 13-00012, 2017

22  U.S. Dist. LEXIS 190902 (D. Guam Nov. 17, 2017) encountered a situation in which one relator provided

23  predominantly all the information and a second relator (the original relator's son) was later added as a co-

24  relator due to the age of the original relator.  Despite the original relator providing nearly all of the

25  information in the case, the court awarded a relator's share to both relators without an allocation between

26  them.  *Id.* at *22.

27          If the Court desires to order a specific allocation of the share among the *Jahr* Relators, the United

28  States does not oppose each of the *Jahr* Relators sharing the award equally.

### 3.    Relator's Shares of the Building Scan Fraud Claim

### (i)    The First-to-File Bar Prevents the *Wadsworth* Relators from Obtaining a Share Under the Building Scan Fraud Claim

The United States proposes a 21% share of the Building Scan Fraud Claim be awarded to Relator Smith.  The *Jahr* Relators do not allege any facts related to the building scan fraud in their complaint. ECF No. 1.  Relator Smith's First Amended Complaint (ECF No. 14) is the first complaint alleging fraudulently conducted building scans.  In his First Amended Complaint, Smith explains the building scanning process as well as how the workers faked the scans.  The United States acknowledges that paragraph 22 of the *Wadsworth* Complaint, which was filed before Smith's First Amended Complaint, references "altered *field* scan results" that could potentially be interpreted very broadly as also referring to building scan fraud.  However, both *Wadsworth* Relators testified that they had no knowledge of building scan fraud. *See* Hoerner Dec. Exs. 4,  5.  Therefore, the United States contends that Smith's First Amended Complaint, which contains an entire section with the heading "Building Survey Scanning Fraud," is the first complaint sufficiently alleging a scheme to fraudulently conduct building scans at HPNS.  The chart below highlights these complaints.

| | |
|---|---|
| *Wadsworth* Complaint ¶ 22 | "The Tetra Tech EC, Inc. field supervisors themselves manually altered the field scan results so that some of the data results falsely represented that the scans had not detected radiological intensity levels that would warrant further study and remediation." |
| *Smith* Amended Complaint ¶ 46 | "HPs were ordered by Tetra Tech EC managers to fake building scans." |
| *Smith* Amended Complaint ¶ 47 | "The HPs were required to 'just get numbers' but the numbers had to be within the background range, namely not too high and not so low the numbers would raise any red flags. When HPs had failed to check to assure that 'just getting numbers' for the scans resulted in numbers within the approved range Tetra Tech sought, then HPs and Tetra Tech supervisors would simply change the scan numbers so they fell within the acceptable range. |

(ii)    **A Relator's Share of 21% is Appropriate for the Building Scan Fraud Claim**

The United States believes that the Senate Factors support a relators' share for Relator Smith of 21% of the $5,130,000 FCA Settlement for the Building Scan Fraud Claim.

***Factor 1: The Significance of the Information Provided by the Relators****:*  Relator Smith provided extensive, first-hand details of the building scan fraud to the United States.  He identified multiple individuals who participated or directed the building scan fraud, and he explained in detail how the building scan fraud was performed.

***Factor 2: Relator's Contribution to the Final Outcome:***  Relator Smith's first-hand details did indeed help contribute to a positive outcome on the Building Scan Fraud Claim.  He provided extensive deposition testimony over three days explaining his knowledge of the fraudulent schemes at HPNS. However, Smith was unable to provide details of exact buildings and dates of the alleged fraudulent activity to assist the United States in proving the Building Scan Fraud.  This required the United States to hire a specialized consultant with the ability to analyze incredibly large volumes of data to identify potentially fraudulent building scan values.  This detailed information was added in the United States' SAC and was not present in the *Smith* Complaint.

***Factor 3: Whether the Government Previously Knew Such Information:***  This factor weighs in favor of awarding a share above the minimum because the government was not previously aware of fraudulent building scans.

\* \* \*

The United States believes that the DOJ Guidelines also support a relators' share for Relator Smith of 21 percent of the $5,130,000 FCA Settlement for the Building Scan Fraud Claim.

***Guidelines Supporting a Downward Adjustment***:  Even though Relator Smith provided extensive details to the United States, multiple factors from the DOJ Guidelines necessitate a downward adjustment of his relator's share.  The primary factor supporting a downward adjustment is Smith's admission, both in a declaration and in deposition testimony, that he participated in the Tetra Tech's misconduct at HPNS. Smith admitted to fraudulently scanning buildings at Hunters Point by "holding the 2360 detector in the spot, or setting it down in one spot for up to 30 minutes while readings were recorded."  Hoerner Dec. Ex.

9 ¶¶ 20, 25.  Smith also did not promptly report the fraud to the government as he waited years to share this information.

### C.    The DOJ Has Already Segregated and Will Retain Sufficient Settlement Funds to Pay Relators' Shares

On January 27, 2025, several days after the United States and Tetra Tech executed the FCA Settlement, the DOJ's Civil Division received payment of $57 million (plus the interest that accrued between the time a tentative settlement was reached and the time Tetra Tech paid the settlement amount) from Tetra Tech.  Hoerner Dec. ¶ 24.  Because Relators initially objected to the FCA Settlement, the Civil Division followed its usual procedure and retained possession of that entire amount in a non-interest-bearing account controlled by DOJ.  No funds have been disbursed yet.  If the Court allows the settlement to proceed and dismisses the claims against Tetra Tech prior to resolution of the share issues, then the Civil Division will retain possession of the maximum allowable share in this case (that is, 25% of the FCA Settlement) so that such funds are available to pay the relators any amount later awarded by the Court.  To ensure that these funds are retained within the Civil Division, DOJ counsel has instructed its financial office to administratively segregate 25% of the funds so they cannot be disbursed absent specific instruction.  *Id.*

<u>**CONCLUSION**</u>

The United States respectfully requests that the Court enter an Order permitting it to perform the FCA Settlement.  The United States also respectfully requests that the Court enter an Order that the *Jahr* Relators are the first-to-file as to the Soil Fraud Claim and Relator Smith is the first-to-file as to the Building Scan Fraud Claim and approve a 21% relator share to each respectively.

///

///

DATED: December 5, 2025                    Respectfully submitted,

                                          */s/ Adam J. DiClemente*
                                          JAMIE YAVELBERG
                                          PATRICK M. KLEIN
                                          A. THOMAS MORRIS
                                          JONATHAN K. HOERNER
                                          ADAM J. DICLEMENTE
                                          Attorneys, Civil Division
                                          United States Department of Justice

                                               P.O. Box 261, Ben Franklin Station
                                               Washington, D.C. 20044
                                               Telephone: (202) 307-6971
                                               Email: adam.diclemente@usdoj.gov

                                          CRAIG H. MISSAKIAN
                                          United States Attorney

                                          */s/ Savith Iyengar*
                                          SAVITH IYENGAR
                                          MICHAEL T. PYLE
                                          Assistant United States Attorneys

                                               150 Almaden Boulevard, Suite 900
                                               San Jose, California 95113
                                               Telephone: (408) 535-5087
                                               FAX: (408) 535-5081
                                               Email: savith.iyengar@usdoj.gov

                                          *Attorneys for the United States of America*